**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| STATE EMPLOYEES BARGAINING | : | CIVIL ACTION NO. |
| AGENT COALITION, ET AL. | : | |
| Plaintiffs, | : | 3:03CV221 (AVC) |
| | : | |
| V. | : | |
| | : | |
| JOHN G. ROWLAND , ET AL., | : | |
| Defendants. | : | DECEMBER 20, 2005 |

**DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**
**WITH REQUESTED CONSOLIDATED MEMORANDUM OF LAW**[1]

The fact that the plaintiffs filed an Amended Complaint -- after full briefing on the

defendants' Motion to Dismiss the initial Complaint -- is a testament to the strength of the

arguments that defendants asserted in support of dismissal.  Moreover, the substance of the

Amended Complaint reflects the plaintiffs' continued, dogged refusal to see this case as what it

is: an attack on the Governor's authority to make difficult policy choices and, thus, an attack on

the very sovereignty of the State.  Accordingly, the defendants once again move,[2] pursuant to

Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, and Rule 7 of the Local

Rules of Civil Procedure, to dismiss the plaintiffs' Amended Complaint in its entirety.

---

[1] Per the Court's request on December 16, 2005, this Motion and Memorandum of Law combines the arguments presented in the defendants' February 24, 2003 Motion to Dismiss and July 7, 2003 Motion to Dismiss Amended Complaint (which referred in part back to the February 24 motion).  Because over two years have elapsed since the defendants filed their second motion to dismiss, this Consolidated Memorandum contains citations to some recent cases decided after July 7, 2003.

The defendants reserve their right to file a similarly consolidated Reply Brief after they receive the plaintiffs' Consolidated Opposition, which is due to be filed on December 22, 2005.

[2] The initial Motion to Dismiss was denied as moot on July 15, 2003 because the plaintiffs amended their Complaint while the motion was pending.

**I.**
**PLAINTIFFS' AMENDED ALLEGATIONS**

The plaintiffs' Amended Complaint has deleted some allegations and added other allegations, but has not changed the legal theories upon which plaintiffs seek relief.  Principally, the plaintiffs' additions are legal conclusions or characterizations, in an apparent attempt to plead their way around the defendants' well-founded defenses.  The new allegations include, for example, such characterizations as "[the challenged actions] were undertaken by defendants solely in their capacity as members of the Connecticut Executive Branch" (¶ 48), and "Defendants were not acting in a legislative capacity when they made their demands for union contract concessions." (¶ 50)  The Amended Complaint has also deleted numerous allegations, principally those concerning the budgetary motivation for the layoffs; for example, the plaintiffs have deleted allegations concerning the purpose of the layoffs being "budget cost savings" (former ¶ 54(d)) and concerning a purported disparity between the "budgetary savings" from the layoffs and the amount of concessions sought from the unions (former ¶ 55).

The plaintiffs' new allegations, and the absence of the deleted allegations, do not change the essential facts of this case.  Simply put, the plaintiffs are still seeking to void the policy decisionmaking undertaken by the Governor of this State to address a severe fiscal crisis.  Indeed, the plaintiffs' amendment of their allegations cannot alter the factual context within which this dispute arose or its fundamental nature.  Despite the plaintiffs' strategic decision not to reference it in the Amended Complaint, the Court may still properly take judicial notice of Connecticut's fiscal crisis that formed the backdrop of the Governor's and Secretary's challenged actions.  See Abbey v. Rowland, 359 F. Supp. 2d 94, 97-98 (D. Conn. 2005) (taking judicial notice of state's budget crisis and holding that layoffs ordered by Governor Rowland were protected by absolute legislative immunity).

## II.
## <u>SUMMARY OF ARGUMENT</u>

As set forth below in more detail, the Amended Complaint should be dismissed in its entirety for lack of subject matter jurisdiction or for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(1) and (6).

The plaintiffs are the State Employees Bargaining Agent Coalition ("SEBAC"), 12 of its constituent unions, and five individual laid-off state employees who purport to represent other union members adversely affected by the layoffs.[3] The defendants are: John G. Rowland, Governor of Connecticut, purportedly in both his "individual" and "official" capacities; and Marc S. Ryan, Secretary of the Office of Policy and Management ("OPM"), purportedly in both his "individual" and "official" capacities.[4] The defendants seek dismissal on the following grounds:

- All ten counts of the Amended Complaint are barred by absolute legislative immunity, because the challenged acts of the defendants were, as a matter of law, broad-based policy actions that were quintessentially legislative in nature and do not lend themselves to judicial resolution;

- All ten counts of the Amended Complaint are barred by the Eleventh Amendment, because the lawsuit is in fact against the State itself, despite its having been pleaded against only the Governor and the Secretary, and because special sovereignty interests are implicated by plaintiffs' claims, or, in the alternative, Counts One, Two, Three,

[3] The defendants oppose the assertion of any putative class-based claims and will object to any attempt by the plaintiffs to seek class certification.

[4] The Federal Rules provide for the automatic substitution of parties for public officers sued in their official capacities. <u>See</u> Fed. R. Civ. P. 25(d). M. Jodi Rell and Robert L. Genuario are the current Governor of Connecticut and Secretary of OPM, respectively. <u>See</u> http://www.ct.gov and http://www.opm.state.ct.us.

Four, Five, Six, Nine and Ten are barred by the Eleventh Amendment because they

seek monetary damages against the State;

- Counts One, Two, Three and Four are barred by qualified immunity, because the defendants' challenged conduct was objectively reasonable;

- Counts One and Five should be dismissed for failure to allege several required elements of a First Amendment claim;

- Counts Two and Six fail to allege any constitutionally protected conduct by the plaintiffs that led to their layoffs and accordingly do not state a First Amendment claim;

- Counts Three and Four should be dismissed because SEBAC and the unions bringing those claims have no standing to do so; and

- Counts Nine and Ten identify no protected property interest, and the substantive due process claims, therefore, fail.

## III.
## FACTUAL ALLEGATIONS

For purposes of this Motion to Dismiss, the Federal Rules of Civil Procedure require the

defendants to take the factual allegations of the Amended Complaint as true. Nevertheless, the

defendants can and do refer to public documents, the collective bargaining agreements to which

the Complaint expressly refers, and newspaper articles to provide additional factual context.[5]

---

[5] See Kramer v. Time Warner, Inc., 937 F.2d 767, 769 (2d Cir. 1991) (recognizing the practice of taking judicial notice of public documents on motions to dismiss as routine); Cortec Indus., Inc. v. Dubin Clark & Co., 949 F.2d 42, 48 (2d Cir. 1991) ("[w]here plaintiff has actual notice of all the information in the [defendant]'s papers and has relied upon these documents in framing the complaint," then court can consider such documents even though the plaintiff has not included them as exhibits to the complaint or incorporated them by reference therein).

