LEXSEE 1994 U.S. DIST. LEXIS 21452

**DR. GEDIMINAS CIBAS, Plaintiff, vs. ANITA LOCKWOOD, CHARLES ROYBAL, THOMAS BAHR, JUANITA ROSALES, ROBERT STOVALL and THE ENERGY, MINERALS AND NATURAL RESOURCES DEPARTMENT OF THE STATE OF NEW MEXICO, Defendants.**

CIV 90-341 JC/WWD

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO

*1994 U.S. Dist. LEXIS 21452*

**August 22, 1994, Decided**
**August 22, 1994, Filed; August 22, 1994, Entered on Docket**

**DISPOSITION:** [*1] Plaintiff's Motion for Partial Summary Judgment as to Defendants' Affirmative Defenses of Qualified and Legislative Immunity denied. Defendants' Motion for Summary Judgment granted.

**COUNSEL:** For Plaintiff: Christopher Carlsen, Santa Fe, New Mexico.

For Defendant: James P. Lyle, BUTT, THORNTON & BAEHR, P.C., Albuquerque, New Mexico.

**JUDGES:** John E. Conway, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** John E. Conway

**OPINION:**

### MEMORANDUM OPINION

This matter comes on for consideration of Plaintiff's Motion for Partial Summary Judgment as to Defendants' Affirmative Defenses of Qualified and Legislative Immunity, filed September 30, 1990, and Defendants' Motion for Summary Judgment, filed January 14, 1991. To conserve limited judicial resources, these motions have been held under advisement pending the decision of Judge Steve Herrera of the Santa Fe County District Court on the related state proceeding. Judge Herrera issued his Judgment and Order on May 10, 1994, at which point this Court set oral argument on the pending motions.

The Court has reviewed the motions and memoranda submitted by the parties, and heard oral argument on Friday, July 1, 1994 at 10:00 a.m. The Court finds that Plaintiff's [*2] Motion for Partial Summary Judgment as to Defendants' Affirmative Defenses of Qualified and Legislative Immunity is not well-taken, and shall be denied. The Court further finds that Defendants' Motion for Summary Judgment is well taken, and shall be granted.

### I. BACKGROUND

Dr. Gediminas Cibas (Cibas) is suing the Defendants in this matter for an alleged violation of his civil rights resulting in his separation from employment with the State of New Mexico. Specifically, Plaintiff's complaint sets forth 10 claims for relief:

> Count I:
> Seeks monetary damages, resulting from an alleged conspiracy to violate Plaintiff's First Amendment Rights, from Defendants Lockwood and Roybal;
>
> Count II:
> Seeks monetary damages, resulting from alleged individual misconduct violating Plaintiff's First Amendment rights, from Defendants Lockwood and Roybal;
>
> Count III:
> Seeks monetary damages, resulting from alleged acts of supervisory misconduct violating Plaintiff's First Amendment rights, from Defendants Lockwood and Bahr;
>
> Count IV:
> Seeks monetary damages, resulting from an alleged conspiracy to violate Plaintiff's Fourteenth Amendment rights to substan-

Case 3:03-cv-00221-AVC   Document 85-9   Filed 12/20/2005   Page 2 of 13

Page 2
1994 U.S. Dist. LEXIS 21452, *

tive [*3] due process, from Defendants Lockwood and Roybal;

Count V:
Seeks monetary damages, resulting from alleged individual misconduct violating Plaintiff's Fourteenth Amendment rights to substantive due process, from Defendants Lockwood, Roybal, Rosales and Stovall;

Count VI:
Seeks monetary damages, resulting from alleged supervisory misconduct violating Plaintiff's Fourteenth Amendment rights to substantive due process, from Defendants Lockwood and Bahr;

Count VII:
Seeks monetary damages, resulting from an alleged conspiracy to violate Plaintiff's Fourteenth Amendment Rights to procedural due process, from Defendants Lockwood, Roybal, Stovall and Rosales;

Count VIII:
Seeks monetary damages, resulting from alleged individual misconduct violating Plaintiff's Fourteenth Amendment rights to procedural due process, from Defendants Lockwood, Roybal, Stovall and Rosales;

Count IX:
Seeks monetary damages, resulting from alleged supervisory misconduct violating Plaintiff's Fourteenth Amendment rights to procedural due process, from Defendants Lockwood, Rosales, Roybal and Stovall;

Count X: Seeks injunctive relief (reinstatement) against [*4] the Department of Energy, Minerals and Natural Resources.

Plaintiff's complaint arises from his alleged termination by the Energy and Minerals Department (EMD or Department) on June 26, 1987. At the time of his termination, Cibas had been working for the Department for more than ten years. Prior to his employment with the Department, he had worked for other State agencies for about three years.

Cibas was employed by the EMD's Planning and Analysis office as an expert in oil and gas economics and related matters, including production reporting and assessment of the tax revenue impact of various governmental proposals and legislation. The Department's stated basis for terminating Cibas was a "legislative mandate" for a reduction in the number of permanent full-time equivalent (FTE) positions in the budget for the fiscal year commencing July 1, 1987, as established in the 1987 General Appropriation Act (Laws 1987, Chapter 355).

The 1987 legislature merged the Energy and Minerals Department with the Natural Resources Department, effective July 1, 1987. (Laws 1987, Chapter 234). Section 3(K) of the 1987 General Appropriations Act explicitly transferred budgets of the formerly [*5] separate departments to the newly created department.

