Notwithstanding that the process afforded to Cibas satisfied the constitutional minima, the Court also notes that Plaintiff was apparently offered, but declined, additional pretermination procedure. Under the grievance procedures set forth by the Energy and Minerals Department, Plaintiff, who was separated by an action of the Secretary, was not entitled to formal grievance procedures within the department. However, additional informal grievance procedures were available. See "State of New Mexico Energy and Minerals Department Grievance Procedures" at 1, attached as Exhibit # 17 to Plaintiff's Affidavit. The Court concludes, therefore, that [*47] even in Plaintiff was entitled to additional pretermination process, qualified immunity is appropriate because a reasonable person, given the facts and circumstances of this case, would not recognize that Plaintiff's rights had been violated.

F. EXCEPTIONS TO GRIEVANCE PROCEDURES

> 1. The following matters are not grievable under this procedure:
>
>> (a) Formal Grievances against the Secretary. Pre-grievance conferences and informal grievance procedures are available for grievances involving the Secretary. In such cases the Deputy Secretary shall exercise the authority granted to the Secretary by these Procedures, unless the Deputy Secretary is a party to the complaint giving rise to the grievance. In such cases, the Assistant Secretary shall exercise such authority. If the grievance cannot be resolved through the informal procedures, any other action must be filed with appropriate State and Federal agencies.

(emphasis supplied). Although the Court is not bound by the decision, the opinion written by the State Personnel Office Hearing Officer is illuminating on this point.

On June 10, 1987, Cibas filed a grievance with the EMD under the agency's [*48] grievance procedures. On June 22, 1987, Charles Roybal ("Roybal"), General Counsel to the EMD, informed Cibas that the proposed layoff was a Secretarial action and was not subject to formal grievance. Roybal informed Cibas on July 10, 1987, that pregrievance conferences were available under the agency's procedures. Cibas declined the offer of an informal meeting with Lockwood. On July 24, 1987, Roybal again informed cibas that grievance conferences and informal grievance procedures were the only procedures available in his case. Cibas did not respond.

"Recommended Decision" at 3, attached as Exhibit # 94 to Plaintiff's Affidavit. Thus, even were this Court to determine that additional pretermination process was necessary, the evidence suggests that Plaintiff waived his right to those procedures.

B. Post-Termination Hearing

The post-termination proceeding is where Plaintiff should receive the majority of his constitutionally prescribed process. Determining whether adequate post-termination process was provided in this instance can be broken into two separate inquiries. First, the Court must ask whether the hearing afforded to the Plaintiff was procedurally [*49] sufficient. Second, as a sub-part of the initial inquiry, the Court must determine whether such process was provided within a constitutionally sufficient timeframe.

As an initial matter, the Court notes that it is generally well-settled that a procedural due process claim under *42 U.S.C. § 1983* cannot be maintained where the state provides an adequate procedure for compensation. See e.g. *Parratt v. Taylor, 451 U.S. 527, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981)*, partially overruled on other grounds, *Daniels v. Williams, 474 U.S. 327, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986)*. This is true even in a situation where the state remedy fails to provide all of the relief available under § 1983 (e.g. punitive damages or a trial by jury). See *451 U.S. at 544*. Thus, while the analysis is difficult to segregate, where an on-going state proceeding offers a remedy capable of making the Plaintiff whole (in this case reinstatement and backpay), the Court's Due Process inquiry may be over. However, for purposes of completeness, the Court shall examine the adequacy of the state procedures.

1. Procedural Sufficiency

As can be gleaned [*50] from the discussion of pre-termination due process requirements, post-termination process is the critical step in affording the appropriate process before a constitutional deprivation occurs.

> "Because the post-termination hearing is where the definitive fact-finding occurs, there is an obvious need for more formal due process protection at that point." We agree with the district court that West received an adequate post-termination hearing. West appeared before the Commissioners for a grievance hearing. She was represented by counsel, and she presented testimony and witnesses on her behalf.

*West v. Grand Cty.*, 967 F.2d at 369. In this matter, it seems evident that Plaintiff received all of the post-termination process which he was due. In fact, as stated above, Plaintiff's previous attorney has attested, under oath, that,

> The parties to the administrative process had two years of preparation between the time of Dr. Cibas' layoff and the final decision by the State Personnel Board. All parties were represented by counsel, had a full and fair opportunity to present evidence, witnesses, direct and cross examination, and numerous pleadings.

In [*51] addition, Plaintiff's attorney during the administrative hearing has also described the completeness of the process afforded.

