UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

STATE EMPLOYEES BARGAINING
AGENT COALITION, ET AL,

        Plaintiffs,

V.

JOHN G. ROWLAND, ET AL,

        Defendants.

        :
        :
        :
        :
        :    CIV. NO. 3:03CV221 (AVC)
        :
        :
        :
        :    DECEMBER 29, 2005

## PLAINTIFFS' CONSOLIDATED[1] MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Submitted by:

DAVID S. GOLUB  ct 00145
JONATHAN M. LEVINE  ct 07584
MARILYN J. RAMOS ct 11433
SILVER GOLUB & TEITELL LLP
184 ATLANTIC STREET
P.O. BOX 389
STAMFORD, CT  06904
(203) 325-4491

Attorneys for Plaintiffs

---

[1] Plaintiffs are submitting this Consolidated Memorandum of Law pursuant to the Court's request during a telephonic conference with the parties on December 16, 2005. This Memorandum of Law combines the arguments presented in the following prior pleadings:

   (1)   Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, dated April 3, 2003 [Dkt. No. 19];

   (2)   Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Amended Complaint, dated August 8, 2003   [Dkt. No. 46];

   (3)   Plaintiffs' Supplemental Memorandum of Law in Opposition to Defendants' Motion to Dismiss Amended Complaint, dated August 12, 2003 [Dkt. No. 47]; and,

   (4)   Plaintiff's Motion to Submit New Legal Authority and Response to Defendants' New Authority, dated April 8, 2005 [Dkt. No. 72].

## I.     <u>INTRODUCTION</u>

This case presents a compelling instance of intentional constitutional misconduct by Connecticut's Governor and one of his top appointed administrators.

In December 2002, defendants announced they were terminating the employment of 3,000 unionized state employees.  Defendants' reason for the terminations – asserted in repeated public statements – was the unions' refusal to give up over $400 million in vested contract benefits conferred by the unions' collective bargaining agreements with the State.  Although all state employees receive the same health and pension benefits, defendants demanded concessions in these areas only from the unions.  Only union members were singled out for termination by defendants.

The unions' contracts were all approved by the Connecticut legislature, and their contract rights are protected by statute.  <u>See</u> Conn. Gen. Stats. § 5-278(b) & (c).  The State was barred by the Contracts Clause of the United States Constitution from passing any law requiring the contract concessions demanded by defendants.  <u>Condell v. Bress</u>, 983 F.2d 415 (2d Cir.), <u>cert</u>. <u>denied</u>, 507 U.S. 1032 (1993) (enjoining Governor of New York and other state officials from enforcing law passed during budget crisis impairing state unions' rights under collective bargaining agreements).

Defendants were not allowed to extract contract concessions that the State could not legally compel by threatening – and then implementing – terminations; likewise, defendants were constitutionally prohibited from penalizing the unions and their members for refusing to give up their constitutionally-protected contract rights.

For over 50 years, it has been a fundamental constitutional rule that a state may not penalize a person's exercise of a constitutional right by denying him the grant of a public benefit – including

the "benefit" of continued public employment. As the Supreme Court stated in 1972,

> For at least a quarter-century, this Court has made clear that even
> though a person has no "right" to a valuable government benefit and
> even though the government may deny him the benefit for any number
> of reasons, there are some reasons upon which the government may
> not rely. It may not deny a benefit to a person on a basis that infringes
> his constitutionally protected interests. ...This would allow the
> government to "produce a result which [it] could not command
> directly." ... [M]ost often, we have applied the principle to denials of
> public employment. ...

Perry v. Sinderman, 408 U.S. 593, 597 (1972) (citations omitted).

Defendants have not only publicly admitted that they terminated state union workers because

of the unions' refusal to give up their constitutionally-protected contract rights, they offered to

reinstate the fired workers if the unions would agree to the demanded concessions.

Defendants have further publicly admitted that their demands for concessions and their

threats (and implementation) of terminations were directed solely to state employees who are

members of unions. State employees have a constitutional right to belong to a union. The First

Amendment prohibits a state from singling out union members for discharge or other adverse

employment action. Smith v. Arkansas State Highway Employees, Local 1315, 441 U.S. 463, 464

(1979). "[C]ourts have repeatedly held that discrimination against public employees because of

their union membership is actionable under section 1983." DeLoreto v. Ment, 944 F. Supp. 1023,

1034 (D. Conn. 1996).

