In renewing their legislative immunity argument in response to plaintiffs' Amended Complaint, defendants refuse to respond to plaintiffs' allegations that defendants were acting in an executive capacity and that the Connecticut legislature was not involved in any way in the conduct at issue in this lawsuit, asserting that plaintiffs' allegations are impermissible conclusions of law, not fact, or are irrelevant. (Def. Mem. at 14-15). But, whether or not the Connecticut legislature participated in the conduct at issue in this action is clearly a matter of fact. Who the decision-makers were with respect to the conduct at issue is clearly a matter of fact. And if the Connecticut legislature did not – as a matter of fact – participate in the conduct at issue, and if the decisions at issue were – as a matter of fact – made solely by the defendants (without legislative participation), what is the conceivable *factual* basis for defendants' claim of legislative immunity?

In their Memorandum, defendants inexplicably assert that "it is simply irrelevant [to the issue of legislative immunity] ... whether the State's legislature had any role in [the challenged] decisions." (Def. Mem. at 15). Defendants apparently now contend that any policy decision by a governor to terminate state employees for budgetary reasons is entitled to legislative immunity, whether or not it was taken as part of a legislative process. This position is a patent misstatement of the law and would vest a governor with absolute immunity for any executive policy decisions affecting state staffing.

Defendants further argue that this Court should take judicial notice of Connecticut's severe fiscal crisis.[15] But the existence of a fiscal crisis is legally irrelevant to whether defendants were

_____

[15] Defendants also repeatedly refer to Connecticut's constitutional requirement of a balanced Budget. (See e.g., Def. Mem. at 5, n.6). As defendants well know, the requirement of a balanced Budget applies at the time the Budget is adopted, and no action defendants took in November 2002 was mandated by any constitutional requirement to balance the Budget. Indeed, governors in Connecticut have often faced budget shortages when revenue projections fall short.

acting in an executive or legislative function: both the executive and the legislature may undertake cost-savings measures. The question presented by defendants' claim of legislative immunity is whether the facts, as alleged in plaintiffs' Amended Complaint, allow this Court to determine that defendants were acting in furtherance of the legislature's adoption of a biennial Budget when they made their concessions demands, threatened, and implemented the terminations at issue in this lawsuit. And the simple answer to that question is that no such "factual" finding is possible.

Defendants further assert (Def. Mem. at 12) that their actions were legislative because Public Act 02-01 (now codified at Gen. Stats. § 4-85(b)) authorizes the Governor to order budgetary cutbacks when there is a deficit in the General Fund greater than one percent of General Fund appropriations. But defendants have not asserted – in a single one of their filings with this Court – that they were *actually* acting pursuant to that statutory provision when they undertook the conduct at issue in this litigation.

Section 4-85(b) requires that a Governor invoking his authority to effectuate budget reductions under the statute file a report to the joint standing committees of the General Assembly, and – in the case of budget cuts imposed pursuant to § 4-85(b)(2) in cases of deficits in excess of one percent of General Fund appropriations – include in that report a specific plan for implementing budget reductions. The statute also imposes a maximum on any reductions ordered by the Governor.[16] Defendants have not contended – and have submitted no evidence to this Court – that they either invoked Gen. Stats.   § 4-85(b) as justification for terminating the plaintiff employees *or*

---

[16]  Section 4-85(b) requires that any budgetary modification pursuant to that provision not exceed three percent of the total appropriation from any fund or more than five percent of any appropriation. Plaintiffs dispute that defendants complied with this provision of the statute and, in fact, believe that several of the terminations ordered by the defendants exceeded five percent of the relevant personnel budgetary line items in several departments.

*that they complied with the requirement to submit the necessary reports to the General Assembly* or limited the cuts in connection with such terminations to the maximum permitted by the statute.

Plaintiffs dispute defendants' contention that the terminations at issue in this litigation were undertaken pursuant to Gen. Stats. § 4-85(b). Indeed, plaintiffs believe that it is *undisputed* that defendants *never* invoked the statute as authority for their actions and *never* submitted the reports or plan to the General Assembly required by the statute.[17] At a minimum, that dispute is not amenable to resolution on a motion to dismiss, in which the factual allegations of plaintiffs' Amended Complaint must be accepted as true. Bello,180 F. Supp.2d at 305.[18]

In sum, defendants' argument for "legislative" immunity for their acts improperly conflates the legislature's adoption of a biennial "Budget" – a "legislative" act – with the executive's ongoing measures to effectuate "budgetary savings." Ostensibly relying on Bogan v. Scott-Harris, 523 U.S. 44 (1998), defendants argue that the term "legislative" as used in the doctrine of legislative immunity "means 'not of the legislature' but rather means discretionary, policymaking, implicating budgetary priorities, and having prospective implications." (Def. Mem. at 8 & n.11). But defendants' effort to gerrymander the definition of "legislative" to fit a governor's cost-savings

------

[17]    To the extent that Judge Squatrito cited Gen. Stats. § 4-85(b) in his decision in Abbey v. Rowland, 359 F. Supp.2d 94, 97-98 (D. Conn. 2005), Judge Squatrito never considered whether defendants had *actually* invoked the statute or were *actually* acting pursuant to and *in compliance with* the statute when they ordered the terminations at issue in that litigation. While it may be that the plaintiffs in Abbey did not properly raise the issue, Judge Squatrito's *factual* finding, on a motion to dismiss, that Governor Rowland "was acting pursuant to the mandate of § 4-85(b)" – notwithstanding defendants' failure to demonstrate Rowland's compliance with the statutory mandate – was mistaken.

