layoff. DeLoreto v. Ment, 944 F. Supp. at 1034 ("a state employer may not retaliate against an individual, such as by terminating his or her employment, because of his or her union activities").

Defendants' argument reduces to a claim that – on a motion to dismiss based on the second prong of the Harlow test – they are entitled to substitute their own (disputed) version of their motivations for plaintiffs' allegations of unlawful subjective intent. Defendants "betray[] a fundamental misconception of the application of the qualified immunity doctrine to constitutional claims for which intent is an element." Locurto v. Safir, 264 F.3d 154, 169 (2d Cir. 2001).

Where the elements of a claimed constitutional tort involve questions of improper subjective intent, a defendant cannot establish a right to qualified immunity by claiming a different motivation. As the Second Circuit has stated:

> In the usual case where intent is not an element, ... the qualified immunity doctrine focuses only on whether the government official's actions were objectively reasonable in light of clearly established law, without regard for possible subjective malice.... But where a more specific intent is actually an element of the plaintiff's [constitutional] claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law.

Id. at 169 (emphasis added). Accordingly, in a case such as this one involving motive-based constitutional torts, the plaintiff need only "put forward specific, nonconclusory factual allegations that establish improper motive causing cognizable injury in order to survive a pre-discovery motion for dismissal or summary judgment." Id., citing Crawford-El v. Britton, 523 U.S. 574, 598 (1998).

Judge Arterton has recently applied this principle in denying summary judgment on qualified immunity grounds in a public employment case alleging First Amendment retaliation. Aquavia v. Goggin, 208 F.Supp.2d 225 (D. Conn. 2002). The plaintiff in Aquavia alleged that she was subjected to adverse employment action in retaliation for protected speech, in violation of her First

Amendment rights. The defendant asserted that the adverse actions were taken in response to plaintiff's misuse of town equipment and moved for summary judgment under <u>Harlow</u> on that basis. Judge Arterton denied the motion, holding that the defendant could not establish entitlement to qualified immunity under the second prong of <u>Harlow</u> based on the <u>defendant's</u> version of the motivation for his actions:

> [Defendant's] argument focuses principally on the propriety of disciplining employees for non-office use of office equipment. Here, however, the First Amendment violation complained of focuses on [defendant's] state of mind in that he is alleged to have issued the disciplinary warning with the intent to punish Aquavia for speech on a matter of public concern. <u>See</u> <u>Rutan</u>, ... (First Amendment protects a public employee from acts "*intended to punish her for exercising her free speech rights*").... Thus, the question is not whether a reasonable employer could have concluded the propriety of disciplining Aquavia for using office equipment; instead it is whether a reasonable employer could have determined that disciplining an employee in retaliation for protected speech was unlawful.

<u>Id.</u> at 236 (emphasis in original); <u>accord</u> <u>DeLoreto</u>, 944 F. Supp. at 1032 (denying summary judgment on qualified immunity ground where defendants based defense on denial of improper motivation).

The United States Court of Appeals for the First Circuit has applied this principle in rejecting a claim of qualified immunity based on the second prong of <u>Harlow</u> in a case where defendants denied they had terminated plaintiffs because of their political affiliations and asserted legitimate budgetary reasons:

> Defendants misunderstand the nature of the claim that they face in this case. For a subset of constitutional torts, motivation or intent is an element of the cause of action. .... The plaintiffs allege that they were terminated because of their political affiliation, a constitutional claim that has no meaning absent the allegation of impermissible motivation. The district court recognized this fact, concluding that the "Defendants' emphasis on the fact that their conduct was 'objectively

46

> reasonable' because they acted pursuant to Puerto Rico Law 81 in the Layoff Plan ... is not sufficient to meet their burden under the relevant legal standard and to grant them qualified immunity." ... That was so, the court continued, because "Plaintiffs have proffered evidence of a triable issue of fact regarding a potentially discriminatory application of the Layoff Plan." ... There was no error in this analysis.

Acevedo-Garcia v. Vera Monroig, 204 F.3d 1, 11 (1st Cir. 2000) (citations omitted).

Aquavia, DeLoreto and Acevedo-Garcia dispose of defendants' qualified immunity argument here. Plaintiffs' Amended Complaint makes specific factual allegations that the terminations and other adverse employment actions were driven by unconstitutional retaliatory motives. (Amended Complaint, First Claim for Relief, ¶¶ 45-46, 58; Second Claim, ¶ 58, Third Claim, ¶¶ 51, 58; Fourth Claim, ¶ 64). Just as the defendants in Aquavia, DeLoreto and Acevedo-Garcia were not entitled to qualified immunity based on their asserted non-retaliatory justification for the adverse employment actions at issue in those cases, defendants are not entitled to dismissal of plaintiffs' First Amendment retaliation claims based on their assertions about their state of mind in undertaking the terminations challenged here.

Defendants' motion to dismiss the First through Fourth Claims for Relief on qualified immunity grounds must, accordingly, be denied.

### F.    PLAINTIFFS HAVE PROPERLY ALLEGED CLAIMS FOR VIOLATION OF THEIR FIRST AMENDMENT RIGHTS TO FREEDOM OF SPEECH AND FREEDOM OF ASSOCIATION.

Defendants next argue that the individual plaintiffs have failed to state a cognizable claim for relief under the Freedom of Speech and Freedom of Association provisions of the First Amendment. Defendants either do not understand the allegations of plaintiffs' Amended Complaint or ignore Supreme Court precedent directly on point.

