## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATE EMPLOYEES BARGAINING | : | CIVIL ACTION NO. |
| AGENT COALITION, ET AL. | : | |
| Plaintiffs, | : | 3:03CV221 (AVC) |
| | : | |
| V. | : | |
| | : | |
| JOHN G. ROWLAND, ET AL., | : | |
| Defendants. | : | JANUARY 5, 2006 |

## DEFENDANTS' CONSOLIDATED REPLY
## BRIEF IN SUPPORT OF MOTION TO DISMISS[1]

Plaintiffs have not cited, and defendants have not found, any case in which a court has held that an employer not bound by a no-layoff clause – and indeed expressly empowered by the applicable collective bargaining agreements to conduct layoffs – is forbidden from requesting concessions from a union and backing up that request with the threat and fact of layoffs of those employees whose union refuses to make the concessions. Plaintiffs have not cited, and defendants have not found, any case in which a federal court has agreed to second-guess a Governor's conclusions that a state's fiscal health requires either union concessions or layoffs of union employees.[2] Rather, at least two cases (one is this District) have concluded exactly the opposite – that a Governor's fiscal policy decisions resulting in layoffs of state employees must not be second-guessed – and have embraced Defendants' position.

---

[1] As requested by the Court, this Reply Brief contains the arguments from Defendants' May 9, 2003 Reply Brief and their August 29, 2003 Reply Brief. The only additions contained herein are points addressing cases decided after August 29, 2003, which Plaintiffs discussed in their Consolidated Opposition.

[2] This reply brief addresses some but not all aspects of Plaintiffs' Consolidated Opposition Brief ("Pl. Br."), filed on December 29, 2005. Defendants do not waive any arguments presented in the primary brief but not raised again herein.

# I.  LEGISLATIVE IMMUNITY:
## DEFENDANTS CANNOT BE SUED IN FEDERAL COURT FOR THEIR ACTIONS TO BALANCE THE STATE BUDGET

Since the relief Plaintiffs claim is literally unprecedented, their complaint that defendants' invocation of legislative immunity has no direct precedent sounds a false note.  (Pl. Br. at 14-30.)  The question before this Court is whether legislative immunity should apply to a Governor's decision to eliminate categories of positions from a severely unbalanced State budget.  That question must be answered by applying the analysis set forth in the Supreme Court's most recent decision on legislative immunity, Bogan v. Scott-Harris, 523 U.S. 44 (1998), to the facts alleged.

Plaintiffs do not deny that the Governor's actions "involved the termination of [] position[s], which, unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant[s] of the office."  Bogan, 523 U.S. at 56.  (Pl. Br. at 21, 23-24.)  They contend, however, that those decisions did not "reflect[] broad, policy-making or Budget decisions" because, they allege, defendants acted on impermissible motives and "without regard to programmatic needs or cost-savings from the lay-offs. . . ."  (Pl. Br. at 27.)  That argument completely misses the point of Bogan, which held that  "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."  Bogan, 523 U.S. at 54.[3]  Plaintiffs' allegations of improper motive and disagreement with the wisdom of defendants' actions do not alter the indisputable fact that the actions alleged were "discretionary, policymaking decision[s] implicating the budgetary

---

[3] Bogan held that legislative immunity protected the defendants in that case even though a jury had found that their action was retaliation for the plaintiff's protected activities.

priorities of the [State] and the services the [State] provides to its constituents."  Bogan, 523 U.S. at 55-56.

Plaintiffs' principal argument against application of legislative immunity to the discretionary, policy decisions at issue here is that the Governor cannot claim legislative immunity for budget decisions because he is the Governor.  (Pl. Br. at 15-17.)  This argument ignores the well-established principle that "[a]bsolute immunity applies to activities, not offices" and "protects officials fulfilling legislative functions even if they are not 'legislators.'"  Bryan v. City of Madison, 213 F.3d 267, 272 (5th Cir. 2000).  See also Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206, 209 (2d Cir. 2003) ("immunity depends on the nature of the act itself, not the identity of the actor performing it").[4]  Plaintiffs also ignore those cases that have applied absolute immunity to Governors.  See Def's Cons. Memo at 10-11, discussing Abbey v. Rowland, 359 F. Supp. 2d 94, 97-98 (D. Conn. 2005) and Lewis v. New Mexico Dept. of Health, 275 F. Supp. 2d 1319, 1328 (D. N.M. 2003).

Engaging in many uses of high-handed rhetoric, Plaintiffs call the defendants' assertion of absolute legislative immunity "a patent misstatement of the law."  (Pl. Br. at 21.)  This accusation is wholly unwarranted, given that defendants' argument is based directly on the

---

[4] In Harhay, the Second Circuit and this Court rejected a claim of legislative immunity because the individualized determination at issue in that case was not legislative in nature.  The Second Circuit explicitly noted that it was not suggesting "that decisions regarding the elimination of a class of jobs for budgetary or policy reasons would not be legislative in nature simply because they relate to employment."  Harhay, 323 F.3d at 208.

Moreover, the Third Circuit's doctrine (Gallas v. Supreme Court of Pennsylvania, 211 F.3d 760, 774 (3d Cir. 2000)) that legislative immunity applies only to actions that are both substantively and "procedurally" legislative (Pl. Br. at 25-26) should be rejected as inconsistent with both the Second Circuit's and Bogan's focus on the substance of the challenged action.  It is also inconsistent with the Supreme Court's recognition that legislative immunity may apply to executive branch rulemaking.  Supreme Court of Virginia v. Consumers Union, 446 U.S. 719, 734 (1980).

