```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT

STATE EMPLOYEES BARGAINING     :
AGENT COALITION, ET AL.,       :
     Plaintiffs,               :
                               :
VS.                            :      Civil No. 3:03CV221 (AVC)
                               :
JOHN G. ROWLAND ET AL.,        :
     Defendants.               :
```

## RULING ON THE DEFENDANTS' MOTION TO DISMISS

This is an action for money damages and injunctive relief brought pursuant to 42 U.S.C. § 1983 and alleging violations of the United States Constitution. The plaintiffs, State Employees Bargaining Agent Coalition ("SEBAC"), and twelve of thirteen unions that comprise the SEBAC along with five individually named union members, allege that the defendants, Connecticut Governor John Rowland and the Connecticut Secretary of the Office of Policy and Management, Marc Ryan ("the defendants" or "Rowland" and "Ryan") violated their constitutional rights when in the fall of 2002, they ordered the lay-offs of approximately 3,000 state union employees.

The defendants now move for dismissal pursuant to Fed. R. Civ. P. 12(b)(1) on grounds that: (1) the amended complaint is barred by the doctrine of absolute legislative immunity; (2) the amended complaint is barred by the Eleventh Amendment to the United States Constitution; and (3) the defendants are entitled to qualified immunity with respect to any award of money damages. The defendants have also moved for dismissal pursuant to Fed. R. Civ. P. 12(b)(6) on grounds that various counts of the amended complaint fail to state a claim for which relief may be granted.

For the reasons hereinafter set forth, the motion is DENIED to the extent it seeks dismissal for want of federal subject matter jurisdiction.  Further, the motion is DENIED WITHOUT PREJUDICE to the extent it seeks dismissal on various counts for failure to state a claim.

**FACTS**

Examination of the amended complaint, the motion to dismiss, the accompanying memorandum of law and the responses thereto, reveal the following factual background.

A. <u>Background</u>

This lawsuit arises out of a decision of the Governor of Connecticut in December of 2002 to terminate the employment of some 3,000 unionized state employees all in the name of required budgetary savings.  As the rules governing formation and modification of the state budget are relevant background, they are recited as follows.

The constitutional[1] and statutory scheme for budget

---

[1] Conn. Const. Art. III § 18 (a), as adopted in Article XXVIII of the amendments (constitutional balanced budget requirement: "The amount of general budget expenditures authorized for any fiscal year shall not exceed the estimated amount of revenue for such fiscal year."); see also Conn. Const. Art. III § 18 (b) as adopted in Article XXVIII of the amendments (constitutional spending cap: "The general assembly shall not authorize an increase in general budget expenditures for any fiscal year above the amount of general budget expenditures authorized for the previous fiscal year by a percentage which exceeds the greater of the percentage increase in personal income or the percentage increase in inflation, unless the governor declares an emergency or the existence of extraordinary circumstances and at least three-fifths of the members of each house of the general assembly vote to exceed such limit for the

administration in Connecticut is a mix of legislative and executive responsibilities.[2]  The Governor is charged by law with presenting a budget plan to the general assembly every two years.  Conn. Gen. Stat. § 4-72 and § 4-73.  On a quarterly basis, each budgeted state agency must submit to the Governor, through the Secretary of OPM, a requisition for a quarterly allotment.  Conn. Gen. Stat. § 4-85(a).  The Governor may disapprove of the request if he/she determines that a change in circumstances since the adoption of budget requires a modification.  Conn. Gen. Stat. 4-85(b)(1).  Before any modification is effected, the Governor must file a report with the joint standing committee of the general assembly charged with responsibility for budget appropriations describing the change in circumstances requiring budget reductions.  Id.  The Governor is also mandated, by law, to devise and implement a plan to prevent a budget deficit if a deficit of more than one percent of the state's general fund of appropriations is projected.  Conn. Gen. Stat. § 4-85(b)(2).

B.  The Amended Complaint

In June of 2001, the general assembly approved a budget for the state of Connecticut to control through 2003.  In the fall of 2002, however, the state faced a budget crisis.[3]  Thereafter,

---

purposes of such emergency or extraordinary circumstances. . .").

