UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATE EMPLOYEES BARGAINING AGENT COALITION, ET AL, | : : : | |
| Plaintiffs, | : : | |
| V. | : : | CIV. NO. 3:03CV221 (AVC) |
| JOHN G. ROWLAND, ET AL, | : : | |
| Defendants. | : | MARCH 15, 2006 |

**PLAINTIFFS' MEMORANDUM IN SUPPORT
OF MOTION FOR RECONSIDERATION**

**I.   INTRODUCTION**

On March 10, 2006, this Court reversed its prior (March 8, 2006) Order denying defendants' Motion for a Stay of Discovery Pending Appeal. The Court's March 10, 2006 Order indicates that the Court was influenced by an April 1, 2003 letter by State Comptroller Wyman ["Comptroller Wyman's letter"] attached to defendants' Reply Memorandum.

In their Reply Memorandum, defendants argued that the letter – which references "a deficit reduction plan" submitted by Governor Rowland on December 6, 2002 – provides evidence of Governor Rowland's compliance with Conn. Gen. Stats. § 4-85(b)(2). [Reply Mem. at 4]. The Court accepted defendants' representations about the meaning of the letter. The Court noted that the letter indicates that "on December 6, 2002, the Governor furnished a deficit reduction plan, fulfilling the only requirements for invoking budget modification authority under § 4-85(b)(2)." The Court concluded that this "constitutes a strong showing that the executive action(s) condemned here were, indeed, legislatively authorized." [March 10, 2006 Order].

Defendants did not submit a copy of the plan referenced in Comptroller Wyman's letter, nor provide any description of its contents.

Plaintiffs had not received defendants' Reply Memorandum prior to the issuance of the Court's March 10, 2006 Order.  Plaintiffs have now obtained a copy of the December 6, 2002 plan referenced in Comptroller Wyman's letter, along with the cover letter transmitting the plan, from the State of Connecticut Legislative Library.  (Copies of these documents are attached as Exhibit A.)

Defendants either do not understand – or have elected to materially mislead the Court about – the December 6, 2002 plan referenced in Comptroller Wyman's letter.  While that plan set forth a series of measures for balancing the budget, <u>the plan did not include the terminations at issue in this action as a measure to be taken as part of the deficit mitigation, nor anywhere even refer to the terminations</u>.  Moreover, the plan was not submitted as a prelude to implementation by Governor Rowland pursuant to § 4-85(b)(2).  Rather, as the cover letter to the plan makes clear, Governor Rowland submitted the plan for consideration by the Connecticut General Assembly at a Special Session being called to address the budget deficit.  That Special Session ultimately led to the General Assembly's passage of a deficit-reduction bill, Public Act 03-02, that included some of the proposals in Governor's Rowland's plan, as well as other deficit-mitigating measures deemed appropriate by the legislature (<u>not</u> including the terminations at issue in this action).

It was that legislation, not any plan implemented by Governor Rowland pursuant to § 4-85(b)(2), that resolved Connecticut's budget deficit.  As Comptroller Wyman's letter, thus, noted,

> The enactment of PA 03-2 brings the General Fund deficit projection below the statutory level requiring additional deficit mitigation initiatives for Fiscal Year 2003.

Public Act 03-02 was passed on February 28, 2003, approximately three months after the terminations were ordered by the Governor.

2

The December 6, 2002 plan referenced in Comptroller Wyman's letter, thus, provides no factual support for a finding that Governor Rowland acted pursuant to § 4-85(b)(2) when he ordered the terminations at issue in this lawsuit (i) because the plan does not include the terminations as a deficit-mitigating measure (or even refer to the terminations); and (ii) because the plan was never implemented by Governor Rowland.

Plaintiffs now move for reconsideration of the March 10, 2006 Order because defendants' argument in their Reply Memorandum that Comptroller Wyman's letter supports their contention that Governor Rowland invoked and complied with Conn. Gen. Stats. § 4-85(b) when he ordered the terminations at issue in this lawsuit is factually incorrect, was based on an incomplete factual record, and led the Court into a mistaken factual conclusion.

## II. COMPTROLLER WYMAN'S LETTER PROVIDES NO FACTUAL SUPPORT FOR DEFENDANTS' CLAIM THAT GOVERNOR ROWLAND ACTED PURSUANT TO CONN. GEN. STATS. § 4-85(b).

The portion of Comptroller Wyman's letter (attached hereto as Exhibit B) relevant to this case is the third paragraph, which states:

> I reported to you by letter dated September 3, 2002 that the Fiscal Year 2003 General Fund deficit exceeded one percent of the fund's appropriations. Connecticut General Statutes Section 4-85(b)(2), required you to submit a deficit mitigation plan to the legislative committees designated in statute by October 3, 2002. On December 6, 2002, you submitted a comprehensive deficit reduction plan for Fiscal Year 2003. The enactment of PA 03-2 brings the General Fund deficit projection below the statutory level requiring additional deficit mitigation initiatives for Fiscal Year 2003.

