UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATE EMPLOYEES BARGAINING | : | CIVIL ACTION NO. |
| AGENT COALITION, ET AL. | : | |
| Plaintiffs, | : | 3:03CV221 (AVC) |
| | : | |
| V. | : | |
| | : | |
| JOHN G. ROWLAND, ET AL., | : | |
| Defendants. | : | MARCH 24, 2006 |

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR RECONSIDERATION

Plaintiffs ask this Court to reconsider its decision to stay discovery, but, in doing so, seek to draw the Court into an unnecessary factual inquiry about how conclusively Defendants have established their compliance with Conn. Gen. Stat. § 4-85(b). The validity of this Court's stay of discovery, however, does not depend on whether Defendants have established conclusively that they complied with § 4-85(b); rather, the only appropriate inquiry is whether Defendants' appeal has such a small likelihood of success on the merits that, when considered in conjunction with the other relevant factors,[1] a stay would be improper.

Plaintiffs emphatically assert that, in recognizing that Comptroller Wyman's letters and the Governor's legislative submissions constitute a "strong showing" that the Defendants' challenged actions were legislative in nature, the Court made a "mistaken factual conclusion." Plaintiffs' March 15 Memorandum at p. 3; see also p. 9 (plaintiffs also contend that this Court's

---

[1] The parties agree that the four relevant factors are: (1) likelihood of success on appeal; (2) irreparable injury to movant if stay is denied; (3) potential for substantial injury to non-moving party; and (4) the public interest. See Defendants' March 9, 2006 Reply Brief at p. 5 n. 5; Plaintiffs' February 23, 2006 Memorandum in Opposition at p. 12. The success of Defendants' appeal will depend largely on the Second Circuit's application of the United States Supreme Court's functional approach to legislative immunity, as stated in Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998).

March 10 Order "was based upon an erroneous understanding of the significance of the December 6, 2002 plan referred to in Comptroller Wyman's letter", again mistakenly suggesting that the Court's Order staying discovery was predicated on findings on the facts themselves). This Court did not, however, make any factual conclusions at all in connection with its March 10 Order, but simply made the legal determination that the evidence highlighted in Defendants' March 9 Reply Brief was "a valid predicate from which the court *could* conclude" that the challenged actions were legislatively authorized. Order of March 10, 2006 (emphasis added). Plaintiffs do not even attempt to suggest – nor could they -- that Comptroller Wyman's letters and the Governor's legislative submissions are inappropriate evidence, or that, on their face, those documents do not address some of the factual issues that this Court identified in its ruling denying Defendants' Motion to Dismiss. Plaintiffs seem intent, instead, on asserting why they have the better of the argument that the Defendants did not comply with § 4-85(b). This assertion, however, is irrelevant for at least two reasons: one, the current procedural posture of this case does not call for the Court to decide, as a factual matter, whether Defendants complied with § 4-85(b), and, two, it is Defendants' position that their compliance with § 4-85(b) does not, in any event, have any bearing on whether they are entitled to legislative immunity.

For the convenience of the Court, Defendants will nonetheless address the Plaintiffs' arguments concerning compliance with § 4-85(b). Contrary to Plaintiffs' assertion, the letters from Nancy Wyman and Governor Rowland's deficit mitigation plan do show the Court exactly what it identified as lacking in its January 18 Ruling, namely, that the executive actions at issue were legislatively authorized. See Jan. 18 Ruling at 9 n.5; March 10 Order. The Governor's

"Balanced Budget Plan," which Plaintiffs attached to their Motion for Reconsideration,[2] does not change the facts that: (i) the deficit exceeded one percent in the fall of 2002; (ii) Governor Rowland submitted a deficit mitigation plan pursuant to Conn. Gen. Stat. § 4-85(b) that contemplated $94 million in labor cost savings; and (iii) when the negotiations to obtain union concession failed, the Governor ordered layoffs, which were ultimately reflected in the budget approved and codified by the legislature. Thus, not only was the Governor empowered to act under Conn. Gen. Stat. § 4-85(b), the legislature ultimately ratified his actions, showing all the marks of traditional legislation.

