UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATE EMPLOYEES BARGAINING AGENT COALITION, ET AL, | : | |
| Plaintiffs, | : | |
| V. | : | CIV. NO. 3:03CV221 (AVC) |
| JOHN G. ROWLAND, ET AL, | : | |
| Defendants. | : | MARCH 31, 2006 |

**PLAINTIFFS' REPLY MEMORANDUM IN
SUPPORT OF MOTION FOR RECONSIDERATION**

I.   **INTRODUCTION**

This Court's March 10, 2006 decision to reverse its March 8, 2006 Order and stay discovery in this action pending appeal was based on defendants' contention that the "deficit reduction plan" referenced in Comptroller Wyman's April 1, 2003 letter was evidence that Governor Rowland had acted pursuant to Conn. Gen. Stats. § 4-85(b)(2) in ordering the terminations at issue in this action.

This "evidence," if true, went to the core of the Court's holding denying defendants' motion to dismiss on legislative immunity grounds. In its Ruling on Defendants' Motion to Dismiss, the Court expressly recognized that § 4-85(b) gives the Governor authority in a budget crisis to modify the State's budget. [Ruling at 9 ("that statute gives the Governor the discretion in a budget crisis to modify a previously adopted budget"). The Court denied defendants' legislative immunity argument because of the factual dispute over whether the Governor actually invoked that statutory authority in ordering the job terminations at issue. Id. ("the record is devoid of evidence that the governor invoked that authority

when ordering the job terminations here"). Presented by defendants with what appeared to be such evidence, the Court deemed it appropriate to stay discovery pending appeal.

Plaintiffs have moved for reconsideration of the Court's March 10, 2006 Order because the actual "plan" referenced by Comptroller Wyman provides no support for a finding that Governor Rowland acted pursuant to § 4-85(b)(2) in ordering the terminations at issue in this action. Plaintiffs have provided the Court with a copy of the plan itself.[1] The plan does not include the terminations as a proposed deficit-mitigating measure. Plaintiffs have also demonstrated the plan was prepared for submission to the General Assembly, and was never implemented by Governor Rowland (or by the General Assembly, which – months after the terminations were announced – enacted a deficit-mitigation statute with substantially different provisions[2]).

Plaintiffs assert that because the plan never mentions the terminations at issue and was never implemented by the Governor, it cannot be deemed evidence of Governor Rowland's invocation of § 4-85(b)(2) in ordering the terminations. Plaintiffs contend that defendants' submission of the Wyman letter, with its unclarified reference to Governor Rowland's plan, misled the Court into believing that the letter "constitutes a strong showing that the executive action(s) condemned here were, indeed, legislatively authorized." (March 10, 2006 Order).

---

[1] See Exhibit A submitted with Plaintiffs' March 15, 2006 Memorandum.

[2] In their Opposition to plaintiffs' Motion for Reconsideration, defendants contend that the General Assembly essentially adopted Governor Rowland's plan when it enacted Public Act 03-02. As discussed below, Public Act 03-02 is materially different from Governor Rowland's plan: the legislation makes total modifications to state revenues and spending of over $617 million, as opposed to the $479 million in Governor Rowland's plan; the legislation adopts revenues increases of over $439 million as opposed to the $203 million in the plan; the legislation authorizes spending cuts of $129 million as opposed to the $201 million in the plan; the legislation contains no savings from union concessions or reductions of the state's aid to municipalities for education as opposed to the proposed $94 million in the plan; and the legislation establishes early retirement programs for union and management employees, providing savings of $49 million, that the plan does not contain. Neither the plan, nor the legislation includes employee terminations as a deficit-mitigating measure. See pp. 8-9, *infra*.

2

In their Opposition to plaintiffs' Motion, defendants argue, *inter alia*,[3] that the plan is evidence that Governor Rowland was involved in a dialogue with the Connecticut General Assembly about the budget deficit. But plaintiffs do not dispute that contention. If Governor Rowland had included the terminations in his proposed Budget-Balancing Plan and if the General Assembly had adopted the plan, there would plainly be legislative immunity for the terminations (and for every other provision of the legislative enactment). Such immunity would not flow from § 4-85(b)(2), but from the absolute immunity provided for legislative enactments.

The issue before the Court is, quite simply, whether the plan referenced in Comptroller Wyman's letter does, in fact, provide evidence that the terminations were ordered by Governor Rowland pursuant to his statutory authority under § 4-85(b)(2), so as to have warranted reversal of this Court's March 8, 2006 Order denying a stay of discovery.

---

[3] Defendants' 10-page Opposition to Plaintiffs' Motion asserts – by plaintiffs' count – at least nine different reasons why there is a basis for their claim of absolute legislative immunity, Thus, defendants contend (1) that whether the plan actually provides proof that Governor Rowland invoked § 4-85(b)(2) is "irrelevant;" (2) that defendants are entitled to legislative immunity irrespective of whether Governor Rowland ever invoked the statute; (3) that defendants are entitled to legislative immunity even if Governor Rowland never implemented a plan; (4) that the plan should be read to include the terminations; (5) that because the Connecticut General Assembly subsequently passed legislation to alleviate the budget deficit, it must be deemed to have ratified the terminations ordered by Governor Rowland; (6) that plaintiffs' challenge to whether Governor Rowland acted pursuant to the statute should be viewed as a trivial attack on whether Governor Rowland fully complied with the statue; (7) that discovery should be stayed because this action is moot; (8) that discovery should be stayed because plaintiffs' claims are barred by the Eleventh Amendment; and (9) that this Court is barred from examining whether Governor Rowland invoked the statute.

In this Reply Memorandum, plaintiffs will focus on the principal issue raised by their Motion for Reconsideration – whether the plan referenced in the Wyman letter provides a factual basis for a finding that the terminations were ordered by Governor Rowland pursuant to his statutory authority under § 4-85(b)(2).

## ARGUMENT

### A.   WHETHER THE PLAN CONSTITUTES EVIDENCE OF GOVERNOR ROWLAND'S INVOCATION OF § 4-85(b)(2) IS NOT IRRELEVANT.

Defendants first argue that it is "irrelevant" whether the plan provides proof that Governor Rowland actually invoked § 4-85(b)(2) in ordering the terminations at issue, since – according to defendants – (1) that is a factual dispute that the Court should not now resolve; and (2) that "does not, in any event, have any bearing on whether they are entitled to legislative immunity." (Opp. at 2).

But defendants submitted the Wyman letter for the express purpose of providing evidence that Governor Rowland had acted pursuant to § 4-85(b)(2). (Def. Rep. Mem. at 4). Having induced the Court to reverse its denial of a stay of discovery by arguing that the letter established that Governor Rowland had acted pursuant to the statutorily-required plan, defendants may hardly now assert that the terms of the actual plan are irrelevant. Quite simply, if the actual plan does not support their claim, there was no valid basis for reversing this Court's March 8, 2006 Order.