Connecticut, which has a constitutional mandate to balance its budget,[6] faced a budget crisis in 2002 and looked aggressively for budgetary savings.  (E.g., Nancy Wyman, State Comptroller, Letter to the Honorable John G. Rowland, Dec. 31, 2002, available at http://www.osc.state.ct.us/2002annual/letter.htm; Nancy Wyman, State Comptroller, Letter to the Honorable John G. Rowland, April 1, 2003 (noting that enactment of PA 03-2, which reflected the reduced payroll effected by the actions at issue in this lawsuit, reduced the estimated deficit for the current fiscal year below one percent), available at http://www.osc.state.ct.us/2002monthly/february/letter.htm).  The General Assembly, in approving a balanced budget in late June 2002, changed state law to define the Governor's authority as including extraordinary rescission authority, in combination with the Governor's other constitutional and statutory authority. (Public Act No. 02-1, May Spec. Sess., §52 (copy attached as Ex. A).)  In November 2002, the defendants sought concessions from the state employees' unions, and, when the concession negotiations failed,[7] the defendants ordered layoffs of state union employees.  (Amended Complaint, ¶¶ 39-42.)

---

[6] Conn. Const. Art. III, § 18(a), as adopted in Article XXVIII of the amendments (constitutional balanced budget requirement: "The amount of general budget expenditures authorized for any fiscal year shall not exceed the estimated amount of revenue for such fiscal year."); see also Conn. Const. Art. III, § 18(b), as adopted in Article XXVIII of the amendments (constitutional spending cap: "The general assembly shall not authorize an increase in general budget expenditures for any fiscal year above the amount of general budget expenditures authorized for the previous fiscal year by a percentage which exceeds the greater of the percentage increase in personal income or the percentage increase in inflation, unless the governor declares an emergency or the existence of extraordinary circumstances and at least three-fifths of the members of each house of the general assembly vote to exceed such limit for the purposes of such emergency or extraordinary circumstances . . . .").

[7] Also as a result of failure of concession negotiations, the existing collective bargaining agreements remain in force, and more than 25,000 Union members received pay increases less than a week before the plaintiffs filed this lawsuit.  Those increases are worth nearly $25 million per year. (Some State Workers Get Scheduled Raises, Hartford Courant, Jan. 31, 2003, at B7, copy attached as Ex. B.)  By contrast, a wage freeze and a hiring freeze have been imposed on

The state of Connecticut has approximately 45,000 union employees. (Amended Complaint, ¶ 3.) Those employees are represented by 13 unions,[8] which in turn comprise a coalition called State Employees Bargaining Agent Coalition ("SEBAC"). (Amended Complaint, ¶¶ 3-15.) SEBAC is the exclusive bargaining agent of its constituent unions for the purpose of negotiating and entering collective bargaining agreements regarding health care, pension and other benefits. (Amended Complaint, ¶ 34.) Each of the unions also has entered into a collective bargaining agreement with the state on behalf of its members. (Amended Complaint, ¶¶ 35-36.) Those agreements include a statement of management rights, such as:

> [T]he State reserves and retains, whether exercised or not, all the lawful and customary rights, powers and prerogatives of public management. Such rights include but are not limited to … determining the mission of an agency and the methods and means necessary to fulfill that mission, including the contracting out of or the discontinuation of services, positions or programs in whole or in part; … the suspension, demotion, discharge or any other appropriate action against its employees; [and] the relief from duty of its employees because of lack of work or for other legitimate reasons.

(E.g., Collective Bargaining Agreement between State and CEUI for Maintenance and Service Unit (NP-2), Art. 5, Sec. 1, copy attached as Ex. C.) In addition, the collective bargaining agreements expressly contemplate and provide the Governor with authority to conduct layoffs of union members. (E.g., id. at Art. 13.)[9]

---

non-union state employees. (E.g. Public Act No. 02-1, May Spec. Sess., §19, copy attached as Ex. A.)

[8] Only 12 of the 13 constituent unions are plaintiffs. The American Association of University Professors, University of Connecticut, was voluntarily dismissed from the case before the Amended Complaint was filed. See Court Order, March 12, 2003.

[9] To the extent union members seek to challenge the layoffs' compliance with the applicable provisions of the collective bargaining agreements, they can file grievances. (E.g., Collective Bargaining Agreement between State and CEUI for Maintenance and Service Unit (NP-2), Art. 16, copy attached as Ex. C.)

Just as significant as what the plaintiffs allege in the Amended Complaint is what they do not allege.  The plaintiffs fail to allege, nor could they allege, that the Governor directed the termination of any particular individual; the plaintiffs fail to allege, nor could they allege, that a budget crisis did not in fact exist in Connecticut or that no action was needed to resolve such crisis; and, finally, the plaintiffs fail to allege, nor could they allege, that the Governor lacks constitutional or statutory power to address such a budget crisis or to make difficult policy decisions about how to address such a crisis.  For the reasons set forth below, the Amended Complaint must be dismissed in its entirety.

## IV.
## ARGUMENT

### A.    Legal Standard

The purpose of a motion to dismiss under Rule 12(b)(1) or 12(b)(6) is "to assess the legal feasibility of the complaint."  Bartolini v. Ashcroft, 226 F. Supp. 2d 350, 353 (D. Conn. 2002); see also Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984).  Dismissal is warranted if, under any set of facts that the plaintiffs can prove consistent with the allegations, it is clear that no relief can be granted.  Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Frasier v. General Elec. Co., 930 F.2d 1004, 1007 (2d Cir. 1991).  "The standards for reviewing dismissals granted under 12(b)(1) and 12(b)(6) are identical."  Moore v. PaineWebber Inc., 189 F.3d 165, 169 n.3 (2d Cir. 1999).

To survive a motion to dismiss, a complaint must state the claims and the basis for them with a level of specificity sufficient to provide the defendant fair notice and show that the substance of the claims is sufficient to proceed to the introduction of evidence.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Conley v. Gibson, 355 U.S. 41, 47 (1957).  The Federal

Rules do not allow the substitution of conclusory statements "for minimally sufficient factual allegations."  Furlong v. Long Island College Hosp., 710 F.2d 922, 927 (2d Cir. 1983).

**B.**    **Absolute Legislative Immunity Bars the Plaintiffs' Claims**

      1.    *The Supreme Court's Opinion In* Bogan v. Scott-Harris *Compels Dismissal Of The Complaint On The Basis Of Legislative Immunity*

The Governor's actions in laying off state employees to achieve budgetary savings were an exercise of the Governor's constitutional and statutory authority and were legislative in nature.[10]  Accordingly, those actions are protected by absolute legislative immunity, and all of the plaintiffs' claims must be dismissed.