Defendants contend that they were required to implement the Legislature's mandates for cutting back full-time equivalent employees at EMD. Based upon the recommendation of at least one study, the Planning and Analysis Office was selected for elimination. As a result, several employees of the Planning and Analysis Office, including the Plaintiff, were laid off. In accordance with State Personnel Board Rules, Defendants contend that Plaintiff was informed of all available positions and salary ranges within the Department. However, all of the available jobs, for which Plaintiff had priority rights, paid less than what Plaintiff was earning in his previous position. Plaintiff apparently was unwilling to consider a salary reduction or a transfer out of the Santa Fe area, and therefore refused to accept any of the offered positions.

Plaintiff's first and primary allegation is that he was in fact terminated and not laid off. He bases this assertion on his contention that a "legislative mandate" for the layoff did not exist. Plaintiff describes numerous alleged improprieties in his termination including: 1) he was not informed of all [*6] available jobs; 2) certain jobs in his salary range, for which he was qualified, were eliminated rather than filled; and 3) he was not allowed to properly exercise his "bumping rights" as to other positions. Plaintiff summarizes his contentions by stating that,

> Dr. Cibas was laid off on June 26, 1987 pursuant to a purported legislative budget 'mandate' which (1) did not exist, and (2) even if it did exist, did not take effect until some five days after his termination date. In other words, on the date Dr. Cibas was laid off, there was not authority to lay him off at all.

Plaintiff's Brief on Preclusive Effect of State Proceeding, at 4, filed May 13, 1994. Plaintiff contends that the timing of Cibas' supposed layoff was orchestrated because,

> [1] The 1987 Legislature had specifically forbidden layoffs in the legislation (Chapter 234) merging the Energy and Minerals with the Natural Resources Department....[2] There was no reduction in force in the combined budgets effective July 1, 1987.

## II. PLAINTIFF'S STATE ADMINISTRATIVE PROCEEDINGS

Prior to the effective date of his layoff, Cibas filed a complaint with the State Personnel Board. His complaint [*7] was dismissed as premature. Cibas also apparently sought, and was denied, a formal pretermination grievance hearing within the department. However, Cibas was informed that he could take advantage of informal grievance procedures within the department. Cibas elected not to participate in the informal procedures. Based on the lack of a formal procedure, Cibas contends that he was denied a pretermination hearing.

After Cibas' layoff, he filed a timely complaint with the State Personnel Board. Because of a series of delays Plaintiff did not get a hearing on the merits of his complaint until November of 1988. The hearing was finally concluded on November 28, 1988, but the State Personnel Board did not enter its decision until June 22, 1989.

The Hearing Officer prepared a Recommended Decision which was adopted, with minor changes, by the State Personnel Board. Therein, the Board found that Plaintiff had been improperly terminated and that the layoff had been a "sham" or "constructive termination." The Board also ordered that Plaintiff be reinstated with full back-pay and benefits. The Department, however, elected to appeal to the State District Court, and refused to reinstate the Plaintiff [*8] pending the appeal.

Again, Plaintiff asserts that the Department caused delay because it did not file its brief with the state district court until almost a year after its notice of appeal. Judge Herrera of the Santa Fe County District Court issued a Judgment and Order on May 10, 1994, wherein he reversed the State Personnel Board. The district court concluded that the Department had authority to lay off the Plaintiff, and that the discharge was, in fact, a layoff and not a termination.

Plaintiff's § 1983 complaint, which is before this Court, apparently asserts exactly the same facts as were presented to the State Personnel Board, and appealed to Judge Herrera. Counsel for the Plaintiff has informed this Court that Judge Herrera's decision will be appealed to the New Mexico Court of Appeals.

## III. PRECLUSIVE EFFECT OF STATE PROCEEDING

In an order issued April 19, 1993, this Court asked the parties to brief several issues regarding the preclusive effect of the state proceedings on this § 1983 action. While the order was issued sua sponte, the issue actually arose in Plaintiff's response to Defendant's immunity motion. Therein, Plaintiff's counsel at the time, Denise [*9] Glore, asserted that the decision of the State Hearing Officer, as adopted by the State Personnel Board, was dispositive of many of the issues to be decided in this litigation. Plaintiff therefore sought to preclude relitigation of any of the issues decided previously, and asserted that the sole question in this litigation was whether Defendants' motivation for Cibas' termination rose to the level of a constitutional violation.

Not surprisingly, when Judge Herrera reversed the State Personnel Board the Plaintiff's position changed, and new counsel, Christopher Carlsen, contends that neither Judge Herrera's decision nor the State Personnel Board decision has preclusive effect on this action. Briefs have been provided on this issue by both sides.

Congress has provided by statute that a federal court is required to give state judicial proceedings "the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they were taken." *28 U.S.C. § 1738.* In so doing, "Congress has specifically required all federal courts to give preclusive [*10] effect to state-court judgments whenever the courts of the State from which the judgments emerged would so do." *Allen v. McCurry, 449 U.S. 90, 96, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980).*

> It has long been established that § 1738 does not allow federal courts to employ their own rules of res judicata in determining the effect of state judgments. Rather, it goes beyond the common law and commands a federal court to accept the rules chosen by the State from which judgment is taken.
>
> . . . .
>
> A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state and federal courts are not required to afford full faith and credit to such a judgment. Section

Case 3:03-cv-00221-AVC    Document 85-9    Filed 12/20/2005    Page 4 of 13

Page 4
1994 U.S. Dist. LEXIS 21452, *

1738 does not suggest otherwise; other state and federal courts would still be providing a state court judgment with the "same" preclusive effect as the courts of the State from which the judgment emerged.

*Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 482, 72 L. Ed. 2d 262, 102 S. Ct. 1883 (1982) (footnote omitted). The Supreme Court has also determined that Congress did not intend for *42 U.S.C. § [*11] 1983* to alter the normal rules of preclusion.

Nothing in the language or legislative history of § 1983 proves any congressional intent to deny binding effect to a state-court judgment or decision when the state court, acting within its proper jurisdiction, has given the parties a full and fair opportunity to litigate federal claims, and thereby has shown itself willing and able to protect federal rights... There is, in short, no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court simply because the issue arose in a state proceeding in which he would rather have not been engaged at all.

*Allen v. McCurry*, 449 U.S. at 104. While the federal claims at issue herein were not specifically litigated in the state proceeding, many of the issues critical to the success of these claims were before the state court. Where the elements of the litigated state claims are essentially identical to the federal claim, there is no need to allow the relitigation of the federal claim. See *Kremer v. Chemical Const. Corp.*, 456 U.S. at 479-80,

Although [*12] the claims presented to the NYHRD [New York State Division of Human Rights] and subsequently reviewed by the Appellate Division were necessarily based on New York law, the alleged discriminatory acts are prohibited by both federal and state laws. The elements of a successful employment discrimination claim are virtually identical; petitioner could not succeed on a Title VII claim consistently with the judgment of the NYHRD that there is no reason to believe he was terminated or not rehired because of age or religion. The Appellate Division's affirmance of the NYHRD's dismissal necessarily decided that petitioner's claim under New York law was meritless, and thus it also decided that a Title VII claim arising from the same events would be equally meritless.

Similarly, while the claims are not identical, many of the critical issues in the state proceeding are identical to issues which must be decided in the federal claim. Thus, the inquiry for the Court is what preclusive effect a New Mexico state court would give the issues determined in Judge Herrera's decision.

The first thing that must be noted is that New Mexico continues to distinguish between res judicata [*13] (claim preclusion) and collateral estoppel (issue preclusion).

New Mexico courts, on the other hand, explicitly distinguish res judicata from collateral estoppel. Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a subsequent suit involving the same parties or their privies based on the same cause of action. Under the doctrine of collateral estoppel, the second action is upon a different cause of action and the judgment in a prior action precludes relitigation of issues actually litigated and necessary to the outcome of the first action. Collateral estoppel differs from res judicata in that the issue to be estopped must actually have been litigated, whereas res judicata bars relitigation of any issue which was, or might have been, litigated in the first suit. Moreover, collateral estoppel bars relitigation of ultimate facts or issues actually and necessarily decided in a prior suit.

*Blea v. Sandoval*, 107 N.M. 554, 558, 761 P.2d 432 (Ct.App. 1988) (citations omitted). At issue in the State proceeding was whether Plaintiff was improperly terminated, whereas in this proceeding, two questions are presented. First, this [*14] proceeding asks the Court to decide whether the motive behind Plaintiff's termination was unconstitutional. That is, whether Plaintiff was terminated in violation of his First Amendment rights. Second, this Court is asked to decide whether the method by which Plaintiff was terminated passed muster under both

the procedural and substantive elements of the 14th Amendment's Due Process Clause. Thus, while the two suits are very similar, the ultimate cause of action differs slightly, and therefore collateral estoppel rather than res judicata is applicable.

The New Mexico Court of Appeals has recently explained how New Mexico courts apply the doctrine of collateral estoppel.

> "Collateral estoppel bars relitigation of ultimate facts or issues actually and necessarily decided in a prior suit. Under collateral estoppel, or 'issue preclusion,' the cause of action in the second suit need not be identical with the first suit." The doctrine differs from the doctrine of res judicata in not requiring the identity of prior and subsequent actions. However, the doctrine of collateral estoppel has its own unique characteristics: (1) the party against whom collateral estoppel is asserted must [*15] have been a party in or in privity with a party to the original action; and (2) the two cases must have concerned the same ultimate issue or fact, which was (a) actually litigated, and (b) necessarily determined in the first suit. In addition, the trial court may determine that "the application of collateral estoppel would be fundamentally unfair and would not further the aim of the doctrine, which is to prevent endless relitigation of issues." "Fundamental fairness requires that the party against whom collateral estoppel is asserted be given a full and fair opportunity to litigate."

*Delisle v. Avallone*, 117 N.M. 602, 605, 874 P.2d 1266, 1994 WL 197971 at *2 (N.M.Ct.App. 1994). The operative prior adjudication, for purposes of the collateral estoppel question, is the decision issued by Judge Herrera. The overruled decision of the State Personnel Board no longer has any preclusive effect, and need not be considered. See *Salas v. Bolagh*, 106 N.M. 613, 615, 747 P.2d 259 (Ct.App. 1987).