> Q. How did you know that Mr. Stovall knew that it was supposed to be a full-blown hearing?
>
> A. I sat through the whole thing with him, and unless the man was unconscious, he heard the same thing I did. There were writings, you know, we went through a whole day of hearing where we were litigating the issues of the case, and then we had like a week to ten-day recess, and it was clear to me during the first full day or two of the hearing what we were doing. The hearing officer made it clear how she was going -- her decision-making process. We were litigating things that clearly had to do with the merits of the case, and for him to sit there and make an Affidavit, "Oh, I didn't know that we were in trial," I thought was taking gross liberty with the truth.
>
> Q. Okay. Now, how long did this last, this administrative hearing?
>
> A. I have no idea. It seems to me like -- I know it was around Thanksgiving. . . . But we came and had a hearing before Thanksgiving, and it seemed to me like he had to go back east somewhere for the holidays or for CLE, or [*52] something like that. So we may have gone a day or a day and a half, then we had Thanksgiving, then we all come back and finished it at sometime later, that was another day or day and a half. I would say probably two to three days was probably the length of the hearing, but it was not consecutive days.
>
> Q. So you've told me how you think Mr. Stovall knew or should have known that it was a hearing on the merits because he sat through the hearing. How about before that? How do you know that he knew beforehand?
>
> A. We had a prehearing conference. We had a Prehearing Order. He wrote me a letter -- this is really funny. He wrote me a letter that said, since it doesn't appear that I'm going to be able to avoid a hearing in this case, I need some information from you. And he's asking me for information that the only way I could give it back to him was to have the documentation that he was supposed to have produced to me a long time ago anyway. I think I marked it because it was an outrageous letter, especially in light of his representation.

Deposition of Frank P. Dickson, Jr. at 27-29, March 8, 1991, attached to Plaintiff's Response to Defendants' Motion for Summary Judgment. [*53]

The Court finds that the procedures provided by the administrative hearing were more than adequate to meet due process requirements. In addition, both the Plaintiff and the Defendants had the right to appeal into the state

courts to remedy any procedural defects. The state courts have the authority to overturn any decision of the State Personnel Board which is "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence; or (3) otherwise not in accordance with law." *§ 10-9-18(G) NMSA* (Michie 1992 Repl.). Under these circumstances, the Court has no difficulty finding that the requirements of due process were met in Plaintiff's post-termination hearing.

For purposes of the qualified immunity analysis, the Court finds that no constitutional inadequacy has been shown. However, even if the procedures were not adequate, the Court finds that the departure from constitutional mandate was so slight that a reasonable person would not have realized Plaintiff's rights were violated, therefore, qualified immunity shall be granted.

### 2. Timeliness of Hearing

Plaintiff also tries to assert that procedural due process was denied because the final decision [*54] was not rendered by the board until almost two years after termination. According to the Loudermill Court, "The Due Process Clause requires provision of a hearing 'at a meaningful time.' At some point, a delay in the post-termination hearing would become a constitutional violation." *Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 84 L. Ed. 2d 494, 105 S. Ct. 1487.* The Supreme Court has not provided a bright line test to determine when a delay in post-termination proceedings crosses the line and becomes a constitutional violation. The Court, however, has provided some general guidance.

> For even though there is a point at which an unjustified delay in completing a post-deprivation proceeding "would become a constitutional violation," the significance of such a delay cannot be evaluated in a vacuum. In determining how long a delay is justified in affording a post-suspension hearing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by the delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the [*55] interim decision may have been mistaken.

*F.D.I.C. v. Mallen, 486 U.S. 230, 242, 108 S. Ct. 1780, 100 L. Ed. 2d 265 (1988).* Therefore, this Court must examine not only the fact that two years elapsed before a decision was rendered, but also must seek the reason for the lapse before determining whether the delay carried otherwise adequate process into unconstitutional territory. The proposed decision of the hearing officer is useful in setting forth the procedural history of the administrative action.