And finally, the terminations ordered by defendants have been directed solely against

members of state unions that supported defendant Rowland's opponent in the 2002 gubernatorial

election. The First Amendment protects a public employee's right to support candidates of his or

her choosing, and it has been well established for over twenty years that a state may not discharge public employees based on their political views. <u>Branti v. Finkel</u>, 445 U.S. 507, 516 (1980). "First Amendment rights are violated when a person holding a nonpolicymaking position is dismissed from employment for political reasons." <u>Vezzetti v. Pellegrini</u>, 22 F.3d 483, 486-87 (2d Cir. 1994).

Plaintiffs State Employees Bargaining Agent Coalition ("SEBAC"), twelve of its constituent unions, and five individual union members illegally terminated or otherwise adversely affected by defendants' illegal conduct have brought this action on their own behalf and on behalf of 45,000 state union employees pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, to redress defendants' violations of their constitutional rights under the Contracts Clause and to freedom of speech, freedom of association, due process and equal protection of the law under the First, Fifth and Fourteenth Amendments to the United States Constitution.

Faced with a lawsuit and their own damning public statements admitting unconstitutional conduct, defendants have responded by moving to dismiss plaintiffs' Amended Complaint, asserting that the defendant Governor cannot be held accountable in federal court for the constitutional misconduct alleged by plaintiffs.

Defendants misunderstand the historic role of federal courts in vindicating official violations of constitutional rights. The Civil Rights Act of 1871 was enacted "to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights." <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658, 700-01 (1978). The federal courts have been granted jurisdiction – and the responsibility – to adjudicate claims that state officials, acting under color of law, have violated constitutional rights.

Defendants' assertion of the defense of absolute *legislative* immunity is unsupportable. The doctrine of legislative immunity is designed to protect legislators or other officials involved in the *legislative* process. It has never been applied to immunize executive actions by a Governor or other executive branch administrators, as are involved in this case. The Supreme Court has repeatedly held that it would undermine the purposes of § 1983 to grant governors and other high state officials absolute immunity. Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982); Scheuer v. Rhodes, 416 U.S. 232, 248-49 (1974). Indeed, over ten years ago, in one of the leading cases establishing the applicability of First Amendment protections in the public employment context, the Supreme Court held that the First Amendment prohibited the Governor of Illinois from implementing a state employee hiring freeze and hiring practices that penalized employees for protected speech and association. Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990).

And finally, defendants' argument that plaintiffs' claims are barred by the Eleventh Amendment is also baseless. The Eleventh Amendment is inapplicable to plaintiffs' claims against defendants in their individual capacities. Hafer v. Melo, 502 U.S. 21, 25-31 (1991). Likewise, the Eleventh Amendment is no bar to claims against state officers in their official capacities for prospective injunctive relief. Ex parte Young, 209 U.S. 123 (1908); accord Verizon Maryland Inc. v. Public Service Commission of Maryland, 535 U.S. 635, 122 S.Ct. 1753, 1760 (2002).

Defendants' repeated assertion that this Court is powerless to review a Governor's policy-making decisions literally flies in the face of the federal courts' historic role in holding state officials – including governors – responsible for unconstitutional conduct. In 1974, in one of the most politically-charged cases of its era, the Supreme Court held that the Governor of Ohio could be

4

held liable under § 1983 for his decision to deploy the National Guard to Kent State University. Scheuer v. Rhodes, 416 U.S. at 248-49. In Scheuer, the Court explicitly rejected the defendant governor's contention that he should have absolute official immunity for his discretionary, policy-making decisions. Id.

In 1990, the Court held, in a § 1983 action, that the Governor of Illinois was prohibited by the First Amendment from implementing a public employment hiring freeze and partisan hiring practices. Rutan, supra. In 1993, the Court of Appeals for the Second Circuit sustained a § 1983 claim against New York's Governor for unconstitutional impairment of state unions' collective bargaining agreements during a budget crisis. Condell v. Bress, supra.

Like Governor Rhodes in Scheuer, Governor Thompson in Rutan, and Governor Cuomo in Condell, Connecticut's Governor is subject to the rule of constitutional law and the authority of the federal courts.

Plaintiffs' claims involve serious allegations of violations by state officials of fundamental constitutional rights, and the consequences of defendants' actions involve serious harm to 3,000 displaced state employees. Defendants' arguments that this Court may not even hear the case, asserted here as an obvious dilatory maneuver,[2] raise the serious issue of defendants' lack of understanding or respect for our constitutional system.