[18]    Moreover, assuming *arguendo*, that a gubernatorial act taken pursuant to Gen. Stats. § 4-85(b) after adoption of the budget to reduce an ensuing budget deficit is deemed legislative for purposes of legislative immunity, plaintiffs dispute that defendants complied with § 4-85(b) when they terminated the employment of the plaintiff union members. To the extent that defendants failed to file the required reports and ordered cuts in appropriations in violation of (or in excess of) the statutory maximum, defendants failed to comply with the legislative procedures mandated by statute and are not entitled to rely on a defense of legislative immunity.

measures taken independent of any "legislation" (or some other "established legislative

procedures") misstates the holding of Bogan (and the other cases cited in defendants'

Memorandum) and is unsupported by any case law.

In Bogan and every other case cited by defendants, the acts of non-legislators that were

afforded absolute legislative immunity arose in the context of a legislative body acting through

established legislative procedures to adopt a form of legislation.  See Bogan, 523 U.S. at 55

(mayor's acts in introducing and signing budget *ordinance* adopted by city council were legislative);

Rateree v. Rockett, 852 F.2d 946, 950 (7th Cir. 1988) (budget *ordinance* approved by vote of city

commissioners was legislative act); Gallas v. Supreme Court of Pennsylvania, 211 F.3d at 776

(where Pennsylvania Supreme Court granted authority to adopt rules for administration of court

system, *adoption of Order* pursuant to vote and "established procedures" was legislative act);

Orange v. City of Suffolk, 830 F. Supp. 701, 705 (E.D.N.Y. 1993) (County Executive's action in

signing budget *resolution* adopted by Suffolk County Counsel was legislative act); Reilly v. City of

West Haven, 2005 WL 1293969 at *3 (D. Conn. 2005) (mayor's conduct in *introducing budget*

*proposal* to city counsel entitled to legislative immunity: no legislative immunity for non-legislative

conduct unassociated with budget); Lorusso, *et al.* v. Borer, 359 F. Supp.2d 121, 126-28 (D. Conn.

2005) (same); Dwonzyk v. Baltimore County, 328 F. Supp.2d 572, 578-79 (D. Md. 2004) (local

legislative *enactment* of a budget that eliminated plaintiff's position entitled to legislative

immunity); Berlickij v. Castleton, 248 F. Supp.2d 335 (D. Vt. 2003) (vote of Selectboard – as

town's legislative body – to eliminate plaintiff's position entitled to legislative immunity); Lewis v.

New Mexico Department of Health, 275 F. Supp.2d 1319, 1327-28 (D. N.M. 2003) (in the context

of budgetary request for less money for waiver services and line item veto of additional funding for

waiver services, which were budgetary acts entitled to legislative immunity, governor's instruction
to executive staff to anticipate limited growth in waiver programs was also legislative act).

Nothing in <u>Bogan</u> or any of the other cases cited by defendants stands for the proposition
that a non-legislator is entitled to absolute legislative immunity for discretionary policy-making acts
undertaken wholly outside a legislative process simply because they involve "budgetary priorities."
Such a contention would immunize virtually any financial decision made by any executive branch
employee; but nothing in <u>Bogan</u> overrules well-established Supreme Court precedent holding that
governors are **not** entitled to absolute immunity for executive decisions taken outside the legislative
process. See <u>Harlow v. Fitzgerald</u>, 457 U.S. at 807; <u>Scheuer v. Rhodes</u>, 416 U.S. at 248-49. To the
contrary, as the case law that defendants cite explicitly holds, for legislative immunity to obtain, the
act at issue must be both "substantively" and "procedurally" legislative:

> We have employed a two-part test to determine whether an act is
> legislative:
>
> First, the act must be "substantively" legislative, i.e., legislative in
> character. Legislative acts are those which involve policy making
> decisions of a general scope .... In addition, the act must be
> "procedurally" legislative, that is, passed by means of established
> legislative procedures. This principle requires that constitutionally
> accepted procedures of enacting the legislation must be followed in
> order to assure that the act is a legitimate, reasoned decision
> representing the will of the people which the governing body has been
> chosen to serve.

<u>Gallas v. Supreme Court of Pennsylvania</u>, 211 F.3d at 774. <u>Accord</u> <u>Lorusso</u>, 359 F. Supp.2d at 128

("It has been [ ] clearly established that in order for legislative immunity to attach, the acts

complained of must not only be substantively legislative but also procedurally legislative").[19]

----

[19]  Indeed, the doctrine of legislative immunity has its origins in the struggles of the English Parliament in
the sixteenth and seventeenth centuries to establish its independence from the Crown and was intended to free

Defendants rely heavily on the discussion in <u>Bogan</u> and its progeny indicating that budget legislation affecting classes of employees generally (as opposed to acts directed at a single employee) is "policy-making" subject to legislative immunity. (Def. Mem. at 17-18). From this case law, defendants argue that their decisions to eliminate plaintiffs' positions are similarly protected. But defendants miss the point of the case law they cite. That distinction is only relevant to the determination in those cases of whether an act which is "procedurally" legislative is also sufficiently <u>substantively</u> legislative to enjoy legislative immunity. Courts grant legislative immunity where the elimination of positions or governmental reorganization *implemented by legislation* is part of an overall budget plan (rather than mere legislative acts that are aimed at specific individuals) because only broader legislative policy decisions merit the protections of legislative immunity. But the fact that an act by a state executive may involve a "policy-making" determination to eliminate multiple positions does not transform an act that is procedurally executive into a "legislative" act entitled to legislative immunity.

Indeed, that is the precise point of the requirement that an act be "substantively" <u>and</u> "procedurally" legislative to qualify for legislative immunity. <u>Gallas</u> at 774; <u>Ryan</u> at 1290-91. And, that is why legislators can be held liable for unconstitutional terminations effectuated by legislation when the terminations are aimed at specific individuals (as opposed to being part of a broader

_____

English legislators from the fear of being prosecuted by the King for taking positions contrary to the sovereign's wishes. <u>Tenney v. Breedlove</u>, 341 U.S. at 372. This purpose of the doctrine was reaffirmed by the Supreme Court in <u>Gravel</u>, 408 U.S. at 618 ("the Court has sought to implement its fundamental purpose of freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator"). The historical and modern underpinnings of the doctrine are, thus, directly contrary to defendants' claim here that Connecticut's chief executive (i.e., the sovereign) is entitled to "legislative" immunity for policy-making decisions taken outside any legislative process.

policy).  See e.g., Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206, 211 (2d Cir. 2003)

(denying legislative immunity to members of Board of Education who "voted" on employment

decision where decision itself not "broad, prospective policymaking that is characteristic of

legislation").