### 1. Plaintiffs' Free Speech Claims

Plaintiffs' Free Speech Claims (Second and Sixth Claims for Relief) assert that the Named Plaintiffs and their class are members of unions that supported governor Rowland's opponent in the 2002 gubernatorial election. (Amended Complaint, Second Claim, ¶¶ 54, 68). These claims further assert that the defendants targeted members of the endorsing unions for terminations because of their political support for defendant Rowland's opponent. (Id. at ¶ 59). These two claims, thus, allege that, because of the political beliefs espoused by them through their affiliation with the unions, the Named Plaintiffs and their class were retaliated against in their public employment by defendants.

The Supreme Court has expressly recognized that denying public employment – or retaliating in the terms and conditions of public employment – based upon the employee's support for a political candidate or political affiliation infringes First Amendment freedoms of belief (speech) and association. Branti v. Finkel, supra; Rutan v. Republican Party of Illinois, supra; Elrod v. Burns, supra ; accord Vezzetti v. Pellegrini, 22 F.3d at 486-87 ("First Amendment rights are violated when a person holding a nonpolicymaking position is dismissed ... for political reasons").

The plaintiffs in Branti were selected for termination from their positions as assistant public defenders, after the appointment of a Democrat as County Public Defender, because they were Republicans. Neither plaintiff engaged in any political speech or activity that gave rise to the threatened termination beyond his registration as a Republican. The Supreme Court held that plaintiffs' claims that they had been threatened with termination because of their political affiliation and belief stated a valid First Amendment claim. The Court noted that it was unnecessary for plaintiffs to establish that they actually undertook affirmative acts or statements in support of their

preferred candidate. The Court further noted that the existence of a cause of action did not depend

on whether the defendant had attempted to coerce the plaintiffs to change their political parties or

had only dismissed them on the basis of their private political beliefs:

> [C]onditioning continued public employment on an employee's
> having obtained support from a particular political party violates the
> First Amendment because of "the coercion of belief that necessarily
> flows from the knowledge that one must have a sponsor in the
> dominant party in order to retain one's job."

Branti, 445 U.S. at 516. The Court held that, to prevail on a claim of retaliatory discharge in

violation of the First Amendment, "public employees need show only that they were discharged

because they were not affiliated with or sponsored by the [dominant] party." Id.

In Rutan, the Supreme Court extended the holding of Branti to prohibit conditioning

promotion, transfer and other terms and conditions of public employment, based on the employees'

political affiliations. The plaintiffs in that case alleged that they had been denied promotions,

denied state employment, or were not called back for state employment after lay-offs because they

did not have the support of the Republican party. Rutan, 497 U.S. at 67. As in Branti, none of the

plaintiffs had engaged in political speech or activity beyond, at most, voting in a Democratic Party

primary. The Court held that the discrimination in promotion and other terms and conditions of

employment alleged by the plaintiffs constituted an impermissible violation of plaintiffs' First

Amendment rights:

> Respondents next argue that the employment decisions at issue here
> do not violate the First Amendment because the decisions ... do not chill the
> exercise of protected belief and association by public employees. This is not
> credible. Employees who find themselves in dead-end positions due to their
> political backgrounds *are* adversely affected. They will feel a significant
> obligation to support political positions held by their superiors, and to refrain
> from acting on the political views they actually hold, in order to progress up
> the career ladder. Employees denied transfers to workplaces reasonably close

49

to their homes until they join and work for the Republican Party will feel a daily pressure from their long commutes to do so. And employees who have been laid off may well feel compelled to engage in whatever political activity is necessary to regain regular paychecks and positions corresponding to their skill and experience.

The same First Amendment concerns that underlay our decisions in Elrod and Branti, are implicated here. .... [Denial of promotions, transfers and recall after layoff] are significant penalties and are imposed for the exercise of rights guaranteed by the First Amendment.

Rutan, 497 U.S. at 73-74 (emphasis in original). The Court in Rutan affirmed its prior holding in Branti that, to prevail on a claim of retaliatory discrimination in public employment based on political affiliation, "public employees need only show that they were discharged because they were not affiliated with or sponsored by the [dominant] party." Id. at 71, quoting Branti, 445 U.S. at 517.

The decisions in Branti, Rutan and Elrod are controlling here. The named plaintiffs (and the class they represent) allege that they were terminated from their public positions because of their support for defendant Rowland's opponent in the 2002 gubernatorial election – support espoused by them through their affiliation with the unions.[30] There is no constitutional difference between the named plaintiffs' and class members' affiliation in this case with the unions that endorsed defendant Rowland's opponent and the affiliation of the plaintiffs in Branti and Rutan with the non-dominant political party (that, presumably, endorsed the incumbent's opponent). Just as punishing the plaintiffs in Branti for their non-support of the dominant party constituted a violation of those plaintiffs' freedoms of political belief, so retaliating against the plaintiffs in this case for their

---

[30] In their Memorandum, defendants discuss at some length the requirement that, to be constitutionally protected, a public employee's speech must relate to a matter of "public concern." (Def. Mem. at 21-22). There can, of course, be no dispute that the support of a political candidate represents a matter of "public concern." See Elrod, 427 U.S. at 356 ("political belief and association constitute the core of those activities protected by the First Amendment").

support, through their respective unions, of the opposing political party, violates these plaintiffs' freedom of political belief.