Supreme Court's decision in <u>Bogan</u> and those cases that have followed it in similar circumstances.  (Def's Cons. Memo at 10-11.)  Indeed, applying these cases to Plaintiffs' allegations leads easily to the conclusion that absolute legislative immunity applies to the defendants' challenged conduct and that this defense is, therefore, compelling.

In light of <u>Bogan</u> and <u>Lewis</u> (and now <u>Abbey</u>), it is Plaintiffs who are disingenuous in asserting that legislative immunity applies only to acts of the legislature or acts in furtherance of the legislature's formal "Budget"[5] process.  (Pl. Br. at 22.)  <u>Bogan</u> specifically holds that:

- "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."  523 U.S. at 54.

- "[O]fficials outside the legislative branch are entitled to legislative immunity when they perform legislative functions."  <u>Id.</u> at 55.

- "We need not determine whether the formally legislative character of petitioners' actions is alone sufficient to entitle petitioners to legislative immunity, because here the ordinance, in substance, bore all the hallmarks of traditional legislation.  The ordinance reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents.  Moreover, it involved the termination of a position, which, unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office."  <u>Id.</u> at 55-56.

The District Court in <u>Lewis</u> applied <u>Bogan</u> to conclude that New Mexico Governor Gary Johnson's challenged actions, including, inter alia, issuing a policy objective that precipitated the

---

[5] Without citation or any hint of authority, plaintiffs seek to distinguish "Budget" related actions from "budget" related actions, i.e., capital B versus small b.  (Pl. Br. at 23.)  Plaintiffs assert that this so-called distinction separates conduct that is potentially subject to legislative immunity from conduct that is not.

revamping of the state personnel system, were legislative in nature and thus entitled to absolute legislative immunity.  275 F. Supp at 1326.  In <u>Lewis</u>, Plaintiffs -- applicants for Medicaid-funded state services -- sued Governor Johnson and another state official, alleging, inter alia, "inadequate funding and support of the [service] programs [for which Plaintiffs had applied]." <u>Id.</u>  In considering the Governor's assertion of legislative immunity, the <u>Lewis</u> court focused its analysis on "the function [the Governor] was performing when the actions at issue took place and . . . the nature of those actions"; the court made nothing of the fact that the Governor's actions did not take the form of legislation.  <u>Id.</u> at 1325.  The court's thoughtful analysis is particularly apt here:

- "'At its core, the legislative function involves determining, formulating, and making policy.'" <u>Id.</u> (citations omitted).

- "Funding for any state program is a budgetary and policy decision for the state to make." <u>Id.</u> at 1327.

- "Governor Johnson's 'policy objective precipitating the revamping of the state personnel system' and his 'advice to [the Secretary of the agency providing services] and his predecessors to plan for limited growth in the Waiver programs,' also are legislative in nature. In planning and formulating the state budget, Defendant Governor Johnson, like the mayor in <u>Bogan</u>, had the discretion to streamline or 'revamp' the state personnel system and to curtail the growth of the waiver programs." <u>Id.</u> at 1327.

As the <u>Lewis</u> decision makes abundantly clear, a state official's broad policy judgments concerning the budget are legislative in nature, regardless of that state official's title or branch of government.  Here, Plaintiffs' emphasis on our state's commitment of certain functions, such as negotiating with state employee unions, to the Executive Branch thus has absolutely no bearing

on the applicability of legislative immunity.  (Pl. Br. at 22-25.)  Moreover, Plaintiffs' allegation

that the Connecticut Legislature was not involved in any of the challenged actions is irrelevant to

the central inquiry required to determine the applicability of legislation immunity.[6]

Equally unavailing is Plaintiff's attempt to distinguish Abbey, *which involved the same*

*set of layoffs*, because they claim (although it is nowhere in their Complaint) that Governor

Rowland never formally invoked Conn. Gen. Stat. § 4-85(b).  (Pl. Br. at 22, 23 n.17, 28.)

Contrary to Plaintiffs' suggestion (Pl. Br. at 27), it makes no difference under Bogan's functional

approach whether the terminations were "pursuant to legislation" or "embodied in legislation."

The Governor's implementation of layoffs to reduce a state-wide budget deficit is exactly the

kind of policy-based decision entitled to immunity under Bogan.  See Bogan, 523 U.S. at 55-56,

Abbey, 359 F. Supp. 2d at 97-98.

Moreover, although the Connecticut Constitution contains the familiar three branches of

government, the Connecticut doctrine of separation of powers allows for a necessary sharing of

functions among the branches:

> "As we have recognized, the great functions of government are not divided in any
> such way that all acts of the nature of the function of one department can never be
> exercised by another department; such a division is impracticable, and if carried
> out would result in the paralysis of government.  Executive, legislative and
> judicial powers, of necessity overlap each other, and cover many acts which are in
> their nature common to more than one department." (Internal quotation marks
> omitted.)  Massameno v. Statewide Grievance Committee, 234 Conn. 539, 552,
> 663 A.2d 317 (1995).  We have consistently "held that there are activities in
> which more than one branch of government may participate."  University of
> Connecticut Chapter, AAUP v. Governor, 200 Conn. 386, 394, 512 A.2d 152
> (1986).