[2] See Conn. Gen. Stat. § 4-69 through § 4-107a.

[3] Although the amended complaint does not allege that during the fall of 2002, a budget crisis existed in the State of Connecticut, the court is authorized to take judicial notice of this fact based on evidence in the record.  The court is further

Governor John Rowland and the Connecticut Secretary of the Office of Policy and Management ("OPM"), Marc Ryan ("the defendants") demanded more than 450 million dollars annually in concessions from state employee unions ("the plaintiffs") under various collective bargaining agreements.

The amended complaint alleges that, to coerce the plaintiffs into making concessions, the defendants threatened to terminate state union workers.  When all contract concessions were not forthcoming, the defendants, through executive orders, began implementing lay-offs of over 3,000 union employees.  The amended complaint alleges that the defendants wrongfully singled out union employees for lay off, motivated by the desire to retaliate against political opponents, as evidenced by Rowland's statement that his "natural enemies have been the unions."  As further evidence of Rowland's anti-union animus, the amended complaint alleges that during Rowland's 2002 re-election campaign, all but one of the unions endorsed his opponent.  The union supporting Rowland was the Connecticut State Police Union ("CSPU").  In the course of soliciting this endorsement, Rowland allegedly told CSPU union leadership that he would not lay off any state troopers.  No CSPU members were selected for the lay-offs at issue here, even though state employees performing police functions in other unions have been selected for lay off.  The

---

authorized to consider this fact in conjunction with the defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1).  See Antares Aircraft, L.P. v. Federal Republic of Nigeria, 948 F.2d 90, 96 (2d Cir. 1991).

union employees selected for lay-off were all members of unions that did not support Rowland.

**STANDARD**

A court must grant a motion to dismiss brought pursuant to Fed. R. Civ. P. Rule 12(b)(1) where a plaintiff has failed to establish subject matter jurisdiction. Golden Hill Paugussett Tribe of Indians v. Weicker, 839 F.Supp. 130, 136 (D.Conn.1993). In analyzing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), the court must accept as true and must draw inferences in favor of the plaintiff. Capitol Leasing Co. v. F.D.I.C., 999 F.2d 188, 191 (7th Cir.1993). Where a defendant challenges the district court's subject matter jurisdiction, the court may resolve disputed factual issues by reference to evidence outside the pleadings, such as affidavits. Antares Aircraft, L.P. v. Federal Republic of Nigeria, 948 F.2d 90, 96 (2d Cir.1991).

**DISCUSSION**

1.  Absolute Legislative Immunity

The defendants first move to dismiss the amended complaint pursuant to Fed. R. Civ. P. Rule 12(b)(1) on grounds that it is barred by the doctrine of absolute legislative immunity. Specifically, they argue that they are entitled to absolute legislative immunity because their "actions in laying off state employees to achieve budgetary savings were an exercise of [their lawful authority] and, [as broad based policy actions] were

5

legislative in nature" and authorized by Conn. Gen. Stat. § 4-85(b). In response, the plaintiffs maintain that the defense is unavailable because the actions condemned here, i.e., demanding collective bargaining agreement concessions, threatening job terminations of union members, and eliminating some 3,000 union jobs, were effectuated by executive actions and not by established legislative procedures.

At this juncture, discovery is required before the court can determine whether the defendants are entitled to the defense. "The principle that legislators are absolutely immune from liability for their activities has long been recognized in Anglo-American law." Bogan v. Scott-Harris, 523 U.S. 44, 49, 118 S. Ct. 966, 970 (1998). "Recognizing this venerable tradition, [the United States Supreme Court has] held that state and regional legislators are entitled to absolute immunity from liability under § 1983 for their legislative activities." Id. The rationale for the defense is that "the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability." Id. (citing Spallone v. United States, 493 U.S. 265, 279, 110 S.Ct. 625, 634 (1990)).

"Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" Bogan, 523 U.S. at 54 (quoting Tenney v. Brandhove, 341 U.S. 367, 376, 71

6

S.Ct. 788 (1951)). Acts within the sphere are those that are both: (1) substantively legislative, i.e., acts that involve policy making; and (2) procedurally legislative, i.e., passed by means of established legislative procedures. Ryan v. Burlington County, 889 F.2d 1286, 1290-91 (3d Cir. 1989). "The test for determining whether an act is legislative 'turns on the nature of the act, rather than on the motive or intent of the official performing it.'" Harhay v. Town of Ellington Bd of Edu., 323 F.3d 206, 210 (2d Cir. 2003). "This approach to immunity law is a 'functional' one." Harlow v. Fitzgerald, 457 U.S. 800, 810, 102 S.Ct. 2727, 2734 (1982). Hence, "officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions. . ." Bogan, 523 U.S. at 55.

In Bogan v. Scott-Harris, 523 U.S. 44 (1998), the United States Supreme Court considered the reach of absolute legislative immunity in a lawsuit brought against a local, executive branch official. Id. In that case, an aggrieved city administrator sued the mayor[4] for introducing a budget that, after being approved by the city council, eliminated her job through a city ordinance. Id. The city administrator claimed that the ordinance was actually motivated by racial animus and by a desire to retaliate against her for the exercise of First Amendment

---

[4] The city administrator also sued the vice president of the city council and other officials.

7

rights. Id. at 44. Although the city administrator prevailed at trial on the First Amendment claim, the United States Supreme Court reversed, concluding that the mayor was entitled to absolute legislative immunity because the ordinance "reflected a discretionary, policymaking decision implicating the city's budgetary priorities and its services to constituents" id. at 45, – actions that, in the Court's view, "were integral steps in the legislative process." Id. at 55.

This court cannot say that the actions condemned here were integral steps in the legislative process. In this case the Governor faced a budget crises in the fall of 2002 and, as the state's chief executive officer, exercised his discretion to reduce expenditures by demanding collective bargaining agreement concessions and by eliminating some 3,000 union jobs through executive order. This action was substantively legislative because it reflected a discretionary, policymaking decision implicating the state's budgetary priorities and its services to constituents. However, the loss of jobs came about through executive order – a quintessentially executive function. For that executive function to be entitled to legislative immunity, it must have been authorized by some legislative scheme. See e.g., Dwonzyok v. Balt. County, 328 F. Supp. 2d 572, 579-80 (D. Md. 2004) (discussing Bogan and holding that city was entitled to absolute legislative immunity because the elimination of the

plaintiff's job resulted from a reorganization plan <u>enacted by the local legislature</u> as part of a budgetary process).

The defendants point to a state statute, Conn. Gen. Stat. § 4-85(b), as authorizing the executive action here. While that statute gives the Governor the discretion in a budget crisis to modify a previously adopted budget, the record is devoid of any evidence that the governor invoked that authority when ordering the job terminations here.[5] For these reasons, the court is unable to conclude that the actions complained of were legitimately legislative, constituting integral steps in the legislative process of which the defendants are absolutely immune.

---

[5] In <u>Abbey v. Rowland</u>, 359 F. Supp.2d 94 (D. Conn. 2005), the court took judicial notice of Connecticut's budget crisis during the fall of 2002 and specifically found that "the State of Connecticut in the autumn of 2002 was facing a projected budget deficit of more than one percent and that, as a result, Governor Rowland was acting pursuant to the mandate of [Conn. Gen. Stat. § 4-85(b)[(2)] [in ordering the layoffs]." <u>Id.</u> at. 98. Although the record in this case supports a finding that the state faced a budget crisis in the fall of 2002, there is no evidence to support a finding that there existed a projected budget deficit of more than one percent, or that Governor Rowland was acting pursuant to Conn. Gen. Stat. § 4-85(b) in ordering the layoffs here. In this regard, before invoking the authority to modify a budget under § 4-85(b)(1), the Governor was required to furnish a report describing the circumstances of the projected budget deficit to the joint standing committee having cognizance of matters relating to state finance, revenue and bonding. Before invoking the authority to modify a budget under § 4-85(b)(2), the Governor was required to furnish not only a report, but also his plan to prevent the deficit. The record contains no such report or plan, or even an affirmation that the Governor had invoked his authority under § 4-85(b).