The first two sentences of the paragraph refer to the existence of a budget deficit in Connecticut as of September 3, 2002 exceeding one percent of the General Fund appropriations and to defendant Rowland's statutory responsibility, pursuant to Conn. Gen. Stats. § 4-85(b)(2), to submit a deficit mitigation plan to the legislative committees specified in the statute by October 3, 2002.

3

This portion of the letter provided no new factual information to the Court:

– in the Court's January 18, 2006 Ruling on Defendants' Motion to Dismiss ("Ruling"), the Court took judicial notice of Connecticut's budget crisis in the fall of 2002 [Ruling at 3 ("In the fall of 2002, however, the state faced a budget crisis"), & 3 n 5 (taking judicial notice of the state's budget crisis).[1]

– in its Ruling, the Court further expressly held that § 4-85(b) "gives the Governor discretion in a budget crisis to modify a previously adopted budget" [Ruling at 9] and that the defendants were claiming that the statute "authoriz[ed] the executive action here." [Id.].

In their Reply Memorandum, defendants argued that the third sentence of the third paragraph of Comptroller Wyman's letter provided factual support for a finding that Governor Rowland had invoked and complied with the statute. [Reply Mem. at 4]. The third sentence of the third paragraph states:

> On December 6, 2002, you submitted a comprehensive deficit reduction plan for Fiscal Year 2003.

In their Reply Memorandum, defendants suggested that Governor Rowland's submission of this plan was evidence of his compliance with the statute. [Reply Mem. at 4].

---

[1] Although Comptroller Wyman's letter provides information that the budget deficit in September 2002 exceeded 1% of the General Fund's appropriations, and thus triggered subsection (2) of § 4-85(b), that "fact" does not materially alter the Court's analysis in its Ruling that there was no record evidence Governor Rowland had actually invoked the statute or complied with the statute in ordering the terminations at issue, but only indicates which section of the statute would be applicable. Indeed, in its Ruling, the Court specifically addressed the potential requirements of § 4-85(b)(2):

> Before invoking the authority to modify the budget under §4-85(b)(2), the Governor was required to furnish not only a report [describing the circumstances of the projected budget deficit], but also his plan to prevent the deficit. The record contains no such report or plan, or even an affirmation that the Governor had invoked his authority under § 4-85(b). [Ruling at 9 n 5].

4

This Court specifically relied on the letter's reference to Governor Rowland's submission of this plan in its March 10, 2006 Order, holding that

> [The letter indicates] that on December 6, 2002, the Governor furnished a deficit reduction plan, fulfilling the only[2] requirements for invoking budget modification authority under § 4-85(b)(2) ...
>
> [and] constitutes a strong showing that the executive action(s) condemned here were, indeed, legislatively authorized and therefore entitled to absolute legislative immunity. [March 10, 2006 Order].

Because defendants did not submit the actual December 6, 2002 "plan" document referenced in Comptroller Wyman's letter, the Court's holding was necessarily based upon defendants' apparent[3] representation in their Reply Memorandum that the December 6, 2002 plan was submitted pursuant to § 4-85(b)(2) and would establish that Governor Rowland had ordered the terminations at issue pursuant to his implementation of the plan in accordance with § 4-85(b)(2).

In fact, the actual "plan" – entitled "Governor Rowland's Balanced Budget Plan" – provides no support for the terminations at issue as the terminations are not included as one of the cost-saving measures set forth in the plan or even mentioned in any way in the Plan. The Plan contains a list of proposed spending reductions and revenue increases to help balance the budget. *The termination of state employees at issue here is not one of the spending reductions listed in the plan.* The only "Spending Reductions" related to direct labor costs in the plan are a $1 million savings from

---

[2] As the Court previously observed, in order to invoke his authority under § 4-85(b)(2), the Governor is required to submit both a report describing the circumstances of the projected budget deficit and a plan to mitigate the deficit. See Ruling at 9 n. 5.

[3] Defendants' Reply Memorandum, while describing the contents of Comptroller Wyman's letter, carefully avoids an actual assertion that the December 6, 2002 plan constitutes evidence of compliance with the statute. See Reply Mem. at 4.

5

eliminating overtime in the Department of Mental Retardation and $170,000 from eliminating certain functions in the Department of Children and Families:

|  | **Gross Savings** |
|---|---|
| **Department of Mental Retardation** | |
| Reduce Personal Services - Overtime | **1.0** |
| ... | |
| **Department of Children and Families** | |
| Personal Services | |
| Eliminate Certain function areas/reduce staffing | **0.17** |

("Governor Rowland's "Balanced Budget Plan'" at 2, 3 ["Spending Reductions (In Millions)"]).