### A.    **Factual Background**

As Defendants' submissions make clear, Connecticut's budget deficit exceeded one percent in the fall of 2002. (Ex. A.) Comptroller Nancy Wyman thus informed the Governor that he was required to submit a deficit mitigation plan pursuant to Conn. Gen. Stat. § 4-85(b)(2). (Ex. A.) On December 6, 2002, the Governor submitted such a plan. (Ex. A.)

As Plaintiffs point out, the Governor's plan contemplated saving $94 million in labor costs to be achieved through union concessions prior to January 1, 2003.[3] (Ex. B at 3, 7; see Pls'

---

[2] Plaintiffs ironically chastise Defendants for attaching one of Nancy Wyman's letters to their latest Reply Brief even though her letters had been cited and relied upon ever since Defendants moved to dismiss Plaintiffs' Amended Complaint in 2003. (Pls' Memo at 9.) It is Plaintiffs, however, who have now submitted new evidence to this Court in an eleventh-hour attempt to seek discovery.

[3] Achieving this $94 million savings was fully anticipated and required by the legislature. In the summer of 2002, the legislature enacted Public Act 02-1 (relevant portion attached hereto as Ex. E), which modified the 2003 fiscal year budget. (See also Rowland's opening remarks to Senate and House in Ex. G.) In that bill, the legislature increased the estimated unallocated lapse by $94 million. Thus, the legislature was fully cognizant and expecting that $94 million must be made up going forward regardless of the fiscal crisis. See Ex F, which contains official explanatory text from the Office of Fiscal Analysis (OFA) and the relevant portion of Public Act § 02-1. The OFA text is available on the General Assembly website at http://www.cga.ct.gov/ofa/Documents/OFABudget/2002/Book/AppropsSummary.pdf.

Memo at 6.)  Union concessions were one way to achieve these savings, as an alternative to laying off workers.  (See Ex. C [also attached to Defs' Cons. Memo at Ex. C].)  It is undisputed that the unions did not agree to the offered concessions.  (Ex. C; Amended Complaint ¶¶ 39-42.)  Because the unions would not agree to any concessions, the $94 million reduction in labor costs was achieved through layoffs and early retirement savings, rather than union concessions.  (See footnote 8, infra.)  Thereafter, on February 28, 2003, the legislature codified the budget revisions in Public Act 03-2, which revised some of the line items in the Governor's December 6, 2002 mitigation plan and which necessarily included the labor cost savings achieved through the layoffs.  (See Ex. D.)

**B.     The Record Shows that the Governor Was Authorized By and Complied With General Statutes § 4-85(b)**

The crux of Plaintiffs' position is that, because the actual layoffs were not listed as another way to save labor costs in the Governor's December 6, 2002 mitigation plan, they were not carried out in compliance with § 4-85(b) and thus not protected by legislative immunity.  (Pls' Memo at 6-7.)  Plaintiffs' argument stems from an unduly restrictive view of legislative immunity and a tortured reading of § 4-85(b).

---

Governor Rowland's December 6 mitigation plan also indicated that the any remaining balance in the $94 million could be made up by reducing ECS up to $94 million, which would require legislative approval.  Contrary to Plaintiff's suggestion, the plan does not say that "in the event the concessions cannot be achieved, that the $94 million will be obtained through a reduction in [ECS]."  (Emphasis added.) (Pls' Memo at 6.)  Instead, the Governor's plan contemplated that the union concessions, i.e., labor cost savings, might yield less than $94 million.  Indeed, the Governor did not have authority under § 4-85(b) – as amended by Public Act 02-1 § 52(d) – to reduce ECS, which is why it was presented as an option should the legislature choose to take it.  (See Exs. B, E.)  As reflected in P.A. 03-2, the legislature did not do so.