### B.   DEFENDANTS' CONTENTION THAT THE TERMINATIONS MAY BE DEEMED TO BE INCLUDED IN THE PLAN AS A SUBSTITUTE FOR THE $94 MILLION IN UNION CONCESSIONS IS FALLACIOUS.

In their Opposition, defendants argue that although the 2,800 terminations at issue were not listed as a cost-saving measure in Governor Rowland's plan, they should be deemed included in the plan because the terminations were – according to defendants – a substitute for the plan's potential $94 million savings from anticipated union concessions. In advancing this argument, defendants contend that the cost-savings achieved from the terminations made up for the portion of the $94 million that was not obtained through union concessions. (See e.g., Opp. at 4, 6).

This contention is not only directly in conflict with the provisions of Governor Rowland's plan, but it literally turns the undisputed events of this case upside down.

It is undisputed that in November 2002, Governor Rowland and OPM Secretary Ryan announced that they were seeking long-term structural changes in the unions' collective bargaining agreements to obtain annual savings in future years of over $400 million per year. After discussions with union leaders failed to produce agreement on the full $400 million in future yearly reductions, Governor Rowland publically announced – in mid-November 2002 – that because the unions would not agree to the demanded concessions, the State was going to terminate 2,800 union employees.[4]

Governor Rowland formally announced the 2,800 terminations in a public address on December 5, 2002. At that time, Governor Rowland stated:

> When I first met with the state employee union leaders to discuss wage and benefit concessions, I told them I wanted to avoid lay-offs. I proposed a fair compromise that would keep **everyone** employed. Tragically, the union leadership rejected my offer and failed to even consult their own members. It is with great disappointment and regret that I have to announce the layoffs of 2,800 state government workers.[5]

Indeed, as the *Hartford Courant* reported on December 6, 2002, "shortly before his speech, Rowland released a list of 2,834 layoffs that cover virtually every state agency [including] 268 at the Department of Transportaion, 249 at the Department of Mental Retardation, and 228 at the Department of Mental Health and Addiction Services."[6]

---

[4] See, e.g., *Hartford Courant*, November 16, 2002, "State Budget Compromise Predicted" ("One day after Gov. John G. Rowland treatened to lay off 3,000 unionized state employees, several prominent legislators predicted Friday that a budgetary compromise will be reached that will avoid widespread layoffs) (attached as Exhibit B).

[5] See Address by Governor John G. Rowland, December 5, 2002 (attached as Exhibit A) at 2 [emphasis in original].

[6] *Hartford Courant*, December 6, 2002, "Rowland Backs Millionaire's Tax; in Round One of Budget Balancing Act, Governor Also Outlines Layoffs") (attached as Exhibit C). A copy of the list distributed by Governor Rowland on December 5, 2002 is attached as Exhibit D.

In his public address on December 5, 2002, immediately after announcing the 2,800 terminations, Governor Rowland further announced that he was submitting a balanced budget plan to the General Assembly. In his address, he cited the State's FY 2003 budget deficit of $500 million and identified the three major components of his plan to eliminate that deficit –

> "• Spending will be reduced by 200 million dollars.
>
> • Taxes will be increased by 200 million dollars. ...
>
> • And I will seek at least 100 million dollars in employee contract concessions **OR** an additional 100 million dollar cut in state aid to cities and towns by December 31[st]."[7]

Governor Rowland's public address made clear (1) that the 2,800 terminations had been ordered because the unions had refused to agree to the concessions demanded the previous month; and (2) that unless $100 million of contract concessions could be obtained, Governor Rowland would seek to cut state aid to municipalities to make up the budget-deficit shortfall.

On December 6, 2002, Governor Rowland transmitted his "Balanced Budget Plan" to members of the General Assembly. Consistent with his address the previous evening, the Plan identified a $479 million budget deficit and proposed to balance the budget through spending reductions of $201.4 million; through revenue increases of $203.8 million; and through

> "Union Concessions to be achieved prior to January 1 $ 94.0
>
> **OR**
>
> Reduction in ECS [Education Cost Sharing][8] Up to $ 94.0."[9]

---

[7] See Address by Governor John G. Rowland (Exhibit A) at 2-3 (emphasis in original).

[8] The State's Education Cost Sharing program ("ECS") is a program that provides state aid to Connecticut municipalities.

[9] See Governor Rowland's Balanced Budget Plan at 6 (attached as Exhibit A to plaintiff's prior Memorandum).

There was nothing in the plan that indicated that if union concessions could not be achieved by January 1, terminations would make up the budget shortfall. To the contrary, the plan expressly stated, as Governor Rowland had stated the previous evening, that if sufficient concessions could not be obtained, the missing moneys would come from reductions in state aid to municipalities.[10]

Equally important, given the undeniable fact that the terminations at issue in this action were already announced prior to the release of Governor Rowland's plan, it is untenable for defendants to argue that the terminations were subsequently implemented in order to fund that portion of the $94 million in union concessions that were not achieved between December 6, 2002 and January 1, 2003.

Moreover, defendants either do not understand – or are intentionally misleading the Court about – the purported cost savings in FY 2003 (i.e., through June 30, 2003) from the terminations. The State of Connecticut is self-insured for federal unemployment compensation obligations and was required to pay each of the terminated employees up to six months of unemployment compensation, as well as all accrued sick leave and vacation pay. As a result, it was well-understood by Governor Rowland and by the General Assembly that there would be no real costs savings in FY 2003 from the terminations. Defendants' contention in their Opposition that the terminations funded over $40 million of savings in FY 2003[11] is wholly without any basis in fact.

---

[10] Defendants suggest now that this section of the plan does not mean what it says since – defendants argue – Governor Rowland lacked the power to unilaterally order a reduction in ECS and thus must have intended to include terminations, which he could order, as the alternative to the $94 million in union concessions. [See Def. Opp. at 4, n.3.] But, as set forth above, Governor Rowland was quite clear in his December 5, 2002 public address that the alternative source of the $94 million savings was a cut in state aid to municipalities. (See Exhibit A at 3.) The fact that Governor Rowland could not, unilaterally, order the ECS reduction is of no moment: likewise, he could not unilaterally order the union concessions, nor could he unilaterally order the $200+ million in revenue increases he was proposing.

[11] The early retirement programs included in Public Act 03-02 generated $49 million of savings, see Def. Ex. H at 2 (explaining fiscal implications of § 6(b) of Public Act 03-02), which defendants assert were credited against the $94 million in Governor Rowland's plan. (Opp. at 6).

C.     **DEFENDANTS' ASSERTIONS THAT THE GENERAL ASSEMBLY ADOPTED GOVERNOR ROWLAND'S PLAN AND THUS IMPLICITLY ADOPTED AND RATIFIED THE TERMINATIONS IS FALLACIOUS.**

Defendants repeatedly assert that the General Assembly adopted Governor Rowland's plan in its enactment of Public Act 03-02 and that this enactment constituted an adoption, approval and ratification of the 2,800 terminations (and thus imbues the terminations with legislative immunity). Defendants misunderstand – or misstate – what occurred in the General Assembly.