In Bogan v. Scott-Harris, 523 U.S. 44 (1998), a city administrator claimed that the city eliminated her one-person department from the budget because of racial discrimination and in retaliation for her exercise of her First Amendment right to criticize city officials.  A jury found for her on her First Amendment claim, and the First Circuit affirmed the judgment against the city's mayor and council president.  The Supreme Court reversed, holding that the officials' actions were legislative and were therefore entitled to absolute immunity.  As Bogan explains, legislative immunity is grounded on the recognition that "[r]egardless of the level of government, the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability."  Id. at 52.[11]

---

[10] The term "legislative", as used herein, means not "of the legislature" but rather means discretionary, policymaking, implicating budgetary priorities, and having prospective implications.  Bogan v. Scott-Harris, 523 U.S. 44, 51-56 (1998).  "Legislative" acts are thus distinguished from ministerial or administrative acts.  Id.

[11] The Court follows the quoted statement with a reference to Spallone v. United States, 493 U.S. 265, 279 (1990), which it describes as "noting, in the context of addressing local legislative action, that 'any restriction on a legislator's freedom undermines the 'public good' by interfering with the rights of the people to representation in the democratic process.'"  Bogan, 523 U.S. at 52.

After stating the rule that "[a]bsolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity,'" id., 523 U.S. at 54 (citing Tenney v. Brandhove, 341 U.S. 367, 376 (1951)), the Bogan Court analyzed whether the officials were entitled to immunity.  The First Circuit, as the Supreme Court noted, had held that the actions were not protected by legislative immunity because they were specifically targeted at the plaintiff.  This reasoning, the Supreme Court concluded, "erroneously relied on [the officials'] subjective intent in resolving the logically prior question of whether their acts were legislative."  Id.  That question depends solely "on the nature of the act, rather than on the motive or intent of the official performing it."  Id.

Proceeding then to examine that "logically prior question," the Supreme Court held that the mayor's action in introducing and signing the budget ordinance and the council president's action in voting for it were entitled to immunity.  Id. at 55.  The Supreme Court did not decide, however, whether the fact that the actions were "formally legislative" sufficed to trigger immunity because "the ordinance, in substance, bore all the hallmarks of traditional legislation." Id.  As the Supreme Court explained:

> [The ordinance] reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents.  Moreover, it involved the termination of a position, which, unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office.  And the city council, "in eliminating [plaintiff's department], certainly governed 'in a field where legislators traditionally have power to act.'" [citation omitted].  Thus, petitioners' activities were undoubtedly legislative.

Id. at 55-56.

The Courts of Appeals have followed Bogan's functional analysis.  See, e.g., Bryan v. City of Madison, 213 F.3d 267, 272 (5th Cir. 2000) ("Absolute immunity applies to activities, not offices" and "protects officials fulfilling legislative functions even if they are not

'legislators'"); Gallas v. Supreme Court of Pennsylvania, 211 F.3d 760, 773 (3d Cir. 2000) ("In determining whether an official is entitled to legislative immunity, we must focus on the nature of the official's action rather than the official's motive or the title of his or her office"); cf. Carlos v. Santos, 123 F.3d 61, 66 (2d Cir. 1997) (pre-Bogan decision holding that doctrine of absolute legislative immunity applies to local legislators and applying "a 'functional approach,' looking to the function being performed rather than to the office or identity of the defendant" to decide whether immunity obtains).

More notably, after the original moving papers were filed in this case, several cases have applied Bogan in strikingly similar circumstances, with one case even involving *the same set of Connecticut layoffs*. See Abbey v. Rowland, 359 F. Supp. 2d 94, 97-98 (D. Conn. 2005). Abbey featured an almost identical claim against Governor Rowland and the Commissioner of Mental Health and Addiction services. The plaintiffs alleged that the Governor's decision to terminate 55 psychiatric social workers was unlawful because the plaintiffs were targeted based on their higher salaries and "bump rights." Id. at 98. The court, following Bogan's functional approach, dismissed the complaint because "remedial budgetary measures" and the "Governor's choices of exactly how to cut the budget may have been discretionary, but they were policy choices of broad import." Id. at 99.

In another similar claim, the Governor of New Mexico was entitled to absolute legislative immunity on claims alleging inappropriate funding for Medicaid-funded state services. See Lewis v. New Mexico Dept. of Health, 275 F. Supp. 2d 1319, 1328 (D. N.M. 2003).[12] The court focused its analysis on "the function [the Governor] was performing when the actions at issue

---

[12] The defendants brought Abbey (decided February 17, 2005) to the Court's attention by motion dated February 25, 2005. The defendants discussed Lewis (decided August 5, 2003) in their August 22, 2003 Reply Brief at 2-4.

took place and . . . the nature of those actions"; the court made nothing of the fact that the Governor's actions did take the form of traditional legislation. Id. at 16-17. Finally, outside of the gubernatorial sphere, other district courts (including those in Connecticut) have applied Bogan to bar similar claims of alleged unlawful terminations. See, e.g., Reilly v. City of West Haven, 2005 U.S. Dist. LEXIS 10338 at *6 (D. Conn. 2005) (Mayor of West Haven entitled to legislative immunity on a claim that he eliminated a position in retaliation for supporting a political opponent); Lorusso v. Borer, 2005 U.S. Dist. LEXIS 3241 at *21-22 (D. Conn. 2005) (similar facts to Reilly, and holding that Mayor of West Haven entitled to absolute immunity for proposing a budget that eliminated certain positions allegedly in retaliation for supporting a political opponent, and also noting that alleged retaliatory conduct that occurred after the job eliminations was irrelevant because "alleged motives for [proposing the budget] are legally irrelevant" to whether conduct is protected by legislative immunity); Dwonzyk v. Balt. County, 328 F. Supp. 2d 572, 580 (D. Md. 2004) ("[T]he elimination of the Plaintiff's job resulted from a reorganization plan enacted by the local legislature as part of the budgetary process. Thus, the reason behind the elimination of the Plaintiff's job 'is not to be inquired into by the courts'"); Berlickij v. Town of Castleton, 248 F. Supp. 2d 335, 341 (D. Vt. 2003) (Vermont board of selectmen entitled to legislative immunity for eliminating position allegedly in retaliation for free speech relating to Fair Housing Act).[13]

Applying the functional analysis to this case, there is no question that the Governor and the Secretary undertook acts that were legislative rather than ministerial when cutting approximately 3000 positions from the State payroll (Complaint, ¶51) as a means of addressing the budget crisis. Connecticut's constitutional and statutory framework reflect that the

---

[13] Copies of unreported cases are attached hereto as Ex. D.