A comparison of the claims at issue in the state proceeding with those at issue here demonstrates that all four of the factors set out in Delisle are satisfied, and therefore that Collateral [*16] estoppel is applicable. The first factor is fulfilled because the parties in both actions are the same, or, in the case of some of the Defendants herein, clearly in privity with the parties to the state personnel action. Second, both actions contain certain ultimate issues of fact which are identical. Namely, one of the most important issues of fact decided by Judge Herrera--whether the adverse action was a termination or a layoff--is essential to the disposition of this action. In the state action, the determination of whether the separation was a termination or a bona fide layoff constituted the ultimate issue decided by the tribunal, and in this action the issue is dispositive as to certain of the constitutional claims. That is, if the separation was the result of a bona fide layoff, rather than a "sham," then Plaintiff cannot show improper motivation, and, assuming the requirements of the due process clause are satisfied, the constitutional claims must necessarily fail. This determination was the center piece of the state procedure, and was therefore "actually litigated" and "necessarily determined" in the first suit. Thus, the second and third Delisle factors are satisfied. [*17]

The final issue is whether the parties had a full and fair opportunity to litigate in the first action. Although he previously asserted that the prior action afforded all parties a full and fair opportunity to litigate, Plaintiff now contends that he did not have a full and fair opportunity to litigate, especially as to certain issues. Plaintiff's attorney must have at least a little trouble making this argument considering that Plaintiff's previous counsel submitted a sworn affidavit stating in part,

> The parties to the administrative process had two years of preparation between the time of Dr. Cibas' layoff and the final decision by the State Personnel Board. All parties were represented by counsel, had a full and fair opportunity to present evidence, witnesses, direct and cross examination, and numerous pleadings.

Plaintiff's Exhibit D to Response to Defendants' Motion for Immunity at 5 (emphasis supplied). Plaintiff now contends, however, that certain issues which are important herein were not decided in the state proceedings. These issues will be discussed more completely below, but, in short, do not effect the preclusive result of the state decision. [*18] As will be discussed more fully in conjunction with the due process analysis below, the Court, after examining approximately 2000 pages of exhibits, including the affidavits of Plaintiff and his previous counsel, finds that Plaintiff had a full and fair opportunity to litigate the issues in the state proceedings.

The only difficulty with the application of collateral estoppel in this situation is that Judge Herrera's decision will undoubtedly be appealed, and therefore there is

Case 3:03-cv-00221-AVC   Document 85-9   Filed 12/20/2005   Page 6 of 13

Page 6
1994 U.S. Dist. LEXIS 21452, *

some doubt as to the finality of his decision. However, the Court finds that in addition to the conclusions which result from the application of collateral estoppel, Defendants' motion for summary judgment has a sufficient independent basis for being granted.

## IV. QUALIFIED IMMUNITY

The determination of whether the grant of qualified immunity is appropriate in a given circumstance consists of a two stage analysis. At the initial stage, the Court must decide whether Plaintiff has shown that a clearly established law or right has been violated. If Plaintiff is successful in carrying the initial burden, the Court must then determine whether the Defendant, while acting under color of state law, engaged in [*19] conduct that a reasonable person would understand violated the law or right in question. The Tenth Circuit has set out the analysis which this Court must follow in determining whether a Defendant is entitled to qualified immunity. See *Hannula v. City of Lakewood*, 907 F.2d 129, 130-31 (10th Cir. 1990),

> Once a defendant raises a qualified immunity defense, the plaintiff bears a heavy burden. The qualified immunity defense "cannot be analogized to other affirmative defenses because of the interests implicated in suits against government officials. Unlike other affirmative defenses, qualified immunity not only shields a defendant from liability, but is also intended to protect the defendant from the burdens associated with trial."
>
> . . . .
>
> Once a defendant raises a qualified immunity defense the plaintiff assumes the burden of showing that the defendant has violated clearly established law. To overcome the defense, the plaintiff must do more than identify a clearly established legal test and then allege that the defendant has violated it. The plaintiff must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing [*20] that the defendant's actions were clearly prohibited. The "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." While Anderson makes clear that there is no requirement that the specific action in question have previously been held unlawful, the plaintiff must show that the unlawfulness of the conduct in question is "apparent" in light of preexisting law.
>
> If the plaintiff fails to meet the burden of showing how a defendant violated a clearly established right, we must prevent the plaintiff from subjecting government officials to trial.
>
> . . . .
>
> If the plaintiff fulfills the burden of showing how the defendant violated a clearly established right, the defendant then bears the normal burden of a movant for summary judgment of demonstrating that no material facts remain in dispute.

(emphasis supplied, citations omitted); see also, *Pueblo Neighborhood Health Centers v. Joseph E. Losavio, Jr.*, 847 F.2d 642, 646 (10th Cir. 1988). The Court shall therefore apply this two stage analysis to the claims brought by the Plaintiff.

The Court shall use the term "Defendants" to [*21] refer to those Defendants named in the particular count under discussion. In their motions, the parties do not tend to individualize their arguments to specific Defendants, nor, given the conspiracy claims, is such specificity necessary in this case. The Court shall therefore address the Defendants as a whole.

### A. First Amendment Claims

#### 1. Application of Collateral Estoppel

Having found collateral estoppel applicable in this circumstance, the Court must look to the documents constituting the opinion rendered by State District Judge Steve Herrera. Judge Herrera issued three documents which comprised his findings and holding in the case. Specifically, on December 3, 1993, Judge Herrera entered a Memorandum Opinion; on April 15, 1994 Judge Herrera entered the Court's Findings of Fact and Conclusions of Law; finally, on May 10, 1994, Judge Herrera issued his Judgment and Order. The Court shall take judicial notice of each of these documents for purposes of the doctrine of collateral estoppel.

In his Memorandum Opinion and Order, Judge Herrera reached the following conclusion regarding Cibas' separation from state employment,

> The Court has reviewed the [*22] entire transcript of proceedings in this case. It is clear that Mr. Cibas positions was elimi-

nated as a result of a appropriate government action. In the Court's opinion, the Department had the authority to layoff Mr. Cibas once the position was eliminated. The court has been unable to find any evidence to support a finding that Cibas was forced to leave employment and, more importantly, any reason for why the Department would do so. As previously indicated, numerous employees were effected by Secretary Lockwood's decisions.