> This matter was heard on November 17 and 29, 1988, pursuant to an appeal filed on June 12, 1987, by Frank Dickson, Jr. ("Dickson"), counsel for Cibas. The letter of appeal was dated June 10, 1987, and was addressed to both Dr. Natalie Babcock ("Babcock"), Acting Director of the SPO, and Lockwood, Acting Secretary of the EMD.
>
> . . . .
>
> On June 18, 1987, Hearing Officer Kolberg informed Dickson that no action had been taken by the agency which could be appealed to the SPB. Under § 10-9-18 NMSA 1978 appeals could only be brought when an employee had been demoted, suspended, or dismissed. In this case, the issue was not yet ripe for adjudication because there had not yet been a separation from employment. [*56]
>
> On July 15, 1987, Kolberg wrote Lockwood requesting information in order to determine if Cibas has any colorable claim to an appeal within the jurisdiction of "this office." Kolberg did not specifically address the issue of appeal of the denial of a grievance under SPB Rule 16.2 which says that "Each agency will establish an orderly procedure for the resolution of complaints." On July 17, 1987, Kolberg informed Roybal that Cibas now had a right to appeal because the EMD had issued its final decision and proceeded with the layoff.
>
> On August 28, 1987, the EMNRD filed a Brief-in-Chief in support of the EMD's position with regard to the layoff. On or about August 31, 1987, the EMNRD submitted a substituted Brief-in-Chief. The only difference in the two briefs was the named person on whose behalf the brief was submitted. The August 28, 1987, brief was submitted on behalf of Tom Bahr ("Bahr") in his official capacity as Secretary of the EMNRD. The August 31, 1987, brief was submitted on behalf of Lockwood in her official capac-

ity as Deputy Secretary of the EMNRD and former Acting Secretary of the EMD.

. . . .

On September 14, 1987, a letter from Dickson memorializes a telephone conversation [*57] in which Kolberg agreed to extend the time for filing the Appellant's response brief. The deadline was extended to September 22, 1987; on October 4, 1987, it was extended again until October 7, 1987. Kolberg left the SPO effective November 13, 1987. Carleton was hired by the SPO effective December 8, 1987. The Cibas case was one of the cases assigned to her.

On January 7, 1988, Dickson filed a Brief in Opposition to Action of Layoff or Termination. In that Brief he stated:

* * *

. . .Under State Personnel Board Rule 16.2(c), complaints filed under an agency's dispute resolution procedure may be appealed to the Director of the State Personnel Office. In this case, we are claiming on the one hand an appeal from the grievance that was filed by the letter of June 10, 1987...On the other hand, we also assert that the "layoff" was a ruse to avoid the just cause standards of the "Personnel Act" and, as such, is subject to appeal in accordance with State Personnel Board rules. At this point, we are apparently at the stage where the hearing officer is making the effort to determine what forum, if any, is applicable to this case.

On January 11, 1988, Carleton acknowledged receipt [*58] of the appeal and set a prehearing conference.

. . . .

The hearing officer granted Cibas the right to a full evidentiary hearing based on Attorney General Opinion 62-138.

. . . .

On July 1, 1988, the newly appointed counsel for the EMNRD, Robert Stovall, wrote to the [sic] Dr. Babcock, State Personnel Director, requesting that the hearing be vacated. He requested Dr. Babcock to review the EMD's position and vacate the hearing "because you cannot give the relief sought, that the hearing would be a waste of time for everyone involved, most particularly your hearing officer, EMNRD and the multiple witnesses who may be called."

Dr. Babcock responded with a letter dated July 7, 1988. In that letter she declined to review the EMD's position. She also stated:

* * *

. . .If it is determined that the layoff was a layoff, the State Personnel Board has no jurisdiction. The September, 1988, hearing is to determine if the facts and circumstances support the Department's allegations that the termination was a layoff and not a dismissal as the Appellant claims.

The hearing was held on November 17, 1988, and November 28, 1988.

"Recommended Decision" at 6-12, attached [*59] as Exhibit # 94 to Plaintiff's Response to Defendants' Motion for Summary Judgment. The record makes obvious numerous reasons for the delay, only some of which can be attributed to the Defendants in this action. Perhaps most telling is the fact that the hearing officer assigned to the case left the State Personnel Office, and a new hearing officer had to be hired and appointed to the case. In addition, Plaintiff himself was at least partly responsible for the delay. His counsel asked for a delay to file a responsive brief, and did not finally file the brief until substantially after the extension of time expired. The majority of the delay, in fact, appears to have arisen within the

State Personnel Office itself. This delay, however, was beyond the control of the Defendants to this action.

For purposes of analyzing the delay under a qualified immunity analysis, the question presented is whether a reasonable person would have known that the delay violated Plaintiff's rights.