---

[2] Defendants have advised plaintiffs that they refuse to proceed with discovery until their motion to dismiss is decided, including through efforts to pursue interlocutory appeals.

II.    **THE ALLEGATIONS OF PLAINTIFFS' AMENDED COMPLAINT**[3]

A.    **PLAINTIFFS' FACTUAL ALLEGATIONS**

Plaintiff State Employees Bargaining Agent Coalition ("SEBAC") is a coalition of 13 state employee unions, representing 45,000 Connecticut state employees. Plaintiff SEBAC has been designated by the State of Connecticut Board of Labor Relations as the representative and exclusive bargaining agent of its constituent unions for the purpose of negotiating and entering into collective bargaining agreements covering health care, pension and other terms of employment of the state employee members of SEBAC's constituent unions. (Amended Complaint, ¶¶ 3, 35).

In 1997, plaintiff SEBAC entered into a collective bargaining agreement ("the SEBAC Agreement") with the State of Connecticut covering health care, pension and other terms of employment for all state union employees. The SEBAC Agreement was approved by the Connecticut legislature pursuant to Conn. Gen. Stats. § 5-278(b). (Id. at ¶¶ 34, 36).

The twelve[4] named plaintiff unions ("the plaintiff Unions") have been designated as the representative and exclusive bargaining agent of their respective members for the purpose, *inter alia*, of negotiating and entering into collective bargaining agreements covering terms of employment on behalf of their members. The plaintiff Unions are parties to collective bargaining agreements with the State of Connecticut approved by the General Assembly pursuant to Gen. Stats. § 5-278(b). (Id. at ¶¶ 35-36).

---

[3] On a motion to dismiss, the factual allegations of plaintiffs' Amended Complaint must be accepted as true. Bello v. Barden Corporation, 180 F. Supp.2d 300, 305 (D. Conn. 2002) (Thompson, J.).

[4] One of SEBAC's constituent unions, University of Connecticut, American Association of University Professors, was originally a plaintiff, but has withdrawn its claims.

6

Pursuant to Conn. Gen. Stats. § 5-278©, the Connecticut legislature is required to appropriate whatever funds are required to comply with the SEBAC Agreement and the plaintiff Unions' collective bargaining agreements. (Id., Ninth Claim for Relief at ¶ 53).

The members of the plaintiff Unions have statutorily-protected rights to receive the wages and other benefits conferred pursuant to the SEBAC Agreement and their respective union's collective bargaining agreements. (Id. at ¶¶ 55). By virtue of their respective union's statutorily-approved collective bargaining agreement, union members also have a statutorily-protected right to continued state employment and cannot be terminated from their state employment or otherwise adversely affected in their employment for arbitrary, irrational or constitutionally impermissible reasons. (Id., Tenth Claim for Relief at ¶ 54).

At the time plaintiffs brought this action, defendant Rowland was the Governor of Connecticut, and defendant Ryan was the Secretary of the Office of Policy and Management and, in their capacities, directed budgetary and staffing matters for the State of Connecticut. Defendants Rowland and Ryan have at all times been aware of plaintiffs' statutorily-protected rights under the collective bargaining agreements, and of the State's obligations to fund these agreements. (Id., First Claim for Relief at ¶ 37; Ninth Claim for Relief at ¶ 55).[5]

In November, 2002, shortly after defendant Rowland's reelection as Governor, defendants demanded that plaintiff SEBAC and the plaintiff Unions grant concessions totaling over $450 million annually under their collective bargaining agreements, concessions which plaintiffs were not

---

[5] Defendants Rowland and Ryan were sued in this action in both their individual and official capacities. (Amended Complaint, ¶¶ 22 and 23). Since the filing of this action, defendant Rowland has resigned his office and he and defendant Ryan have now been succeeded by M. Jodi Rell and Robert L. Genuario respectively. By operation of Fed. R. Civ. P. 25(d), Rell and Genuario are now substituted as defendants with respect to claims against the Governor and Secretary of OPM in their official capacities.

– and could not be – required to make by law. (Id., First Claim for Relief at ¶¶ 39-40). To coerce plaintiffs into giving up their rights, defendants threatened to terminate the employment of state union workers if plaintiffs did not meet defendants' demands. (Id. at ¶ 41).