There is no dispute that defendants' actions were **not** taken pursuant to "established

legislative procedures."  Neither defendants' demand for contract concessions, nor defendants'

threat of terminations if the demands were not granted, nor the actual terminations themselves were

pursuant to legislation or legislative processes.  Defendants' conduct was undisputably not

"procedurally" legislative.

Equally important, plaintiffs do not allege – or agree – that defendants' termination decisions

reflected broad, policy-making or Budget decisions.  Nothing in plaintiffs' Amended Complaint

(other than the number of persons terminated) supports defendants' contrary assertion that they were

exercising budgetary or programmatic priorities.  Indeed, defendants' terminations were not

embodied in any legislation reducing agency classified position counts, which remained the same

after the terminations as before.  While it is plaintiffs' position that defendants' conduct was clearly

not "substantively" legislative, at the very least there is a factual dispute on this point that cannot be

resolved on a motion to dismiss.

In the absence of an undisputed basis for finding defendants' conduct "procedurally" and

"substantively" legislative, there is no basis for extending legislative immunity to defendants'

conduct.

Defendants' reliance on Judge Squatrito's decision in Abbey as somehow excusing the

requirement that the act be both procedurally and substantively legislative in order to qualify for

27

legislative immunity [see Def. Mem. at 10 ("Governor's choices ... were policy choices of broad import")] is unavailing. As plaintiffs have previously noted, see n. 17, *supra*, Judge Squatrito's decision was based on the incorrect conclusion that defendants had actually invoked Conn. Gen. Stats. § 4-85(b) and were actually acting pursuant to legitimate statutory budgetary authority when they ordered the terminations at issue in that litigation. Absent such invocation of the proper statutory *budgetary* authority, defendants' conduct constituted a pure exercise of the executive's collective bargaining function that is not entitled to the protection of *legislative* immunity. At a minimum, the existence of a factual dispute over whether defendants were acting pursuant to Conn. Gen. Stats. § 4-85(b) precludes the granting of defendants' Motion to Dismiss on legislative immunity grounds.

In their Memorandum in support of their renewed Motion, defendants urge this Court to disregard plaintiffs' allegations and "not ignore what everyone knows." (Def. Mem. at 9). But what "everyone knows" is the following:

1. Connecticut's 2002 Budget was passed in 2001 and amended by the legislature in June 2002. The Connecticut legislature was not in session and not considering a new Budget in November 2002 when defendants acted. Neither the demands for union concessions, the threats of termination or the terminations themselves were part of any legislation, let alone part of any Budget.

2. Defendants acted unilaterally, without legislative involvement. Defendants have repeatedly opposed legislative attempts to reinstate the terminated workers, vetoing legislation that would have done so. See P.A. 03-1 (vetoed on February 19 , 2003).

3. And, most important, what "everyone knows" is that, in the real world, defendant Rowland explicitly contradicted his attorneys' claim here that he was acting in a legislative capacity,

28

specifically asserting that the authority to negotiate union concessions is solely an Executive Branch function that cannot be infringed by the legislature and that legislative attempts to do so would violate the separation of powers provided for in the Connecticut Constitution.

On August 8, 2003 (after plaintiffs' initial Memorandum in opposition to the Motion to Dismiss plaintiffs' Amended Complaint was submitted), defendant Rowland formally took this position in his veto of proposed House Bill 6803, *An Act Concerning State Employees.* His veto message specifically states that the proposed bill – which sought to legislate collective bargaining agreement concessions and reinstatement of laid off workers – is "unconstitutional." [A certified copy of the veto message is attached hereto as Exhibit B.][20]

The defendant Governor's issuance of the veto message is constitutionally and statutorily mandated pursuant to Article Fourth, § 15 of the Connecticut Constitution and Conn. Gen. Stats. § 2-30, and thus part of the official records of the State of Connecticut. This Court can properly consider a veto message in considering a motion to dismiss. See In re Advanta Corp. Securities

---

[20]  Even prior to taking this formal position, defendant Rowland had publicly stated that the Executive Branch has exclusive authority to negotiate wage concessions and that it would be unconstitutional infringement of the Executive Branch powers for the legislature to pass an act providing for re-employment of state workers in return for collective bargaining agreement concessions. As the Associated Press reported on June 4, 2003:

> At a Capitol news conference, Rowland said the [proposed budget] plan [which provided for union contract concessions in return for reinstatement of the union workers terminated by defendant Rowland] ... unconstitutionally interfered in the executive's ability to negotiate contracts with state employee unions. ....

> The budget, which passed the House 84-65 at 4 a.m. and the Senate 20-15 at 6:40 a.m., also calls for the governor to rehire 2,800 laid-off state workers and agree to specific union concessions.

> Rowland said those provisions violate the separation of powers provided for in the state Constitution and "circumvents the collective bargaining process."

(A copy of the AP news report is attached as Exhibit C.)

Litigation, 180 F.3d 525, 532-533 (3d Cir. 1999) (discussing veto message in context of motion to dismiss); cf., Keating v. Johnson, 918 P.2d 51,62 n. 1 (Okla. 1996) (taking judicial notice under Oklahoma law of Governor's veto).