Plaintiffs' Amended Complaint, in short, alleges the precise type of retaliation for political belief well recognized by Supreme Court precedent as a First Amendment free speech violation. Defendants' motion to dismiss these claims for failure to allege a freedom of speech violation is baseless.

### 2. Plaintiffs' Freedom of Association Claims

Defendants do not dispute that the First Amendment protects the rights of employees to associate and participate in labor unions and that discrimination against public employees because of their union membership is actionable under § 1983. See DeLoreto v. Ment, 944 F.Supp. at 1034, citing Smith v. Arkansas State Highway Employees, Local 1315, 441 U.S. at 464-65.

The sole basis for defendants' motion to dismiss directed to plaintiffs' freedom of association claims is their assertion that the Amended Complaint purportedly contains "no facts to support the alleged reason for these individuals' layoffs, leaving a purely conclusory allegation that their relationship to the Union Plaintiffs led to their layoff." (Def. Mem. at 22). Defendants' argument represents a willful misreading of plaintiffs' complaint.

Plaintiffs' Amended Complaint expressly alleges that "defendants intentionally singled out only union members for termination," (Amended Complaint, ¶ 44); that "the terminations ordered by defendants have been intentionally directed solely against state union members because of their state union membership," (id. at ¶ 45); and that "defendants' order to terminate union-member state employees was motivated by impermissible anti-union animus." (Id. at ¶ 46). These factual

allegations are more than sufficient to state a claim for termination of plaintiff union members based on their union membership and activity, in violation of plaintiffs' First Amendment associational rights. See DeLoreto, 944 F.Supp. at 1034 (allegation that Connecticut Judicial Department eliminated job classification because of prevalence of union activists in that job category states a cognizable § 1983 claim for violation of First Amendment rights of free association).

### G.    PLAINTIFFS' THIRD AND FOURTH COUNTS SHOULD NOT BE DISMISSED FOR LACK OF STANDING.

Defendants next move to dismiss plaintiffs' Third and Fourth Claims for Relief on the basis that SEBAC and the plaintiff Unions have no standing in their own right to prosecute their claims of constitutional violations because they have alleged no injury as a result of the defendants' conduct. (Def. Mem. at 23-25). Defendants also contend that these plaintiffs lack standing to assert the claims of their respective members in their capacity as associations. (Id.).

SEBAC and the plaintiff Unions have alleged wrongful conduct on the part of defendants directly impacting their First Amendment rights to function as unions and bargaining agents free of retribution. They clearly have standing to seek damages for defendants' infringement of these rights. Plaintiffs have also alleged wrongful conduct by defendants affecting their membership's rights to freely associate as union members and to express their political interests without reprisal. As more fully discussed below, they have standing to assert those rights on behalf of their membership.[31]

---

[31] Plaintiff SEBAC has alleged that it "brings this action on its behalf and on behalf of its constituent unions and their individual union members to vindicate its own rights and the associational rights of its constituent unions and their members." (Amended Complaint at ¶ 3). SEBAC also alleges that it "brings this action individually and on behalf of a class ("the SEBAC Class") consisting of all of the members of its constituent unions who have been affected by defendants' conduct. (Id. at ¶ 29). The twelve plaintiff Unions

1.    SEBAC and the Plaintiff Unions Have Standing in Their Own
Right to Assert Claims of First Amendment Violations under
Section 1983.

In Allee v. Medrano, 416 U.S. 802 (1974), the Supreme Court unequivocally stated that a

union is a "person" for purposes of 42 U.S.C. § 1983 actions, and has standing to raise any claims

that its members could raise:

> Unions may sue under 42 USC § 1983 as persons deprived of their
> rights secured by the Constitution and laws, and *it has been implicitly
> recognized that protected First Amendment rights flow to unions as
> well as to their members and organizers.* If, as alleged by the union in
> its complaint, its members were subject to unlawful arrests and
> intimidation for engaging in union organizational activity protected by
> the First Amendment, the union's capacity to communicate is
> unlawfully impeded, since the union can act only through its
> members. *The union then has standing to complain of the arrests and
> intimidation and bring this action.*

Id. at 820 n. 13 (1974) (internal citations omitted; emphasis added);

Allee has been cited over nearly thirty years by numerous federal courts for the proposition

that unions may challenge First Amendment violations directed at them and their members. See

e.g., Missouri National Education Assoc. v. New Madrid County R-1 Enlarged School District, 810

F.2d 164, 167 (8th Cir. 1987); Professional Assoc. of College Educators, TSTA/NEA v. El Paso

County Community College District, 730 F.2d 258, 261-63 (5th Cir.), cert. denied, 469 U.S. 881

(1984); Memphis American Federation of Teachers, Local 2032 v. Board of Education of Memphis

City Schools, 534 F.2d 699, 702 (6th Cir. 1976); Burrus v. Vegliante, 247 F. Supp.2d 372, 378-79

(S.D.N.Y. 2002), rev'd on other grounds, 336 F.3d 82 (2d Cir. 2003); National Union of Hospital

and Health Care Employees, RWDSU, District 1199 v. City of New Rochelle, 1978 WL 1570 at *3

---

each "brings this action on its own behalf and on behalf of its members to vindicate its own rights and the
associational rights of it members." (Id. at ¶¶ 4-16).