---

[6] The plaintiffs' attempt to attack the Governor's recent statements regarding the
Legislature's proposed budget plan, which he ultimately vetoed on August 8, 2003, is similarly
misguided.  (Pl. Br. at 29.)  Whether certain activities "are matters entrusted to the Executive
Branch" has no bearing on whether, as a matter of law, the nature of the activities is broad,
discretionary policymaking that is "quintessentially legislative".  See Bogan, 523 U.S. at 55-56.

Seymour v. Elections Enforcement Comm'n, 255 Conn. 78, 107, 672 A.2d 880 (2000).   One of

those "activities in which more than one branch of government may participate" in Connecticut

is the necessary adjustment of the budget to meet changing fiscal circumstances.   University of

Connecticut Chapter, AAUP v. Governor, 200 Conn. 386, 512 A.2d 152 (1986).   The Governor's

invocation of the power and responsibility he shares with the Legislature to make "discretionary,

policymaking decision[s] implicating the budgetary priorities of the [State] and the services the

[State] provides to its constituents," Bogan, 523 U.S. at 55-56, like a legislator's involvement in

budgetary decision-making, "should not be inhibited by judicial interference or distorted by the

fear of personal liability."   Id. at 52.[7]

      This Court must also reject Plaintiffs' claim that they can maintain their suit for

injunctive relief against the defendants in their official capacities even if they cannot proceed

against the defendants individually for damages. (Pl. Br. at 30.)  The Second Circuit has held that

state legislative immunity bars actions for injunctive relief.   Star Distributors, Ltd. v.  Marino,

613 F.2d 4, 6-10 (2d Cir. 1980).  The holding in Star Distributors was specifically approved by

the Supreme Court, which reached the same conclusion.   Supreme Court of Virginia v.

Consumers Union, 446 U.S. 719, 732 n.10 (1980); id. at 732-34.

      Plaintiffs attempt to avoid these holdings by arguing that they seek injunctive relief

against defendants in their capacity as "enforcers" of the decision not to fund certain positions.

Their Complaint, however, does not allege that defendants have violated the Constitution by

failing to provide funds for the positions to which Plaintiff union members seek reinstatement, or

that the Constitution requires Connecticut to provide a larger number of unionized positions than

---

[7] Plaintiffs' suggestion that the underlying and limiting purpose of legislative immunity is
to protect members of the legislative branch from over-reaching by the executive branch (Pl. Br.

it has made available, and no such allegations could be made. Rather, their claims for injunctive

relief seek to challenge the discretionary decision making in which defendants have engaged and

to force them to reach a different conclusion. That is precisely the kind of harassment and

interference with the processes of self-government that the doctrine of legislative immunity is

intended to prevent.

For these reasons, this Court should dismiss the Complaint on the ground that legislative

immunity applies.

## II.  ELEVENTH AMENDMENT SOVEREIGN IMMUNITY:
## THE <u>EX PARTE YOUNG</u> EXCEPTION TO THE ELEVENTH AMENDMENT
## DOES NOT APPLY[8]

Plaintiffs begin their discussion of Eleventh Amendment sovereign immunity by

invoking empty formalisms concerning the manner in which they have pled their claims. (Pl. Br.

at 32.) The Supreme Court has flatly rejected such simplistic arguments, cautioning that "[t]he

real interests served by the Eleventh Amendment are not to be sacrificed to elementary

mechanics of captions and pleading." <u>Idaho v. Coeur d'Alene Tribe</u>, 521 U.S. 261, 270 (1997);[9]

<u>see also</u> <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 102 n.11 (1984) ("'[A] suit is

against the sovereign if 'the judgment sought would expend itself on the public treasury or

domain, or interfere with the public administration,' or if the effect of the judgment would be to

restrain the Government from acting, or to compel it to act.'"). Accordingly, despite Plaintiffs'

---

at 25 n.19) founders on the undisputed applicability of legislative immunity to the exercise of the
power to veto.

[8] <u>Ex parte Young</u>, 209 U.S. 123 (1908), held that the Eleventh Amendment did not bar
suits against state officials for prospective injunctive relief.

[9] This portion of the <u>Coeur d'Alene</u> opinion – section IIa – is supported by a majority of
five Justices, not a mere two Justices, as the plaintiffs imply. (Pl. Br. at 37.)

hope that this Court will review their claims only superficially, this Court must put aside Plaintiffs' denomination of their claims and conduct a careful analysis of whether the Eleventh Amendment bars this lawsuit.