9

2.  <u>Eleventh Amendment Immunity</u>

The defendants next move to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(1) on grounds that it is barred by the Eleventh Amendment to the United States Constitution. Specifically, they argue that although the lawsuit names two public officials, it is in essence a suit against the state and therefore subject to the Eleventh Amendment bar. In addition, the defendants argue that "special sovereignty interests" as articulated by the Supreme Court in <u>Idaho v. Coeur d'Alene Tribe</u>, 521 U.S. 261, 269 (1997), militate in favor of declining jurisdiction to the extent the amended complaint seeks prospective injunctive relief under <u>Ex parte Young</u>, 209 U.S. 123 (1908).

In response, the plaintiffs maintain that the Eleventh Amendment does not bar claims for money damages against the defendants in their individual capacities, and that, in accordance with <u>Ex parte Young</u>, 209 U.S. 123 (1908) and the Supreme Court's recent decision in <u>Verizon Maryland v. Public Service Commission of Maryland</u>, 535 U.S. 635 (2004), the court has jurisdiction to adjudicate claims for prospective injunctive relief without regard to so called special sovereignty interests.

The Eleventh Amendment bars "citizens from bringing actions against states for money damages, absent consent." <u>Atasadero State hospital v. Scanlon</u>, 473 U.S. 234, 105 S.Ct. 3142 (1985). It is well established, however, that the Eleventh Amendment does not bar an action seeking prospective injunctive relief with

10

respect to ongoing violations of federal law. Ex parte Young, 209 U.S. 123 (1908). Courts have recognized that where a public employee seeks reinstatement to employment terminated in alleged violation of his constitutional rights, the constitutional wrong is ongoing for purposes of jurisdiction. Elliott v. Hinds, 786 F.2d 298, 302 (7th Cir. 1986); see also Shane v. State of Connecticut, 821 F. Supp. 829, 832 (D. Conn. 1993) ("the Eleventh Amendment does not bar an action seeking prospective injunctive relief, such as reinstatement or restoration of employment benefits").

In Idaho v. Coeur d'Alene Tribe, 521 U.S. 261 (1997), the Supreme Court considered whether the Eleventh Amendment barred an Indian tribe from seeking declaratory relief against the state of Idaho and its officials, establishing the tribe's rights to certain lands held by the state and shifting substantially all benefits of ownership and control to the tribe. Id. The Court found that the claim was a functional equivalent of a quiet title action with respect to historically sovereign lands that implicated Idaho's special sovereignty interests and was therefore barred by the Eleventh Amendment. Id. at 281-82. Justice Kennedy, joined by Chief Justice Rehnquist, agreed that special or core sovereignty interest can limit lawsuits that seek declaratory or injunctive relief against states where the relief requested would be so much of a divestiture of the state's sovereignty as to render the suit as one against the state itself. Id. at 283-87. A majority of the Court, however, have

11

agreed that this standard is vague and, accordingly, in determining whether the Eleventh Amendment presents a bar to suit, lower courts need only "conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon Maryland v. Public Service Commission of Maryland, 535 U.S. 635, 645 (2004) (quoting Coeur d'Alene, 521 U.S. at 296)).

With respect to money damages, the Eleventh Amendment presents no obstacle so long as the suit is against a state official in his individual capacity. Shane, 821 F. Supp. at 832. "But even when a suit is against a public officer in his or her individual capacity, the court is obliged to consider whether it may really and substantially be against the state." Luder v. Endicott, 253 F.3d 1020, 1023 (7th Cir. 2001). Hence, "a suit nominally against state employees in their individual capacities that demonstrably has the identical effect as a suit against the state is [] barred." Id. "[A] suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be to restrain the government from acting, or to compel it to act.'" Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 102 n.11 (1984).