The Plan references a savings of $94 million in union contract concessions to be achieved by January 1, 2003, but specifies, in the event the concessions cannot be achieved, that the $94 million will be obtained through a reduction in the State's Education Cost Sharing program ("ECS") with the municipalities. (Id. at 6). The Plan makes no mention of unionized state employee terminations in the event the anticipated concessions were not granted by the unions. (Id.)[4]

Section 4-85(b)(2) imposes a mandatory duty on the Governor to implement the plan he submits, not some other plan:

> The Governor, within thirty days following the issuance [of the Comptroller's notification of the 1% deficit] shall file a report with such joint standing committees, including a **plan which he shall implement** to modify such allotments to the extent necessary to prevent a deficit.

Conn. Gen. Stats. 4-85(b)(2) (Rev. 1991) (emphasis and bold added). If defendants truly contend

---

[4] It is undisputed that the Governor has no power to compel concessions – i.e., modifications of the unions' collective bargain agreements. See Condell v. Bress, 983 F.2d 415 (2d Cir.), cert. denied, 507 U.S. 1032 (1993) (enjoining Governor of New York and other state officials from enforcing law passed during budget crisis impairing state unions' rights under collective bargaining agreements).

that Governor Rowland's December 6, 2002 "Balanced Budget Plan" constitutes their proof of Governor Rowland's invocation of and compliance with § 4-85(b), the plan's failure to include the terminations at issue in this lawsuit as a deficit-mitigating measure conclusively establishes that the terminations were not ordered pursuant to the statute.

Equally important, defendants' suggestion that the December 6, 2002 Plan was submitted by the Governor as the required statutory act prior to implementation by him pursuant to § 4-85(b)(2) is factually baseless. Rather, as the cover letter transmitting the Plan states, the Plan was submitted to the Connecticut General Assembly for its consideration at a Special Session called to address the budget deficit:

> Last night, Governor Rowland indicated that he was prepared to submit a deficit reduction plan and have that plan considered by the General Assembly in a Special Session later this month. Attached you will find the Governor's plan to close the FY '03 deficit. Today the Governor has filed the necessary paperwork with the Secretary of State to call the General Assembly into a Special Session on December 18, 2002.[5]

Indeed, even had Governor Rowland wanted to implement his "Balanced Budget Plan," he could not have done so. While § 4-85(b) gives the Governor authority to implement spending reductions, it does not authorize him to order revenue increases (i.e., taxes). That can only be done by the General Assembly. "Governor Rowland's Balanced Budget Plan" called for over $203 million in "Revenue Increases" in Fiscal year 2003, specifying new or increased income taxes (including the so-called "Millionaires Tax," a controversial tax that has never been adopted in Connecticut); increased sales and use taxes on computer and data processing; increased cigarette

---

[5] The cover letter was signed by defendant Ryan in his capacity as Secretary of the Office of Policy and Management.

taxes; increased real estate conveyance fees; and a suspension of oil companies' transfers. (See "Governor Rowland's Balanced Budget Plan" at 4 ["Revenue Increases, Tax Type & Description"].

It is undisputed that Governor Rowland never implemented his December 6, 2002 plan. As the fourth sentence of the third paragraph of Comptroller Wyman's letter makes clear, it was the legislature, not Governor Rowland, that took action to balance the budget – by enacting Public Act 03-02:

> The enactment of PA 03-2 brings the General Fund deficit projection below the statutory level requiring additional deficit mitigation initiatives for Fiscal Year 2003.

"Governor Rowland's Balanced Budget Plan" was, quite simply, not something created or submitted within the rubric of § 4-85(b),[6] or ever implemented by Governor Rowland pursuant to § 4-85(b)(2).

Comptroller Wyman's letter (and the December 6, 2002 plan referred to in the letter), thus, provide no factual support for defendants' claimed invocation of (and compliance with) § 4-85(b) as a basis for immunizing the terminations at issue in four critical respects:

– first, because the plan did not even propose the terminations at issue and thus, even if submitted pursuant to the statute, would not provide statutory authorization (and legislative immunity) for the terminations;

– second, because the plan was submitted for consideration by the General Assembly, not for unilateral implementation by defendant Rowland pursuant to the statute; and

---

[6] Nothing in the cover letter or plan references § 4-85(b)(2); indicates in any way that the plan was being submitted pursuant to that statute; or states that Governor Rowland intended to or would seek to implement the plan pursuant to the statutory authority. Plaintiffs further note that the "Balanced Budget Plan" is unaccompanied by the report required by the statute and was not submitted within thirty days of the Comptroller's notification of the budget deficit greater than 1% as required by the statute. The cover letter transmitting the report is, further, only addressed to the General Assembly's Joint Committee on Finance, Revenue and Bonding, and there is no record at the Legislative Library of a similar transmission to the Joint Committee on Appropriations, as required by the statute.