Consistent with the State Constitution,[4] Conn. Gen. Stat. § 4-85(b) empowers the Governor to make budget modifications in the event of a fiscal crisis. Section 4-85(b)(1) permits the Governor to make budget modifications in the event of a shortfall "to the extent the Governor deems necessary." Section 4-85(b)(2) requires the Governor to make budget modifications if the State Comptroller indicates that the deficit exceeds one percent. Pursuant to the statute, the Governor is to file a report and an accompanying deficit reduction plan with the appropriate legislative committees within thirty days of the Comptroller's statement.[5]

Here, there no dispute that the Governor submitted a deficit mitigation plan to the legislature on December 6, 2002 indicating that he anticipated achieving $94 million in labor cost savings through union concessions. Moreover, Plaintiffs begrudgingly concede that the fiscal crisis in the fall of 2002 and § 4-85(b) empowered the Governor to modify the State's budget.[6] (Pls' Memo at 4.) Plaintiffs have taken the untenable position, however, that the

---

[4] The State Constitution mandates that the legislature balance the budget every year. Article Third, § 18. The obligation and authority to comply with this requirement is legislative power that both the legislature and governor share. See generally University of Connecticut Chapter AAUP v. Governor, 200 Conn. 386 (Conn. 1986) (interpreting constitutionality of Conn. Gen. Stat. § 4-85).

[5] There is no merit to Plaintiffs' irrelevant comment that the Governor did not submit his plan within thirty days and that his cover letter was not addressed to the Appropriations Committee. (Pls' Memo at 8 n.6.) No one could possibly argue that the Governor's immunity depends on a thirty day time limit or the details provided in his cover letter. *See infra* pp. 9-10. As Plaintiffs' own submissions make clear, the cover letter and plan were circulated to every member of the General Assembly, and the plan was presented to the General Assembly during the December 18 Special Session. (See Exs. B, G; Pls' Memo at Ex. A.)

[6] Plaintiffs now have changed the issue before the Court from whether the Governor was *empowered* to modify the budget to whether the Governor *procedurally followed* the budget modification statute, thus attempting to invite the Court to permit discovery. In its January 18 Ruling, this Court concluded that absolute immunity was not yet triggered because there was no evidence showing that: (a) the deficit exceeded one percent; or (b) that the Governor submitted a plan to the legislature to prevent the deficit. (Jan. 19 Ruling at 9 n.5.) In other words, this Court was concerned that the factual predicates required by § 4-85(b) had not been met, and therefore the Governor might not have been statutorily empowered to modify the budget. There is now no

Governor's actions are not sufficiently "legislative" because he either did not follow every requirement listed in § 4-85(b) or did not expressly mention § 4-85(b) when he submitted his deficit mitigation plan. These arguments both fail.

First, there is no merit to Plaintiffs' argument that legislative immunity is not triggered because the layoffs were not expressly written into the Governor's December 6, 2002 deficit mitigation plan. (Pls' Memo at 6-7.) As discussed above, the Governor submitted a plan to the legislature that contemplated saving $94 million in labor costs to be achieved through union concessions prior to January 1, 2003. The plan also contemplated that the union concessions might yield less than $94 million because it indicated that the difference could be made up by reducing ECS up to $94 million. (See footnote 3, supra.) When the unions refused to agree to the concessions, the cost savings were achieved through layoffs and early retirement savings. (Ex. C; Amended Complaint ¶¶ 39-42; footnote 8, infra.)

Nothing in § 4-85(b) required the Governor to submit a new modification plan to the legislature expressly calling for layoffs as opposed to union concessions. Indeed, as Plaintiffs point out, the legislature ultimately approved and enacted a budget based on the Governor's modification plan after the layoffs at issue.[7] (Pls' Br. at 2, 8-9.) Public Act 03-2 (attached hereto

---

dispute that the Governor was statutorily *empowered* to modify the budget, which is all that should be necessary for absolute legislative immunity even if the court rejects Defendants' position that the nature of the Governor's action leads to immunity under Bogan, 523 U.S. at 54, without reliance on § 4-85(b).