Governor Rowland called the General Assembly into a Special Session on December 18, 2002 to consider his Balanced Budget Plan. The General Assembly did not adopt the plan or any other legislation to mitigate the budget deficit during the Special Session.

In January 2003, the legislature returned to a General Session and considered legislation to mitigate the budget deficit. Initially, the General Assembly passed an act, Public Act 03-01, that eliminated the budget deficit and included provisions requiring the reinstatement of the terminated union workers. See House Bill 6397 (Public Act 03-01) [attached hereto as Exhibit E]. Governor Rowland vetoed that legislation on February 19, 2003. (See Exhibit E.)

On February 28, 2003, the General Assembly passed a second deficit mitigation bill, Public Act 03-02. That bill did not provide for reinstatement of the terminated union workers. While that legislation included some of the measures suggested by Governor Rowland in his December 6, 2002 Balanced Budget Plan, the legislation was substantially different from the plan:

– Public Act 03-02 provided for over $617 million in deficit mitigation measures, as opposed to the $479 million in Governor Rowland's plan;

– Public Act 03-02 provided for over $439 million in revenue increases rather than the $203 million in Governor Rowland's plan;

8

– Public Act 03-02 provided for only $129 million in General Fund allotment reductions instead of the $201 million proposed by Governor Rowland;

– Public Act 03-02 provided for the creation of an early retirement plan for union employees that provided $45 million in savings for FY 2003, and an early retirement plan for management employees that saved another $4 million in FY 2003;

– Public Act 03-02 contained no provision for union concessions[12] or reduction in ECS, while the plan provided for $94 million in savings from either concessions or ECS reductions.[13]

In sum, in February 2003, the General Assembly adopted various measures to increase revenues and decrease expenses, resulting in over $125 million more in savings/gains than had been proposed by Governor Rowland's plan. Moreover, the revenue increases in the act were substantially greater than and different from those contained in Governor Rowland's plan. For example, the controversial "millionaire's tax" proposed by Governor Rowland was not adopted by the General Assembly, while various sales tax extensions and business tax surcharges, which had never been proposed by Governor Rowland, were included in Public Act 03-02. And, at no time did the General Assembly affirmatively approve or ratify the 2,800 terminations previously ordered by Governor Rowland; to the contrary, the General Assembly passed legislation eliminating the deficit and ordering the workers reinstated, only to have that legislation vetoed by Governor Rowland.

---

[12] The early retirement provisions were enacted by the General Assembly without the consent of the unions and modified the unions' collective bargaining agreements without their consent.

[13] Defendants claim that Governor Rowland did not have the unilateral authority to reduce ECS and could do no more than present it as an option to the General Assembly. Plaintiffs do not dispute this contention. Indeed, as plaintiffs pointed out in their prior Memorandum, Governor Rowland's proposed plan called for revenue increases (i.e., taxes) of over $203 million that were beyond his authority and were no more than an option for the legislature's consideration. The General Assembly chose not to reduce ECS, chose to order revenue increases of more than twice what Governor Rowland had proposed ($439.8 million), and chose to establish early retirement programs beyond Governor Rowland's authority to implement.

9

In this context, there is simply no basis for defendants' repeated statements that the General Assembly enacted Governor Rowland's plan or that, since Public Act 03-02 was passed after the terminations at issue had been ordered, the legislature's deficit mitigation measures in February 2003 constituted a ratification of those terminations.

Defendants' argument of legislative ratification amounts to the contention that any action by the Executive Branch that resulted in cost savings prior to the enactment of Public Act 03-02 was ratified by the legislature when it adopted Public Act 03-02 (even if, as here, the legislature first, unsuccessfully, sought to overturn the action). If upheld, defendants' argument would imbue with legislative immunity every act taken by the Executive Branch in the fall of 2002 (when the budget deficit was announced) that had the direct or indirect effect of reducing costs.

In its Ruling on Defendants' Motion to Dismiss, this Court recognized held that, in order for legislative immunity to apply to actions by Governor Rowland, the actions must be "both (1) substantively legislative, i.e., acts that involve policy making; and (2) procedurally legislative, i.e., passed by means of established legislative procedures." [Ruling at 7.]    It was to satisfy the second prong of this test that the Court looked for – but could not find – "evidence that Governor Rowland  invoked [his] authority [under § 4-85(b)(2)] when ordering the job terminations here." [Id. at 8].

Plaintiffs submit that Governor Rowland's Balanced Budget Plan provides no such evidence because it does not include the terminations as a deficit mitigation measure; because it was never implemented, nor meant to be implemented by Governor Rowland pursuant to the statute, but rather was submitted by him for consideration by the Connecticut General Assembly; and because,  ultimately, the Connecticut legislature enacted substantially different legislation to address the budget deficit that did not include the terminations as a deficit-mitigating measure.

10

**D.     THE ISSUE HERE IS NOT WHETHER GOVERNOR ROWLAND FAILED TO COMPLY WITH THE PROCEDURAL REQUIREMENTS OF § 4-85(b)(2).**

Defendants argue that Governor Rowland's entitlement to legislative immunity cannot turn on whether he complied perfectly with the procedural requirements of § 4-85(b)(2) and accuse plaintiffs of demanding a "magic phrase" as a pre-condition to a finding of Governor Rowland's invocation of § 4-85(b)(2).  (Opp. at 8).  Defendants misunderstand plaintiffs' argument.

Plaintiffs submit that it may reasonably be assumed that when a Connecticut Governor undertakes the important action of rescinding budget allotments to effectuate deficit mitigation pursuant to § 4-85(b)(2), that action will be reflected in some official documentation and will be performed in accordance with statutory requirements.  The absence of any official invocation of the statute with respect to the terminations or compliance with the statutory requirements by Governor Rowland in regard to the terminations is, thus, of evidentiary significance in evaluating whether the terminations were, in fact, ordered pursuant to the statutory authority.

Here, there is no document evidencing that the terminations were ordered pursuant to the Governor's exercise of his rescission authority under the statute;  the  Governor did not act within 30 days, as required by § 4-85(b)(2); did not submit a report explaining the reasons for the deficit required by § 4-85(b)(2); did not submit a plan for spending reductions that he could implement to eliminate the budget deficit, but rather prepared a plan to eliminate the budget deficit that required action by the General Assembly; did not submit the plan to both of the legislative committees specified by the statute.  There is simply nothing to support a finding that the terminations were ordered pursuant to § 4-85(b)(2).