Governor[14] has significant power and obligations related to the state budget and spending.  For example, the Governor has responsibility, with assistance from OPM, for creating and transmitting, at designated intervals, a budget containing a financial program for a two-year period.  Conn. Gen. Stat. §§ 4-70b, 71.  The Governor further has authority to modify any allotments of funds, or allotment requisitions, as he or she deems necessary.[15]  Such modification is to be predicated on a determination by the Governor that "due to a change in circumstances since the budget was adopted certain reductions should be made in allotment requisitions or allotments in force or that estimated budget resources during the fiscal year will be insufficient to finance all appropriations in full."  Conn. Gen. Stat. § 4-85(b).  In June 2002, the General Assembly passed additional legislation, effective July 1, 2002, defining the Governor's extraordinary rescission authority.  (See Public Act No. 02-1, May Spec. Sess., §52(a); see also Public Act No. 02-1, May Spec. Sess., §52(b) (expressly contemplating that Governor would order reductions to allotments "to prevent a deficit") (copies attached as Ex. A).)

In exercising this constitutional and statutory authority related to budgeting and spending, the Governor acted in a manner fully consistent with Bogan's definition of actions that are substantively legislative.  He made "discretionary, policymaking decision[s] implicating the budgetary priorities of the [state] and the services the [state] provides to its constituents."

---

[14] The statutory framework makes clear that the Secretary has an important role in assisting the Governor with, inter alia, the budget.  E.g., Conn. Gen. Stat. § 4-38c, 65a (OPM is an executive branch agency that has responsibility for "all aspects of state staff planning and analysis in the areas of budgeting, management, [and others]"); § 70b(a) (OPM shall "assist the Governor in his duties respecting the investigation, supervision and coordination of the expenditures and *other fiscal operations of such budgeted agencies*") (emphasis added).

[15] The Connecticut Constitution imposes an affirmative obligation to match expenditures to revenues (Conn. Const. Art. III, § 18(a), as adopted in Article XXVIII of the amendments), and also imposes a spending cap that forbids state spending from being increased beyond a certain amount, regardless of the state's revenues (Conn. Const. Art. III, § 18(b), as adopted in Article XXVIII of the amendments).

Bogan, 523 U.S. at 55-56.  His actions "involved the termination of [] position[s], which, unlike

the hiring or firing of a particular employee, may have prospective implications that reach well

beyond the particular occupant[s] of the office."  Id.  Finally, "in eliminating [positions], [the

Governor] certainly governed 'in a field where legislators [and the Governor] traditionally have

[a shared power] to act.'"  Id.  "Thus, [the Governor's activities] were undoubtedly legislative."

Id.

> In the words of the Seventh Circuit, directly applicable here:
>
> Almost all budget decisions have an effect on employment by either creating or eliminating positions or by raising or lowering salaries.  This reality, however, does not transform a uniquely legislative function into an administrative one. . . .[T]he defendants here did not fire the plaintiffs, but rather eliminated their jobs from the [state] budget. . . . Employment decisions are not administrative when accomplished through traditional legislative functions.  **They are not 'employment decisions' at all but instead, legislative, public policy choices that necessarily impact on the employment policies of the governing body.  The political decision making inevitably involved in exercising budgetary restraint strikes at the heart of the legislative process and is protected legislative conduct.**

Rateree v. Rockett, 852 F.2d 946, 950-51 (7th Cir. 1988) (emphasis added); see also Orange v.

Cty. of Suffolk, 830 F. Supp. 701, 705 (E.D.N.Y. 1993) (holding that when a governing body, as

a part of its budget or policy-making process, eliminates a "series of positions," its members may

be protected by absolute legislative immunity).

The public policy choices the Governor makes to fulfill this constitutional and statutory

obligations to balance Connecticut's budget cannot be questioned in this Court.  This Court must

find that absolute immunity applies to the defendants' actions, and the Complaint must be

dismissed in its entirety.[16]

---

[16] To the extent that this Court deems Connecticut law to be unsettled with respect to the obligations and responsibilities imposed on the Governor by the constitutional and statutory framework cited above, the defendants urge certification of such issues to the Connecticut Supreme Court for resolution.  See Conn. Gen. Stat. §51-199b.

2.     *The Plaintiffs' Attempt to Plead Around Legislative Immunity Fails*

The plaintiffs, apparently recognizing the force of the defendants' legislative immunity defense, have removed from the Amended Complaint all references to the fact that the defendants' decision to conduct layoffs was designed to address the fiscal crisis affecting the state. They have also added characterizations as to whether the defendants' conduct was legislative in nature. These changes to the allegations are unavailing, and legislative immunity precludes plaintiffs' pursuit of these claims, even as restated.

First, this Court must not "ignore what everyone knows"; Richardson v. Belcher, 404 U.S. 78, 90 (1971) (Marshall, J., dissenting); United States v. Maze, 414 U.S. 395, 403 n.7 (1974); and disregard the fact that the plaintiffs' layoffs were undertaken in the midst of a severe fiscal crisis in the state government. Accordingly, despite the plaintiffs' new pleading, they cannot erase this critical fact.

Second, on a motion to dismiss, the Court must accept all well-pleaded facts as true, but must not credit any allegations stating legal conclusions or characterizations. E.g., Smith v. Local 189 IBT Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002) ("'conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss'" (citation omitted)); Yusuf v. Vassar College, 35 F.3d 709, 913 (2d Cir. 1994). Here, the plaintiffs' inclusion of such assertions as "Defendants were not acting in a legislative capacity …" (Amended Complaint, ¶ 50) is a transparent attempt to defeat the legislative immunity defense through the niceties of pleading; it is clear, however, that such an assertion is not a fact, but goes to the ultimate legal issue concerning the applicability of legislative immunity. See also Bogan, 523 U.S. at 55 (treating issue of whether challenged acts were legislative in nature as legal question for court to decide).

-14-

As to other new allegations that are arguably factual -- "the defendant Governor and the defendant Secretary of OPM have been the decision-makers for the State of Connecticut . . ." and "[t]he Connecticut General Assembly did not participate in demanding [union concessions]" (Amended Complaint, ¶¶ 47, 49) -- the defendants acknowledge that they must be taken as true for purposes of this Motion.  Such factual allegations do not, however, defeat the legislative immunity defense because, as <u>Bogan</u> instructs, the applicability of the defense turns on the nature of the act in question, not on the office or title of the actor.  523 U.S. at 54-56.  In light of this focus on the nature of the challenged act, it is simply irrelevant to the <u>Bogan</u> analysis whether the Governor made the ultimate decision to conduct layoffs or whether the State's legislature had any role in that decision.

Even considering the plaintiffs' new factual allegations, the central inquiry on the legislative immunity defense remains whether the defendants' layoff of approximately 3000 state union employees was "a discretionary, policymaking decision implicating the budgetary priorities of the [State] and the services the [State] provides to its constituents."  <u>Id.</u> at 55-56.  For the reasons stated herein, the answer is, as a matter of law based on the factual allegations in the Amended Complaint, yes.  Accordingly, this Court should dismiss the Amended Complaint in its entirety.