New Mexico Energy and Natural Resources Dept. v. Cibas et al., No. SF 89-1417(C), Memorandum Opinion at 5 (N.M.Dist.Ct. December 3, 1993)(emphasis in original).

5. There are no findings of fact or evidence from review of the whole record to support the Board's conclusion of law number 7 that "Cibas's layoff was a dismissal."

6. Chapter 234 of the Law of 1987 created the New Mexico Energy, Minerals and Natural Resources Department (Department) and provided that there were to be no staff reductions below the full-time employee (FTE) positions in the 76th fiscal year except by attrition, transfer and dismissal for cause except for positions [*23] vacant on the effective date of Chapter 234, i.e. July 1, 1987.

7. The General Appropriation Act for the 76th fiscal year, Chapter 355, Laws of 1987, authorized 16 permanent FTE positions for the Resource Development and Management Division of the Department effective July 1, 1987; the Division had been authorized 19 FTE positions for the 75th fiscal year.

. . . .

10. To comply with Chapters 355 and 234, the Acting Secretary of the Department, Anita Lockwood, had to reduce the number of permanent FTE positions before July 1, 1987.

11. Acting Secretary Lockwood determined that the reasonable way to comply with both acts would be a layoff in advance of July 1, 1987.

12. The Legislative Finance Committee's budget document recommended eliminating the Planning and Analysis Office within the Division; the Governor's budget also proposed cuts in the Division.

13. Acting Secretary Lockwood submitted a layoff plan to the State Personnel Office for approval that eliminated three FTE positions in the Division and two FTE positions in other divisions.

14. The State Personnel Office approved the layoff plan.

15. In early 1987, Appellee, Gediminas Cibas, was [*24] in charge of the Planning and Analysis Office; he performed energy modeling work.

16. As a permanent employee with seniority, Cibas had certain displacement or bumping rights pursuant to State Personnel Board (SPB) Rule 14.3(G), in effect at the time relevant to these proceedings, but there were no other employees with the Energy Consultant - Option A classification that he held in the Department.

17. There were other energy consultants with different options who did different work with different requirements in the Department in 1987.

18. Between January and June of 1987, a total of 14 FTE positions in the Department were deleted by the layoff plan and by attrition in accordance with the law.

19. The Department advised Cibas of other positions for which he was qualified as the positions became available.

20. Cibas chose not to accept any of the positions for which he qualified because the salaries for the positions were less than Cibas's salary as head of the Planning and Analysis Office; Cibas refused to consider a salary reduction in order to accept an available position.

> 21. Cibas was laid off; the energy modeling work he performed ended and was no [*25] longer performed by the Department.

New Mexico Energy and Natural Resources Dept. v. Cibas et al., No. SF 89-1417(C), Court's Findings of Fact and Conclusions of Law at 2-4 (N.M.Dist.Ct. December 3, 1993).

Judge Herrera's conclusion that Plaintiff's release from employment was in fact a bona fide layoff, and further determination that the position was eliminated through "appropriate government action," is dispositive on the First Amendment issue. Since Cibas was properly laid off, rather than terminated for cause, an improper motive cannot be shown. Plaintiff has therefore failed to show that an established right was violated, and cannot meet the burden required to defeat Defendant's qualified immunity motion. However, even if collateral estoppel cannot be applied to this issue, a direct analysis of Plaintiff's First Amendment claim results in an identical conclusion.

### 2. Direct Analysis of First Amendment Claims

Plaintiff's allegations arise from his claim that he was terminated for his "outspokenness" on public issues, in violation of his rights under the First Amendment.

> It is clearly established that a State may not discharge an employee on a basis [*26] that infringes that employee's constitutionally protected interest in freedom of speech. Even though McPherson was merely a probationary employee, and even if she could have been discharged for any reason or for no reason at all, she may nonetheless be entitled to reinstatement if she was discharged for exercising her constitutional right to freedom of expression.

*Rankin v. McPherson*, 483 U.S. 378, 383-84, 97 L. Ed. 2d 315, 107 S. Ct. 2891 (1987) (citation omitted).

> Determining whether a governmental employer has infringed upon an employee's First Amendment rights requires a case-by-case, two-part analysis: First, we must determine if the speech was on a matter of public concern; and second, we must "balance ... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

*Patrick v. Miller*, 953 F.2d 1240, 1246 (10th Cir. 1992). However, even if the speech is a matter of public concern, and the interests of the employee outweigh the interests of the employer, the [*27] mere utterance of protected speech is not enough. The Plaintiff has the burden not only to show that his conduct was constitutionally protected, but also to show "that this conduct was a 'substantial factor'--or, to put it in other words, that it was a 'motivating factor'" in the adverse employment decision. See *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 287, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977).

The problem with Plaintiff's argument is that he has not provided any evidence to support his theory. In fact, in the approximately 2000 pages of exhibits reviewed by the Court, only three references are made which could reasonably be inferred to relate to Plaintiff's First Amendment claim. However, none of these exhibits offer evidence which would be admissible at trial. Two of these exhibits fail to comply with *Fed. R. Civ. P. 56(e)*, and the third constitutes self-serving speculation on the part of the Plaintiff. Thus, even assuming that Plaintiff engaged in speech which was constitutionally protected, Plaintiff has failed to show that such conduct was a "substantial factor" or "motivating factor" in the decision to end his employment with the state.