> Colins claims that the 19 months from the time of his request for an administrative hearing to the resolution of his case clearly violated his due process right to prompt postsuspension proceedings. [*60] In *Cleveland Bd. of Education v. Loudermill, 470 U.S. 532, 547, 105 S. Ct. 1487, 1496, 84 L. Ed. 2d 494 (1985)*, the Supreme Court did note that, "at some point, a delay in the post-termination hearing would become a constitutional violation." A 9-month adjudication process, however, was not found unconstitutionally lengthy per se. And the Court observed that, absent evidence of unreasonable prolongation by defendants, the fact of a long hearing process may suggest only that the process was thorough. Most important for qualified immunity purposes, Loudermill established no bright line test for when a delay would become a constitutional violation.
>
> No controlling decision involved facts materially similar to the ones that are undisputed by Collins in this case; so, the law did not clearly proscribe defendants' acts when they acted. The delays caused by the defendants here were far less substantial than those at issue in Loudermill. The School Board referred the Collins matter to the DOAH within eight days of his request for a hearing. And once the DOAH's officer made her recommendation, the Board compensated Collins in a little over a month. For the [*61] 17 to 19 months in question, the course of the proceedings was outside the control of the Dade County School Board officials. That Collins caused much of the delay is also important.
>
> Although the hearing ultimately exonerated Collins, this fact entitles Collins to no retroactive relief against Dade County school officials for failing to exonerate him faster. At the time defendants acted by referring the Collins matter to the appropriate state agency and then by waiting for the ordinary process to conclude, they violated no clearly established law.

*Collins v. School Bd. of Dade County, 981 F.2d 1203, 1205-06 (11th Cir. 1993)* (emphasis supplied). Similarly, there is no showing that the Defendants in this matter acted improperly to delay the state proceedings. The matter was brought expeditiously to the State Personnel Office, and the remainder of the delay occurred due to the ordinary progress of the case.

Simple delay, without more, is not per se unconstitutional. Under the Mallen factors, the Plaintiff's private interest in re-employment is outweighed in this situation by the interests of all parties in receiving a fair and just adjudication of [*62] the issues. Therefore, the Court finds for purposes of the qualified immunity analysis that the delay did not rise to the level of a constitutional violation. However, in the event that the delay was unlawful, the Court finds that the Defendants are entitled to qualified immunity on this issue. See also, *DeVito v. Chicago Park Dist., 972 F.2d 851, 855 and 857-58 (7th Cir. 1992)*,

> The trial court determined that the reasons for the delay in Mr. DeVito's hearing were "an administrative 'bottleneck' created by a revamping of the [Park] District's disciplinary rules and procedures, coupled with employee turnover in the department handling disciplinary cases and finally, the fact that Mr. DeVito's case, which involved medical evidence was more complicated than most."
>
> . . . .
>
> We think that the balance of the three Mallen factors weighs in favor of the Park District. Accepting that Mr. DeVito's private interest in continued employment the Park District is an important interest, we think the Park District provided protection to that interest by scheduling a pretermination hearing. The record supports the Park District's assertion that an administrative bottleneck [*63] in processing discipline cases contributed to the delay in granting Mr. DeVito's hearing. . . .
>
> . . . .

There is similarly not enough evidence to support Mr. DeVito's claim that "someone" in the Park District intentionally delayed his claim. While we sympathize with Mr. DeVito--he was without pay for a year while he was waiting for his post-termination hearing--we do not believe that his wait, in light of the circumstances presented in the record of this case and the fact that Mr. DeVito received an adequate predeprivation hearing, was so long that it reached the point of a constitutional violation. We think the district court correctly granted summary judgment in favor of the Park District.

Plaintiff has also raised the issue of the delay caused by the Department's appeal of the administrative decision. The Department has a statutory appeal as of right to the State District Court pursuant to § 10-9-18(G) (Michie 1992 Repl.), and the exercise of the right to appeal acted to stay the reinstatement order. See *State ex rel. N.M. Highway Dept. v. Silva*, 98 N.M. 549, 556, 650 P.2d 833 (N.M.Ct.App. 1982); Rule of Civ. Proc. 62(E) (Michie 1992 Repl.). Given that **[*64]** the Department is fully within its rights in appealing the decision to the state court, it would be entirely inconsistent with Defendants' Due Process rights to punish them for exercising their right to appeal. Defendants are not in control of the length of time necessary to process their appeal, nor has there been any showing of purposeful delay. Furthermore, should Plaintiff ultimately prevail in the state proceedings, he will be entitled to back-pay and benefits through the pendency of the appeal. The Court finds, therefore that the delay resulting from the appeal does not constitute an improper delay.