When plaintiff SEBAC and the plaintiff Unions declined to grant all of the contract concessions demanded by defendants, defendants carried out their prior threats and began implementing the termination of over 3,000 union employees. Defendants have, further, threatened to terminate the employment of at least 1,000 more state union employees. (Id. at ¶ 42). Employees have been singled out for termination based upon their status as union employees. (Id. at ¶¶ 43-45).

Defendants' decision to order these terminations and their selection of union-member state employees as the targets of the terminations were motivated by impermissible anti-union animus, and were arbitrary, irrational and/or undertaken for constitutionally impermissible reasons. (Id. at ¶¶ 43-45; Tenth Claim for Relief at ¶¶ 55-56).

In deciding which union members to terminate, defendant Rowland was further motivated by the desire to retaliate against his political opponents. (Id., Second Claim for Relief, at ¶ 51). Throughout his tenure as Governor, defendant Rowland has had a hostile attitude toward state employee unions and has publicly stated that his "natural enemies have been the unions." (Id. at ¶ 52).

In the fall of 2002, when defendant Rowland was running for reelection as Governor of the State of Connecticut, all but one of the plaintiff Unions endorsed and supported defendant Rowland's opponent in the gubernatorial race. (Id. at ¶¶ 53-54, 59). During the campaign, defendant Rowland sought the endorsement of plaintiff Connecticut State Police Union (CSPU), the

only state employee union that was not supporting his opponent.  In the course of soliciting this endorsement, defendant Rowland told the CSPU union leadership on at least two occasions that he would not lay off any state troopers.  CSPU voted to endorse defendant Rowland for reelection as Governor. (Id. at ¶¶ 55-57).  No members of CSPU were selected for termination by defendants, even though state employees performing police functions in other unions have been selected for termination.  All of the union employees selected for termination are members of the unions that supported defendant Rowland's opponent in 2002. (Id. at ¶ 58).

Defendants' conduct was intended to undermine SEBAC's and the plaintiff Unions' ability to organize, function and represent their members.  (Id. at ¶¶ 41, 43-45; Third and Seventh Claims for Relief at ¶¶ 51-53).  It was also intended to interfere with the union members' exercise of their rights of freedom of association and freedom of speech. (Id., Third Claim for Relief at ¶ 58; Fourth Claim for Relief at ¶ 64).  Plaintiffs' First and Fourteenth Amendment rights of freedom of speech and association have been violated by defendants' conduct.  (Id., Third Claim for Relief at ¶ 55; Fourth Claim for Relief at ¶ 61).

Defendants' conduct was further undertaken for the purpose of retaliating against the unions and their members who opposed defendant Rowland's reelection in the 2002 gubernatorial election.  The endorsing unions' and their members' First and Fourteenth Amendment rights of freedom of political speech and political association have been violated by defendants' conduct. (Id.).

Defendants' conduct was further undertaken, with impermissible anti-union animus, to punish plaintiff SEBAC, the plaintiff Unions and their members for refusing to give up their constitutionally protected rights to the benefits conferred under their collective bargaining agreements, in violation of the First, Fifth and Fourteenth Amendments. (Id., First Claim for Relief

at ¶¶ 46, 54).

Defendants' conduct was further undertaken for the purpose of, and had the effect of, depriving the named plaintiffs and other terminated or displaced union members of their constitutionally-protected interest in continued state employment free of arbitrary, irrational or constitutionally-impermissible termination, in violation of the First, Fifth and Fourteenth Amendments. (Id., Ninth Claim for Relief at ¶¶ 59-60).

At all times mentioned herein, defendants, acting under color of state law, were aware that their conduct violated plaintiffs' First, Fifth and Fourteenth Amendment rights, and intended to interfere with plaintiffs' constitutional rights. (Id., First Claim for Relief at ¶¶ 57-58).   As a result of the defendants' wrongful conduct, plaintiffs have suffered and will in the future suffer financial loss. (Id. at ¶ 55).  Union members have also suffered and will in the future suffer emotional distress because of defendants' actions.  (Id. at ¶ 56).

Nowhere in the Amended Complaint do plaintiffs allege that defendants' actions were taken in connection with the consideration or adoption of the State's biennial Budget or other legislation, to effectuate broad Budget policy, or that the Connecticut Legislature was in any way involved in defendants' conduct.  To the contrary, plaintiffs' Amended Complaint precisely sets forth plaintiffs' claims about the non-legislative context in which defendants' actions were taken.  Plaintiffs' Amended Complaint explicitly alleges:

> 1.  That defendants had responsibility, in furtherance of their Executive Branch functions, for management of the state's work force and negotiation of the terms of collective bargaining agreements with state employees.   (First Claim for Relief, ¶¶ 37 & 38).
>
> 2.   That defendants' responsibility for managing the state's work force and negotiation of the terms of collective bargaining agreements is statutorily codified in Conn. Gen. Stats. §§ 4-65a, 5-278. (Id. at ¶¶

10

37-38).