Defendants' assertion of the defense of legislative immunity reflects, at bottom, a cynical effort to invoke the protections afforded those acting in a legislative capacity to two executive branch members who acted unilaterally and in stated defiance of the legislators. And defendants' refusal to acknowledge that legislative immunity requires actions that are part of a legislative process – in this case, the adoption of legislation – reflects a cynical attempt to mislead this Court by quoting language about *legislation* affecting budget priorities and policy-making out of context.

## C.    THE DEFENSE OF LEGISLATIVE IMMUNITY IS INAPPLICABLE TO CLAIMS FOR INJUNCTIVE RELIEF.

Even were defendants entitled to legislative immunity for their role in causing the terminations, they would nonetheless be proper defendants in an action for injunctive relief. While a legislator (or one acting in a legislative function) cannot be held liable for his legislative acts, a party subjected to unconstitutional deprivation through "legislation" may seek to enjoin the appropriate state official from enforcing the "legislation." Supreme Court of Virginia v. Consumers Union of the U.S., Inc., 446 U.S. 719, 736 (1980); Lajoie v. Connecticut Board of Labor Relations, 837 F. Supp. 34, 39 n. 9 (D. Conn. 1993) (Cabranes, J.).

In Consumers Union, the Court ruled that although the Supreme Court of Virginia was acting in a legislative capacity – and thus protected by legislative immunity – when it adopted disciplinary rules governing the conduct of attorneys pursuant to statutory authorization "to promulgate and amend [such] rules and regulations," such immunity did not extend to its

30

independent authority to *enforce* the rules. In its enforcement capacity, "immunity [did] not shield the Virginia court and its chief justice," who "were proper defendants in a suit for declaratory and injunctive relief, just as other enforcement officers and agencies were." Id. at 736-37; accord Gravel v. United States, 408 U.S. at 618-19, discussing Kilbourn v. Thompson, 103 U.S. 168 (1880) (while House Members had legislative immunity under Speech or Debate Clause for adoption of resolution authorizing illegal arrest, those who made the arrest could be held liable).

The same reasoning was applied by Judge Cabranes, while a district judge in this District, in an action involving the constitutionality of a Connecticut statute barring special deputy sheriffs from forming a labor union. Plaintiffs sought a declaration that the statute was unconstitutional (Count Four) and an injunction against its enforcement (Count Nine), as well as money damages from the Governor for signing the legislation (Count Eight). The court dismissed the count against the Governor on grounds of legislative immunity[21] and dismissed the counts challenging the constitutionality of the statute without prejudice, pending renewal after clarification of the statute's scope by the Connecticut Labor Board. The court noted that "any [subsequent] claim for injunctive relief ... must be directed *solely* at the state official charged with enforcement of the statute in conformity with Ex parte Young ...." 837 F. Supp. at 39 n.9.

Indeed, that is precisely what occurred in Condell v. Bress, a case where "legislative acts" and "legislation" were actually involved in causing a deprivation of state union employees' rights. In Condell, the Second Circuit held that the legislation impairing union collective bargaining rights was unconstitutional and upheld an injunction enjoining the defendant Governor and Comptroller –

---

[21]  A governor's act of signing (or vetoing) a bill is part of the legislative process and, thus, is protected by legislative immunity. Bogan, 532 U.S. at 55. Thus, plaintiffs could not – and do not – claim that defendant Rowland can be held liable for his veto of Public Act 03-1.

in their official capacities – from enforcing the legislation.

Defendants are responsible for administering the State's work force as part of their executive functions. (Amended Complaint at ¶ 47). Thus, even were defendants acting in a "legislative" function (and immune) when they caused the terminations at issue, they would nonetheless be properly subject – in their official capacities – to injunctive relief to bar the ongoing unconstitutional effects of their "legislative" conduct. Consumer Union, 446 U.S. at 736-37; Lajoie, 837 F. Supp at 39 n.9.

### D.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE ELEVENTH AMENDMENT.

As the third ground of their Motion to Dismiss, defendants assert that plaintiffs' claims are barred in their entirety by the Eleventh Amendment (Def. Mem. at 15-17), or if not wholly precluded, barred insofar as they seek recovery of "retrospective pay and benefits." (Def. Mem. at 17-19). These contentions are frivolous.

Plaintiffs' first four Claims for Relief assert claims against defendants in their *individual* capacities.[22] The law is clear that the Eleventh Amendment is inapplicable to these claims. Hafer v. Melo, 502 U.S. at 25-31; Ford v. Reynolds, 316 F.3d 351, 356 (2d Cir. 2003). As the Court stated in Hafer:

> [T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal' liability on state officials under §1983.

---

[22] "Individual" or "personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." Kentucky v. Graham, 473 U.S. 159, 166 (1985). "To establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." Id. (emphasis in original). Plaintiffs expressly allege that their claims in the first four Claims are asserted against defendants "in their individual capacity." (See ¶¶ 86-87 of the First, Second, Third and Fourth Claims for Relief.)

32

502 U.S. at 31, citing Scheuer v. Rhodes, 416 U.S. at 237. This principle is applicable to any state

official, including Governors. Scheuer at 238; Hafer at 28.

The Second Circuit has repeatedly held that state officials sued in their individual capacities

have no Eleventh Amendment protection from liability for § 1983 damages:

> [T]he Eleventh Amendment does not extend to a suit against a state
> official in his [or her] individual capacity, even when the conduct
> complained of was carried out in accordance with state law.

Ford v. Reynolds, 316 F.3d at 356, quoting Berman Enters. v. Jorling, 3 F.3d 602, 606 (2d Cir.

1993); accord Dube v. State University of New York, 900 F.2d 587 (2d Cir. 1990), cert. denied, 501

U.S. 1211 (1991) ("The Eleventh Amendment, however, provides no immunity for state officials

sued in their personal capacities"); Yorktown Medical Laboratory, Inc. v. Perales, 948 F.2d 84, 88-

89 (2d Cir. 1991) ("The Eleventh Amendment bar, by definition, only applies to official capacity

suits").