53

(S.D.N.Y. 1978) (attached as Exhibit D).

Even where the wrongful conduct is directed *solely at a union's membership and not specifically at the organization*, a union has standing in its own right to raise infringements of its members' rights to free speech and association. Allee, 416 U.S. at 820 n. 13; Missouri National Education Assoc., 810 F.2d at 167; Memphis American Fed. of Teachers, 534 F.2d at 702; Broderick v. City of Boston, 755 F.Supp. 482, 483 (D.Mass. 1991). See also Warth v. Seldin, 422 U.S. 490, 511 (1975) (association may assert rights of members where associational ties affected). This is so because "[i]ntimidation of those individuals who speak for the union could unlawfully chill the capacity of the organization itself to communicate." Broderick, 755 F.Supp. at 483 (citing to Allee); see also Undergraduate Student Assoc. v. Peltason, 359 F.Supp. 320, 322-23 (N.D. Ill. 1973) (political organization has standing because injury to its members is injury to the organization).

Like any other "person" under the statute, a union bringing a § 1983 action may seek compensatory damages, as well as other forms of relief, including out of pocket and other monetary loss, and harm to its reputation. Memphis Community Sch. Dist. v. Stachura, 477 U.S. at 307; Professional Assoc. of College Educators, 730 F.2d at 262-63. A union may also seek punitive damages under § 1983 against public officers in their individual capacities. Smith v. Wade, 461 U.S. 30, 31, 35 (1983).

Defendants do not argue (nor could they) that unions are precluded from bringing § 1983 actions under the First and Fourteenth Amendments. Instead, they argue that plaintiffs "have not alleged that they as entities – as opposed to as representatives of their members – have been the victims of any violations of federal law." (Def. Mem. at 24). Defendants ignore the specific

54

allegations of plaintiffs' Amended Complaint.[32]

SEBAC and the plaintiff Unions have alleged *inter alia* an anti-union animus on the part of the defendants which plaintiffs contend motivated the selection and implementation of the termination of their union members, including singling out state union employees for termination based upon their status as union employees. (Amended Complaint, Third and Fourth Claims, ¶46; Fourth Claim, ¶ 52). Plaintiffs allege that defendants' illegal conduct was taken to coerce the plaintiff unions into giving up their members' rights. (Id. at ¶ 41). Plaintiffs further allege that defendants sought to penalize those unions that refused to support defendant Rowland in his re-election campaign. (See, e.g., Amended Complaint, Fourth Claim at ¶¶ 51-60).

Plaintiffs specifically allege that defendants' conduct "was intended to undermine plaintiff SEBAC's and the plaintiff Unions' ability to organize, function and represent their members." (Id., Third Claim, ¶ 51). Plaintiffs' Amended Complaint further asserts:

> 52. In a further effort to undermine plaintiff SEBAC, the plaintiff Unions and the unions' leadership, defendants publicly derided the union leadership and made direct appeals to union members to urge their leadership to agree to the rejected concessions. Defendants have caused email messages to be sent directly to union members describing negotiating proposals not previously presented to the unions' leadership, thereby attempting to by-pass the union leadership. (Id., ¶ 52).

Thus, the plaintiff unions allege that defendants "impermissibly penalized [them] for exercising their First and Fourteenth Amendment rights to organize as unions ... and to represent their members." (Id., ¶ 54).

---

[32]    "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice [to establish standing], for on a motion to dismiss [the court] presumes that general allegations embrace those specific facts that are necessary to support the claim." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (internal quotation marks omitted). See also Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 58 (2d Cir. 1994).

Likewise, in their Fourth Claim for Relief, the plaintiff unions allege that defendants "impermissibly penalized [them] for exercising their First and Fourteenth Amendment rights to support, as unions ..., political candidates of their choice." (Id., Fourth Claim, ¶ 60).

These allegations, which must be presumed to be true, Scheuer v. Rhodes, 416 U.S. at 236, assert First Amendment violations directly infringing upon the rights of the plaintiff Unions and SEBAC, and suffice to give them standing. See Allee, 416 U.S. at 814-16 (intimidation by state officers which interfered with exercise of constitutionally protected rights of free expression, assembly and association was irreparable injury to union for purposes of issuing injunction); National Assoc. for Advancement of Colored People v. Alabama, 357 U.S. 449, 458-60 (1958) ("diminished financial support and membership" causes injury to organization for purpose of standing); Katz v. McAulay, 438 F.2d 1058, 1060 n. 3 (2d Cir. 1971), ("irreparable harm is manifest where it is alleged that First Amendment rights have been chilled as the result of governmental action"), cert. denied, 405 U.S. 933 (1972); Professional Assoc. of College Educators, 730 F.2d at 262 ("union's first amendment rights are violated by state action whose purpose is either to intimidate public employees from joining a union or from taking an active part in its affairs or to retaliate against those who do").

    2.    **Plaintiffs Meet the Constitutional Standing Requirements and May Assert the Claims of Their Members.**

Defendants also argue that SEBAC and the plaintiff Unions have no associational standing to assert claims for monetary damages on behalf of the unions and union membership. (Def. Mem. at 23-25). The injuries that the unions and union membership allege in the Third and Fourth Counts are those caused by defendants' interference with union activity (Third Claim for Relief), their interference with plaintiffs' political speech (Fourth Claim for Relief), and for the chilling effect on

the unions and their memberships that such interference has caused. (Amended Complaint, Prayer for Relief at ¶¶ 5-8).