This analysis must follow two separate, though closely related, paths within the caselaw:

## A.    The State Is The Real Party In Interest

Despite Plaintiffs' platitudes about "individual capacity" and "official capacity" nomenclature, their claims are against the State itself.  (Pl. Br. at 32.)  Where the relief sought is that which is uniquely available from the state, not the individual state officials sued, the Eleventh Amendment applies to preclude the suit. See Dwyer v. Regan, 777 F.2d 825, 836 (2d Cir. 1985), modified, reh'g denied, 793 F.2d 457 (2d Cir. 1986); see also Lizzi v. Alexander, 255 F.3d 128, 136-37 (4th Cir. 2001) (dismissing lawsuit alleging Family and Medical Leave Act violations against, inter alia, state officials in their individual capacities, because the real party in interest is the state itself); Luder v. Endicott, 253 F.3d 1020, 1024 (7th Cir. 2001) (dismissing lawsuit alleging Fair Labor Standards Act violations against state officials in their individual capacities, because "Plaintiffs are seeking to accomplish exactly what they would accomplish were they allowed to maintain this suit against the state"); accord United States ex rel. Gaudineer & Comito, L.L.P. v. Iowa Health & Human Services, 269 F.3d 932, 937 (8th Cir. 2001) (affirming district court's refusal to permit Plaintiff to add individual capacity claim against state official, because the allegations in proposed new claim revealed that the same acts underlay both the official capacity claim (which had been dismissed under the Eleventh Amendment) and the proposed individual capacity claim); Hughes v. Savell, 902 F.2d 376, 377-79 (5th Cir. 1990)

(dismissing individual capacity claims against state official because state was real party in interest), cert. denied, 536 U.S. 925 (2002). [10]

The Second Circuit has recognized that when a state has not been sued in its own name, but a state official is sued instead, "the 'question arises as to whether that suit is a suit against the state itself.'" Dwyer, 777 F.2d at 835 (citations omitted). Determining whether the State is the real party in interest on Plaintiffs' claims requires an analysis of the challenged actions as well as the nature of the relief sought, which will in turn reveal whether the lawsuit "*demonstrably* has the *identical* effect as a suit against the state." Luder, 253 F.3d at 1023. Here, Plaintiffs' claims seek to reverse governmental action (the layoffs authorized by the collective bargaining agreements) and to force the State to choose other cost-cutting methods, while making Plaintiffs whole for alleged "financial losses" (see Amended Complaint ¶ 62) and other alleged damages. These allegations overwhelmingly show that this is an action against the State; the Governor and Secretary did not act as individual citizens while employing and laying off State workers, nor would the reversal of the layoff decisions and payment of lost wages relate to the Governor and Secretary as citizens. [11] It is perfectly clear, notwithstanding Plaintiffs' convoluted explanation of

---

[10] Cases holding that the Eleventh Amendment is not a bar to individual capacity claims against state officials merely because the state would indemnify the official against any monetary judgment are of no consequence here. See, e.g., Ashker v. California Dep't of Corrections, 112 F.3d 392 (9th Cir. 1997). Here, the defendants' Eleventh Amendment argument is not based primarily, or even partially, on the likelihood of indemnification of them by the State. Rather, the defendants' Eleventh Amendment argument is founded on the nature of the challenged actions and the nature of the relief sought, as set forth herein and in the defendants' primary brief in support of dismissal.

[11] The Connecticut Legislature's recently passed budget, signed by the Governor on August 16, 2003, does not provide for re-creation of the positions eliminated in the layoffs that this lawsuit challenges. At this point, therefore, the plaintiffs' continued unemployment is the result of the Legislature's action in failing to provide for re-creation of those positions, not the result of any action by the defendants. Accordingly, no prospective injunctive relief (even if it were otherwise warranted) is possible, as it would have to be directed toward the Legislature.

why "back pay and benefits" are not "actual economic loss" (Pl. Br. at 34-35), that Plaintiffs

seek to force the State to change its chosen means of dealing with the budget crisis and that the

State is the real party in interest.  See Dwyer, 777 F.2d at 835-36. [12]

## B.    Special Sovereignty Interests Are Implicated By Plaintiffs' Claims

In Coeur d'Alene, the Supreme Court enunciated an exception to Ex parte Young for

lawsuits that implicate "special sovereignty interests" of the state.  521 U.S. at 281.  To

determine whether special sovereignty interests were at stake, the Supreme Court looked to the

importance of the matter to state sovereignty and the potential for diminishing the state's

sovereignty in the course of resolving the dispute.  521 U.S. at 283-87.  The Courts of Appeals

have also recognized this Coeur d'Alene exception to Ex parte Young, though they have

construed the exception narrowly.  See, e.g., Cardenas v. Anzai, 311 F.3d 929, 938 (9th Cir.

2002); Barton v. Summers, 293 F.3d 944, 951 (6th Cir. 2002); In re Ellett, 2001 U.S. App.

---

[12] The plaintiffs' argument that, in the individual capacity claims, they may seek their lost wages, or back pay, and benefits as necessary part of their alleged compensatory damages is ill-founded and misleading.  (Pl. Br. at 30.)  The Second Circuit's decision in Dwyer, which itself relies on Edelman v. Jordan, 415 U.S. 651 (1974), makes crystal clear that the Eleventh Amendment bars claims for money that the state as employer was responsible for paying but did not: "[w]hile [the defendant] had no duty in his individual capacity to pay [the plaintiff's] salary, he did have a duty not to deny [the plaintiff] his federally protected right[s] … [and] there would be no Eleventh Amendment impediment to his recovering damages for that denial."  Dwyer, 777 F.2d at 836-37.