The present action seeks an order reversing thousands of state employment decisions and to compel the state to make the plaintiffs whole for all financial losses arising from the

defendants' actions. Such relief, if granted, could hardly be accomplished in the absence of substantial interference with public administration or the loss of substantial public resources. Consequently, this action, though nominally against the Governor and the Secretary of OPM, is a suit against the state. Any claim for money damages, to include back-pay or retroactive benefits, is barred by the Eleventh Amendment. Because the amended complaint alleges unconstitutional job terminations, that is, an ongoing violation of federal law and seeks relief properly characterized as prospective, the Eleventh Amendment presents no bar to the extent the action seeks prospective injunctive relief against the defendants in their official capacities.[6]

3. <u>Qualified Immunity</u>

The defendants next argue that they are entitled to qualified immunity because, in their view, it was objectively reasonable for them to believe that their actions, in laying off unionized state employees, were in furtherance of their constitutional and statutory duties and did not violate the First Amendment. In response, the plaintiffs maintain that qualified immunity is unavailable to the defendants because, when viewing

---

[6] Even if the court were required to consider whether, under <u>Idaho v. Coeur d'Alene Tribe</u>, 521 U.S. 261 (1997), there exist a special sovereignty interest foreclosing relief available under <u>Ex parte Young</u>, the court would be hesitant to conclude – in the absence of more extensive briefing – that granting the relief requested here would impermissibly divest the state of its control over a core sovereign interest.

the amended complaint in the light most favorable to the plaintiffs, it was not objectively reasonable for the defendants to have believed that selecting the plaintiffs for layoff on account of their union membership would be constitutionally permissible.

Government officials performing discretionary functions are entitled to qualified immunity from money damages if "(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe that their acts did not violate those rights." Oliveira v. Mayer, 23 F.3d 642, 648 (2d Cir. 1994).

Although the defendants maintain that, in their view, it was objectively reasonable for them to believe that their actions did not violate the constitution, their view does not control on a motion to dismiss. Rather, examining the amended complaint in the view most favorable to the plaintiffs, the court concludes that an issue of fact exists as to whether the defendants belief was objectively reasonable. See DeLoreto v. Ment, 944 F. Supp. 1023, 1034 (D. Conn. 1996) ("a state employer may not retaliate against an individual, such as by terminating his or her employment, because of his or her union activities"). Accordingly, the defendants are not entitled to qualified immunity at this juncture. However, because qualified immunity does nothing more than immunize a defendant from an award of money damages, and the court has already concluded that the plaintiffs may not recover money damages under principles of

Eleventh Amendment immunity, the defense is moot.

4.  Other Arguments

The defendants also move to dismiss varying counts of the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) on grounds that the claims fail to state a claim for which relief may be granted. At first glance, the court is of the opinion that the arguments presented are without merit and, accordingly, the court declines to invest any further time in addressing these claims at this juncture. To the extent a bona fide basis for dismissal of these claims exist, that basis may be brought to the court's attention at summary judgment.

## CONCLUSION AND ORDER

For the forgoing reasons, the motion to dismiss the amended complaint (document no. 85) is DENIED to the extent it seeks dismissal for want of subject matter jurisdiction. The motion is DENIED WITHOUT PREJUDICE to the extent it seeks dismissal for failure to state a claim for which relief may be granted. The defendants earlier filed motion to dismiss (document no. 35) is DENIED AS MOOT.

Further, the court's previous orders staying discovery in this matter (document nos. 59 and 83) are hereby VACATED. In light of the substantial time that has lapsed since the filing of the complaint, discovery will commence without delay, notwithstanding the rule that immunity determinations are entitled to interlocutory appeal. See e.g., Poe v. Leonard, 282 F.3d 123 (2d Cir. 2002). However, because absolute legislative

immunity may bar this action in toto - to include claims for injunctive relief – and the issue of whether the defendants are entitled to the defense remains undecided, the court will authorize a limited first phase of discovery concerning the application of absolute legislative immunity, and re-argument on that issue before merits discovery, if desired.  The parties are to report their respective positions to the court in a joint submission to be filed on or before January 27, 2006.

It is so ordered this 18th day of January, 2006 at Hartford, Connecticut.

_____
Alfred V. Covello
United States District Judge

16