– third, because the actual balancing of the budget was accomplished – as Comptroller Wyman's letter says – not by Governor Rowland's implementation of his plan pursuant to the statute, but by a legislative enactment passed nearly three months after the terminations at issue were ordered.

Plaintiffs submit that there is no meaningful dispute about any of these factual matters – indeed, if there were evidence of Governor Rowland's actual invocation of, and compliance with § 4-85(b)(2), defendants would not need to resort to letters drawn from the Comptroller's web site, but would have submitted the December 6, 2002 plan itself,[7] and would not have opposed the Court's offer of limited discovery on the legislative immunity issue.

### III.    RECONSIDERATION OF THE COURT'S MARCH 10, 2006 IS WARRANTED.

Reconsideration is appropriate where new evidence is available on a material issue or to correct a clear error or prevent manifest injustice. As the Second Circuit has held, "We may reconsider a prior ruling if 'new evidence has become available or there is a need to correct a clear error or prevent manifest injustice.'" Hemstreet v. Greiner, 378 F.3d 265, 269 (2d Cir. 2004) (sua sponte reconsideration to consider new evidence that clarifies "meager" record), quoting DiGugliemo v. Smith, 366 F.3d 130, 135 (2d Cir. 2004).

Here, plaintiffs have responded to the misleading evidentiary submission attached to defendants' Reply Memorandum with evidence that clarifies the meaning of defendants' submission; and here, the Court's March 10, 2006 Order was based upon an erroneous understanding of the significance of the December 6, 2002 plan referred to in Comptroller Wyman's letter. Under such

---

[7] This Court may well question whether defendants intentionally failed to submit the December 6, 2002 plan and cover letter in the hope that Comptroller Wyman's unexplained reference to the plan in her letter would mislead the Court.

9

circumstances, the Court may and should properly reconsider its March 10, 2006 Order granting defendants' motion to stay discovery pending appeal.

Morever, unless vacated, the March 10, 2006 Order will have substantial detrimental effect on plaintiffs' efforts to vindicate their constitutional rights. As this Court has observed on three separate occasions, discovery in this matter has been delayed for over three years, and "further delay is simply too costly because, if the plaintiffs are to prevail, they cannot recover money damages for their lost time, only reinstatement to lost jobs." March 8, 2006 Order; see also January 31, 2006 Order Directing the Commencement of Discovery at 2 (because plaintiffs are limited to prospective injunctive relief, "the court must expedite resolution of this case"); Ruling at 15 (dissolving stay of discovery and ordering that "in light of the substantial time that has elapsed since the filing of the complaint," discovery will commence without delay").

Furthermore, unless vacated, the Court's March 10, 2006 Order has the potential to unfairly affect the outcome of defendants' interlocutory appeal. Although defendants' pending appeal of the Court's Ruling denying their Motion to Dismiss does not, technically, involve evidentiary issues, to the extent that the Court's March 10, 2006 Order mistakenly states that defendants have provided "a strong showing" to support their claimed legislative immunity defense, the Order should be vacated to avoid any misimpression.

## IV. CONCLUSION

For the foregoing reasons, plaintiffs respectfully submit that their Motion for Reconsideration should be granted, the Court's March 10, 2006 Order should be vacated, and a ruling denying defendants' Motion for Stay Pending Appeal entered.

        PLAINTIFFS STATE EMPLOYEES
        BARGAINING AGENT COALITION,
        ET AL,


BY _____
   DAVID S. GOLUB  ct 00145
   JONATHAN M. LEVINE ct 07584
   SILVER GOLUB & TEITELL LLP
   184 ATLANTIC STREET
   P.O. BOX 389
   STAMFORD, CONNECTICUT  06904
   TEL.  (203) 325-4491
   FAC.  (203) 325-3759
   dgolub@sgtlaw.com
   jlevine@sgtlaw.com

## **CERTIFICATION**

      This is to certify that a copy of the foregoing has been electronically transmitted and mailed, postage prepaid, this 15th day of March, 2006 to:

Albert Zakarian, Esq.
Allan B. Taylor, Esq.
Victoria Woodin Chavey, Esq.
Douglas W. Bartinik, Esq.
Day, Berry & Howard LLP
CityPlace I
Hartford, CT 06103-3499

Ann H. Rubin, Esq.
Carmody and Torrance
50 Leavenworth Street
Waterbury, CT 06721-1110.

                                                      DAVID S. GOLUB