[7] This concession disposes of Plaintiffs' claim that they meet the Ex Parte Young exception to Eleventh Amendment immunity because there is no longer an ongoing violation of federal law. It is well settled that the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief, but only to the extent that such a remedy is designed to "to prevent a continuing violation of federal law." Green v. Mansour, 474 U.S. 64, 68-69 (1985) (not permitting a declaratory judgment that state officials violated federal law in the past because there was no ongoing violation of federal law, making the case moot); see Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 102 (1984). Here, even if the Governor were not entitled to legislative immunity, there is no "continuing violation" of federal law because the

as Ex. D) was enacted on February 28, 2003 and mirrors the Governor's modification plan with some additional changes. (Ex. D.) It also <u>expressly</u> references the laid off workers and their rights to recall and early retirement.[8] <u>See</u> P.A. 03-2 §§ 6(b)(F)2 (recall rights for union workers); 6(b)(G) (early retirement for laid-off workers); and 6(i) (employment continuity for returning laid off workers). In other words, the legislature acknowledged, accepted, approved, and adopted the Governor's mitigation plan <u>along with the layoffs</u>. Thus, the record shows that the Governor was authorized by § 4-85(b) to effectuate budget modifications and that the legislature subsequently approved those modifications. This sequence of events was undoubtedly "taken in the sphere of legitimate legislative activity" as contemplated by <u>Bogan</u>.[9] <u>See</u> 523 U.S. at 54.

Second, Plaintiffs are wrong in their assertion that Conn. Gen. Stat. § 4-85(b) required the Governor unilaterally to implement his modification plan. (Pls' Memo at 6.) Section 4-85(b) requires the Governor to take corrective action if the budget deficit exceeds one percent. Besides

---

legislature subsequently approved and adopted the Governor's budget <u>with the layoffs</u>. In other words, there is no individual conduct left for this Court to enjoin, making this case moot. (<u>See also</u> Defendants' March 9 Reply Brief at 7.) Defendants have raised this issue in their Notice of Appeal, which is yet another reason why Defendants have a strong position on appeal and why the stay of discovery is appropriate.

[8] The official fiscal notes to Public Act 03-2 indicate that the early retirement plan would also account for a portion of the Governor's union concession proposal. See fiscal note explaining § 6(b) of Public Act 03-2, attached hereto as Ex. H.

[9] This sequence of events is indistinguishable from <u>Bogan</u>, wherein Mayor Bogan, <u>in his executive capacity</u>, called for the elimination of the Department of Health and Human Services, of which Scott-Harris was the only employee. <u>See</u> 523 U.S. 46-47, 55. The city counsel thereafter adopted the budget and Mayor Bogan signed the ordinance into law. <u>Id.</u> at 47. Even though Mayor Bogan's actions were undisputedly taken within his executive function as the City's mayor, they were entitled to legislative immunity because the ordinance effecting the terminations "reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents." Id. at 55-56. Here, Governor Rowland proposed $94 million in labor cost savings through union concessions; when the concessions failed he ordered layoffs; and the legislature ultimately approved the budget with the layoffs in lieu of the concessions.

submitting a deficit mitigation plan to the legislature, the statute does not say anything about how the Governor "shall implement [a plan] to modify such allotments to the extent necessary to prevent a deficit." Conn. Gen. Stat. § 4-85(b)(2). Under this language he may unilaterally implement the modifications (as Plaintiffs suggest) or he may submit a proposal to the legislature for its approval and adoption (as he did here) – so long as the budget deficit is averted. Moreover, under § 4-85(c), which Plaintiffs ignore, the Governor's power is not unlimited because the legislature must approve reductions exceeding five percent. In any case, the Governor's actions here were consistent with the shared budgetary power of the Governor and the General Assembly as called for in the State Constitution and General Statutes. See generally Connecticut Constitution Article Third, § 18; Conn. Gen. Stat. §§ 4-71 – 4-89; University of Connecticut Chapter AAUP v. Governor, 200 Conn. 386 (Conn. 1986).