Plaintiffs contend that a plan that – on its face – is submitted for consideration by the General Assembly and that contains revenue and other measures beyond the authority of the Governor to

implement unilaterally is not a § 4-85(b)(2) plan.[14] And, because plaintiffs believe that Governor

Rowland did not seek to invoke his authority under § 4-85(b)(2), plaintiffs are not surprised that the plan

and the cover letter transmitting the plan make no reference to § 4-85(b)(2).

It may properly be noted that Governor Rowland did exercise his rescission authority under § 4-

85(b)(2) in November 2002 ($68 million)[15] and January 2003 $24 million)[16] to reduce budget allotments

in other areas.

---

[14] Defendants argue that § 4-85(b)(2) does not specify how the Governor is to implement his plan, and therefore does not require him to "unilaterally" implement any requisite deficit mitigation modifications. Accordingly, defendants argue, it was perfectly permissible for Governor Rowland to invoke § 4-85(b)(2) by requesting the General Assembly to adopt a deficit-mitigation plan.

This argument ignores the specific language of the statute, which imposes a mandatory duty on the Governor to submit a report and plan and to implement the plan he submits in order to eliminate a budget deficit over 1%:

> The Governor, within thirty days following the issuance [of the Comptroller's notification of the 1% deficit] shall file a report with such joint standing committees, including a **plan which he shall implement** to modify such allotments to the extent necessary to prevent a deficit. [Conn. Gen. Stats. § 4-85(b)(2), Rev. of    ].

While it is true, as defendants argue, that if the Governor's proposed spending reductions exceed 5% of the total budget, the Governor must obtain General Assembly approval for the reductions, id., there is no dispute here that the $200 million in spending reductions proposed in Governor Rowland's plan did not come close to 5% of Connecticut's $13 billion budget.

But, more important, even assuming that the Governor can invoke § 4-85(b)(2) by submitting a plan for approval by the General Assembly, neither the plan Governor Rowland submitted, nor the legislation enacted by the Connecticut legislature included the terminations at issue here as a deficit-mitigation measure.

[15] See Hartford Courant, November 27, 2002, "Rowland Begins Budget Grind; $68 Million in Cuts Come Days Before Scheduled Layoffs" ("Using increased authority granted by the legislature, Gov. John G. Rowland unilaterally imposed $68 million in state budget cuts – less than a week before as many as 3,000 layoff notices are scheduled to go out to state employees") (attached as Exhibit F).

[16] The January 2003 exercises of his statutory authority is noted in Section 1 of Public Act 03-02.

**E.    THIS COURT MAY PROPERLY DETERMINE WHETHER GOVERNOR ROWLAND ACTED PURSUANT TO § 4-85(b)(2) WHEN HE ORDERED THE TERMINATIONS AT ISSUE.**

Finally, defendants argue that this Court is not even allowed to examine whether Governor Rowland acted pursuant to § 4-85(b)(2) when he ordered the terminations at issue. In support of this remarkable proposition, defendants cite, completely out of context, the holding of Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 106 (1984).

In Pennhurst, the Supreme Court ruled that the Eleventh Amendment bars a pendent state-law claim in federal court against a state official for violation of a state law.[17] The Court held that allowing a federal court to impose liability on a state official for violation of a state law would violate principles of federalism. 465 U.S. at 106.

The Court did not say – and has never said – that in the course of determining whether a state official has violated federal law, a federal court is barred from determining whether the official complied with applicable state laws. See, e.g., Monaco v. Carpinello, 2004 WL 3090598, at * 4 (E.D.N.Y. 2004) (attached hereto) (Pennhurst does not preclude examination of whether defendant violated state law where the particularized substantive criteria and mandatory language in the state law creates limits on the official's conduct and creates federally protected liberty interest whose violation is actionable under § 1983). Indeed, where as here, a state official seeks the benefit of immunity conferred by his official state position, a federal court must necessarily examine the state-law basis of the immunity.

Moreover, the issue posed by plaintiffs' Motion for Reconsideration is not whether defendants "complied" with the procedural requirements of § 4-85(b)(2); rather the issue is whether Governor

_____

[17] The plaintiffs in Pennhurst had brought claims in federal court under federal statutes and a Pennsylvania law providing rights to mentally retarded citizens and had obtained relief under the state-law cause of action. The Supreme Court held that the state statutory right could not be pursued in federal court. 465 U.S. at 106.

Rowland acted *pursuant* to § 4-85(b)(2) when he ordered the termination. As this Court noted in its Ruling denying defendants' Motion to Dismiss, "the record is devoid of evidence that the governor invoked that authority when ordering the job terminations here." (Ruling at 9, n. 3). Governor Rowland's "Balanced Budget Plan" does not provide the missing evidence.

**F.     VACATION OF THE COURT'S MARCH 10, 2006 ORDER IS EQUITABLY NECESSARY TO AVOID GREAT HARM TO PLAINTIFFS' RIGHTS.**

Prior to defendants' submission of Comptroller Wyman's letter, this Court had recognized, on three separate occasions, the critical need for discovery to go forward at this time. See March 8, 2006 Order ( "further delay is simply too costly because, if the plaintiffs are to prevail, they cannot recover money damages for their lost time, only reinstatement to lost jobs"); see also January 31, 2006 Order Directing the Commencement of Discovery at 2; Ruling at 15.

Defendants now seek to delay discovery for at least another 18 months, while they appeal a fact-based legislative immunity claim to the Second Circuit and to the United States Supreme Court. If the stay entered on March 10, 2006 is not vacated, this case will remain dormant for five years from the events at issue. The harm to plaintiffs' efforts to vindicate their constitutional rights and obtain any meaningful relief is apparent. And the public interest in a prompt determination of whether the conduct challenged by plaintiffs is permissible will also be impaired.

Equally important, unless the Court's March 10, 2006 Order is vacated, it has the potential to unfairly affect the outcome of defendants' interlocutory appeal. The statement in the March 10, 2006 Order statement that defendants have provided "a strong showing" to support their claimed legislative immunity defense should be vacated to avoid any misimpression.

14

## IV.    **CONCLUSION**

For the foregoing reasons, plaintiffs respectfully submit that their Motion for Reconsideration

should be granted, the Court's March 10, 2006 Order should be vacated, and a ruling denying

defendants' Motion for Stay Pending Appeal entered.

PLAINTIFFS STATE EMPLOYEES
BARGAINING AGENT COALITION,
ET AL,


BY_____
    DAVID S. GOLUB  ct 00145
    JONATHAN M. LEVINE ct 07584
    SILVER GOLUB & TEITELL LLP
    184 ATLANTIC STREET
    P.O. BOX 389
    STAMFORD, CONNECTICUT  06904
    TEL.  (203) 325-4491
    FAC.  (203) 325-3759
    dgolub@sgtlaw.com
    jlevine@sgtlaw.com

## <u>CERTIFICATION</u>

This is to certify that a copy of the foregoing has been electronically transmitted and

mailed, postage prepaid,  this 31st day of March, 2006 to:

Albert Zakarian, Esq.
Allan B. Taylor, Esq.
Victoria Woodin Chavey, Esq.
Douglas W. Bartinik, Esq.
Day, Berry & Howard LLP
CityPlace I
Hartford, CT 06103-3499

Ann H. Rubin, Esq.
Carmody and Torrance
50 Leavenworth Street
Waterbury, CT 06721-1110.