**C.**     **<u>Eleventh Amendment Sovereign Immunity Bars Plaintiffs' Claims</u>**

   1.     *The Scope of Sovereign Immunity*

The Eleventh Amendment[17] to the Constitution shields a state from suits in federal court in the absence of waiver of that protection or consent to suit.  <u>Pennhurst State School and Hosp.</u>

---

[17] The Eleventh Amendment to the U.S. Constitution states that "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or

v. Halderman, 465 U.S. 89, 98 (1984).  This principle of sovereign immunity is founded on the recognition that federalism prohibits one sovereign from being required to appear in the courts of another sovereign.  Pennhurst, 465 U.S. at 100.

      2.    *The Ex parte Young Exception to Sovereign Immunity Does Not Apply In This Case*

No one would suggest that this lawsuit against two state officials asking for the state to be forced to change its conduct with regard to 45,000 of its employees is not, in fact, a suit against the state of Connecticut.  Accordingly, it would be barred by the Eleventh Amendment, as construed by the Supreme Court, were it not for "the exception [the] Court has recognized for certain suits seeking declaratory and injunctive relief against state officers in their individual capacities.  See Ex parte Young, 209 U.S. 123 (1908)."  Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 269 (1997) ("Coeur d'Alene Tribe").  Plaintiffs' assertion that this Court has subject matter jurisdiction over their claims presumably relies on that exception.

As the Supreme Court warned in Coeur d'Alene Tribe, however, allowing every action against an officer for declaratory and injunctive relief to proceed in federal court "would be to adhere to an empty formalism and to undermine the principle . . . that Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction."  Id. at 270.  In order to give full recognition to the principle of Eleventh Amendment immunity, which is but a "convenient shorthand" for the sovereignty of the states that is fundamental to our constitutional structure, see Alden v. Maine, 527 U.S. 706, 713 (1999), federal courts must refrain from asserting jurisdiction over suits asserting jurisdiction under Ex parte Young that

---

Subjects of any Foreign State."  The Amendment has been interpreted also to bar a suit brought a citizen against his or her own state.  Hans v. Louisiana, 134 U.S. 1 (1890).

impact on the "special sovereignty interests" of a state. <u>Coeur d'Alene Tribe</u>, 521 U.S. at 456, 456-59. This is such a suit.

If plaintiffs prevail, the size, composition, and functions of the state's work force will be determined by this Court, not by the Governor elected by the people of Connecticut. If plaintiffs prevail, the Governor's judgments as to how to address a budget crisis will be overridden by this Court's own notions of how a state government should be run. If plaintiffs prevail, the state's elected leadership will be precluded from exercising their own discretion, which the people of Connecticut elected to do, about the relative importance of different state functions performed by different groups of employees. In short, the state's ability to manage its fiscal crisis and its workforce will be substantially curtailed. But as the United States Supreme Court has recognized, the power to control its fiscal policies is at the core of the state's sovereignty:

> Today, as at the time of the founding, the allocation of scarce resources among competing needs and interests lies at the heart of the political process. . . . If the principle of representative government is to be preserved to the States, the balance between competing interests must be reached after deliberation by the political process established by the citizens of the State, not by judicial decree mandated by the Federal Government and invoked by the private citizen.

<u>Alden v. Maine</u>, 527 U.S. at 751.

The fundamental structure of the Constitution requires that the Complaint be dismissed.

3.    Even If <u>Ex parte Young</u> Were Applicable, Plaintiffs' Claims Against the Defendants for Retrospective Pay and Benefits Are Barred By The Eleventh Amendment

Plaintiffs seek, in eight of the ten counts pled in the Complaint, relief that includes "monetary damages" or restoration of "full and uninterrupted seniority and benefits." (Amended Complaint, Count One, ¶ 59; Count Two, ¶ 66; Count Three, ¶ 60; Count Four, ¶ 65; Count Five, ¶ 56; Count Six, ¶ 63; Count Nine, ¶ 62; and Count Ten, ¶ 60.) These claims are barred because the Eleventh Amendment prohibits such relief from being awarded against state officials.

If a federal action is brought against state officials alone, the court must decide whether the suit is, in fact, against a state in order to decide whether sovereign immunity applies. In such cases, the court must determine whether "the state is the real, substantial party in interest." Ford Motor Co. v. Dep't of Treasury, 323 U.S. 459, 464 (1945). Where a federal constitutional violation is alleged, the suit may proceed against individual state officials as long as the only relief sought is prospective injunctive relief. Edelman v. Jordan, 415 U.S. 651, 666-67 (1974); Ex parte Young, 209 U.S. 123 (1908). Moreover, although claims against state officials in their individual capacities are deemed not to be barred by the Eleventh Amendment, those claims may seek only monetary damages *other* than back pay and benefits. Dwyer v. Regan, 777 F.2d 825, 836 (2d Cir. 1985), modified, 793 F.2d 457 (2d Cir. 1986). Indeed, requests for back pay and retroactive benefits, however they may be pled, are claims peculiarly against the state as employer because state officials do not personally have any duty to pay or provide benefits to state employees. DeLoreto v. Ment, 944 F. Supp. 1023, 1031-32 & n.5 (D. Conn. 1996).

In Counts One, Two, Three and Four, plaintiffs sue the Governor and the Secretary in their individual capacities, seeking relief including "monetary damages." To the extent plaintiffs thereby seek back pay, back benefits, or any other "monetary damages" that are a function only of their employment by the state of Connecticut, or termination thereof, those claims for relief are barred by the Eleventh Amendment. DeLoreto, 944 F. Supp. at 1031-32 & n.5.

Moreover, in Counts Five, Six, Nine and Ten, plaintiffs seek restoration of "full and uninterrupted seniority and benefits" against the defendants in their official capacities. This claim for damages, seeking an award of the lost seniority credit and other employee benefits lost after and as a result of the challenged layoffs, is in essence a request for retrospective damages against the state of Connecticut, because it seeks from the defendants in their official capacities,

recovery for benefits lost from the time of the layoff to the present.  The Eleventh Amendment

bars recovery for retrospective losses.  Edelman, 415 U.S. at 663-64 (relief seeking "accrued"

money damages is barred); see also Milliken v. Bradley, 433 U.S. 267, 289 (1977) (interpreting

Edelman as permitting remedy to require payment of state funds only for *future* compliance with

constitutional standard).  Accordingly, Counts One, Two, Three, Four, Five, Six, Nine and Ten

should be dismissed.

**D.**    **Qualified Immunity Bars Plaintiffs' Claims Against Defendants In Their Individual Capacities**

Even if the defendants' conduct is not protected from suit by an absolute immunity,

Counts One, Two, Three and Four (the "individual capacity claims") are nonetheless barred by

the doctrine of qualified immunity and, therefore, should be dismissed.