Plaintiff's [*28] initial piece of evidence in support of his First Amendment claim is contained in the affidavit of Jeff Taylor, attached as Exhibit A to Plaintiff's Response to Defendants' Motion for Summary Judgment. Therein, Mr. Taylor states at p. 2, P 3,

> I specifically recall a staff meeting which I attended, held after Dr. Cibas had been notified that he would be terminated. To the best of my recollection the staff meeting took place sometime between June of 1987 and January of 1988. At the staff meeting, Bill LeMay, the Director of the Oil Conservation Division was discussing filling the new Natural Gas Marketing positions which had been recently created by Lockwood. It is my best recollection that Bill LeMay stated at that meeting that the Gas Marketer positions were created as exempt positions, rather than classified

positions, so that Gedi Cibas would not be hired.

(emphasis added). This statement fails to provide admissible evidence. First, the statement is inadmissible under *Fed. R. Evid. 802*, and does not fall under any *Fed. R. Evid. 803* or *804* exception. Second, Mr. LeMay is not a Defendant in this action, and the statement does not directly implicate any of the Defendants [*29] in this action. Therefore, even if the statement was not hearsay, without additional foundation the statement violates *Fed. R. Evid. 402* as to the party Defendants.

Plaintiff's second attempt to show a constitutionally improper motive for the separation is equally inadmissible. In a letter dated March 18, 1991 from Carlos J. Ortiz to Denise Glore, attached as Exhibit B to Plaintiff's Response to Defendants' Motion for Summary Judgment, Mr. Ortiz states in relevant part,

> This letter serves to inform you of my discussions with staff members of the Energy, Minerals and Natural Resources Department regarding the reemployment rights of Mr. Gedi Cibas and Mr. John McClure.
>
> Prior to the discussion of Mr. Cibas and McClure, Mr. Kerry Boyd, former Director of the Energy Conservation and Management Division and I had negotiated a salary increase and promotion to a Manager position. We were informed by Ms. Juanita Rosales, Personnel Director of the Department that they could not promote me to the negotiated salary in one single step and if they were to open up the Manager V position for recruitment, they would have to offer the position to Mr. Gedi Cibas and Mr. John McClure as they had [*30] reemployment rights for a defined period of time. I told Ms. Rosales and Mr. Boyd that I didn't think either one of the two would want a position so much lower than they previously held. Ms. Rosales told me that they would probably take it as they were appealing their termination and they were currently unemployed.
>
> As a result of these obstacles in fulfilling our negotiated agreement, they upgraded my existing position and promised to promote me into the Manager V position after the reemployment rights of Mr. Cibas and Mr. McClure had expired.

(emphasis added). The first, and most obvious defect is that this exhibit is simply a letter to Plaintiff's previous attorney. The document is not sworn, and therefore does not qualify as an affidavit for purposes of *Fed. R. Civ. P. 56(e)*. In addition, the letter is also inadmissible under *Fed. R. Evid. 802*.

Plaintiff's last attempt at producing admissible evidence in support of his First Amendment claim, and the only evidence which makes direct reference to a violation of Plaintiff's First Amendment rights, is Plaintiff's own affidavit.

> 94. My "outspokenness" is represented by memos and reports generated, as attested by the various [*31] Exhibits cited above. I contend that to discontinue receiving these memos and reports, and therefore to "eliminate" my "outspokenness", I was targeted for layoff. The right to transfer to other classified positions (which may have meant reassignment to different work prioritized by the new managers) was denied to me by the defendants.
>
> 95. A summary of my "outspokenness" is presented in excerpts from my resume, Addendum A: Public Presentations, B: Analyses and Related Work Products, and C: Publications (see Exhibit 80). This is proof that I spoke out numerous times during three previous gubernatorial administrations, about important matters of public concern to the citizens of New Mexico.
>
> 96. Bill LeMay, who was a close associate of Payton and George Yates, had in January, 1987, become the Oil Conservation Division Director and had frequent contact with all the Defendants. (Exhibit 81 recounts a meeting I had with Mr. LeMay.)
>
> 97. Payton Yates had been placed on the Governor's Oil and Gas Economic Development Task Force. Both Payton Yates and George Yates had through the years often objected to recommendations resulting from my work. Four Task Force meetings to obtain [*32] input from industry as to State policy were held between January and July, 1987 (see Exhibit 82). Item 1 - Oil/Gas Policy, in the February 4, 1987 meeting, appears to show that

the Task Force used an output from the NMEEMS system (see Exhibit 70, cited earlier) as I had prepared it for the New Mexico Department of Finance and Administration (DFA).

. . . .

103. A letter from Governor Carruthers to Defendant Bahr, on June 24, 1987, clearly explains that the Legislature did not adopt the Executive budget. Quoting from the letter: "Further, language was included in each of the reorganization bills which specifically states that staff reductions must be accomplished only through attrition or transfers to other agencies, and by no other means," (see Exhibit 86). Two days after the date of this letter, three "outspoken" employees-- namely, Gordon Venable, John McClure, and myself--lost their jobs through a "layoff."

Plaintiff's Affidavit, attached to Plaintiff's Response to Defendants' Motion for Summary Judgment, at 22-25 (emphasis added). Notwithstanding the fact that Plaintiff's "contentions" constitute speculation and not admissible evidence, Plaintiff's theory fails on its merits. [*33] As best the Court can discern, Plaintiff's theory can basically be summed up as follows: 1) Cibas offered opinions and published reports (which, of course, appears to have been a large part of his job description); 2) some people disagreed with his analysis and conclusions; 3) he was laid-off, therefore, 4) he must have been wrongfully terminated for expressing his opinions in violation of his first amendment rights.