## VI. BUMPING RIGHTS

As part of Plaintiff's claims for deprivation of his rights under the procedural and substantive elements of the Due Process Clause, Plaintiff claims that he was deprived of a property interest by not being allowed to transfer into another position with the Department. Bumping rights are a property interest which cannot be denied without due process. See *Alexander v. City of Menlo Park*, 787 F.2d 1371, 1374 (9th Cir. 1986). As with Plaintiff's right to employment, the scope of this interest is created and defined by state law. Therefore, **[*65]** we must first inquire as to the limits of Plaintiff's right to either "bump" another employee or be rehired in another position, and then determine whether Plaintiff was afforded his rights.

According to *§ 10-9-19 NMSA* (Michie 1992 Repl.),

> Whenever an employee is terminated by an employer in a reduction in force by the employer, the terminated employee shall be rehired by that employer if the same or a comparable position becomes available in an increase of force within six months after the termination.

This requirement has been further defined by the State Personnel Office. The "Bumping Rights" claimed by Plaintiff are set out in a memorandum from the State Personnel Director, dated March 31, 1986,

> 3. Identification and Appoval of Units
>
> Each agency shall prepare a written identification of organizational unit groupings for purposes of layoff. These organizational groupings must be approved by the State Personnel Board, or in emergency situations, by the State Personnel Director if time does not permit consideration by the Board.
>
> . . . .
>
> 4. Notification of State Personnel Office
>
> Agencies will notify the State Personnel Director **[*66]** and agency employees of the need for layoff as soon as it becomes evident. All actions such as promotions, transfers and reclassifications which have an effect on the layoff process will be frozen upon such notification. The notification must contain the following:
>
>> A. The approved organizational units to be affected by layoff.
>>
>> B. The specific positions within each classification which will be abolished.
>
> 5. Layoff Order
>
> . . . .
>
>> C. Permanent and term permanent employees whose positions have been

targeted for deletion, but who have the highest seniority in the classification within the agency are "transferred" by virtue of management rights to positions within the organizational unit which will be vacated by the least senior incumbents of that same class.

. . . .

D. Definition of terms which affect layoff order

. . . .

(3) An Organizational Unit is the grouping of organizational components of an agency which have been approved by the State Personnel Board for layoff and to which layoff and displacement rights will be confined.

. . . .

6. Displacement Rights

Only permanent and term employees (those with [*67] more than one year of classified service) who have a summary evaluation of "met performance criteria" or its equivalent, and are designated for layoff are entitled to exercise a displacement right.

A. Displacement rights may only be exercised when the employee designated for layoff has more seniority in a classification within the agency than others holding the classification in that organizational unit.

B. The displacement rights extends only to classifications which have been actually held by an employee during his/her tenure with the agency.

. . . .

G. Employees who have no options available within the designated organizational unit to exercise displacement rights, or employees who decline to exercise such rights or employees who are otherwise unable to displace under this procedure shall be laid off and shall be afforded re-employment rights in accordance with SPB Rules 6.3 and 6.5 and as outlined in Paragraph 10 of this memorandum.

H. Salaries must be reduced when the displacement right is exercised to a classification with a lower range. Agencies must determine the level of salary decrease to be applied in these cases and insure uniform application [*68] throughout the agency.

"State Personnel Office General Memorandum 34" at 1-5, attached as Exhibit # 55.

Plaintiff's argument as to his "bumping" rights seems to stem not from the fact that he was denied the opportunity to displace a less senior person in the same job classification, but rather that certain of the Defendants defined his job classification too narrowly. In fact, the Plaintiff does not dispute that no positions within his job classification, "Energy Consultant-Option A", were available. Under the Court's reading of the above cited personnel rules, Plaintiff's "bumping rights" are limited to positions where the "employee designated for layoff has more seniority in a classification within the agency than others holding the classification in that organizational unit." Where there are no positions in that classification which fit the criteria, Plaintiff's rights are limited to the rights of re-employment discussed below.

The Court finds that Plaintiff has failed to state a constitutional claim with regard to his bumping rights for two reasons. First, Plaintiff has not provided any evidence which would indicate that he was denied bumping rights for a position [*69] within his job classification, Energy Consultant-Option A. This Court does not have the expertise to define job classifications for the state, and therefore the determination of whether the Department properly classified his position is beyond the scope of review of this Court. See, e.g., *DiPiro v. Taft*, 584 F.2d 1, 3 (1st Cir. 1978) ("The federal courts are not super personnel boards ordained to reevaluate appointments and dismissals made in the course of state and local government operations"); *Dodson v. U.S. Govt., Dept. of Army*, 988 F.2d 1199, 1205 (Fed.Cir. 1993) ("This Court does not sit as a super-selection board making personnel decisions for the Army").