3.    That in November 2002, defendants sought changes to plaintiff
SEBAC's and the plaintiff Unions' collective bargaining agreements.
(Id. at ¶ 39).

4.    That defendants threatened to terminate union (and only union)
workers if the unions refused to grant the demanded concessions.  (Id.
at ¶ 41).

5.    That when the unions refused to grant the demanded concessions,
defendants implemented the threatened terminations.  (Id. at ¶ 42).

6.    That defendants directed their demands for health care and
pension benefit concessions solely against the unions, even though
non-union state employees  receive the same benefits.  (Id. at ¶ 43).

7.    That defendants intentionally singled out state union workers for
termination because of their union membership and acted with anti-
union animus.  (Id. at ¶¶ 45, 46).

8.    That defendants were the decision-makers for State of
Connecticut with respect to the demand for concessions, the threats of
termination and the terminations at issue in this lawsuit. (Id. at
¶ 47).

9.    That the Connecticut General Assembly did not participate in
demanding the collective bargaining agreement concessions, did not
participate in threatening terminations of union members if the
demands were not granted, and was not involved in determining
whether any (and, if so, which) state union employees would be
terminated when the demands were not granted. (Id. at ¶ 49).


10.    That defendants were acting as members of the Executive
Branch when they demanded the concessions, made the threats, and
implemented the terminations at issue in this lawsuit.  (Id. at
¶ 48).

11.    That defendants' actions were taken solely in furtherance of
their Executive Branch functions.   (Id.).

### B.    PLAINTIFFS' CLAIMS FOR RELIEF

Plaintiffs' Amended Complaint asserts ten Claims for Relief pursuant to 42 U.S.C. § 1983. Plaintiffs' first Four Claims are asserted against defendants in their individual capacities, and seek awards of compensatory and punitive damages.  Plaintiffs' Fifth through Tenth Claims are asserted against defendants in their official capacities, and seek injunctive relief ordering the reinstatement of terminated and displaced workers and a bar on further terminations or other retaliatory action by defendants on account of plaintiffs' exercise of protected rights.[6]

Plaintiff SEBAC seeks to bring this action on behalf of itself and as a class action on behalf of all members of its constituent unions.  The individual plaintiffs seek to bring this action on their own behalf and as a class action on behalf of all state union members terminated or adversely affected by defendants' conduct.

---

[6]  Plaintiffs' First, Third, Fifth and Seventh Claims allege that defendants have violated the individual plaintiffs' rights to join a union and participate in union activities (First and Fifth Claims) and the unions' rights to organize as unions, to seek union representation, and to represent their members (Third and Seventh Claims), as guaranteed by the First and Fourteenth Amendment rights to freedom of speech and freedom of association.

Plaintiffs' Second, Fourth, Sixth and Eighth Claims allege that defendants have violated plaintiffs' rights to support, individually (Second and Sixth Claims) and as unions (Fourth and Eighth Claims), political candidates of their choice, as guaranteed by the First and Fourteenth Amendment rights to freedom of political speech and freedom of political association.

Plaintiffs' Ninth Claim alleges that defendants unconstitutionally retaliated against plaintiffs for refusing to give up their protected contract rights, violating plaintiffs' rights under the Contracts Clause and to freedom of association, substantive due process and equal protection of the laws, as guaranteed by the First, Fifth and Fourteenth Amendments.

Plaintiffs' Tenth Claim alleges that defendants have subjected them to terminations and other adverse employment actions for arbitrary, irrational and constitutionally-impermissible reasons, in violation of plaintiffs' right to freedom of association, substantive due process and equal protection of the laws, as guaranteed by the First, Fifth and Fourteenth Amendments.

## III.     ARGUMENT

### A.     THE STANDARD OF REVIEW

"When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all the factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff." Bello v. Barden Corporation, 180 F. Supp.2d at 305; Leatherman v. Tarrant County Narcotics Unit, 507 U.S. 163, 164 (1993); Scheuer v. Rhodes, 416 U.S. at 236.

A complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-45 (1957). A court's task in considering a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000). "The issue is not whether the plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." Id. These principles "appl[y] with particular force where the plaintiff alleges civil rights violations." Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998).

"In considering a motion dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." Newman & Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660, 662 (2d Cir. 1996). Although a court may also consider "matters of public record ... including case law and statutes," Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998); Bello at 306, it is otherwise improper for a court to rely upon "extra

complaint information in granting [a] motion to dismiss." Newman & Schwartz at 662.[7]

**B.    DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OF PLAINTIFFS' CLAIMS ON THE GROUND OF LEGISLATIVE IMMUNITY.**

As the second[8] ground of their Motion to Dismiss, defendants – the chief executive officer of the State of Connecticut and one of the top appointed administrators in the State's executive branch – contend that they are entitled to absolute *legislative* immunity from plaintiffs' claims. Defendants' assertion of this defense – like their attempt to invoke the political-question doctrine – misconstrues applicable law and is wrongheaded.

Legislative immunity covers the conduct of legislators and other officials performing legislative acts "generally done in the course of the process of enacting legislation." Hutchinson v. Proxmire, 443 U.S. 111, 131 (1979), quoting United States v. Johnson, 383 U.S. 169 (1966). The doctrine is designed to protect legislators or other officials "for what they do or say in legislative proceedings." Tenney v. Brandhove, 341 U.S. 367, 372 (1951); see also id. at 379 (Black, J., concurring) (referencing "long-standing and wise tradition that legislators are immune from legal responsibility *for their intra-legislative statements and activities*") (emphasis supplied).   It applies to acts that are "substantively legislative" – i.e., involve "policy-making decisions of a general

---

[7]  Plaintiffs are at a loss to understand the good-faith basis for defendants' submission of hearsay newspaper articles in support of their Motion to Dismiss.  (Def. Mem. at 5 and n.7; Def. Ex. B). Such materials are blatantly improper and may not be considered by the Court.  Newman & Schwartz at 662.

[8]  Defendants have now withdrawn the first ground of their Motion to Dismiss – their purported immunity from suit on the basis of the "political question" doctrine.  As plaintiffs previously pointed out, that doctrine applies only to disputes between branches of the federal government and is inapplicable to the power and authority of a federal court to adjudicate the constitutionality of a state official's conduct.  See Elrod v. Burns, 427 U.S. 347, 351 (1976) (plurality opinion).

scope" – but only when the acts are "procedurally legislative" as well – i.e., "passed by mean of established legislative procedures." Gallas v. Supreme Court of Pennsylvania, 211 F.3d 760, 776 (3d Cir. 2000); Ryan v. Burlington County, 889 F.2d 1286, 1290-91 (3d Cir. 1989).

The conduct of defendants at issue here represents quintessential executive branch conduct – the management of the state's workforce, negotiations with unions, and seeking to reduce existing state labor costs. The terminations at issue in this action were effectuated by executive actions, not by legislation or other "established legislative procedures."[9]

Defendants' attempt to expand the concept of absolute legislative immunity to encompass their executive acts flies in the face of established case law. Legislative immunity has never been applied to protect acts taken by the executive outside of the legislative process. It has never been applied to protect a Governor's hiring and firing decisions implemented – as here – by executive order.

The Supreme Court has recognized that because absolute immunity shields unconstitutional conduct from review and detracts from § 1983's broadly remedial purpose, courts must be "sparing" in affording state officers such protection. Forrester v. White, 484 U.S. 219, 224 (1988) ("This Court has generally been quite sparing in its recognition of claims to absolute official immunity"); accord Scotto v. Almenas, 143 F.3d 105, 110 (2d. Cir. 1998) (absolute immunity proper only in "rare circumstances"). Thus, while the Court has held that the President has absolute immunity, "based on his unique constitutional status," his federal aides and cabinet members do not; "nor are the highest executive officials in the States protected by absolute immunity." Forrester at 228. As the

---

[9] Indeed, Connecticut's legislators (unsuccessfully) sought to overturn defendants' executive actions. See P.A. 03-1 (vetoed on February 19 , 2003).

15

Supreme Court has made clear, "for executive officials in general ... our cases make plain that qualified immunity represents the norm." Harlow v. Fitzgerald, 457 U.S. at 807.