Because the Eleventh Amendment is inapplicable to plaintiffs' claims against defendants in

their individual capacity, id., it does not bar plaintiffs' recovery of compensatory damages from

defendants, individually, for lost wages and benefits. Shane v. State of Connecticut, 821 F. Supp.

829, 831 (D. Conn. 1993) (Eginton, J.) ("the Eleventh Amendment does not prohibit an action for

money damages, whether compensatory or punitive, against a state official in his individual

capacity").

A § 1983 plaintiff is entitled to recover "compensatory damages" – damages determined in

accordance with traditional common law tort principles to compensate a plaintiff for his actual

losses. Memphis Community School District v. Stachura, 477 U.S. 299, 305-06 (1986).

Recoverable damages include "out-of-pocket loss and other monetary harms [as well as] such

injuries as impairment of reputation ..., personal humiliation, and mental anguish and suffering." Id. at 307 (internal quotations omitted).

If plaintiffs establish that defendants unconstitutionally deprived them of their jobs, compensatory damages may properly include an award to compensate plaintiffs for their lost wages and benefits. See e.g. St. George v. Mak, 2000 WL 303249 (D. Conn. 2000) (in § 1983 action against state official [High Sheriff Edwin Mak], in individual capacity, awarding lost income to special deputy sheriffs subjected to retaliation in violation of First Amendment for union organizing activity) (attached at Exhibit D); Quartararo v. Hoy, 113 F. Supp.2d 405, 418-19 (E.D.N.Y. 2000) (plaintiff in § 1983 action against state prison officials in individual capacity entitled to compensatory damages for lost income resulting from unconstitutional conduct); see also Gierlinger v. Gleason, 160 F.3d 858, 867-68, 873-75 (2d Cir. 1998) (in § 1983 action against state troop commander, in individual capacity, ordering prejudgment interest on jury's award of $117,738 in "financial damages for loss of past and future income").

Defendants argue that plaintiffs are barred from recovering any award for "retrospective pay" or "retroactive benefits" in any form ("however they may be pled") on the first four Claims for Relief, because state officials cannot be held liable (in their individual capacities) for "back pay." (Def. Mem. at 18, citing Dwyer v. Regan, 777 F.2d 825, 836 (2d Cir. 1985), modified, 793 F.2d 457 (1986); DeLoreto v. Ment, 944 F. Supp. at 1031 n.5.)

Defendants confuse the concept of "back pay and benefits" – relief that can only be ordered against the employer with the obligation to pay salary or provide benefits[23] – with a § 1983

---

[23] "Back pay" is a term of art in federal employment litigation, drawn from the statutory language of Title VII. See 42 U.S.C. 2000e-5(g)(1) ("the court may ... order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or

plaintiff's right to recover an award of his actual economic loss as an element of compensatory damages from an individual constitutional wrongdoer. As one court has observed, back pay "must be paid by or on behalf of the employer *by definition.* ... To say that an 'individual capacity' defendant is liable for 'back pay' is a misnomer; he may be liable for compensatory damages in the same amount (plaintiff's lost wages) ..." Figueroa-Rodriguez v. Aquino, 863 F.2d 1037, 1043 n. 7 (1st Cir. 1988) (emphasis added); accord Los Angeles Police Protective League v. Gates, 995 F.2d 1469, 1472 n. 1 (9th Cir. 1993); see also Skeets v. Johnson, 805 F.2d 767, 783 (8th Cir. 1986) (Bowman, J., dissenting) (taking note of holding in Dwyer and explaining that "the defendants could be liable in their individual capacity for damages only, of which lost wages, or back pay, might be a component").[24]

As in the common law system of tort damages, a state officer sued individually who wrongfully causes a plaintiff to lose his job is liable for the plaintiff's lost wages and the value of

_____

any other equitable relief as the court deems appropriate"). The term is used to denote "a form of restitution," intended by Congress "to be awarded together with reinstatement or other forms of equitable relief." See Great-West Life & Annuity Insurance Company v. Knudsen, 534 U.S. 204, 218, n. 4 (2002); see also id. at 230 n. 2 (Ginsburg, J., dissenting). "Back pay" is recoverable from an employer in a Title VII action as a component of the statutory mandate that an injured plaintiff be made whole for his losses. Albemarle Paper Co. v. Moody, 422 U.S. 405, 421 (1975) ("In addressing the 'make whole' purpose of Title VII, Congress took care to arm the courts with full equitable powers"). In 1985, when Dwyer was decided, back pay in Title VII cases was often considered "a form of equitable relief," and not an award of damages. See Knudsen at 230, n. 2 (Ginsburg, J., dissenting). The Dwyer court's use of the phrase in "back pay" reflected that meaning of the term – a form of restitution, often combined with reinstatement and other equitable relief, ordered by a court against an employer.

[24] Indeed, defendants' contention that a state official cannot be held individually liable for lost wages would produce bizarre results: if a municipal police officer used unconstitutional excessive force against a suspect, the police officer could, of course, be held personally responsible for his victim's resulting lost wages. O'Neill v. Krzeminski, 839 F.2d 9, 13 (2d Cir. 1993). According to defendants, if a state trooper used the same impermissible force, and was sued in his individual capacity, he could not be held liable for such damages. But on what principled basis can this divergence be justified? Certainly not the Eleventh Amendment, since the law is clear that the Eleventh Amendment does not apply to a state officer sued in his individual capacity; certainly not principles of common law causation, since in both instances the plaintiff's economic loss was caused by the defendant officer's unconstitutional use of excessive force.

any lost benefits. <u>St. George v. Mak</u>, 2000 WL 303249 at *2 (Exhibit D attached); <u>Quartararo v. Hoy</u>, 113 F. Supp.2d at 418-19; <u>see also</u> <u>Gierlinger v. Gleason</u>, 160 F.3d at 867-68, 873-75.