In determining whether plaintiffs have standing as associations to assert the claims of their memberships, the court must be guided by the three factor analysis set forth in <u>Warth v. Seldin</u>, 422 U.S. at 511, later paraphrased in <u>Hunt v. Washington Apple Advertising Commission</u>, 432 U.S. 333, 343 (1977). Under this test,

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interest it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

<u>Hunt</u>, 432 U.S. at 343.

There is no question that the plaintiffs meet the first two prongs of the test, and defendants do not challenge plaintiffs' associational standing on that basis. Defendants rely instead on the third prong, and argue that plaintiffs SEBAC and the plaintiff Unions cannot satisfy this element because "the Second Circuit requires individualized proof of damages in actions under section 1983." (Def. Mem. at 24). The law, however, is not as narrow as defendants assert.

<u>Hunt</u> clearly holds that the third prong precludes associational standing only where "individualized proof" is required, and that where claims can properly be resolved in a group context, the third prong is not a barrier to associational standing. <u>Hunt</u>, 432 U.S. at 344. "Individualized proof" was defined in <u>Warth</u> as the "individual participation of *each* injured party indispensable to proper resolution of the cause." 422 U.S. at 511 (emphasis added); <u>accord</u> <u>United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.</u>, 517 U.S. 544, 552-54 (1996).

Participation in the litigation by some members of the organization to establish the claims of

the group did not preclude standing of the association in <u>Retired Chicago Police Assoc. v. City of Chicago</u>, 7 F.3d 584, 599-603 (7th Cir. 1993), where a police association brought a §1983 action to retain health care coverage for its retirees.  The Seventh Circuit stated:

> We can discern no indication in <u>Warth</u>, <u>Hunt</u>, or [International Union, UAW v. Brock, 477 U.S. 274, 281-82 (1986)] that the Supreme Court intended to limit representational standing to cases in which it would not be necessary to take any evidence from individual members of an association.  Such a stringent limitation on representational standing cannot be squared with the Court's assessment in [International Union, UAW v. Brock, 477 U.S. 274, 281-82 (1986)] of the efficiencies for both the litigant and the judicial system from the use of representational standing. [<u>Id</u>. at 602].

In the Third and Fourth Claims for Relief, the unions and their members seek monetary damages from defendants for their wrongful conduct in undermining the unions and penalizing their members, resulting in a chilling of plaintiffs' First Amendment rights.  In this case, the unions and their members are injured by the same wrongful conduct, and no "fact-intensive-individual inquiry" will be required to prove plaintiffs' allegations.[33]

Moreover, defendants' argument that the Third and Fourth Counts should be dismissed for lack of associational standing loses vigor in light of plaintiff SEBAC's prayer for certification as class representative to assert claims on behalf of all members of its constituent unions.  (<u>See</u> Amended Complaint at ¶¶ 29-33; Prayer for Relief at ¶ 1).  Members of the putative SEBAC Class are the same members represented by plaintiff SEBAC and the plaintiff Unions in this lawsuit. (Compare ¶ 24 of the Amended Complaint with ¶ 29).  Defendants have not challenged the standing of the SEBAC Class, which is also a plaintiff in the Third Count.  Class representative status would

---

[33] The third prong has been deemed by the Supreme Court to be merely "prudential,"and designed to promote efficiency in adjudication, and not an Article III "case or controversy" requirement.  <u>United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.</u>, 517 U.S. 544, 552-54 (1996).

permit SEBAC to assert claims for money damages on behalf of all its member unions and all members of those unions, and, where pertinent, would permit an individualized assessment of monetary damages. Accordingly, even should the court determine that SEBAC and the plaintiff Unions lack associational standing in the Third and Fourth Counts, the claims on behalf of union members, nonetheless, should not be stricken because they can be asserted by the SEBAC Class.

Defendants' Motion to Dismiss the Third and Fourth Counts should, thus, be denied.

## H.    PLAINTIFFS' NINTH CLAIM FOR RELIEF STATES A COGNIZABLE CLAIM FOR VIOLATION OF THE DUE PROCESS, EQUAL PROTECTION AND CONTRACTS CLAUSES.

Defendants next move to dismiss plaintiffs' Ninth Claim for Relief, contending that the Ninth Claim does not state a cause of action for substantive due process. Defendants misconstrue plaintiffs' Ninth Claim and misunderstand the applicable legal principles.

The Ninth Claim alleges that defendants' reason for terminating more that 3,000 unionized state employees was the plaintiff Unions' refusal to give up over $400 million in vested contract benefits conferred by the unions' collective bargaining agreements with the State. (Amended Complaint, Ninth Claim, ¶ 39). The Amended Complaint further alleges that defendants demanded concessions in these areas only from the unions and singled out only union members for termination. (Id. at ¶¶ 43-44).

Plaintiffs' Ninth Claim is based upon the well-established constitutional rule that the state cannot cause a citizen to forfeit a government benefit in retaliation for, or as a penalty for, the individual's exercise of a constitutional right. This is true whether the government benefit being forfeited – in this case continued public employment – is a right or merely a privilege. As the

Supreme Court stated over thirty years ago:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests. ... This would allow the government to "produce a result which [it] could not command directly." ... Such interference with constitutional rights is impermissible. .... [M]ost often, we have applied the principle to denials of public employment.