Moreover, the First Circuit decision in Figueroa-Rodriguez v. Aquino, 863 F.2d 1037, 1043 n. 7 (1st Cir. 1988), is quoted incompletely, and misleadingly, by plaintiffs.  As the First Circuit explicitly held, "The [backpay] order should not have run against Aquino [the defendant]."  The missing phrase that follows the plaintiffs' quotation ("To say that an 'individual capacity' defendant is liable for 'back pay' is a misnomer; he may be liable for compensatory damages in the same amount (plaintiff's lost wages)") is significant: "but such liability must first hurdle any applicable immunity defense."  Id. This passage from Figueroa-Rodriguez, therefore, poses, rather than answers, the very question presented by defendants' motion: are defendants immune from the plaintiffs' claims?

LEXIS 19184, *19-24 (9th Cir. 2001).[13]  The Ninth Circuit has articulated the Coeur d'Alene

exception to Ex parte Young by saying that it applies only when the relief sought "would be so

much of a divestiture of the state's sovereignty as to render the suit one against the state itself."

In re Ellett, 2001 U.S. App. LEXIS 19184, at *19-20 (quoting Agua Caliente Band of Cahuilla

Indians v. Hardin, 223 F.3d 1041, 1048-49 (9th Cir. 2000)).

Unlike Plaintiffs, these Courts of Appeals have not declared Coeur d'Alene a dead letter

in light of Verizon Maryland v. Public Service Comm'n of Maryland, 535 U.S. 635 (2002).  (Pl.

Br. at 37-38.)[14]  Both Barton and Cardenas were decided after Verizon Maryland, yet

nonetheless recognized the vitality of the "special sovereignty interests" exception to Ex parte

Young.  More specifically, in Barton, the court held that an attempt to force the allocation of

state funds did indeed implicate special sovereignty interests, and it held that the Eleventh

Amendment barred the lawsuit. 293 F.3d at 951.[15]

Here, even applying a narrow interpretation of the Coeur d'Alene exception to Ex parte

Young, this case should be dismissed on the basis of Eleventh Amendment immunity.  As in

Barton, the relief sought here strikes at the very core of the State's sovereignty, insofar as it asks

_____

[13] Copies of unreported cases are attached hereto as Exhibit A.

[14] Contrary to plaintiffs' implication, the Second Circuit has not embraced Verizon
Maryland to the exclusion of Coeur d'Alene.  Although the plaintiffs correctly state that the
Second Circuit has twice cited Verizon Maryland, neither of those cases involved a claimed
"special sovereignty interest" such that the Coeur d'Alene exception was even mentioned.  Ford
v. Reynolds, 316 F.3d 351, 255 (2d Cir. 2003) (dismissing plaintiffs' claims under Eleventh
Amendment because plaintiffs made no valid claim for prospective injunctive relief); CSX
Transp., Inc. v. N.Y.S. Office of Real Prop. Servs., 306 F.3d 87, 98-99 (2d Cir. 2002) (citing
both Verizon Maryland and Coeur d'Alene in complementary fashion).

[15] In Cardenas, the court determined that providing for the health and welfare of its
residents was not a unique and important aspect of state sovereignty, and, therefore, the lawsuit
was not barred by the Eleventh Amendment.  311 F.3d at 938.

this Court to evaluate the State's attempt to resolve its severe budget crisis and to direct its fiscal, programmatic, and operational choices. Even more so than the allocation of state funds in <u>Barton</u>, the relief sought here would intrude profoundly on the State's sovereignty. Indeed, making decisions about the level and nature of state services and programs is fundamental to self-government, inherent in "[t]he dignity and status of . . . statehood." <u>Coeur d'Alene</u>, 521 U.S. at 287. Accordingly, Plaintiffs' claims fall squarely within the <u>Coeur d'Alene</u> exception to <u>Ex parte Young</u>, even if narrowly circumscribed, and must be dismissed.

### III.  QUALIFIED IMMUNITY:
### DEFENDANTS' ALLEGED CONDUCT WAS OBJECTIVELY REASONABLE

In asserting the qualified immunity defense, defendants do not, contrary to Plaintiffs' bald assertions, simply seek to substitute their version of the facts for Plaintiffs' version. (Pl. Br. at 42.) Rather, defendants argue that it was objectively reasonable, as a matter of law, for them to believe that their conduct, now challenged by Plaintiffs, was not violative of constitutional rights.

Plaintiffs' argument is conspicuous in its failure to cite even one case in which a Governor was found to have acted unconstitutionally when addressing a budget crisis by conducting layoffs that were expressly authorized by the applicable bargaining agreements. Their failure to cite, and presumably to find, such a case reveals the fundamental weakness in their argument that it was not objectively reasonable for the defendants to act as they allegedly did. The key question is "whether the state of the law [at the time of the alleged violations] gave [defendants] fair warning that their alleged [conduct] was unconstitutional." <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002). Here, in the absence of any case law that gives notice that the defendants' alleged conduct may be unconstitutional, their alleged conduct must be considered objectively reasonable.

-13-

Moreover, Plaintiffs' individual capacity claims, which will ultimately require a showing of retaliatory motive if permitted to proceed, cannot survive a motion to dismiss on so slender a reed as their circular allegations of the defendants' anti-union animus.  Although Plaintiffs assert that the Governor and Secretary were motivated by anti-union animus, the only allegations they have pled in support of this purported motivation go to the basic fact that the State laid off union members.  (E.g., Complaint, ¶¶ 43-46.)  It is inconceivable that layoffs of union members could be considered, in and of themselves, proof of animus against union members.  Moreover, Plaintiffs have not alleged any comments made or documents created by either the Governor or the Secretary during the bargaining process that suggest that either person intended to use layoffs for an improper purpose.  The emptiness of Plaintiffs' allegations concerning the defendants' anti-union animus, together with the objective reasonableness of the defendants' invocation of the layoff provisions in the applicable bargaining agreements, renders the doctrine of qualified immunity applicable to the individual capacity claims, which must therefore be dismissed.