Third, Plaintiffs also are wrong in their argument that the Governor is not entitled to legislative immunity unless he accompanied his actions with the magic phrase that that he was "invoking" § 4-85 or something similar.[10] Such a procedural formality, which is not listed in the statute and which finds no support under Bogan, cannot possibly control whether the actions here were legislative. Indeed, "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." Bogan, 523 U.S. at 54. Thus, it makes no difference what the Governor intended to do or thought he was doing because those issues

---

[10] For instance, Plaintiffs point to the fact that the cover letter accompanying the deficit mitigation plan did not reference § 4-85(b). (Pls' Memo at 7.) Defendants are at a loss as to why the Governor must expressly mention § 4-85(b) or lose his absolute immunity. Putting aside that such express invocation has nothing to with the function being performed for legislative immunity purposes, the statute does not require any such express recognition. Moreover, Defendants are not sure how the Governor would have done so – must he say it in the mitigation plan? – must he orally address the General Assembly? – must he write it in each and every layoff notice?

cannot be considered for the purposes of legislative immunity; only the function he ultimately performed is relevant. Id.

Finally, the essential premise of Plaintiff's argument – that the Governor's absolute immunity depends on his compliance with state law as evaluated by this federal court – is untenable. The Supreme Court has held that federal courts cannot base relief against a state official on a federal court's determination that the official violated state law. As the Court in Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 106 (1984) noted:

> [I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

Plaintiffs' claim that they can proceed against the Governor because the Governor's actions did not comply with § 4-85(b) requires this Court to "instruct[] state officials on how to conform their conduct to state law." Id. That Plaintiffs ask this Court to deliver that instruction in the form of an order requiring the State to undo acts it took over three years ago in furtherance of its most fundamental sovereign function – setting and revising its budget – makes the conflict with the principle of Pennhurst even more egregious.[11]

**C.   Conclusion**

There is no dispute that the Governor was statutorily empowered to make budget modifications under the facts and circumstances on the record. There is also no dispute that the labor costs reductions achieved through the union layoffs (in lieu of union concessions) were

---

[11] Not only were the acts condemned here – the layoffs of approximately 2800 employees – taken over three years ago, they were shortly thereafter ratified by the legislature. This case is moot because, even if the original layoffs were an illegal act by the Governor, the employees' current status is based on subsequent budgeting enactments, not the Governor's initial action. The Eleventh Amendment precludes an injunctive action against the State to compel the employees' reinstatement, nor are there any budgeted positions to which Plaintiffs can return. (See footnote 7, supra; Defendants' March 9 Reply Brief at 7.)

reflected in the actual budget approved and adopted by the legislature. The Court correctly concluded in its most recent order that, at the least, Defendants have a strong position on appeal and that discovery should be stayed.

                              DEFENDANTS,

                            By: /s/ Albert Zakarian
                                Albert Zakarian (ct04201)
                                Day, Berry & Howard LLP
                                CityPlace I
                                Hartford, Connecticut 06103-3499
                                (860) 275-0100
                                (860) 275-0343 (fax)
                                *azakarian@dbh.com*

                                Their Attorneys

## **CERTIFICATE OF SERVICE**

       THIS IS TO CERTIFY that a copy of the foregoing was mailed this date, postage prepaid, to:

David S. Golub
Jonathan M. Levine
Silver, Golub & Teitell, LLP
184 Atlantic Street
P.O. Box 389
Stamford, CT 06904-0389

Ann H. Rubin
Carmody and Torrance
50 Leavenworth Street
Waterbury, CT 06721-1110

                                /s/ Albert Zakarian
                                Albert Zakarian