DAVID S. GOLUB

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2004 WL 3090598 (E.D.N.Y.)

**(Cite as: 2004 WL 3090598 (E.D.N.Y.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Gregory B. MONACO, etc., et ano., Plaintiffs,
v.
Sharon CARPINELLO, etc., et alia, Defendants.
**No. CV-98-3386(CPS).**

July 22, 2004.

Michelle Marie Buescher, The City of New York Law Department Office of Corporation Counsel, New York, NY, William M. Brooks, Huntington, NY, for Plaintiffs.

Christine E. Morrison, Attorney General of the State of New York, Edward J. Curtis, Attorney General's Office for the State of New York, Kenneth L. Falk, Office of Court Administration, Lisa Fleming Grumet, Corporation Counsel of the City of New York, Erika B. Stein, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, New York, NY, Gary W. Weintraub, Caputi, Weintraub & Neary, Huntington, NY, Derrick J. Robinson, Kelly A. Reape, Suffolk County Attorney's Office, Hauppauge, NY, for Defendants.

MEMORANDUM AND ORDER

SIFTON, Senior J.

*1 Plaintiffs Gregory B. Monaco, on behalf of himself and similarly situated individuals facing civil commitment, and the Mental Disability Law Clinic of Touro Law Center ("the Clinic") bring this class action for declaratory and injunctive relief against the following defendants: Sharon Carpinello, in her official capacity as Acting Commissioner of the New York State Office of Mental Health; Catherine Cahill, in her official

capacity as Justice of the East Hampton Town Justice Court, on behalf of herself and all other local criminal court judges in New York State; Benjamin Chu, in his official capacity as the Director of the New York City Health and Hospitals Corporation; Mark Sedler, in his official capacity as Chairman of the Department of Psychiatry at University Hospital of the State University at Stony Brook; Kenneth Skodnek, in his official capacity as Chairman of Psychiatry at Nassau University Medical Center; Arnold Licht, in his official capacity as Director of the psychiatric unit of Long Island College Hospital; Alfred Tisch, in his official capacity of Sheriff of Suffolk County; and Martin Horn, in his official capacity of Commissioner of the New York City Department of Corrections. [FN1]

> FN1. In a previous decision, this Court dismissed the claims against Licht and granted summary judgment in favor of four other defendants. In their fifth amended complaint, plaintiffs reasserted these claims against these defendants in order to preserve their right to appeal this Court's judgment. *See* 6 WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1476 at 560 (2d ed.1990). All of the defendants except Licht have agreed to dismissal of these claims by stipulation.

Plaintiffs allege violations of the Fourth Amendment, the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. § 1983, as well as state law claims for false imprisonment negligence, and medical malpractice. As amended, the complaint contains two major components: 1) a challenge to the constitutionality of the practices of Cahill, Horn, and Tisch in keeping confined unnecessarily individuals found incompetent to stand trial for minor felonies and misdemeanors and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 3090598 (E.D.N.Y.)

**(Cite as: 2004 WL 3090598 (E.D.N.Y.))**

those awaiting such a determination; 2) a challenge to the constitutionality of the procedures used by Chu, Sedler, Skodnek, and Licht to hospitalize involuntarily individuals deemed mentally ill.

Defendant Sedler has brought three motions. First, Sedler has moved to dismiss the claims asserted against him pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Second, Sedler has moved for dismissal pursuant to Federal Rule of Civil Procedure 9(b) on the ground that plaintiffs have failed to allege averments of fraud and mistake with particularity. Third, Sedler has moved pursuant to Federal Rule of Civil Procedure 12(e) for a more definite statement.

The specific causes of action with regard to Sedler include:
Seventh Cause of Action
....
As a result of physicians at [SUNY Stony Brook] certifying individuals who have been evaluated for civil commitment purposes as dangerous because the physicians believe that such individuals' clinical condition warrants in-patient care and treatment, [defendant Sedler is] responsible for the confinement of nondangerous individuals, which violates the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.
*2 Eighth Cause of Action
....
By failing to examine and employ significant criteria related to the likelihood of causing harm when examining allegedly mentally ill individuals for civil commitment purposes, physicians at [SUNY Stony Brook] make clinical determinations that do not promise some degree of accuracy and such decisions result in the confinement of nondangerous individuals, both of which violate the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.
Ninth Cause of Action
....
By conducting clinical evaluations that frequently do not last more than five or ten minutes when examining allegedly mentally ill individuals for

civil commitment purposes, physicians at [SUNY Stony Brook] make clinical determinations that do not promise some degree of accuracy and such decisions result in the confinement of nondangerous individual [sic], both of which violate the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.
Tenth Cause of Action
....
By failing to apply the statutory criteria of the provisions of the New York Mental Hygiene Law pursuant to which the physicians act, physicians at [SUNY Stony Brook] violate the procedural component of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.
Eleventh Cause of Action
....
The failure of physicians at [SUNY Stony Brook] to use guidelines that inform physicians of the likelihood and magnitude of harm that must exist before a physician certifies a mentally ill person for hospitalization results in the arbitrary exercise of authority by physicians at [SUNY Stony Brook] when they certify an allegedly mentally ill person for involuntary hospitalization, which violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.
Fifth Amended Complaint, ¶¶ 201-10.

For the reasons stated below, Sedler's motion to dismiss is granted with respect to claim for relief number eleven. The motion is denied with respect to the remaining claims. Sedler's motions pursuant to Rule 9 and Rule 12(e) are denied.

*Background*
The following facts are taken from the complaint. For purposes of this motion to dismiss, they are assumed to be true, and all reasonable inferences are made in favor of the plaintiff. *Freedom Holdings, Inc., v. Spitzer*, 357 F.3d 205, 215 (2d Cir.2004).

New York's statutory scheme for committing a defendant found incompetent to stand trial is as follows. After arraignment, a New York State court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 3090598 (E.D.N.Y.)

**(Cite as: 2004 WL 3090598 (E.D.N.Y.))**

must order a psychiatric evaluation if it believes the defendant may be incompetent to stand trial. N.Y. CRIM. PROC. LAW § 730.30(1). A defendant is incompetent to stand trial if by virtue of mental illness or defect he "lacks capacity to understand the proceedings against him or assist in his own defense." § 730.10(1). The competency examination is performed by two court appointed psychiatrists.