1.    *The Scope of Qualified Immunity*

In a § 1983 action, a state official sued in his individual capacity is entitled to qualified

immunity if (1) his challenged conduct does not violate clearly established constitutional or

statutory rights of which a reasonable person would have known, or (2) even though the rights

were clearly established, it was objectively reasonable for the official to believe that his acts did

not violate those rights.  Anderson v. Creighton, 483 U.S. 635, 638 (1987); Harlow v. Fitzgerald,

457 U.S. 800, 818 (1982); see also Patel v. Searles, 305 F.3d 130, 135 (2d Cir. 2002).  The

defense of qualified immunity prevents "bare allegations of malice [from] subject[ing]

government officials [who perform discretionary functions] either to the costs of trial or to the

burdens of broad-reaching discovery."  Harlow, 457 U.S. at 817-18.  The test is an objective one;

it does not require or permit any inquiry into the state official's subjective state of mind, but

focuses only on the objective reasonableness of his conduct.  Crawford-El v. Britton, 523 U.S.

574, 588 (1998).

2.    *The Defendants' Conduct Was Objectively Reasonable*

Qualified immunity protects the Governor and the Secretary from suit because it was objectively reasonable for them to believe that their actions, in laying off unionized state employees, were in furtherance of their constitutional and statutory duties and did not violate the First Amendment.  Indeed, the defendants undertook the layoffs in compliance not only with applicable collective bargaining agreements but also with state statutes and constitutional provisions concerning fiscal control of the state government operations.

First, the Union Plaintiffs' collective bargaining agreements provide for layoffs, specifying applicable procedures, available bases for layoff, bumping and reemployment rights, and other such indicators that layoffs were contemplated as a possibility by both parties to the collective bargaining agreements. (E.g., Collective Bargaining Agreement between State and CEUI for Maintenance and Service Unit (NP-2), Art. 13, attached as Ex. C.)  In light of that clear contractual authority for conducting layoffs, the defendants' actions in ordering layoffs were wholly reasonable.

Second, the constitutional and statutory provisions cited in Section B above clearly provide that the Governor, with assistance from the Secretary, in the exercise of discretion and constitutional powers may take action to reduce spending when necessary and that such reductions are to be made based on the Governor's  own determination of what is reasonable and appropriate.  The power -- reflected in Public Act No. 02-1, May Spec. Sess., §§52(a), (b) (attached as Ex. A) -- to "determine [whether] a fiscal exigency" exists and to take appropriate action in response thereto, makes the Governor's decision to conduct layoffs all the more objectively reasonable.  Indeed, the Governor is constitutionally and statutorily invested with the power, and the obligation, to address a budget crisis in the way that he determines is appropriate, and his exercise of such power cannot be attacked as objectively unreasonable.

Given these sound bases for conducting layoffs of state union employees in the face of a budget crisis, the defendants' actions were objectively reasonable, and qualified immunity applies to bar the individual capacity claims in Counts One, Two, Three and Four.

**E.**    **Freedom Of Speech And Association Claims By Named Plaintiffs And Union Members Class Must Be Dismissed**

In the First and Fifth Counts, the Named Plaintiffs and Union Members Class allege that the defendants violated their rights of freedom of speech and freedom of association as guaranteed by the First Amendment.  These claims must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because they fail to state a cognizable claim under federal law.

1.    *Alleged Freedom of Speech Violations*

To state a free speech claim under the First Amendment, a public employee must show that (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him.  Hale v. Moss, 219 F.3d 67, 70 (2d Cir. 1999); Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999); see also Connick v. Myers, 461 U.S. 138, 140 (1983); Pickering v. Board of Educ., 391 U.S. 563, 568 (1968); Hankard v. Town of Avon, 126 F.3d 418 (2d Cir. 1997).

To be constitutionally protected, the speech must relate to a matter of "public concern," which is an issue of law for the court to determine as an initial matter.  Hale, 219 F.3d at 70. "'When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude . . . without intrusive oversight by the judiciary.'" Lewis v. Cowen, 165 F.3d 154, 161 (2d Cir. 1999) (quoting Connick, 461 U.S. at 146.)  Thus, if the employee is merely speaking "as an employee

upon matters only of personal interest[,]" his speech is not subject to First Amendment

protection. <u>Connick</u>, 461 U.S. at 147.

Here, the Named Plaintiffs and the Union Members Class fail to allege either that they

made any statements that resulted in their termination or that they made any statements about

matters of public concern.  Indeed, other than being identified as a "Named Plaintiff" in the

Complaint, those so identified provide no details regarding their employment or the

circumstances surrounding their termination.  There are no allegations surrounding the speech

allegedly made by these Named Plaintiffs, nor any allegations that such speech related to matters

of "public concern."  Moreover, there are no allegations that the defendants terminated the

Named Plaintiffs' employment *because of* any speech by the Named Plaintiffs.  Plaintiffs must

make specific allegations that indicate a deprivation of constitutional rights; general, indirect and

conclusory allegations are not sufficient.  <u>See</u> <u>Alfaro Motors, Inc. v. Ward,</u> 814 F.2d 883, 887

(2d Cir. 1987); <u>Koch v. Yunich</u>, 533 F.2d 80, 85 (2d Cir. 1976).

      2.    *Alleged Freedom of Association Violations*

To the extent that they have alleged that their freedom of association as guaranteed by the

First Amendment has been abridged, the claims of Named Plaintiffs and the Union Members

Class must also be dismissed because no facts have been alleged that support such a claim.

Indeed, there are no facts to support the alleged reason for these individuals' layoffs, leaving a

purely conclusory allegation that their relationship to the Union Plaintiffs led to their layoff.

(Complaint, ¶¶ 71, 83.)  Again, general, indirect, and conclusory allegations of a deprivation of

constitutional rights are insufficient to establish a violation, and the Second Circuit has

specifically required that freedom of association claims allege that the interference with

associational rights be "direct and substantial" or "significant."  <u>Fighting Finest, Inc. v. Bratton</u>,

1996 U.S. App. LEXIS 28748, at *8-9 (2d Cir. 1996) (citing <u>Younger v. Harris</u>, 401 U.S. 37, 51

(1971) ("The existence of a 'chilling effect,' even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action.")).

In the absence of any allegation by the Named Plaintiffs that warrants invocation of the First Amendment, this Court should dismiss the Named Plaintiffs' freedom of speech and association claims in Counts One and Five.[18]

## F.    Counts Two And Six Alleging A Violation Of The Right To Support Political Candidates Must Also Be Dismissed

In the Second and Sixth Counts, the Named Plaintiffs and Union Members Class claim that they were terminated in violation of their right to support political candidates of their own choosing.  However, the Named Plaintiffs fail to allege that, in the 2002 gubernatorial election, they actually supported any particular candidate, much less that they supported a candidate other than the Governor, and they fail to allege that they were terminated for any such support. Moreover, the Named Plaintiffs fail to allege that the defendants ordered them to be laid off because of their political preferences.  Without these allegations, there is no claim upon which relief may be granted, and Counts Two and Six must be dismissed.[19]

## G.    The Third And Fourth Counts Must Be Dismissed For Lack Of Standing

In the Third and Fourth Counts, which seek monetary relief against the defendants in their individual capacities, SEBAC, the SEBAC Class and the Union Plaintiffs claim that their First Amendment rights to organize and to support political candidates have been violated. There is no doubt that the First Amendment protects the rights of employees to associate and

---

[18] Upon dismissal of the Named Plaintiffs' claims, and in the resulting absence of any class representatives, the Union Members Class claims must also be dismissed.  See Fed. R. Civ. P. 23 (class action requires class representatives).