Unfortunately for Plaintiff, his theory relies on conjecture and supposition. To reach Plaintiff's conclusion, and find that a violation of Plaintiff's First Amendment rights in fact occurred, requires the Court to decide that if 1, 2 & 3 are true then 4 must also be true. However, Plaintiff has provided absolutely no admissible evidence by which this conclusion can be reached. In the real world, 1, 2 & 3 do not mandate a conclusion of 4. Plaintiff was in essence an analyst making assumptions to predict the results of legislative changes. Not surprisingly, some people did not agree with the conclusions he reached or the assumptions he made. In fact, if analysts always agreed, thousands of people on Wall Street would be out of a job. Disagreement without causal connection [*34] does not equal improper termination. Plaintiff's theory is missing its vital link, the nexus between his expression and his separation from employment.

Even Plaintiff's conjectural theory suffers from a few analytical defects. First, the vast majority of Plaintiff's expression, and criticism thereto, occurred during previous administrations--some of the things Plaintiff cites occurred six or more years before he was terminated. Second, the person who terminated Plaintiff was a member of the previous administration (although in a different capacity), and there has not been any admissible evidence provided which shows that she didn't like what Plaintiff was doing, or that she had a political agenda divergent from Plaintiff. Finally, if Plaintiff was really the victim of retaliation, it was part and parcel of a rather sophisticated plot that required the State Legislature to reduce the number of FTE positions in the EMD, to then eliminate two departments, form a third and eliminate several positions in addition to the Plaintiffs.

While the Court is not in a position to weigh the relative merits of the evidence submitted, Plaintiff does have the burden of overcoming Defendants' motion [*35] for qualified immunity. As set forth above, to meet his burden, and avoid qualified immunity, Plaintiff must satisfy the two part test set forth by the Tenth Circuit. Plaintiff has failed to even reach the first stage of the test, that is, Plaintiff has not shown that a clearly established right was violated. The Defendants are therefore entitled to qualified immunity on this issue.

### V. PROCEDURAL DUE PROCESS

As the first stage of establishing a claim under the due process clause, Plaintiff must establish that he had a protected property interest.

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily determined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions [*36] are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Board of Regents v. Roth, 408 U.S. 564, 577, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972).* Thus, the determination of whether a protected property interest existed is based on New Mexico law.

The Tenth Circuit has had occasion to examine New Mexico law, and has set forth when a public employee has a protected property interest.

> Noting that whether a property interest in employment exists is determined under state law, the district judge said that New Mexico law is settled that in the absence of an employment contract for a definite term, an employee is terminable at will. However, there are exceptions, one being where personnel regulations or policies prescribe termination procedures.
>
> . . . .
>
> In Bailey, we explained that "we must now hold that a public employee, who could not be suspended except for cause, had a property interest in continued employment, even though the city's suspension provisions may not provide for a right of appeal. [*37] " The property right in Bailey was grounded on a provision in the personnel policies of the city which provided that an employee could not be suspended without pay, demoted or removed from his position except for good and sufficient cause. Bailey points out that the property interest does exist, even though the personnel policies provide for no right of appeal.

*Ewers v. Board of County Comm'rs of County of Curry, 874 F.2d 736, 738 (10th Cir. 1989)* (citation omitted). Plaintiff was a classified employee of the State, entitled to the protection set out in the state personnel manual. As such, Plaintiff had a property interest in continued employment. See also, *Lovato v. City of Albuquerque, 106 N.M. 287, 290, 742 P.2d 499 (1987),*

> It also has been recognized that under New Mexico law a constitutionally protected property interest can arise despite the absence of a statute or formal contract. In the case at bar, the independent source of rules and understandings consists of (1) the city's action in retaining Lovato in the assignment position for thirteen years, and (2) the merit system and personnel rules which pertain to permanent positions. [*38]

(citation omitted). Having determined that Plaintiff had a protected property interest in continued employment, the next question for the Court is whether he received the appropriate process when that interest was taken away.

### A. Pre-Termination Hearing

As a general rule, an employee with a property interest in continued employment is entitled to a hearing prior to being deprived of that interest. See *Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985),*

> An essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." We have described "the root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." This principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment.

(citations omitted, emphasis in original). The Tenth Circuit, however, has indicated that where [*39] a termination results from a reduction in force, a pretermination hearing may not necessarily be required. See *West v. Grand Cty., 967 F.2d 362, 367 (10th Cir. 1992),*

> Several circuits have suggested, without so holding, that the due process clause may not require a pretermination hearing when a termination is the result of a bona fide reduction in force, particularly when the reduction involves a large number of employees and is not directed toward just one employee or a small number of employees. The following factors militate against the need for a pretermination hear-

ing in such circumstances: such terminations are not stigmatizing, job performance is not particularly relevant, and pre-termination hearings may be impractical.

(citations omitted). However, since this language is only dicta in this Circuit, and given the fact that a fairly small number of employees were laid off (although a larger number of positions were eliminated), the Court will assume for purposes of these motions that Cibas was entitled to both pretermination and post-termination hearings complying with Cleveland Bd. of Educ. v. Loudermill. In West, the Tenth Circuit summarized [*40] the case law, and set out the applicable standards for a pretermination hearing.