Second, assuming, ad arguendo, Plaintiff had the right to bump into positions outside of his defined classi-

fication, he has not provided any information to show that he actually had bumping rights into any other classifications, e.g. other options of the Energy Consultant position. To "bump" into a position outside of his classification, at minimum he must show with regard to those classifications 1) he actually held that classification during his tenure with the agency; and 2) [*70] that he was more senior, in that position, than the person he sought to bump. Plaintiff has not shown that both of those conditions were satisfied as to any other position outside of his classification.

Having determined that Plaintiff failed to establish a deprivation of his right to "bump" into another position, the Court must now examine whether he was deprived of a right to be rehired. As set forth in the memorandum cited above, if a displaced employee cannot bump into another position, he is limited to those rights set forth in State Personnel Board Rules 6.3 and 6.5. The above cited memorandum provides a good summary of those two rules.

10. Reemployment Rights for Laid-off Employees

There are two different provisions extended to laid-off employees which govern reemployment. The first provision is a "right" extended only to employees who were laid off; the second is available to employees who leave state government "in good standing" and includes employees laid off. The rules and procedures to implement these provisions are outlined below.

A. Reemployment Right Within Agency

After exhausting the master "restoration" list, former employees who were [*71] laid off, and who comply with and meet the following requirements have a right to be offered vacancies which occur in the agency from which laid off. This right extends for 6 months from the effective date of layoff.

(1) Such employees are required to submit an updated application within the specified time. The application is used to identify those classifications within the agency for which such employee qualifies.

(2) After an analysis of the application, each laid-off employee will be notified of the classifications for which he/she qualifies.

(3) Laid-off employees must indicate to the agency in accordance with agency established procedures the following:

(a) Those classifications in which reemployment would be accepted by them from among the classes for which they are qualified. The reemployment right extends only to classifications equal or lower in range to the last classification held in the agency.

(b) The minimal acceptable salary.

(c) The geographic locations in which one is willing to work.

(d) The status one is willing to accept (Permanent, Term, Temporary or Part-time).

. . . .

B. Reemployment With Other State Agencies [*72]

Former employees who were laid off may be considered for reemployment in other agencies without having to be certified from competitive employment lists. This provision extends to 2 years from the date of separation from the state. Such employees:

(1) May be reemployed to their former classification, or a lower classification in the same series. . . .

(2) May be reemployed in a different classification series at the same or lower sal-

ary range than the one held at the time or separation...

"State Personnel Office General Memorandum 34" at 1-5, attached as Exhibit # 55. The facts are uncontroverted that Plaintiff exercised his displacement rights and was given a list of all classifications for which he was qualified. However, Plaintiff narrowly defined his salary requirements and the geographic location in which he was willing to work. Plaintiff inquired about, and was offered a position as a "Financial Specialist III," however, the position was at a salary range substantially below the range sought by the Plaintiff. Plaintiff refused the position in a memorandum which stated in part,

> Unfortunately, the career and financial implications [*73] of my acceptance of that position would be so devastating that I am unable to accept. I have worked many years for my range, salary, and professional status in State government; and the position offered does not begin to approximate that which has been taken from me by the "layoff". Because of the obvious financial implications of a reduction to 47% of my previous salary, I simply cannot sustain myself and my family with that sort of salary cut.

"Memorandum from Gediminas A. Cibas to Juanita Rosales" dated July 3, 1987, attached as Exhibit # 87 to Plaintiff's Affidavit. After refusing an offered position, Defendants were entitled to rely on the following paragraph from the State Personnel Board Rules, dated October 20, 1986,

> 2. Any individual who refuses or fails to respond to an offer of reemployment in the same or other positions with the same range, type of appointment, and geographic area, from which laid off will be removed from the agency's reemployment list.

"SPB Rule 6" at 6-3, attached as Exhibit # 57 to Plaintiff's Affidavit (emphasis added). After Plaintiff's refusal of a job at a salary range below his previous salary, Defendants [*74] reasonably assumed that Plaintiff would not accept such a position, and, in accordance with the above cited rule, did not offer him any other positions below his previous salary level. The simple fact of the matter is that no positions were available which met Plaintiff's salary and geographical requirements. Plaintiff's argument that he should have been offered, in writing, every open position within the department is nonsensical.