Indeed, the Supreme Court has expressly cautioned against unwarranted expansions of legislative immunity. The Court has emphasized that legislative immunity "has not been extended beyond the legislative sphere," Gravel v. United States, 408 U.S. 606, 624-25 (1972),[10] and has warned that "claims [for legislative immunity] going beyond what is needed to protect legislative independence are to be closely scrutinized." Hutchinson v. Proxmire, 443 U.S. at 127. The "shield [of legislative immunity] does not extend beyond what is necessary to preserve the integrity of the legislative process." Id.

The Supreme Court has been especially unwilling to extend absolute immunity to bar claims of unconstitutional conduct by a state Governor. In Scheuer v. Rhodes, supra, the Court reviewed at length the form of immunity that should be afforded a State's executive officers. The Court recognized the need to balance the competing values of affording executive officials sufficient legal protection to insure freedom to exercise policy-making discretion without fear of undue civil liability with the need to protect citizens' rights to seek a remedy under § 1983 for unconstitutional misconduct by state officers. The Court specifically rejected the concept of "absolute 'executive immunity'" for governors and other high state executives:

> [Section] 1983 would be drained of meaning were we to hold that the
> acts of a governor or other high executive officer have "the quality of
> a supreme and unchangeable edict, overriding all conflicting rights of
> property and unreviewable through the judicial power of the federal

---

[10] Thus, while immunity will extend to "voting ... and committee reports ... and conduct at legislative committee hearings," Gravel at 625, "contact with the Executive Branch of government or with administrative agencies," even if undertaken in respect to administration of a statute, "is not protected legislative activity." Id.

government."

Scheuer at 248, quoting Sterling v. Constantin, 287 U.S. 378, 397 (1932).  The Court ruled that

qualified immunity strikes the proper balance in affording governors the necessary protection while,

at the same time, protecting the ability of citizens to vindicate violations of their constitutional

rights.  Scheuer at 248-49; accord Harlow, 457 U.S. at 807 ("governor and his aides could receive

the requisite protection from qualified or good faith immunity"); Imbler v. Pachtman, 424 U.S. 409,

419 (1976) ("the Governor and other executive officials of a State ha[ve] a qualified immunity" that

varies with scope of discretion, responsibilities of office and circumstances).  The holding in

Scheuer was extended to high officials of the federal Executive Branch.  Butz v. Economou, 438

U.S. 478, 508-12 (1978).

     In Scheuer, the Court expressly rejected the notion – argued here by defendants – that a

governor's discretionary, policy-making decisions are beyond the review of a federal court:

> If this extreme position could be deemed to be well taken, it is
> manifest that the fiat of a state Governor, and not the Constitution of
> the United States would be the supreme law of the land; that the
> restrictions of the Federal Constitution upon the exercise of state
> power would be but impotent phrases, the futility of which the State
> may at any time disclose by the simple process of transferring powers
> of legislation to the Governor to be exercised by him, beyond control,
> upon his assertion of necessity.  Under our system of government,
> such a conclusion is obviously untenable. ...  When there is a
> substantial showing that the exertion of state power has overridden
> private rights secured by th[e] Constitution, the subject is necessarily
> one for judicial inquiry in an appropriate proceeding directed against
> the individuals charged with the transgression.

416 U.S. at 248-49, quoting Sterling, 287 U.S. at 397-98.

     Consistent with the Supreme Court's rejection of absolute immunity for state Governors,

both the Supreme Court and lower federal courts – including the Court of Appeals for the Second

Circuit – have unhesitatingly adjudicated constitutional challenges to public employee hiring and firing policies implemented by Governors dealing with claimed budgetary problems, and have held Governors accountable for unconstitutional budgetary hiring and firing practices. See e.g., Rutan, supra; Condell v. Bress, supra; Haley v. Pataki, 883 F. Supp. 816 (N.D.N.Y.), appeal dismissed as moot, 60 F.3d 137 (2d Cir. 1995), after remand, 901 F. Supp. 85 (N.D.N.Y. 1995), aff'd, 106 F.3d 478 (2d Cir. 1997); England v. Rockefeller, 739 F.2d 140 (4th Cir. 1984); University of Hawaii Prof. Ass. v. Cayetano, 183 F.3d 1096 (9th Cir. 1999); Jeffries v. Celeste, 654 F. Supp. 305 (S.D. Ohio 1986).