Defendants offer no basis for dismissing plaintiffs' first four Claims against them individually, or limiting the scope of compensatory damages, on Eleventh Amendment grounds, and there is none.

Plaintiffs' Fifth through Tenth Claims for Relief assert claims for *prospective injunctive* relief against defendants, in their *official* capacities.[25] It has been well-established for over ninety-five years that even though a state itself may be immune from suit under the Eleventh Amendment, a federal court has jurisdiction over a suit against a state officer *in his official capacity* to enjoin official actions that violate federal law. <u>Ex parte Young</u>, 209 U.S. 123; <u>accord</u> <u>Verizon Maryland v. Public Service Commission of Maryland</u>, 535 U.S. 635.

As the Second Circuit has explained:

> The doctrine of <u>Ex Parte Young</u> is a limited exception to the general principle of sovereign immunity and allows "a suit [for injunctive relief] challenging the constitutionality of a state official's action in enforcing state law" under the theory that such a suit is not "one against the State," and therefore not barred by the Eleventh Amendment.

<u>CSX Transportation, Inc. v New York State Office of Real Property Services</u>, 306 F.3d 87, 98 (2d Cir. 2002), <u>quoting</u> <u>Ex parte Young</u>, 209 U.S. at 154. The rule of <u>Ex parte Young</u> applies to actions against state officials for prospective injunctive relief brought pursuant to 42 U.S.C. § 1983, <u>Quern v. Jordan</u>, 440 U.S. 332 (1979), including actions against a sitting Governor. <u>Scheuer v. Rhodes</u>, 416 U.S. at 237.

---

[25] See ¶¶ 83, 86 of the Fifth Claim for Relief; ¶¶ 82, 85 of the Sixth Claim for Relief; ¶ 85 of the Seventh and Eighth Claims for Relief; ¶ 91 of the Ninth Claim for Relief; and ¶ 87 of the Tenth Claim for Relief.

Defendants argue that "the Ex parte Young exception to sovereign immunity does not apply in this case." According to defendants, "federal courts must refrain from asserting jurisdiction ... under Ex parte Young [over cases] that impact on the 'special sovereignty interests' of a state." Defendants' sole support for this claimed "limitation" on the rule of Ex parte Young is a citation to Justice Kennedy's principal opinion in Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261 (1997). (Def. Mem. at 20).

But the language of Justice Kennedy's principal opinion commanded only two votes – his and Chief Justice Rehnquist's – and the balancing test he advocated was rejected by the other seven justices who adhered to a "straightforward inquiry" into whether the requirements of Ex parte Young had been satisfied.[26] Indeed, last year in Verizon Maryland, the Court specifically held that the "straightforward inquiry" test enunciated by Justice O'Connor in Coeur d' Alene represented the proper standard for assessing the propriety of jurisdiction under Ex parte Young. As Justice Scalia's decision stated:

> In determining whether the doctrine of Ex parte Young avoids an
> Eleventh Amendment bar to suit, a court need only conduct a
> 'straightforward inquiry into whether [the] complaint alleges an
> ongoing violation of federal law and seeks relief properly
> characterized as prospective.' Idaho v. Coeur d'Alene Tribe of Idaho,
> 521 U.S. 261, 296 (1977) (O'Connor, J., joined by Scalia and
> Thomas, JJ., concurring in part and concurring in judgment); see also

---

[26] Id. at 296 (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment); id. at 298-99 (Souter, J., dissenting, joined by Stevens, Ginsbury, and Breyer, JJ.).
In light of the seven-Justice support for Justice O'Connor's position, the courts of appeals generally concluded, subsequent to Coeur d' Alene, that the traditional test for federal jurisdiction under Ex parte Young remained applicable. Earles v. State Board of Certified Public Accountants of Louisiana, 139 F.3d 1033, 1039 (5th Cir. 1998) (recognizing that Justice Kennedy's approach "did not muster a majority, and a majority of the Court would continue to apply the rule of Ex parte Young as it has been traditionally understood"); accord Marie O. v. Edgar, 131 F.3d 610, 616 n. 10, 617 n. 13 (7th Cir. 1997); Strahan v. Cove, 127 F.3d 155, 166-67 (1st Cir. 1997), cert. denied, 525 U.S. 978 (1998); Doe v. Lawrence Livermore National Laboratory, 131 F.3d 836, 839 (9th Cir. 1997).

> id. at 298-99, 117 S.Ct. 2028 (Souter, J., dissenting, joined by
> Stevens, Ginsburg, and Breyer, JJ.).

Verizon Maryland, 535 U.S. at 645.

The Second Circuit has twice cited to the Verizon Maryland test in cases challenging the exercise of jurisdiction over state officials under § 1983. Ford v. Reynolds, 316 F.3d at 355; CSX Transportation, Inc., 306 F.3d at 98; see also Ameritech Corp. v. McCann, 297 F.3d 582, 588 (7th Cir. 2002) (rejecting Coeur d'Alene "balancing approach" in favor of Verizon Maryland test, and holding "we need not assess the precise nature of the State's sovereign interest ... so long as [the] complaint seeks prospective injunctive relief to cure an ongoing violation of federal law, the Eleventh Amendment poses no bar").

There is no question that plaintiffs' Amended Complaint meets the Verizon Maryland test for the exercise of jurisdiction over defendants (in their official capacities). Plaintiffs allege that they are wrongfully being denied their right to continued state employment by defendants' violations of the First, Fifth and Fourteenth Amendments and seek the prospective injunctive relief of reinstatement. Plaintiffs' Amended Complaint further asserts that defendants have threatened further terminations (Amended Complaint, First Claim for Relief, ¶ 42), and seek to enjoin further terminations and further conduct by defendants infringing plaintiffs' First Amendment rights. (Id. at Prayer for Relief, ¶¶ 9, 10).