Perry v. Sinderman, 408 U.S. at 597 (citations omitted); see also Shapiro v. Thompson, 394 U.S. 618 (1969); United States v. Jackson, 390 U.S. 570 (1968); Rutan, 497 U.S. at 72.[34]

Where the government retaliates against or penalizes the individual's assertion of a constitutional right, it violates the constitutional right being asserted. Perry, 408 U.S. at 598 (refusing to renew employment contract of untenured public university professor because of his public criticism of university regents constitutes violation of professor's First Amendment free speech rights); Shapiro, 394 U.S. at 629-30 (one year residency requirement before individual is eligible for AFDC benefits has effect of penalizing new state residents and violates new residents' right to travel); Jackson, 390 U.S. at 581-82 (federal kidnapping statute that limits death penalty to defendants electing jury trial violates defendant's Fifth Amendment right not to plead guilty and Sixth Amendment right to trial by jury).

Plaintiff SEBAC and the plaintiff Unions are parties to collective bargaining agreements approved by the Connecticut legislature, pursuant to Conn. Gen. Stats. § 5-278(b). (Amended Complaint, Ninth Claim at ¶ 52). Pursuant to Conn. Gen. Stats. § 5-278©, the Connecticut

---

[34] This principle is supported by a long line of Supreme Court precedent. See Rutan, 497 U.S. at 86-88 (Stevens, J., concurring) (quoting Perry and citing 16 cases in which Supreme Court applied principle that government may not deny a benefit to a person on a basis that infringes his constitutionally protected interests).

legislature has been required to appropriate all funds necessary to comply with these agreements. (Id. at ¶ 53).

Plaintiffs enjoyed a right under the Contracts Clause of the United States Constitution not to have their respective collective bargaining agreements impaired unreasonably. The State was barred from passing any law compelling state employees to give up the benefits of their collective bargaining agreements. See e.g., Condell v. Bress, supra (sustaining claim for unconstitutional infringement of collective bargaining agreements with state employees to meet budget deficit). See also Association of Surrogates and Supreme Court Reporters, 940 F.2d 766, 770 (2d Cir. 1991) (same).

What the state "could not command directly," Perry, 408 U.S. at 597 – by passing a law impairing plaintiffs' collective bargaining agreements – defendants could not produce indirectly by conditioning continued enjoyment of a government benefit upon forfeiture of a constitutional right. Thus, defendants could not, permissibly, demand that plaintiffs agree to concessions under their collective bargaining agreements – i.e., forego the constitutional protection under the Contracts Clause against impairment of those collective bargaining agreements – or be subject to the termination of their public employment. But this is exactly what the Amended Complaint alleges defendants did. When plaintiffs did not agree to the reductions in their collective bargaining agreement rights that defendants demanded, defendants announced and implemented the termination of 3,000 unionized state employees. Defendants' denial of the government "benefit" of continued state employment as a penalty for plaintiffs' refusal to relinquish their rights under the Contracts Clause constitutes an actionable violation of the Contracts Clause. Perry at 597; Shapiro, 394 U.S. at 629-30; Jackson, 390 U.S. at 581-82.

61

Defendants' denial of the "benefit" of continued government employment in retaliation for plaintiffs' insistence on their rights under their collective bargaining agreements also constitutes a deprivation of property in violation of the substantive due process clause. The law is well-established that interests guaranteed by state statute constitute a "right" or "entitlement" implicating the protections of the Due Process Clause. Board of Regents v. Roth, 408 U.S. 564, 577 (1972); Russell v. Dunston, 896 F.2d at 668 (disability retirement is constitutionally protected property interest); Winston v. City of New York, 759 F.2d 242, 248 (2d Cir. 1985) (pension benefits guaranteed by state law constitute constitutionally protected property interest); Basciano v. Herkimer, 605 F.2d 605, 608 (2d Cir. 1978) (statutory scheme detailing eligibility requirements for disability benefits gave rise to constitutionally protected property interest).[35]

State action resulting in a deprivation of those protected interests on arbitrary or irrational grounds can constitute a substantive due process violation. Brady v. Town of Colchester, 863 F.2d

---

[35] Defendants' reliance on Albright v. Oliver, 510 U.S. 266, 273 (1994), for the proposition that a substantive due process claim cannot proceed where there are other constitutional protections against the governmental behavior challenged overstates the holding in Albright. That case holds only that a plaintiff may not assert a "generalized" or penumbral due process claim where there are more explicit textual rights available to the plaintiff. But where, as here, a plaintiff enjoys a constitutionally protected property right under federal law, plaintiff enjoys a specific – not "generalized" or "penumbral" – right subject to Fifth and Fourteenth Amendment protections, and nothing in the language of Albright precludes a substantive due process claim for violation of that right.

Likewise, defendants' assertion that not every breach of contract rises to the level of a violation of substantive due process (Def. Mem. at 34) is simply inapposite here. In determining whether a particular property interest rises to the level of constitutional protection, "a court must look to whether the interest involved would be protected under state law and must weight the importance to the holder of the right." Ciambriello v. County of Nassau, 292 F.3d 307, 317 (2d Cir. 2002). The interests implicated by the collective bargaining agreements in this case include pension rights, health care benefits and wages – three of the most fundamental aspects of the employment relationship – and are interests which the Second Circuit has held rise to the level of constitutionally protected property rights. Russell, 896 F.2d at 668; Winston, 759 F.2d at 248; Basciano, 605 F.2d at 608.