## IV.  FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED: COUNTS SECOND, SIXTH, NINTH AND TENTH

Even putting aside the immunity issues, the underlying constitutional claims of Plaintiffs are, themselves, deficient and must still be dismissed.

### A.    Counts Two and Six Do Not State Viable Causes of Action

Plaintiffs[16] claim that Counts Two and Six, purporting to state claims of  a violation of freedom of speech under the First Amendment, should not be dismissed because Plaintiffs allege that they are members of an organization – a union – that supported Governor Rowland's

---

[16] The plaintiffs in Counts Two and Six are the Named Plaintiffs and a purported class of members of unions that supported the Governor's opponent in the 2002 election.  Complaint Count Two ¶ 66-67, Count Six ¶¶ 62-63.

opponent in the 2002 election.  (Pl. Br. at 47-50.)  However, Plaintiffs miss the point of defendants' arguments and the cases cited in support of dismissal. Ultimately, Plaintiffs' claims must fail because they have not alleged that they themselves – and not some entity or organization – engaged in protected political speech and that they themselves were targeted for layoff accordingly.

Although defendants acknowledge the holdings in three Supreme Court cases – <u>Branti v. Finkel</u>, 445 U.S. 507 (1980); <u>Rutan v. Republican Party of Ill.</u>, 497 U.S. 62 (1990); and <u>Elrod v. Burns</u>, 427 U.S. 347 (1976) – on somewhat related issues, the Supreme Court's trilogy is not controlling here because each of those cases involved specific allegations regarding individualized political speech, on the basis of which each state employee Plaintiff was allegedly discharged from or denied employment.  Indeed, in each of those cases, Plaintiffs alleged that they were members of an opposition political party and not merely members of an entity or organization.

For example, in <u>Branti</u>, Plaintiffs were terminated from their positions as public defenders <u>because</u> they were Republicans. 445 U.S. 507  In <u>Elrod</u>, a new sheriff – who was a Democrat – discharged the existing non-civil service employees <u>because</u> they did not affiliate with the Democratic party.  Specifically, Plaintiffs were allegedly required to pledge political allegiance to the Democratic Party, work for the election of other candidates of the Party, contribute a portion of their wages to the Party, or obtain the sponsorship of a member of the Party. 427 U.S. at 354.  In <u>Rutan</u>, the Governor of Illinois implemented a hiring freeze whereby all new hires were required to have the Governor's "express permission."  497 U.S. at 66.  In that case, in reviewing an agency's request that a particular applicant receive permission for a particular position, the Governor's Office looked, among other factors, at whether the applicant

voted in Republican primaries in past election years and whether the applicant had provided financial or other support to the Republican Party and its candidates.  Id.

In stark contrast, Plaintiffs make no allegations that rise to the level of the constitutional violations suggested by these Supreme Court cases. Indeed, there are no allegations that even suggest that each of Plaintiffs was a member of the Democratic Party or that they each voted for, or otherwise acted in support of, Governor's Rowland's opponent.[17]  Plaintiffs have failed to cite any case, and defendants can find no case, that finds a constitutional violation to be stated simply by alleging that Plaintiffs were members of an entity or organization that endorsed an opponent's political campaign, in the absence of any allegation of political speech in which each Plaintiff individually engaged.  Quite simply, being a member of a union is not the same as being a member of an opposition political party.  Plaintiffs are, therefore, wrong in their assertion that there is "no constitutional difference" between the facts of this case and the Supreme Court's line of cases. (Pl. Br. at 50.)  Accordingly, Counts Two and Six should be dismissed for failure to state a cognizable claim.[18]

**B.    Plaintiffs' Ninth Claim for Relief Must Also Be Dismissed**

Plaintiffs continue to be evasive about the specific basis of Count Nine.  Is it a substantive due process claim? A claim under the Contracts Clause of the Constitution? Plaintiffs never address this issue and instead spew legal theories in the apparent hope that this Court will

---

[17] Presumably, some of the 45,000 members of the state unions who are in the purported class voted for Governor Rowland because he won re-election by a broad majority in November 2002.

[18] Plaintiffs' argument that their freedom of association claims in Counts Two and Six are adequately supported by allegations of improper motive (Pl. Br. at 51-52) fail for the same reasons as defendants' qualified immunity defense should prevail as a matter of law.  See infra at 13 (allegations of anti-union animus are circular and legally insufficient).

craft some type of constitutional claim for them.  (Pl. Br. at 60.)  In any event, Plaintiffs' claims still fail.