*3 When a defendant is determined to be incompetent to stand trial, the court dismisses the indictment and issues an order of observation authorizing care and treatment in a facility operated by the New York State Office of Mental Health ("OMH") for up to ninety days. §§ 730.10, 730.40. Issuance of such an order does not require a finding that the defendant poses a danger to himself or others. In contrast, involuntary commitment of a person not charged with a crime implicates a different statutory scheme and requires a showing of dangerousness by clear and convincing evidence. N.Y. MENTAL HYG. LAW § 9.37(a).

According to the complaint, the statutory scheme subjects those involuntarily committed pursuant to a finding of incompetency to unequal treatment while at the OMH facility. Regulations required a forensics committee to review and approve any application for transfer to a less restrictive setting. N.Y. COMP.CODES R. & REGS. TIT. 14, § 540.3 . Various law enforcement officers and any potential victim of the defendant were required to receive four days notice prior to transferring the defendant to a less-restrictive setting. N.Y. CRIM. PROC. LAW. § 730.60; N.Y. MENTAL HYG. LAW § 29.11(h); 14 N.Y. Comp.Codes R. & Regs. tit. 14, § 540.10.

This procedure was found unconstitutional by a New York court in *Ritter v. Surles,* 144 Misc.2d 945, 545 N.Y.S.2d 962 (N.Y.Sup.Ct.1988). The *Ritter* court held that this impermissibly created two classes of incompetents: those who had been charged with an offense that was ultimately dismissed, and those who had not. The statutes provided greater protection for the latter group by only allowing commitment upon a showing by clear

and convincing evidence that they were dangerous. *Id.* at 965. Once the indictment had been dismissed against the incompetent defendant, however, he should no longer have been subject to the criminal justice system. *Id.*

In light of *Ritter,* the OMH adopted a new policy by which upon receipt of a patient declared incompetent to stand trial, OMH physicians evaluate whether he meets the criteria for civil commitment. By the end of that period, the defendant must either be released or civilly committed. OMH facilities were also no longer required to subject defendants to a forensics committee or provide the former notices prior to transfer to a less-restrictive setting.

Plaintiffs allege that the implementation of these new OMH policies are unlawful in several respects. First, they allege that many OMH doctors conducting the initial 72 hour evaluation decide to commit patients, not because they are dangerous, but because the doctor believes he is in need of treatment. This is caused in part by OMH's failure to properly train physicians to ensure they commit only defendants they believe are dangerous. This is also caused in part by the brevity of the examinations, which often last only five to ten minutes. Second, plaintiffs allege that many OMH facilities still subject defendants to forensics panels or their functional equivalent, thereby delaying transfer.

*4 Defendant Sedler is Chairman of the Department of Psychiatry at University Hospital of the State University of New York at Stony Brook. Stony Brook evaluates patients for OMH during their initial 72 hour screening. Depending on capacity, Stony Brook also confines some defendants deemed dangerous and transfers others to private hospitals.

*Discussion*
*Rule 12(b)(6) Motion*

A complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim. *Freedom Holdings,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2004 WL 3090598 (E.D.N.Y.)

**(Cite as: 2004 WL 3090598 (E.D.N.Y.))**

*Inc.*, 357 F.3d at 216.

*Tenth Claim--Failure to Apply Statutory Standards*

Sedler first argues the Supreme Court's decision in *Pennhurst State School v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) bars plaintiffs' claim. In *Pennhurst*, the Court placed an important limit on the doctrine of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *Ex parte Young* held that, for Eleventh Amendment purposes, a suit challenging the constitutionality of a state official's action is not one against the state. In such a case, the Eleventh Amendment did not bar issuance of an injunction because the unconstitutional act was "void" and therefore did not impart immunity. *Id.* at 160. *Pennhurst* held that the *Young* doctrine does not apply when a plaintiff sues to enjoin an act that violates *state* law , but not federal. The foundation of the *Young* doctrine is the need to ensure the supremacy of federal law. *Pennhurst*, 465 U.S. at 105. The same interest is not implicated when the state official is accused of violating solely state law. *Id.*

Sedler argues that plaintiff's tenth claim for relief seeks to enforce New York's Mental Hygiene Law and is therefore barred by *Pennhurst.* Claim number ten alleges that in making determinations of dangerousness, doctors in OMH facilities do not apply the criteria stated in New York's Mental Hygiene Law.

Plaintiffs argue that New York Mental Hygiene Law § 9.37 creates a constitutionally protected liberty interest in avoiding unwanted government interference. That provision allows involuntary commitment of patients who are likely to result in serious harm to himself or others. "Likelihood of serious harm" is defined by statute as:
1. substantial risk of physical harm to himself as manifested by threats or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or
2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

N.Y. MENTAL HYG. LAW § 9.37.

Relying on *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), plaintiffs argue that these statutory provisions create a justified expectation that they will not be involuntarily committed without a doctor making the finding of "substantial risk of harm" required by the statute. In *Hewitt v. Helms*, the Court held that a state law can create a protected liberty interest where the statute is couched in "language of an unmistakably mandatory character" and bases deprivation on "specified substantive predicates." 459 U.S. at 471-72. Plaintiffs argue that New York state law mandates that, in determining dangerousness, doctors make the factual findings identified in § 9.37 .

*5 I therefore consider whether § 9.37 creates a liberty interest in having the examining psychiatrist follow the procedures outlined in the statute in determining the patient's dangerousness. A statutorily created liberty interest protected by the Due Process Clause can arise when 1) the statute contains particularized substantive criteria to guide state officials; and 2) the statute uses mandatory as opposed to discretionary language in describing the limits the standards have on the official's conduct. *See Hewitt*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675; *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981); *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

Section 9.37 contains particularized substantive criteria to guide a physician's decision to commit a patient. Involuntary hospitalization cannot occur unless the patient poses a likeliness of serious harm. § 9.37. A determination of likeliness of serious harm should be made on a basis of threats of suicide or other harm to self as well as homicidal or other violent behavior.

The statute is mandatory. A patient cannot be involuntarily hospitalized pursuant to § 9.37 unless the evaluating psychiatrist identifies the facts and circumstances upon which he bases the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 5

Not Reported in F.Supp.2d, 2004 WL 3090598 (E.D.N.Y.)

**(Cite as: 2004 WL 3090598 (E.D.N.Y.))**

determination that the patient is dangerous. *See Matter of Nancy H.*, 177 Misc.2d 30, 675 N.Y.S.2d 774 (N.Y.Sup.Ct.1998). Failure to follow those procedures requires the patient's release. *Id.* Plaintiffs therefore have a justified expectation that this mandatory procedure will be followed and that the statutory definition will be applied before they will be deprived of a protected liberty interest.

A judge of the Middle District of Georgia reached a similar conclusion in *Heidelbach v. Evans*, 798 F.Supp. 708 (M.D.Ga.1992). Georgia law provided mandatory procedures for involuntary hospitalization. *Id.* at 712. These mandatory procedures produced a protected liberty interest. *Id.* The state's failure to comply with those mandatory procedures provided the foundation for the plaintiff's § 1983 claim.