[19] Because the claims of the Named Plaintiffs must be dismissed for failure to state a claim upon which relief may be granted, so too do the Union Members Class claims fail, for lack of any class representative.  See note 18, above.

participate in labor unions.  <u>Smith v. Arkansas State Highway Employees, Local 1315</u>, 441 U.S. 463, 464 (1979).  Nevertheless, the Union Plaintiffs may not bring § 1983 claims for monetary damages for harms suffered by their members because SEBAC and the Union Plaintiffs lack standing to pursue those claims.

It is well established in the Second Circuit that an organization does not have standing to seek monetary damages under § 1983 for alleged violations of its members' rights.  <u>Aguayo v. Richardson</u>, 473 F.2d 1090, 1099 (2d Cir. 1973) (neither the language nor history of Section 1983 "suggests that an organization may sue under the Civil Rights Act for the violation of rights of members."); <u>League of Women Voters v. Nassau County Bd. Of Supervisors,</u> 737 F.2d 155, 160 (2d Cir. 1984) ("This Circuit has restricted organizational standing under § 1983 by interpreting the rights it secures to be personal to those purportedly injured.")  Thus, § 1983 is available only to those persons purportedly injured by unconstitutional conduct, and unions do not have standing to seek compensatory damages for injuries they have not suffered.

In <u>Legal Aid Soc'y v. City of New York</u>, 114 F. Supp. 2d 204 (S. D. N. Y. 2000), the Court held that an organization had no statutory standing to seek damages "for injuries that are purely derivative of harms suffered" by its members because the Second Circuit requires individualized proof of damages in actions under § 1983.  Here, SEBAC and the Union Plaintiffs are trying to do just that.  However, they have no standing to do so, and, therefore, SEBAC and the Union Plaintiffs' claims in Counts Three and Four should be dismissed.

Moreover, to the extent that SEBAC and the Union Plaintiffs purport to bring a claim on their own behalf separately from claims on behalf of their members, they have not alleged that they as entities -- as opposed to as representatives of their members -- have been the victims of any violations of federal law.  The Complaint is utterly devoid of any allegations that SEBAC or

the Union Plaintiffs have been injured by the defendants' conduct. For example, although the
Complaint generally states that SEBAC and the Union Plaintiffs have been "penalized" for
exercising First Amendment rights (e.g., Complaint, Third Count, ¶ 54), there is no allegation as
to what penalty was imposed. In the absence of any allegation of harm suffered a result of
allegedly unconstitutional conduct, the claim must fail. Lujan v. Defenders of Wildlife, 504 U.S.
555 (1992) (organization must have suffered an "injury in fact - an invasion of a legally-
protected interest which is (a) concrete and particularized and (b) actual or imminent, not
conjectural or hypothetical" in order to have standing); American Charities for Reasonable
Fundraising Regulation v. Shiffrin, 46 F. Supp. 2d 143 (D. Conn. 1999) (following Lujan and
Second Circuit law above for § 1983 claim). Because SEBAC and the Union Plaintiffs fail to
assert sufficient allegations for standing, their claims in Counts Three and Four should be
dismissed.[20]

## H.  The Ninth Count Must Be Dismissed Because There Is No Substantive Due Process Violation

In the Ninth Count, the Named Plaintiffs and the Union Members Class claim that their
substantive due process rights have been violated.[21] However, once again, these plaintiffs have

---

[20] Upon dismissal of SEBAC's claims in Counts Three and Four, the claims by the
purported SEBAC Class in those counts should similarly be dismissed, for lack of class
representative. See note 14, above.

[21] To the extent that the plaintiffs also refer in Counts Nine and Ten to the Equal
Protection clause of the Fourteenth Amendment (Amended Complaint, ¶¶ 58 (Count Two), 60
(Count Nine), 58 (Count Ten).), they have failed to state a valid claim because, given that they
attempt to allege that their status as union employees was the basis for the layoff decisions, yet
they also allege, as they must, that one union was not impacted at all by the layoffs. City of
Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Accordingly, the plaintiffs' own
allegations are self defeating under the Equal Protection Clause. Moreover, union and nonunion
employees are not "similarly situated" in this context. Id.

failed to state a cause of action because they have no "property" interest, as is required to establish such a claim; therefore, Count Nine must be dismissed.

As an initial matter, because they have alleged other violations of the Constitution, their substantive due process claims should not be allowed to continue. As the Supreme Court has held, "[w]here a particular Amendment [to the Constitution] 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process", must be the guide for analyzing these claims.'" Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)).

Nevertheless, substantive due process is "an area of the law famous for its controversy, and not known for its simplicity." Schaper v. City of Huntsville, 813 F.2d 709, 716 (5th Cir. 1987). Substantive due process circumscribes an "outer limit" on permissible governmental action. Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999). Such rights are violated only by conduct "so outrageously arbitrary as to constitute a gross abuse of governmental authority." Natale, 170 F.3d at 263. To state a due process violation, a plaintiff must first show a deprivation of a constitutionally protected property or liberty interest. White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1061-62 (2d Cir. 1993); Costello v. McEnery, No. 91 Civ. 3475, 1994 U.S. Dist. LEXIS 10778 at *11 (S.D.N.Y. Aug. 3, 1994), aff'd, 57 F.3d 1064 (2d Cir. 1995). It is only when such a right is established that the court may turn to a discussion of whether there has been a deprivation of that right without due process. While state law may define the interest sought to be protected, federal law determines whether an interest rises to the level of an "entitlement" implicating the protections of the Due Process Clause. Ezekwo v. New York City Health & Hosp. Corp., 940 F.2d 775, 782 (2d Cir. 1991).

The Supreme Court has recently reiterated that "in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated." County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998). Here, the Named Plaintiffs and the Union Members Class have failed to identify any legally recognizable federal liberty or property right. The only right that they seem to allege in the Ninth Count is an amorphous right to be free from undue economic pressure for "asserting their rights under the SEBAC Agreement." (Ninth Count, ¶¶ 89, 91.) In other words, the Named Plaintiffs and Union Members Class appear to be asserting that they have a right not to be subjected to pressure from the defendants to agree to changes to the terms of the SEBAC Agreement. The source of this purported right, however, is not identified, and no provision of state or federal law prohibits hard bargaining between a state and its unionized employees.