> The standards for a pretermination hearing are not stringent because of the expectation that a more formal post-termination hearing will remedy any resulting deficiencies. "The pretermination 'hearing,' though necessary, need not be elaborate... 'The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.'" "The pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions-- essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.
>
> A full evidentiary hearing is not required prior to an adverse employment action. The individual entitled to due process protection needs only to be given notice and an opportunity to respond. We have held that pretermination warnings and an opportunity for a face-to-face meeting with supervisors, and a conversation between an employee and his supervisor immediately prior to the employee's [*41] termination, were sufficient to satisfy constitutional requirements.

*West v. Grand Cty., 967 F.2d at 367* (citations omitted, emphasis supplied). Even though the Court is assuming that a pretermination hearing was required in this circumstance, as the Tenth Circuit set out in West, the considerations facing an employee who is about to be laid off are different from those facing an employee who is about to be terminated for cause. See i.d. As set forth above, the Court has found no indication that Plaintiff was terminated in violation of his First Amendment rights, nor has the Plaintiff provided evidence of any other impermissible reason for the termination. In addition, neither side has raised any inference that Cibas was terminated for cause. Cibas' employment record was good, and all indicia of the termination point to a layoff rather than a termination for cause. Therefore, in accordance with the above findings, and in accordance with the application of the doctrine of collateral estoppel, for purposes of the procedural due process analysis the Court shall treat Cibas' separation as a layoff rather than a termination for cause.

A laid off employee [*42] does not have the negative stigma associated with a termination for cause, nor has the employee's job performance been called into question. In such an instance, the purpose of the pretermination proceeding is narrow, and the requirements of process fairly minimal. In the instant case, Plaintiff was clearly given all the process he was due prior to being laid off. Plaintiff had two opportunities to meet with his supervisor, Defendant Lockwood, prior to termination.

> 90. On April 10, 1987 defendant Lockwood told me I would be terminated, based upon lack of funding for my activities. (Exhibit 77 recounts this meeting and another meeting on April 15, 1987.)

Plaintiff's Affidavit, attached to Plaintiff's Response to Defendants' Motion for Summary Judgment, at 22-23. Exhibit # 77 to Plaintiff's Affidavit sets forth Plaintiff's recollection of two separate meetings with Defendant Lockwood, wherein Plaintiff's pending layoff was discussed. While this "Description" is unsworn, it is probably not hearsay under *Fed. R. Evid. 801(d)(2)*, and was also incorporated by reference in Plaintiff's Affidavit. The Court shall therefore treat Exhibit # 77 admissible for purposes of Defendants' [*43] motion.

Plaintiff's first meeting with Defendant Lockwood occurred on April 10, 1987. Cibas recalls that the focus of the meeting was Lockwood's discussion of his impending layoff.

> Defendant Lockwood told me [Cibas] that she had decided to eliminate the Planning and Analysis Office, and that my system analyst and I would be terminated on June 26, 1987; there was no mention of the third staff person working with us.

"Description of Two Meetings with Defendant Lockwood, Based on My Best Recollection" at 1, attached as Exhibit # 77 to Plaintiff's Affidavit. Similarly, at the April 15, 1987 meeting, Lockwood again discussed Cibas' impending layoff,

> She told me not to take my termination personally, that she knew how I felt because she also had lost her job when she was working at the EMD previously; and that she would not reconsider her decision and that I should not have trouble finding employment because I had a good reputation.
>
> Both meetings described above were very brief, approximately 10 minutes each. The certainty as to my departure was very clear, even though two and a half months remained prior to the so-called "layoff " -- more than adequate time [*44] to process a transfer to a comparable job. Especially the second meeting had a tone of finality, it was an announcement that I had no future in the Department since a classified position I qualified for, a position not included in the layoff plan, becoming vacant and available within a week, was being withheld from me.
>
> . . . .
>
> Defendant Roybal did not attend these meetings but described them later in a memo date [sic] June 22, 1987 as "informal grievance conferences" that had been provided to me.

Id. at 2-3. See also, Memorandum of April 16, 1987 from Anita Lockwood to Files, attached as Exhibit # 2 to Deposition of Juanita Rosales.

> Discussions were held with the following employees on the following dates to explain that they were directly affected by the layoff plan to be submitted to the State Personnel Office in the memo of April 10 as attached.
>
> April 2: Jeff Sloan - Attorney 5
>
> April 10: Gedi Cibas - Energy Consultant A
>
> John McClure - Systems Analyst 2
> April 13: Anita Hisenberg - Deputy Director 4-A
>
> Mr. Gedi Cibas then met with me on April 15 to discuss his situation in detail.

(emphasis supplied). In addition, by [*45] letter dated June 1, 1987, Plaintiff was provided with written notice of his pending layoff. Under the standards set forth in the Loudermill decision, and as applied by the Tenth Circuit in West, the two meetings with Defendant Lockwood, coupled with the written notice of layoff, more than satisfied the pretermination process to which Plaintiff was entitled. Plaintiff was given both oral and written notice of his impending separation from employment, was informed as to the reasons for the separation, and had the opportunity to discuss his situation with the person responsible for the separation on two separate occasions. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. at 546,

> The essential requirements of due process, and all that respondents seek or the Court of Appeals required, are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence [reasons], and an opportunity to present [*46] his side of the story.

(emphasis supplied). In addition, Plaintiff did not suffer from a stigmatizing termination for cause, and had the opportunity for a full evidentiary hearing post-termination. The Court finds, therefore, as a matter of law, that Plaintiff was afforded all of the pretermination process he was due. The Court finds that Plaintiff has failed to show a constitutional deprivation of his right to pretermination process. The Court finds, therefore, that qualified immunity is appropriate under these circumstances.