With regard to positions outside of his department, Plaintiff's argument is equally unpersuasive. Reemployment outside of the department is purely permissive under rule 6.5, and therefore did not create a protected property interest. Put simply, Plaintiff has failed to provide evidence of the existence of any position to which he had bumping or reemployment rights and which satisfied his salary and geographic requirements. Plaintiff has therefore failed to show an improper deprivation of a property interest in violation of the procedural aspects of the due process clause. In addition, Plaintiff has failed to show the personnel board's rules were not followed, and therefore cannot show an arbitrary or capricious action in violation of the substantive aspects [*75] of the due process clause. However, even assuming that either such deprivation occurred, Plaintiff has fallen far short of his burden to defeat qualified immunity, and therefore the Court would grant qualified immunity in favor of the Defendants on this issue.

### VII. SUBSTANTIVE DUE PROCESS

Plaintiff's final allegations are based on alleged deprivations of his right to substantive due process under the Fourteenth Amendment. The Eleventh Circuit, in a recent and well-written en banc opinion, held that a substantive due process claim could not arise out of the termination of public employment unless a claim was made showing that the termination was the result of a curtailment of a fundamental constitutional right.

> Whether an individual complains that a state lacks constitutionally adequate procedures for termination of employees or assets that his particular hearing was not fair and impartial, he has raised only procedural due process concerns.
>
> . . . .
>
> When these [United States Supreme Court] cases are examined, it becomes evident that the law in this circuit diverges from Supreme Court precedent in three distinct and important ways. First, unlike our cases, [*76] Supreme Court precedent demonstrates that an employee with a property right in employment is protected only by the procedural component of the Due Process Clause, not its substantive component. Because employment

rights are state created rights and are not "fundamental" rights created by the Constitution, they do not enjoy substantive due process protection.

The second error in this circuit's law is that it allows a terminated employee to sue in federal court under section 1983 before the employee utilizes appropriate, available state remedial procedures. When a state procedure is inadequate, no procedural due process right has been violated unless and until the state fails to remedy the inadequacy. By converting pretextual terminations into substantive due process violations, however, our circuit's law forecloses the state's ability to remedy the procedural failings of its subdivisions and agencies in the appropriate fora--agencies, review boards, and state courts. . . .

Finally, this circuit's law provides an inappropriate remedy to pretextually terminated employees. As we stated above, the appropriate remedy for a pretextual termination is not damages calculated on the [*77] employee's potential earnings for the rest of his or her working life, but rather procedural, equitable remedies: reinstatement and a directive that proper procedures be used in any future termination proceedings.

The Supreme Court's analysis clearly distinguishes between procedural and substantive due process rights, violations, and remedies. To date, however, our cases have confused these two categories and incorrectly placed the claims of pretextually terminated employees on the substantive due process side of the ledger. Today, however, we hold that, in non-legislative cases, only procedural due process claims are available to pretextually terminated employees.

*McKinney v. Pate, 20 F.3d 1550, 1559-60 (11th Cir. 1994)*(emphasis supplied); see also, *Sutton v. Cleveland Bd. of Educ., 958 F.2d 1339, 1350-51 (6th Cir. 1992),*

We conclude that plaintiffs' state-created right to tenured employment lacks substantive due process protection.

Although the court has not specifically addressed the question whether an interest in tenured employment rises to the level of a "fundamental" interest protected by substantive due process, we have [*78] recently addressed the scope of substantive due process when answering the question whether a public employee could assert a substantive due process right to promotion.

> We conclude that no such right exists. Most, if not all, state-created contract rights, while assuredly protected by procedural due process, are not protected by substantive due process. The substantive Due Process Clause is not concerned with the garden variety issues of common law contract. Its concerns are far narrower, but at the same time, far more important. Substantive due process "affords only those protections 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" It protects those interests, some yet to be enumerated, "implicit in the concept of ordered liberty," like personal choice in matters of marriage and the family.
>
> State-created rights such as [plaintiff's] contractual right to promotion do not rise to the level of "fundamental" interest protected by substantive due process. Routine state-created contractual rights are not ... so vital that "neither liberty nor justice would exist if [they] were sacrificed."

*Charles v. Baesler, 910 F.2d 1349, 1353 (6th Cir. 1990)* [*79] (citations omitted).

Although Baesler did not conclude that all state-created contract rights lack substantive due process protection, and specifically left unanswered the question whether substantive due process may protect a contract right to keep a tenured job, we are persuaded by the reasoning of Baesler that plaintiffs' statutory right to be discharged only for cause is not a fundamental interest protected by substantive due process.