The wrongdoing alleged in plaintiffs' Amended Complaint involves misconduct by defendants in the process of collective bargaining with state unions. Plaintiffs allege that defendants attempted to extract union contract concessions (that the State could not legally compel[11]) by threatening – and then implementing – terminations of state employees. (Amended Complaint at ¶ 50), and that the terminations ordered and implemented by defendants impermissibly singled out state union employees based upon their status as union employees. (Id. at ¶ 52). Plaintiffs' Amended Complaint references Connecticut's statutes, Conn. Gen. Stats. §§ 5-271 and 5-272, that require the State to recognize SEBAC and the plaintiff Unions as the exclusive bargaining agent for their members, to bargain collectively with them as the exclusive bargaining agents for their members, and to refrain from conduct interfering with their existence or administration or otherwise discouraging union membership. (Id. at ¶ 59).[12]

The misconduct alleged in plaintiffs' Amended Complaint involves classic personnel

---

[11] See Condell v. Bress, supra.

[12] Copies of the collective bargaining and OPM statutes referenced herein are attached as Exhibit A.

18

management and labor and cost savings negotiations, spheres of activity that are plainly executive, not legislative. Indeed, Connecticut statutes expressly commit responsibility for collective bargaining with state employees to the executive branch – not the legislature. Thus, under Connecticut law, the duties of the executive branch expressly include negotiating with and entering into collective bargaining agreements with state employee unions. See Conn. Gen. Stats. § 5-270 *et seq*. The statutory scheme imposing the collective bargaining obligation and setting forth permitted and prohibited practices in connection with such collective bargaining defines the "employer" to include only "the executive and judicial branches" of the State of Connecticut. The statute was specifically amended in 1977 to delete "the legislative branch" from the definition of employer, see Public Act 77-22, making clear that collective bargaining is not a legislative function.[13] Pursuant to Conn. Gen. Stats. § 4-65a(1) & (2), the Secretary of the Office of Policy and Management (defendant Ryan) is designated as the employer representative "in collective bargaining negotiations concerning changes to the employees retirement system and health and welfare benefits," and in other matters involving collective bargaining, including the negotiation, administration and changes to ("supplemental understandings") collective bargaining agreements. The Secretary of OPM is appointed by the Governor, Conn. Gen. Stats. §§ 4-6, 4-65a, and "acts as the executive officer of the Governor for accomplishing the purposes of his department." Conn. Gen. Stats. § 4-8.

---

[13] Conn. Gen. Stat. § 5-270 provides, in pertinent part:

> **Sec. 5-270. Collective bargaining. Definitions.** When used in sections 5-270 to 5-280 inclusive:
>
> (a) "Employer" means the state of Connecticut, *its executive and judicial branches*, including, without limitation, any board, department, commission, institution, or agency of such branches or any appropriate unit thereof .... [emphasis added].

19

Defendants ignore plaintiffs' allegations of misconduct in the collective bargaining context -- plainly an executive function -- and argue that their conduct should be viewed as "legislative" because, under Connecticut law, they have responsibilities to participate with the legislature in adoption of the State's Budget. (Def. Mem. at 17). But, plaintiffs' Amended Complaint nowhere alleges that the terminations imposed by defendants (or their unconstitutional attempt to extract contract concessions) were undertaken as part of the statutorily or constitutionally-sanctioned Budget process. Connecticut's Budget process is not even mentioned in plaintiffs' Amended Complaint. Nor, for that matter, do defendants contend that their actions were *actually* part of Connecticut's statutory biennial Budget process. Although defendants enumerate some of the Governor's and OPM's statutory responsibilities in connection with the legislature's adoption of the Budget, defendants nowhere assert that they were *actually* performing any of those functions at the time they undertook the unconstitutional actions at issue here.[14]

Indeed, it is undisputed that defendants' actions were not taken in connection with the adoption of Connecticut's Budget. Connecticut's Budget for 2001-03 was adopted by legislative act in June 2001. (Special Act 01-01). The Connecticut General Assembly was not in session, and Connecticut's Budget for 2003-05 was not even under consideration by the legislature in November 2002, when defendants announced their demand for concessions, or in December 2002, when defendants implemented the terminations of state union workers.

---

[14] The burden is on defendants to establish a factual basis for their claim of legislative immunity. Harlow, 457 U.S. at 808; Hill v. City of New York, 45 F.3d 653, 660 (2d Cir. 1995). Where, as here, the allegations of plaintiffs' Amended Complaint do not support a finding that a defendant was acting in a legislative function, a defendant cannot, on a motion to dismiss, introduce (or argue) "facts" to the contrary. Newman & Schwartz, 103 F.3d at 662 (court may not consider extra-complaint information on Rule 12(b)(6) motion to dismiss).