The law is clear that a complaint seeking the remedy of reinstatement constitutes a request for prospective injunctive relief permitted under the Eleventh Amendment:

> Reinstatement is purely prospective injunctive relief that orders the
> state official to return the former employee to the state's payroll. ...
> [A]n order that reinstatement be granted ... is the sort of prospective
> relief that is not barred by the Eleventh Amendment.

Dwyer v. Regan, 777 F.2d at 836; Russell v. Dunston, 896 F.2d 664, 667-67 (2d Cir.), cert. denied,

498 U.S. 813 (1990); Shane v. State of Connecticut, 821 F. Supp. at 832 ("well-established" that

Eleventh Amendment no bar to "prospective injunctive relief" of "reinstatement" or "restoration of

benefits").

Courts have recognized that where a public employee seeks reinstatement to employment

terminated in alleged violation of his constitutional rights, the constitutional wrong at issue is

"ongoing" for purposes of jurisdiction under the Young rule. Doe v. Lawrence Livermore National

Laboratory, 131 F.3d at 839-41; Elliott v. Hinds, 786 F.2d 298, 302 (7th Cir. 1986). As the Seventh

Circuit held in Elliott:

> The goal of reinstatement ... is not compensatory; rather, it is to compel the state
> official to cease her actions in violation of federal law and to comply with
> constitutional requirements. Elliott's wrongful discharge is a continuing violation; as
> long as the state official keeps him out of his allegedly tenured position the official
> acts in what is claimed to be derogation of Elliott's constitutional rights.

786 F.2d at 302; accord Doe at 841.[27]

The ongoing nature of defendants' alleged constitutional violations is even clearer in this

case since not all of the terminations announced by defendants have yet been effectuated, (Amended

Complaint ¶ 42), and since, as plaintiffs allege, defendants have threatened even more terminations.

(Id.). Indeed, in recognition of the ongoing nature of defendants' infringement of plaintiffs'

constitutional rights, plaintiffs' Amended Complaint seeks forms of prospective injunctive relief in

addition to reinstatement of those union members already terminated – including injunctions against

---

[27]   Accord Koslow v. Pennsylvania, 302 F.2d 161, 179 (3d Cir. 2002); Coakley v. Welch, 877 F.2d 304,
306-07 (4th Cir.), cert. denied, 493 U.S. 976 (1989); Warnack v. Pecos, 188 F.3d 341, 343 (5th Cir. 1996); Canten
v. Kent State University, 282 F.3d 391, 395 (6th Cir. 2002); Flynn v. Sandahl, 58 F.3d 283, 288 (7th Cir. 1995);
Hopkins v. Saunders, 199 F.3d 968, 977 (8th Cir. 1999); Ramirez v. Oklahoma Department of Health, 41 F.3d
584, 589 (10th Cir. 1994); Cross v. Alabama, 49 F.3d 1490, 1503 (11th Cir. 1995).

further terminations of members of the plaintiff Unions on account of their participation in or support of constitutionally-protected union activities or other future penalty or retaliation against plaintiffs for their union activities or political opposition to defendant Rowland. (Amended Complaint, Prayer for Relief, ¶¶ 9(b), 10). All of this injunctive relief sought by plaintiffs is plainly prospective in nature, and is sufficient to confer jurisdiction under Ex parte Young over plaintiffs' Fifth through Tenth Claims for Relief.

Nor do plaintiffs seek monetary relief on these Claims barred by the Eleventh Amendment. Plaintiffs do not seek an award of "back pay" in these Claims. (See Amended Complaint, Prayer for Relief at ¶¶ 9-10.) The individual plaintiffs (for themselves and other displaced employees) do seek "reinstatement to their former positions with the State of Connecticut or such other position as the Court deems appropriate, with full and appropriate restoration of seniority and benefits." (Id. at ¶ 9). As discussed above, "reinstatement" is a form of prospective injunctive relief that is not barred by the Eleventh Amendment. Dwyer, 777 F.2d at 836. Reinstatement of seniority and benefits, as well as position, is also allowable under the Eleventh Amendment since it does not require a direct payment from a State Treasury. Russell, 896 F.2d at 668; Shane, 821 F. Supp at 832.

While the Eleventh Amendment bars an order against a state officer in his official capacity for payment of retroactive benefits, as such an order impermissibly requires a direct payment of public funds, "a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury." Quern v. Jordan, 440 U.S. at 337; accord Edelman v. Jordan, 415 U.S. 651, 667-68 (1974).

Thus, while the Supreme Court in Edelman invalidated an injunction requiring a retroactive

40

award from public funds of wrongfully withheld benefits, 415 U.S. at 677, it upheld an order

requiring the state to restore plaintiffs to the state's welfare roles, even though the order would

provide plaintiffs' with ancillary monetary relief in the future. Id. at 664. Similarly, the Court has

approved orders prohibiting a state official from denying benefits to specified groups, Graham v.

Richardson, 403 U.S. 365 (1971), enjoining a state official from enforcing unconstitutional benefit

termination procedures, Goldberg v. Kelly, 397 U.S. 254 (1970), or requiring a state to give notice

to a plaintiff class of eligibility for wrongfully withheld benefits. Quern v. Jordan, 440 U.S. at 349.

In each instance, such orders were upheld – even though likely requiring the future expenditure of

state funds – as "ancillary" relief proper under the Eleventh Amendment to insure that state officials

conform their conduct to the requirements of federal law. Id.