205, 215 (2d Cir. 1988).[36] A "substantial infringement of state law prompted by personal or group animus, or a deliberate flouting of the law that trammels significant personal or property rights, qualifies for relief under § 1983." Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999), quoting Silverman v. Barry, 845 F.2d 1072, 1080 (D.C. Cir. 1988); see also Gargiul v. Tompkins, 704 F.2d 661 (2d Cir.1983), vacated and remanded on other grounds, 465 U.S. 1016 (1984) (plaintiff states claim of denial of substantive due process in connection with the termination of public employment where employer's conduct "is so unreasonable as to be arbitrary"). That is exactly what plaintiffs allege here. Plaintiffs' Amended Complaint asserts that defendants terminated 3,000 union employees who had statutory and contractual rights to continued employment based on anti-union animus and in retaliation for the employees' unions' endorsement of defendant Rowland's opponent in the 2002 gubernatorial election. Government actions taken for such illegal – and constitutionally impermissible – reasons are a gross abuse of governmental authority, are inherently arbitrary (i.e., not prompted by legitimate government concerns or based on legitimate governmental process) and constitute a denial of substantive due process.

Finally, defendants' conduct – in singling out only union members who insisted upon their Contracts Clause protection against involuntary impairment of their collective bargaining agreement – violated the Equal Protection Clause of the United States Constitution. See, e.g., LaTrieste

---

[36] Similar substantive due process claims have been alleged, but not ruled upon, in Second Circuit precedents under the Contracts Clause. Thus, in Condell, the plaintiff unions asserted that the State's attempt to impose a lag payroll on its union employees violated the Contracts Clause and constituted a denial of substantive due process under the Fourteenth Amendment. 983 F.2d at 417. The Second Circuit sustained the unions' Contracts Clause claim, and did not reach the substantive due process claim. Id. at 420. See Association of Surrogates, 940 F.2d at 770 (same). Significantly, in neither Condell nor Association of Surrogates was there any suggestion -- as defendants argue here (see Def. Mem. at 32) -- that a substantive due process claim could not be asserted simultaneously with a claim grounded in another constitutional provision.

Restaurant & Cabaret, Inc. v. Port Chester, 40 F.3d 587, 590 (2d Cir. 1994) (plaintiff states cognizable equal protection claim for impermissible selective action if (1) plaintiff, compared with others similarly situated, was selectively treated; and (2) such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person).

Defendants misunderstand plaintiffs' Equal Protection Clause claim. (Def. Mem. at 25, n.21). That claim is premised not on plaintiffs' status as union employees, but rather on their assertion of their rights under the SEBAC Agreement (and the concomitant right against impairment of that Agreement). (Amended Complaint, Ninth Claim, ¶ 60). The classification effected by defendants' actions distinguishes between union employees (who have exercised their Contracts Clause rights) and non-union employees (who did not) and, thus, directly implicates the exercise of a constitutional right. That members of the Connecticut State Police Union have been spared terminations does not defeat plaintiffs' Equal Protection Clause claim since it does not alter the fact that only employees who exercised their constitutional rights have been affected by the terminations.

It is, of course, well-established that "any classification which serves to penalize the exercise of [a constitutional right], unless shown to be necessary to promote a compelling governmental interest, is unconstitutional." Shapiro, 394 U.S. at 634 (rejecting rational relationship review of classifications infringing on fundamental constitutional rights). Defendants can point to no compelling state interest for singling out for termination only union members who have exercised their rights under the Contract Clause, purportedly to achieve budget savings, while sparing altogether non-union members from lay-off. Defendants' motion to dismiss plaintiffs' Ninth Claim for Relief must, accordingly, be denied.

64

I.    THE TENTH CLAIM FOR RELIEF STATES A COGNIZABLE CAUSE
      OF ACTION UNDER THE DUE PROCESS CLAUSE FOR DENIAL OF
      PLAINTIFFS' PROPERTY INTEREST IN STATE EMPLOYMENT.

In the Tenth Claim for Relief, the individual plaintiffs assert that they (and their putative

class) enjoyed a constitutionally protected property right to continued state employment arising from

their respective collective bargaining agreements.  Plaintiffs further assert that defendants' actions in

terminating their employment for constitutionally impermissible reasons deprived them of their

property right in continued state employment and violates their rights of substantive due process.

Defendants move to dismiss the substantive due process claim in plaintiffs' Tenth Claim for Relief,

asserting that plaintiffs do not have a constitutionally protected property interest in continued state

employment.[37]  This argument is contrary to established case law.

The Second Circuit has repeatedly held that "a public employee has a property interest in

continued employment if the employee is guaranteed continued employment absent 'just cause' for

discharge." Harhay v. Town of Ellington Bd. of Educ., 323 F.3d at 212-13;[38] Ciambriello, 292 F.3d

at 313, citing Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991); accord Dobosz v.