     1.    *Contracts Clause*

To the extent that Plaintiffs appear to allege a violation of the Contracts Clause (Pl. Br. at 61), such a claim fails because the defendants have not passed any law that changes the terms or conditions of a contract.[19] The Contracts Clause provides in pertinent part: "No state shall . . . pass any . . . law impairing the obligation of contracts . . ." The cases cited by Plaintiffs are inapposite. In each of those cases, various states passed a law which changed the state's obligation under the contract. For example, in University of Hawaii Prof. Assembly v. Cayetano, 183 F.3d 1096, 1101 (9th Cir. 1999), Plaintiffs contended that a new Hawaii law substantially impaired the obligation of the collective bargaining agreement with the state because it not only changed the employees' pay dates, but removed the whole subject from the bargaining table in violation of Hawaii's labor law.  Moreover, in Condell v. Bress, 983 F.2d 415 (2d Cir. 1993), the Second Circuit had to address the constitutionality of a new law that withheld lagged wages to employees.  Here, there is no allegation that the State, much less the Governor or Secretary himself, passed any law or took any other State action that changed any of the terms and conditions of the collective bargaining agreements.

In this case, Plaintiffs claim nothing more than an ordinary breach of the collective bargaining agreements.  As Plaintiffs concede elsewhere in their brief:  "The wrongdoing alleged

---

[19] Moreover, to the extent that the plaintiffs are claiming that the specific terms or conditions of the collective bargaining agreements have been violated, such claims do not state constitutional claims. "The Constitution does not provide a federal action for a simple breach of contract merely by virtue of the involvement of a state official." Association of Surrogate's and Supreme Court Reporters v. New York, 1995 U.S. Dist. LEXIS 13554 (S.D.N.Y. 1995) "The contracts clause prohibits the enactment of a law, not conduct that induces passage of a law….Not every contract dispute with the state is a violation of the Constitution."

in Plaintiffs' Complaint involves misconduct by defendants in the process of collective bargaining with state unions." (Pl. Br. at 18). Indeed, even Plaintiffs do not dispute that the applicable collective bargaining agreements provide for layoffs. Nor do they dispute that, if layoff procedures were to be violated, Plaintiffs have ample remedies provided in the collective bargaining agreement to address those concerns.

In essence, Plaintiffs' claims are not constitutional violations, but are, at best, simply complaints that the terms of the collective bargaining agreement were not followed. This Court must dismiss the Ninth Claim to the extent that it attempts to raise a violation of the Contracts Clause.

2.     *Substantive Due Process*

Plaintiffs also discuss what appears to be a substantive due process claim in the Ninth Claim. (Pl. Br. at 55) Strangely, they rely heavily on <u>Natale v. Town of Ridgefield</u>, 170 F.3d 258, 263 (2d Cir. 1999) for the proposition that they need state only a "substantial infringement of state law" in order to state a claim. However, <u>Natale</u> does not stand for that proposition, but rather, sets a higher standard for alleging substantive due process claims.

> Substantive due process … does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action. Substantive due process standards are violated only by conduct that is *so outrageously arbitrary* as to constitute *a gross abuse* of governmental authority.

<u>Id.</u> at 263 (emphasis added).

Here, there can be no legitimate debate that the alleged conduct of the defendants was "outrageously arbitrary." Indeed, as noted before, there can be no dispute about the financial quandaries the state has faced. While Plaintiffs disagree with the choices and selections made by the chief elected official in the state, their disagreement does not make the decision "outrageously arbitrary."

Plaintiffs further contend that interests "guaranteed by state statute" implicate substantive due process concerns. (Pl. Br. at 62.)  As Plaintiffs have done repeatedly, they simply ignore the facts as they have pled them; the applicable collective bargaining agreements all provide for significant discretion on the part of the State to conduct layoffs and make other employment decisions.  (Def. Br. at 29.)  There is simply no guarantee of no layoffs.  Therefore, Plaintiffs do not have a property right not to be laid off and their claims cannot give rise to a substantive due process claim.

3.    *Equal Protection*

Lastly, Plaintiffs now claim that that their Equal Protection Clause claim should also not be dismissed because defendants' actions affected union employees and not non-union employees.  (Pl. Br. at 64.)  This argument overlooks an obvious point and one that is fatal to the claim:  union and non-union employees are not similarly situated to each other.[20]  Indeed, as defendants noted in their primary brief, the equal protection clause "is essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985) (emphasis added).

Here, one group of employees is subject to a collective bargaining agreement that governs the terms and conditions of employment; the other does not.  Given this fundamental difference in employment status, it would be unreasonable and illogical to consider union and non-union state employees to be similarly situated for these purposes.  Moreover, Plaintiffs' own arguments are self-defeating:  "[t]he wrongdoing alleged in Plaintiffs' Complaint involves

---

[20] It is also puzzling why the plaintiffs cite to LaTrieste Restaurant & Cabaret, Inc. v Village of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994), which involved the applicability of zoning restrictions to topless dancing – a fact scenario completely different than that presented in this case.  Moreover, that case relied on the theory of "selective enforcement" for an equal protection claim – namely, that a government official applied a law differently to two parties. In this case, plaintiffs are merely suggesting that the defendants treated two groups differently.

misconduct by defendants in the process of collective bargaining with state unions." (Pl. Br. at 18.) Therefore, an equal protection claim that tries to compare treatment of union and non-union employees is baseless because those two types of employees have different rules and policies governing their employment.

For all of these reasons, the Ninth Count must be dismissed.

## C.    The Tenth Count Must Also Be Dismissed for Failure to State a Claim

Much of Plaintiffs' Tenth Count now appears repetitive of the Ninth Count in that it also attempts to state a substantive due process claim. Nevertheless, Plaintiffs also suggest that they have a "protected property interest" in continued state employment. (Pl. Br. at 65.) Such an assertion misstates the applicable law and ignores the express terms of the collective bargaining agreement.