Sedler argues that *Heidelbach* is distinguishable because in the present case plaintiffs have not alleged that OMH doctors do not, at least nominally, follow the procedures outlined by New York law. Sedler argues that instead of alleging that doctors do not actually certify patients as posing a likelihood of serious harm, plaintiffs have alleged that doctors fraudulently certify patients that are not dangerous. This claim, Sedler argues, is a violation of state law, not federal law.

Sedler's proposed distinction is unpersuasive because the violation of state law alleged in *Heidelbach* and the present case are also violations of federal law. *See id.* at 712. State law requires physicians to make findings of dangerousness prior to involuntarily committing patients. The existence of this mandatory state law protecting patients from commitment absent the requisite findings and procedures produces liberty interests protected by federal law. Because plaintiffs seek to vindicate this federally protected liberty interest, the claim for relief therefore sounds in federal law.

*Ninth Claim--Length of Interview*

\*6 Sedler next argues that plaintiffs' ninth claim for relief should be dismissed. Claim nine alleges that OMH facilities frequently conduct dangerousness

evaluations that last no more than five or ten minutes. This, plaintiffs argue, fails to promise a reasonable degree of accuracy as required by the Court of Appeals in *Rodriguez v. City of New York*, 72 F.3d 1051 (2d Cir.1995). In *Rodriguez*, the court stated that due process required that a decision to involuntarily commit someone must be conducted "in a accordance with a standard that promises some reasonable degree of certainty." *Id.* at 1062.

Sedler argues that the Court of Appeals found a five minute interview did not violate due process in *Kulak v. City of New York*, 88 F.3d 63 (2d Cir.1996) . The *Kulak* court did not reach the issue of whether Kulak's interview satisfied due process. The court dismissed the claim on grounds of collateral estoppel. *Id.* at 71-73.

Due process for an involuntary commitment requires a psychiatrist's determination of dangerousness be exercised based on criteria that "are not substantially below the standards generally accepted in the medical community." *Katzman v. Khan*, 67 F.Supp.2d 103, 109-10 (E.D.N.Y.1999) (quoting *Rodriguez*, 72 F.3d at 1062). Whether a five minute interview is generally accepted in the medical community prior to involuntary committing a patient is an issue upon which plaintiffs are entitled to present evidence. *See id.*

*Eleventh Claim--Lack of Guidelines*

In their eleventh claim for relief, plaintiffs state that Stony Brook does not use "guidelines that inform physicians of the likelihood and magnitude of harm that must exist before a physician certifies a mentally ill person for hospitalization" and that this "results in the arbitrary exercise of authority by physicians." Sedler argues that this claim should be dismissed because the complaint does not allege that such guidelines are generally accepted in the medical community.

Plaintiffs argue that guidelines are necessary because the statutory definition of "likelihood of serious harm" is impermissibly vague, thereby allowing individual physicians to impose their personal values when determining whether the risk

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6

Not Reported in F.Supp.2d, 2004 WL 3090598 (E.D.N.Y.)

**(Cite as: 2004 WL 3090598 (E.D.N.Y.))**

posed by a particular patient is substantial enough to justify the loss of liberty from involuntary hospitalization. Relying on cases applying the void-for-vagueness doctrine, plaintiffs contend that in the absence of more extensive guidance, the application of the statutory standard will vary depending on what value particular physicians place on a patient's liberty when balancing it against the substantiality of the risk of harm.

The Supreme Court in *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), struck down a vagrancy ordinance as excessively vague because, in the absences of more explicit standards, it provided law enforcement officers an opportunity for arbitrary enforcement. Plaintiffs argue that, in the absence of guidelines, the involuntary hospitalization standard provided by New York law creates similar opportunities for arbitrary commitments. While the vagueness doctrine is usually employed in challenges to criminal statutes, it has also been applied to civil confinement statutes. *See, e.g., Stamus v. Leonhardt*, 414 F.Supp. 439 (S.D.Iowa 1976).

*7 Plaintiffs acknowledge that a Washington and an Arizona state court have rejected similar void for vagueness challenges to similar criteria in their state's involuntary commitment statutes. *See In re LaBelle*, 107 Wash.2d 196, 728 P.2d 138 (Wash.1986); *In the Matter of Maricopa County Cause No. MH-90- 00566*, 173 Ariz. 177, 840 P.2d 1042 (Ct.App.Ariz.1992) [hereinafter *"Maricopa County"*]. The statutory scheme for commitment in *In re LaBelle* also allowed for hospitalization when, as a result of mental disorder, the patient was "in danger of serious physical harm resulting from a failure to provide for his essential human needs of health or safety." 7 Cal.Rptr.2d 238, 828 P.2d at 143 . Similar to the New York statutory scheme, the court required that the risk of danger be substantial and the harm be serious. *Id.* at 144.

The *LaBelle* court then addressed the argument that plaintiffs now present: whether there is a danger that doctors may commit patients solely because they might benefit from treatment and not because

they pose a substantial enough danger. *Id.* at 144. The court construed the statute to require the state to present "recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm in the near future." *Id.* at 144.

The patient in *Maricopa County* was committed by court order. The Arizona statute allowed for commitment when the court found that the patient was "persistently or acutely disabled." 840 P.2d at 1048. To be "persistently or acutely disabled," the patient must have a mental disorder that presented a substantial probability that "the patient will suffer some danger of harm if the condition is not treated." *Id.* The court rejected a vagueness challenge to this statute and noted that due to the difficulty in precisely define the elements that lead to the finding of mental illness, the precision required in mental health statutes is not equal to that required in criminal statutes. *Id.* at 1050.

Plaintiffs attempt to avoid the impact of these cases by, somewhat confusingly, characterizing the eleventh claim for relief as "differing from traditional void for vagueness challenges" in that this claim for relief presents "an 'as applied' challenge to the manner in which physicians enforce" the constitutional standards and not a facial challenge to the statute. [FN2] Plaintiffs do not cite any authority for applying the void for vagueness doctrine outside the scope of facial challenges.

> FN2. It should also be noted that the Court of Appeals has upheld the constitutionality of New York's commitment statutes against other constitutional challenges. *See Woe by Woe v. Cuomo*, 729 F.2d 96 (2d Cir.1984); *Project Release v. Prevost*, 722 F.2d 960 (2d Cir.1983).

Either plaintiffs allege that the failure of the statutory scheme to require guidelines provides physicians with too much discretion, in which case the challenge is to the statute on the grounds of vagueness, or plaintiffs allege that the statute is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 7

Not Reported in F.Supp.2d, 2004 WL 3090598 (E.D.N.Y.)

**(Cite as: 2004 WL 3090598 (E.D.N.Y.))**

acceptable and is merely being applied in a manner that violates the Constitution. Plaintiffs have abandoned the first option and adopted the second, arguing that physicians are applying the New York law impermissibly.