To the extent that the Named Plaintiffs and Union Members Class seek to rely on provisions of Connecticut law to support their claims (as they appear to do throughout, by stating that they have "statutorily-protected rights" under Conn. Gen. Stat. § 5-278(b) (e.g., Count Nine, ¶ 85)), such reliance is misplaced. "[T]he due process clause does not require, or even permit, federal courts to enforce the substantive promises in state laws and regulations. . . . [Moreover, if] a state's violation of its own laws and regulations does not violate the due process clause, it is hard to see how failure to keep a promise contained in a contract can violate the due process clause." Mid-American Waste Sys., Inc. v. Gary, 49 F.3d 286, 290 (7th Cir. 1995). Litigants who contend that a state actor has violated state law or broken a contract must present their claims to state court. See Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.").

-27-

Accordingly, the Named Plaintiffs and the Union Members Class have alleged no viable basis for the asserted property right, and, therefore, this Court must dismiss the Ninth Count.

I.    **The Tenth Count, Which Also Purports To State A Substantive Due Process Claim, Must Be Dismissed**

In the Tenth Count, the Named Plaintiffs and the Union Members Class purport to state another claim that their substantive due process rights have been violated by the defendants. Specifically, the plaintiffs allege that they have a "statutorily-protected right to continued state employment." (Amended Complaint, Count 10, ¶ 54.) This claim fails because they do not have a "property" interest or entitlement to a state job, nor do they have a "property" right not to be laid off.

As noted above in Section H, the first step in the substantive due process analysis is whether a property right exists. This inquiry is governed by federal law, which determines whether an interest is an "entitlement" so as to trigger application of the Due Process Clause. Ezekwo, 940 F.2d at 782. "It is neither workable nor within the intent of section 1983 to convert every breach of contract claim against a [state actor] into a federal claim." Id. "[T]he existence of provisions that retain for the state significant discretionary authority over the bestowal or continuation of a government benefit suggests that the recipients of such benefits have no entitlement to them." Plaza Health Labs v. Perales, 878 F.2d 577 (2d Cir. 1989); Petrario v. Cutler 187 F. Supp. 2d 26, 34-35 (D. Conn. 2002) (no property right to be promoted or not to be furloughed, where plaintiff is public employee covered by collective bargaining agreement with University of Connecticut Health Center); see also RR Village Ass'n v. Denver Sewer Corp., 826 F.2d 1197, 1201 (2d Cir. 1987) (distinguishing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985) ("[when state law] makes the pertinent official action discretionary, one's interest . . . does not rise to the level of a property right entitled to procedural due process")).

Here, each of the applicable collective bargaining agreements contains provisions that give the state the express power to conduct layoffs and other employment decisions as to the state's union employees. Indeed, as noted previously, the applicable collective bargaining agreements provide for significant discretion on the part of the state of Connecticut, such as:

> [R]eserves and retains, whether exercised or not, all the lawful and customary rights, powers and prerogatives of public management. Such rights include but are not limited to … determining the mission of an agency and the methods and means necessary to fulfill that mission, including the contracting out of or the discontinuation of services, positions or programs in whole or in part; … the suspension, demotion, discharge or any other appropriate action against its employees; [and] the relief from duty of its employees because of lack of work or for other legitimate reasons.

(E.g., Collective Bargaining Agreement between State and CEUI for Maintenance and Service Unit (NP-2), Art. 5, Sec. 1, copy attached as Ex. C.) Thus, based on the collective bargaining agreements, Connecticut public employees have no "property" interest that they will not be laid off.[22] See Shegog v. Board of Educ., 99 C 211, 2000 U.S. Dist. LEXIS 6099 (N.D. Ill., May 1, 2000) (no property right not to be laid off); see also Cibas v. Lockwood, et al., No. Civ. 90-341, 1994 U.S. Dist. LEXIS 21452, *79 (D.N.M. 1994) (finding no substantive due process violation and holding that "[a]bsent some infringement of some 'fundamental' right, it would appear that the termination of public employment does not constitute a denial of substantive due process").[23]

In other states, public employees have also tried to have courts rescind state layoffs, without success. For example, in Mandel v. Allen, 889 F. Supp. 857 (E.D. Va. 1995), aff'd, 81

---

[22] This Court need not decide whether public employees have a "property" right to a state job, in general, because of the narrow issue involved – namely, whether the state can conduct layoffs in accordance with the applicable collective bargaining agreements.

[23] The plaintiffs' apparent attempt to use the applicable collective bargaining agreements as a shield from layoffs is misguided: "Where the [employee] received the benefits of the collective bargaining contract, he must also accept its disadvantages, i.e., he must, so to speak, accept the bitter with the sweet." Morris v. Lindau, 196 F.3d 102 (2d Cir. 1999).

F.3d 478 (4th Cir. 1996), Virginia's Governor and several other state executives, were sued by state employees whose jobs were either abolished or reclassified as part of a reorganization of the state government. The <u>Mandel</u> court recognized that the state employees could not have a legitimate expectation that their positions would never be abolished, and upheld the need for the government to retain the flexibility necessary to effect a bona fide reorganization of state resources. <u>Mandel</u>, 889 F. Supp. at 866. "Public offices are created to meet the needs of the people, and when such need ceases to exist, there is no obligation or necessity to continue a useless office. The determination that a position should be abolished for reasons of efficiency and economy is solely within the judgment and discretion of the governing authority in whom the power to eliminate the office is vested." <u>Id.</u> Similarly here, and as discussed above, the Governor is entrusted with the authority to make such budgetary decisions and is expressly authorized by the collective bargaining agreements to undertake layoffs. Accordingly, this Court should dismiss Count Ten.

**V.**
**<u>CONCLUSION</u>**

For all of the foregoing reasons, this Court should refuse the plaintiffs' invitation to override the difficult policy choices made by the Governor and the Secretary to address a severe fiscal crisis and thereby to substitute its own judgment for these quintessentially legislative decisions in the defendants' exercise of their constitutional and statutory authority. This Court should grant defendants' Motion to Dismiss.

For THE DEFENDANTS,

By: _/s/ Douglas W. Bartinik_____
     Albert Zakarian (ct04201)
     Allan B. Taylor (ct05332)
     Victoria Woodin Chavey (ct14232)
     Douglas W. Bartinik (ct26196)
     Day, Berry & Howard LLP
     CityPlace I
     Hartford, Connecticut 06103-3499
     (860) 275-0100
     (860) 275-0343 (fax)
     *dwbartinik@dbh.com*

     Their Attorneys

## CERTIFICATE OF SERVICE

     THIS IS TO CERTIFY that a copy of the foregoing was mailed this date, postage prepaid, to:

David S. Golub
Silver, Golub & Teitell, LLP
184 Atlantic Street
P.O. Box 389
Stamford, CT 06904.

Ann H. Rubin
Carmody and Torrance
50 Leavenworth Street
Waterbury, CT 06721-1110

         /s/_____
         Douglas W. Bartinik