Here, as in Baesler, we find persuasive Justice Powell's concurrence in *Regents of University of Michigan v. Ewing, 474 U.S. 214, 229, 106 S. Ct. 507, 515, 88 L. Ed. 2d 523 (1985)*:

> Even if one assumes the existence of a property right, however, not every such right is entitled to the protection of substantive due process. While property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, substantive due process rights are created only by the Constitution.

Absent the infringement of some "fundamental" right, it would appear that the termination of public employment does not constitute a denial of substantive due process. Since [*80] the legal basis relied upon for plaintiffs' terminations is not clearly developed in the record, and since plaintiffs may have adequate state remedy on remand that will compensate them for any interference with their right to tenured employment, we conclude that plaintiffs do not have a cognizable substantive due process claim.

The Tenth Circuit does not appear to have ever directly addressed this issue. In *Archuleta v. Colorado Dept. of Institution, 936 F.2d 483, 489 (10th Cir. 1991)*, the Tenth Circuit assumed, without so holding, that a property interest in continued public employment was entitled to protection against arbitrary and capricious deprivation under Fourteenth Amendment substantive due process. The Tenth Circuit did not reach the issue, however, because they found that the plaintiff in the Archuleta case had not shown injury.

The Court finds that the Eleventh Circuit's reasoning is clear and well thought out and should therefore be adopted. The Court finds, therefore, that Plaintiff's due process remedy is limited to the protections of procedural due process, and does not include a claim under the substantive portions of the Due Process Clause. [*81]

Notwithstanding the above conclusion, the Court also finds that the substantive due process claims fail on their merits for two other reasons. First, applying collateral estoppel to this issue, Judge Herrera found that Plaintiff's separation was a bona fide layoff, therefore, by definition, not arbitrary and capricious. See *Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1077 (3rd Cir. 1990)*,

> We have already determined that preclusive effect must be given to the state finding that defendants could properly terminate Bradley for failure to adhere to the prohibition on Learnball. In light of the preclusive finding that there was a legitimate basis for his termination, we cannot say that the firing was so arbitrary and capricious as to violate substantive due process.

Finally, a direct analysis of the substantive due process claim yields a determination that the action taken was not arbitrary and capricious. The Plaintiff's department, the Planning and Analysis Office was eliminated based upon the recommendation contained in at least one report. Plaintiff was not selected in an arbitrary or capricious manner for layoff, but rather happened to be in a position [*82] targeted for elimination under the Department's layoff plan. This layoff plan was drafted by the Department, and then approved by the State Personnel office, before it was implemented. See "Deposition of Juanita Rosales, taken March 25, 1991" at 9, attached to Plaintiff's Response to Defendants' Motion for Summary Judgment. The Court finds nothing arbitrary or capricious in the manner in which Plaintiff was selected for layoff, nor in the manner in which Plaintiff was laid off. Plaintiff has therefore failed to show a constitutional violation. In the alternative, even if Plaintiff's substantive due process rights were violated, the Defendants followed the procedures set forth by the state. Defendants were entitled to rely on these procedures, and therefore are entitled to qualified immunity on this issue.

VIII.    EQUITABLE    CLAIM    AGAINST NMEMNRD

Having found that Plaintiff has failed to set forth a compensable constitutional violation by the Defendants, the Court must also dismiss the equitable claim against the Energy Minerals and Natural Resources Department of The State of New Mexico. See *City of Los Angeles v. Heller, 475 U.S. 796, 799, 89 L. Ed. 2d 806, 106 S. Ct. 1571 (1986).* **[*83]**

### IX. CONCLUSION

In conclusion, after conducting a thorough review of approximately 2000 pages of exhibits, reviewing all of the briefs and memoranda submitted by the parties, taking judicial notice of the decision rendered by state district Judge Herrera and hearing oral argument, the Court has concluded that Defendants' Motion for Summary Judgment is well-taken and should be granted. As set forth above, the first burden on a Plaintiff seeking to defeat a motion for qualified immunity is to show that a clearly established law or right has been violated. Plaintiff has not met this burden, and, even assuming that he could meet this burden on any or all of the claims stated, Plaintiff has not shown that a reasonable person in the shoes of any of the Defendants would have understood that their actions violated Plaintiff's rights or violated clearly established law. Defendants' motion, with respect to qualified immunity, shall therefore be granted in full, and judgment entered in favor of the Defendants on all issues.

An order in accordance with this opinion shall be entered.

August 22, 1994

John E. Conway

UNITED STATES DISTRICT JUDGE