  In Russell, the Second Circuit held that an injunction ordering state officials to restore a

public employee to medical leave status "would be prospective relief and not barred by the Eleventh

Amendment." 896 F.2d at 668. Judge Eginton has similarly held that restoration of benefits is

prospective relief permitted under the Eleventh Amendment. Shane, 821 F. Supp. at 832 ("well-

established that the Eleventh Amendment does not bar ... prospective injunctive relief, such as

...restoration of employment benefits against state officials in their official capacities").[28]

  Plaintiffs' request for restoration of seniority and benefits status will not, if granted, directly

---

[28] In DeLoreto Judge Goettel ruled that "prospective reinstatement of benefits ... would not be barred
under the Eleventh Amendment," but that "retroactive reinstatement or money damages for lost benefits ... would
be." 944 F. Supp. at 1032. Plaintiffs concur with the holding in DeLoreto to the extent that "retroactive
reinstatement" means payment of past benefits – the manner in which the phrase is used in Sauceda v.
Department of Labor & Industries, 917 F.2d 1261, 1218 (9th Cir. 1990), the case cited by Judge Goettel in support
of his holding. To the extent that crediting a public employee for the seniority or service he was wrongfully
denied may affect the employee's future entitlements, such relief is permissible under the Eleventh Amendment,
its future ancillary impact on the State treasury notwithstanding.

require payment of moneys from the State fisc, but rather will only help rectify the effects of
defendants' unconstitutional conduct by providing for plaintiffs' future seniority, pension and other
benefit entitlements.  Such relief is permitted under the Eleventh Amendment.

### E.    DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OF PLAINTIFFS' FIRST FOUR CLAIMS FOR RELIEF ON GROUNDS OF QUALIFIED IMMUNITY.

Defendants next argue that they are entitled to qualified immunity on plaintiffs' first four
Claims for Relief,[29] which allege that plaintiffs were subjected to adverse employment action in
retaliation for their exercise of their First Amendment rights to join and participate in union activity
(First Claim for Relief), to organize as unions (Second Claim for Relief), and to support political
candidates of their choice (Third and Fourth Claims for Relief).

The doctrine of qualified immunity entitles public officials to freedom from suit for acts
undertaken in their individual capacity if (1) their conduct does not violate clearly established
constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not
violate those rights.  Harlow v. Fitzgerald, 457 U.S. at 818; Martinez v. Simonetti, 202 F.3d 625,
633-34 (2d Cir. 2000).

In arguing for qualified immunity, defendants engage in a faulty analysis that disregards the
first prong of the Harlow test and misapplies the second prong.

The first question in any qualified immunity inquiry – whether the plaintiff has asserted a
violation of a clearly established constitutional right – is not even addressed by defendants in their

---

[29]  These claims are asserted against defendants in their individual capacities.  The defense of qualified
immunity is not applicable to plaintiffs' remaining Claims for Relief against defendants in their official
capacities.  Kentucky v. Graham, 473 U.S. at 167.

Memorandum, and for good reason.  The constitutional rights relied upon by plaintiffs –

- the First Amendment right of public employees to be free from retaliation for union membership and union activities (First and Third Claims for Relief); and

- the First Amendment right of public employees to be free from retaliation for political association and support of opposing political candidates (Second and Fourth Claims for Relief) –

have been well-established both nationally, in the Second Circuit and in this District for decades.

"The First Amendment protects the rights of employees to associate and participate in labor unions," DeLoreto v. Ment, 944 F.Supp. at 1034, and "protects the right of associations to engage in advocacy on behalf of their members.   ... The public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment for doing so." Smith v. Arkansas State Highway Employees, Local 1315, 441 U.S. at 464-65, "A state employer may not retaliate against an individual, such as by terminating his or her employment, because of his or her union activities." DeLoreto, at 1034; accord Stellmaker v. DePetrillo, 710 F.Supp. 891, 893 (D. Conn. 1989) ("[T]he state may not abridge the right of public employees to associate in a labor union ..., nor may it retaliate against an employee for doing so"); Lajoie v. Connecticut State Board of Labor Relations, 837 F.Supp. at 41 (recognizing First Amendment claim where defendants allegedly threatened termination if plaintiff continued union activity).  "[C]ourts have repeatedly held that discrimination against public employees because of their union membership is actionable under section 1983." DeLoreto at 1034.

Plaintiffs' First Amendment right to be free from retaliation for political association and support of opposing political candidates is equally well-established.  "First Amendment rights are violated when a person holding a nonpolicymaking position is dismissed from employment for political reasons." Vezzetti v. Pellegrini, 22 F.3d at 486-87.  "Under our sustained precedent,

conditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition...." Rutan, 497 U.S. at 78; see also Elrod, 427 U.S. at 362-63 (public employees discharged or threatened with discharge solely because of their partisan political affiliation state a § 1983 claim); Branti v. Finkel, 445 U.S. at 515-16 (firing public employees based solely on party affiliation constitutes a § 1983 violation and holding that to prevail in such an action it was sufficient for plaintiffs to prove that they were discharged solely for the reason that they were not affiliated with or sponsored by party in power); Lieberman v. Reisman, 857 F.2d 896, 900 (2d Cir. 1988) (refusal to pay plaintiff public employee for compensatory time and vacation time due to her political affiliation constituted actionable § 1983 violation).

Given this well-established case law, any contention that defendants are entitled to qualified immunity based on the first prong of the Harlow test would be frivolous.

Defendants argue that they are entitled to qualified immunity on the second prong of the Harlow test because – they contend – it was objectively reasonable for them to believe that their actions in terminating unionized state employees were properly in furtherance of their duties to maintain fiscal control of state government operations. (Def. Mem. at 20). Defendants' continued assertion that it was objectively reasonable for defendants to believe it was permissible for them to exercise their contractual right of lay-off is simply beside the point. Defendants' decision to make lay-offs, in general, is not at issue in this lawsuit; plaintiffs challenge defendants' decision to make "lay-off" (i.e., termination) choices based on impermissible considerations.

Just as it would be objectively unreasonable for defendants to choose only members of one race, one gender or one political party for layoff, see Rutan v. Republican Party of Illinois, 497 U.S. 62, so it is objectively unreasonable for defendants to have chosen only members of unions for