Walsh, 892 F.2d 1135, 1141 (2d Cir. 1989); Dwyer v. Regan, 777 F.2d at 830-31 (holding that

---

[37]  Plaintiffs also allege that the selection of members of the endorsing unions for lay-offs violates those plaintiffs' right to equal protection. (Amended Complaint, Tenth Claim, ¶¶ 55, 58).  Defendants' assertion that this claim fails because the members of the Connecticut State Police Union were spared lay-offs, (Def. Mem. at 25, n.21), once again mistakes the basis for plaintiffs' claim.  The equal protection violation alleged in the Tenth Claim is premised not on plaintiffs' status as union employees, but rather on their status as members of endorsing unions.  The classification effected by defendants' actions singles out state employees who have exercised their First Amendment rights of political belief and, thus, directly implicates the exercise of a constitutional right. Shapiro, 394 U.S. at 634 (classification which serves to penalize exercise of a constitutional right is unconstitutional).

[38]  In Harhay the Second Circuit held that plaintiff had not proven a procedural due process violation.  It did not consider whether her property interest was protected by substantive due process because she failed to assert a substantive due process claim.  Harhay, 323 F.3d at 212 & n.1.

65

plaintiff had adequately alleged a property interest by alleging that he could not be removed from his position except for incompetency or misconduct).

The plaintiff Unions' respective collective bargaining agreements specifically provide that permanent union employees cannot be subjected to adverse employment action except for just cause:

> No permanent employee who has completed the working test period shall be demoted, transferred for disciplinary reasons, suspended, discharged or otherwise disciplined except for just cause.

(See Collective Bargaining Agreement between State and CEUI for Maintenance and Service Unit (NP-2), Art.17, Sec. 1, copy attached to Def. Mem. as Exhibit C).  Under well-established Second Circuit precedent, this language in plaintiffs' respective collective bargaining agreements gives plaintiffs a constitutionally protected property interest in continued state employment. Ciambriello, 292 F.3d at 313.

Defendants' reliance on language from the collective bargaining agreements retaining for the State the right to make lay-offs "because of lack of work or for other legitimate reasons" is unavailing.  Plaintiffs' Amended Complaint makes specific factual allegations that the terminations and other adverse employment actions were driven by unconstitutional – and, thus, illegitimate – retaliatory motives.  By the express terms of their collective bargaining agreements, plaintiffs had an interest in not being laid-off for illegitimate reasons.  The right not to be laid off for illegitimate reasons is fully analogous with the right not to be discharged or disciplined except for just cause – and just as the latter right is sufficiently substantial to create a constitutionally protected property

66

interest, so too is the former.[39]

Defendants' reliance on <u>Mandel v. Allen</u>, 889 F. Supp. 857 (E.D. Va. 1995), <u>aff'd</u>, 81 F.3d

478 (4th Cir. 1996) once again reflects an improper attempt, on a motion to dismiss, to substitute

their own (disputed) version of their motivations for plaintiffs' allegations that the terminations in

this case were undertaken for unlawful reasons.  While <u>Mandel</u> held that there was no property

interest against lay-offs undertaken for legitimate programmatic reasons, it specifically noted that

"job abolition ... may not be cited as a pretext for avoiding an employee's right to due process" when

a termination is actually for reasons other than a legitimate governmental reorganization.  <u>Id</u>. at 866.

Likewise, here, on a motion to dismiss, defendants cannot invoke their asserted legitimate

justification for the lay-offs to defeat plaintiffs' claim that these lay-offs were motivated by

impermissible reasons and, thus, violated plaintiffs' constitutionally protected property rights under

their collective bargaining agreements.

---

[39] Significantly, while asserting their retained right to order lay-offs for legitimate programmatic reasons, defendants ignore additional limitations on that right.  Thus, for example, plaintiffs' collective bargaining agreements expressly provide for re-employment after layoff.  (<u>See</u> Defendants' Exhibit C at Art.13, Sec. 7).  But defendants have announced that laid-off union employees will never be brought back for reemployment.  (Amended Complaint, ¶ 54f).  Defendants' refusal to recall such employees is independently actionable as a due process violation.  As the Second Circuit held in <u>Harhay</u>:

> Harhay's right to reappointment – explicitly delineated with the establishment of a "reappointment list" in her employment contract – is a property interest for the purposes of due process analysis.  Her contractual right is defined and enforced by Connecticut law under the CBA.  Furthermore, it can – and should – be characterized as an "important" interest – as opposed to a "trivial and insubstantial" interest – as it directly affects her right to be employed at all. [<u>Harhay</u>, 323 F.3d at 212-13].

IV.     **CONCLUSION**

For the foregoing reasons, defendants' Motion to Dismiss should be denied.

<div style="margin-left:50%">

PLAINTIFFS STATE EMPLOYEES
BARGAINING AGENT COALITION,
ET AL.

BY _____

DAVID S. GOLUB  ct 00145
JONATHAN M. LEVINE ct 07584
MARILYN J. RAMOS ct 11433
SILVER GOLUB & TEITELL LLP
184 ATLANTIC STREET
P.O. BOX 389
STAMFORD, CONNECTICUT  06904
(203) 325-4491

</div>

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been served, this 29th day of December,

2005, by overnight delivery to:


Albert Zakarian, Esq.
Allan B. Taylor, Esq.
Victoria Woodin Chavey, Esq.
Daniel A. Schwartz, Esq.
Day, Berry & Howard LLP
CityPlace I
Hartford, CT 06103-3499

James K. Robertson, Jr., Esq.
Carmody and Torrance
50 Leavenworth Street
Waterbury, CT 06721-1110.


_____
JONATHAN M. LEVINE