The issue is not whether Plaintiffs had a continued right to state employment – but whether Plaintiffs had a right not to be laid off.[21] "The existence of provisions that retain for the state significant discretionary authority over the bestowal or continuation of a government benefit suggests that the recipients of such benefits have no entitlement to them." Plaza Health Labs. Inc. v. Perales, 878 F.2d 577 (2d Cir. 1989). Here, Plaintiffs do not dispute – and cannot dispute – that the applicable collective bargaining agreements give the state the express power to conduct layoffs with significant discretion.

Plaintiffs also claim that "defendants' [sic] cannot invoke their legitimate justification for the lay-offs" in an "improper attempt, on a motion to dismiss, to substitute their own (disputed)

---

[21] The cases cited by the plaintiffs do not address this issue and address only issues relating to disciplinary discharges or demotions. Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206 (2d. Cir. 2003); Ciambriello v. Country of Nassau, 292 F.3d 307 (2d Cir. 2002). As they have done elsewhere in the brief, plaintiffs fail to address, much less distinguish, the cases cited by defendants that suggest that there is no property interest not to be laid off. (Def. Br. at 28.)

version [of events]." (Pl. Br. at 60.) Such bald assertions aside, defendants do not seek to invoke their own account of the events alleged; rather, they use Plaintiffs' own allegations to show that their claims have no basis in law or in fact. Here, the "statutorily-approved" collective bargaining agreements referenced in the Complaint (and thereby incorporated in Complaint) defeat any claim to a property interest to unlimited state employment. The provisions of the collective bargaining agreements are clear; the State has the discretion to conduct layoffs. Therefore, there can be no claim that the employees had a right to unlimited state employment.

Plaintiffs' attempt to distinguish Mandel v. Allen, 81 F.3d 478 (4th Cir. 1996) is unpersuasive (Pl. Br. at 67), and the rationale cited by that decision is equally applicable here. In Mandel, laid-off state employees sought "to have the federal courts restrict Virginia's right to regulate the number and type of state employees in its service." Id. at 481-82. The Fourth Circuit soundly rejected that plea and held that there is a difference between disciplinary discharges and layoffs.

> Our Constitution … embodies no such federal constraint on the ability of states to remodel their workforces or restructure their governments. The determination that a position should be abolished for reasons of efficiency and economy is solely within the judgment and discretion of the governing authority in whom the power to eliminate the office is vested. Thus, elected officials may expand or contract the overall size of government, and create or eliminate its components as the times and the voters demand.

Id. at 482 (citations omitted). Here, Plaintiffs seek to do exactly that which the Court in Mandel rejected, namely, have this Court substitute its judgment for the judgment of the elected officials of the State. Substantive due process does not allow such an intrusion into the State's affairs.

In a similar vein, another District Court summarized the law as follows:

> It would indeed be an odd situation if the chief executive of a government body could not cut the budget in a way that affected salaries without giving each of the affected employees a hearing before doing so. It is important to distinguish the type of governmental action in question from every-day decisions directed toward an individual employee. We are troubled by the implications of a decision that

-21-

would afford protected property status and due process protection to all persons affected by broad fiscal initiatives of elected government. The decision of which [Plaintiff] complains is quintessentially a political and not an individual one. It was grounded upon the obvious public good to be accomplished through maintenance of the City's financial health. Undoubtedly, there were alternative routes to fiscal salvation, but in the judgment of the elected officials, none as politically palatable as the one selected.

The point is that the same procedural due process requirements so exquisitely fit to provide justice in cases involving wrongs against individuals are ill-suited as substitutes for political judgment, which, after all, reflects the will of the people through their elected representatives. Who better than they to decide that the burden of cost reduction could best be borne by higher paid salaried employees than some other group? Who better than they to interpret the will of the electorate in making difficult, but necessary decisions about the expenditure of public funds? The time and place for an accounting for such actions is at the ballot box, not in the courts.

McNeil, 1997 U.S. Dist. LEXIS 2034, *17.  In this case, it is plain that substantive due process does not insulate Plaintiffs from the decisions made here. For these reasons, Plaintiffs' Tenth Count must also fail.

## V.
## CONCLUSION

For all of the foregoing reasons, and those stated in the defendants' primary brief, this Court should grant defendants' Motion to Dismiss in its entirety.

For THE DEFENDANTS,

By: /s/ Douglas W. Bartinik
      Albert Zakarian (ct04201)
      Allan B. Taylor (ct05332)
      Victoria Woodin Chavey (ct14232)
      Douglas W. Bartinik (ct26196)
      Day, Berry & Howard LLP
      CityPlace I
      Hartford, Connecticut 06103-3499
      (860) 275-0100
      (860) 275-0343 (fax)
      *dwbartinik@dbh.com*

      Their Attorneys

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that a copy of the foregoing was mailed this date, postage prepaid, to:

David S. Golub
Jonathan M. Levine
Silver, Golub & Teitell, LLP
184 Atlantic Street
P.O. Box 389
Stamford, CT 06904-0389

Ann H. Rubin
Carmody and Torrance
50 Leavenworth Street
Waterbury, CT 06721-1110

      /s/
      Douglas W. Bartinik