*8 Plaintiff's construction of claim for relief number eleven renders it substantially duplicative of plaintiffs' eighth claim for relief. Claim number eight alleges that Stony Brook physicians commit patients without employing "significant criteria related to the likelihood of causing harm." Both claims allege that the failure to employ additional criteria beyond those listed in the statute violate plaintiffs' due process rights. Because the claim is duplicative, claim for relief number eleven is dismissed. *See Scientech, Inc. v. Metro-North R.R.,* 01-CV-8210, 2002 WL 1813854 (S.D.N.Y. Aug.7, 2002); Neiberger v. Hawkins, 208 F.R.D. 301 (D.Colo.2002) (dismissing duplicative claims).

*Eighth Claim--Failure to Employ Criteria Related to Likelihood of Harm*

Claim for relief number eight alleges that physicians at Stony Brook fail to use significant criteria relating to the likelihood of causing harm when committing patients. This failure results in clinical determinations that do not promise "some degree of accuracy" and results in the commitment of non-dangerous individuals.

Sedler argues that this fails to state a claim for relief because the Second Circuit has not held that OMH facilities must employ a specific list of criteria when committing patients.

Although Sedler is correct that the Court of Appeals has not held as a matter of law that due process requires a specific list of criteria when committing patients, it has held that such determinations must be made in accordance with "a standard that promises some reasonable degree of accuracy." *Rodriguez,* 72 F.3d 1062. That standard must not fall substantially below that which is generally accepted in the medical community. *See Katzman,* 67 F.Supp.2d at 109-10. The question of whether a particular practice in committing patients

falls below this standard is one of fact, upon which plaintiffs are entitled to present evidence. *Rodriguez,* 72 F.3d at 1063.

Accordingly, Sedler's request to dismiss count eight is denied.

*Seventh Claim--Whether Stony Brook Doctors Commit Patients They Believe Are Not Dangerous*

Plaintiffs' seventh claim for relief alleges that Stony Brook doctors commit patients because the doctor feels the patient's "clinical condition" warrants treatment, even though the doctor believes that the patient is not dangerous.

Sedler misconstrues the allegations in the seventh claim for relief. Sedler argues that plaintiffs complaint alleges that Stony Brook doctors are not permitted to determine patients' "clinical condition." Accordingly, Sedler argues that there is no prohibition on a doctor determining a patient's "clinical condition" in addition to determining his dangerousness.

Plaintiffs have not alleged that a determination of "clinical condition" in addition to a determination of dangerousness violates their rights. Instead, plaintiffs allege that Stony Brook doctors are committing patients who have never been determined to be dangerous. Sedler's motion to dismiss claim number seven is therefore denied.

*Rule 9 Motion*

*9 Federal Rule of Civil Procedure 9(b) requires that "[i]n all 'averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Sedler argues that plaintiffs complaint alleges that Stony Brook doctors fraudulently certify patients as dangerous, and plaintiffs should therefore plead with greater particularity. Sedler cites to no case where Rule 9 has been applied to a similar § 1983 claims.

Because the special pleading requirement of Rule 9(b) is contrary to the simplified pleading standard adopted by the Federal Rules, courts have construed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 8

Not Reported in F.Supp.2d, 2004 WL 3090598 (E.D.N.Y.)

**(Cite as: 2004 WL 3090598 (E.D.N.Y.))**

it narrowly and not extended it to other legal theories. 5 WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE, § 1297 at 615; *see Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Under New York law, the elements of fraud are: 1) a representation of fact; 2) which is either untrue and known to be untrue or recklessly made; 3) offered to deceive and to induce the plaintiff to act upon it; 4) which is justifiably relied on by the plaintiff; 5) causing injury to the plaintiff. *Tanzman v. LaPietra,* 8 A.D.3d 706, 778 N.Y.S.2d 199 (N.Y.App.Div.2004); *Cirillo v. Slomin's, Inc.,* 196 Misc.2d 922, 768 N.Y.S.2d 759 (N.Y.Sup.Ct.2003). Liability for fraud extends only to the parties that the defendant intends or has reason to expect to act in reliance on his statement. Restatement (Second) of Torts § 531 (1977); 2 Harper et al., The Law of Torts § 7.2 (1986).

The complaint does not allege fraud. Plaintiffs have not alleged that the dangerousness findings of Stony Brook physicians were offered to deceive them or that they relied on these representations. Instead, plaintiffs have alleged that the fraudulent representation was made to the hospital and to the courts reviewing patients' commitments. Therefore Rule 9(b) is inapplicable.

*Rule 12(e) Motion for a More Definite Statement*

Sedler moves pursuant to Federal Rule of Civil Procedure 12(e) for a more definite statement. Rule 12(e) allows for an order requiring a more definite statement when the pleading is so vague that the opposing party cannot reasonably be required to respond. Sedler suggests that plaintiffs should be required to identify which physicians at Stony Brook have engaged in the actions of which they complain.

Whether to grant a motion for a more definite statement is in the discretion of the court. 5A Wright et al., at § 1377. For a more definite statement to be warranted, the complaint must be "so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant

seriously in attempting to answer it." *Kok v. First Unum Life Ins. Co.,* 154 F.Supp.2d 777, 781-82 (S.D.N.Y.2001). When a complaint satisfies Rule 8, then the Rule 12(e) motion should be denied. *Vapac Music Publ'g, Inc. v. Tuff'N'Rumble Mgmt.,* 99-CV-10656, 2000 WL 1006257, *6 (S.D.N.Y. July 19, 2000). Federal Rule of Civil Procedure 8 merely requires "a short and plain statement of the claim." The preferred course is to encourage the use of discovery to inform the defendant of the factual basis of the complaint. *Greater New York Auto. Dealers Ass'n v. Environmental Systems Testing, Inc.,* 211 F.R.D. 71, 77 (E.D.N.Y.2002).

**\*10** I conclude that the complaint complies with Rule 8(a). Plaintiffs have provided Sedler with a complaint spanning fifty-eight pages. It is clear from the complaint that plaintiffs allege a pattern of diagnosis that do not meet the minimal requirements of New York or provide a sufficient guarantee of accuracy as required by federal law. This results in the illegal confinement of non-dangerous individuals. Sedler will undoubtedly require more information concerning plaintiffs' allegations, but he will have to obtain those details via discovery. The motion for a more definite statement is therefore denied.

*Conclusion*

For the reasons stated, Sedler's motion to dismiss is granted with respect to claim for relief number eleven. The motion is denied with respect to the remaining claims. Sedler's motions pursuant to Rule 9 and Rule 12(e) are denied.

The Clerk is directed to furnish a filed copy of the within to all parties and to the magistrate judge.

SO ORDERED.

Not Reported in F.Supp.2d, 2004 WL 3090598 (E.D.N.Y.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.