LEXSEE 2007 U.S. APP. LEXIS 20213


Analysis
As of: Sep 14, 2007

CORVET CURLEY; ELAINE CURLEY v. RONALD KLEM, a Police Officer, SUED IN HIS INDIVIDUAL CAPACITY; JOHN DOE; BILL DOE, two currently unknown Police Officers also sued in their individual capacities Corvet Curley, Appellant

No. 05-4701

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

2007 U.S. App. LEXIS 20213

March 27, 2007, Argued
August 24, 2007, Filed

**PRIOR HISTORY:** [*1]
On Appeal from the United States District Court for the District of New Jersey. (D.C. No. 98-cv-05256). District Judge: Honorable Katharine S. Hayden.
*Curley v. Klem*, 2006 U.S. Dist. LEXIS 8606 (D.N.J., Feb. 21, 2006)

**LexisNexis(R) Headnotes**

*Civil Rights Law > Section 1983 Actions > Law Enforcement Officials > Excessive Force*
[HN1] To state a claim for excessive force as an unreasonable seizure under the *Fourth Amendment*, a plaintiff must show that a seizure occurred and that it was unreasonable. There is no question that a shooting constitutes a seizure under the *Fourth Amendment*. In such a case, the question that remains is whether the shooting was reasonable.

*Civil Procedure > Trials > Judgment as Matter of Law > General Overview*
*Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
*Civil Procedure > Appeals > Standards of Review > Fact & Law Issues*
[HN2] The standard of review for a motion for judgment as a matter of law is plenary. The standard of review on a motion for a new trial is abuse of discretion unless the court's denial of the motion is based on application of a legal precept, in which case the appellate court's review is plenary.

*Civil Rights Law > Section 1983 Actions > Elements > General Overview*
[HN3] *42 U.S.C.S. § 1983* provides a cause of action for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law.

*Civil Rights Law > Immunity From Liability > Defenses*
*Civil Rights Law > Section 1983 Actions > Law Enforcement Officials > General Overview*
[HN4] Police officers, embodying the authority of the state, are liable under *42 U.S.C.S. § 1983* when they violate someone's constitutional rights, unless they are protected by qualified immunity. Qualified immunity is the best attainable accommodation of competing values. Since public officials exercising discretionary powers may sometimes abuse their discretion, the immunity is qualified, rather than absolute, so that civil damages can serve as a restraint. At the same time, the immunity incorporates a recognition that claims frequently run against the innocent as well as the guilty--at a cost not only to the defendant officials, but to society as a whole.

While unproductive societal costs may be unavoidable in a system that relies on private litigation as one means to enforce our constitutional norms, the aim of qualified immunity is to limit those costs to the greatest practical degree. This immunity is broad in scope and protects all but the plainly incompetent or those who knowingly violate the law.

*Civil Rights Law > Immunity From Liability > Defenses*
*Civil Rights Law > Section 1983 Actions > Law Enforcement Officials > General Overview*
[HN5] In Saucier, the U.S. Supreme Court articulated a two step test for determining whether a government official, such as a police officer, is entitled to qualified immunity. In the first step, a court must address whether the officer's conduct violated a constitutional right. If, and only if, the court finds a violation of a constitutional right, the court moves to the second step of the analysis and asks whether immunity should nevertheless shield the officer from liability.

*Civil Rights Law > Immunity From Liability > Defenses*
*Civil Rights Law > Section 1983 Actions > Law Enforcement Officials > Excessive Force*
[HN6] In an excessive force case, whether there is a constitutional violation is properly analyzed under the *Fourth Amendment's* objective reasonableness standard. The relevant inquiry is the reasonableness of the officer's belief as to the appropriate level of force, which should be judged from the officer's on-scene perspective, and not in the 20/20 vision of hindsight. That reasonableness inquiry requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. The analysis requires a careful balancing of the nature and quality of the intrusion on the individual's *Fourth Amendment* interests against the countervailing governmental interests at stake. The balancing must be conducted in light of the facts that were available to the officer. It is, in other words, a totality of the circumstances analysis.

*Civil Rights Law > Immunity From Liability > Defenses*
*Civil Rights Law > Section 1983 Actions > Law Enforcement Officials > Excessive Force*
[HN7] In examining whether a law officer is protected by qualified immunity, if, and only if, the court first finds a violation of a constitutional right, the court moves to the second step of the analysis and asks whether immunity should nevertheless shield the officer from liability. The question at this second step is whether the right that was violated was clearly established, or, in other words, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. Even where reasonableness is a part of the inquiry for both the constitutional question and for qualified immunity, as it is in an excessive force case, the inquiries remain distinct. The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.

*Civil Rights Law > Immunity From Liability > Defenses*
*Civil Rights Law > Section 1983 Actions > Law Enforcement Officials > Excessive Force*
[HN8] In examining whether a law officer is protected by qualified immunity in an alleged excessive force case, the first step of the analysis addresses whether the force used by the officer was excessive, and therefore violative of the plaintiff's constitutional rights, or whether it was reasonable in light of the facts and circumstances available to the officer at the time. This is not a question of immunity at all, but is instead the underlying question of whether there is even a wrong to be addressed in an analysis of immunity. The second step is the immunity analysis and addresses whether, if there was a wrong, such as the use of excessive force, the officer made a reasonable mistake about the legal constraints on his actions and should therefore be protected against suit.

*Civil Rights Law > Immunity From Liability > Defenses*
[HN9] While the U.S. Supreme Court's analytical approach to qualified immunity in Saucier has been criticized for being unduly rigid and demanding resolution of constitutional issues when cases could be more simply disposed of on other grounds, its order of inquiry nevertheless remains mandatory.

*Civil Rights Law > Immunity From Liability > Defenses*
[HN10] The point of immunity is to protect someone from the burden imposed by litigation itself. It is supposed to be an immunity from suit rather than a mere defense to liability. Hence, the U.S. Supreme Court has instructed that immunity ordinarily should be decided by the court long before trial. That is well and good when

there are no factual issues in a case, but often the facts are intensely disputed, and Third Circuit precedent makes clear that such disputes must be resolved by a jury after a trial. As a practical matter, then, in such cases the immunity becomes no more than a mere defense, and a sometimes challenging one to establish at that.

*Governments > Courts > Dicta*
*Governments > Courts > Judicial Precedents*
[HN11] While it is the tradition of the United States Court of Appeals for the Third Circuit that the holding of a panel in a precedential opinion is binding on subsequent panels, 3rd Cir. Internal Operating P. 9.1, it is also well established that the court is not bound by dictum in an earlier opinion.

*Civil Procedure > Appeals > Standards of Review > Fact & Law Issues*
*Civil Rights Law > Immunity From Liability > Defenses*
*Civil Rights Law > Section 1983 Actions > Law Enforcement Officials > General Overview*
[HN12] The United States Court of Appeals for the Third Circuit holds that whether a law enforcement officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury. When a district court submits that question of law to a jury, it commits reversible error.

*Civil Procedure > Appeals > Standards of Review > Fact & Law Issues*
*Civil Rights Law > Immunity From Liability > Defenses*
*Civil Rights Law > Section 1983 Actions > Law Enforcement Officials > General Overview*
[HN13] The second step in the U.S. Supreme Court's Saucier analysis, i.e., whether a law enforcement officer made a reasonable mistake about the legal constraints on police action and is entitled to qualified immunity, is a question of law that is exclusively for the court. When the ultimate question of the objective reasonableness of an officer's behavior involves tightly intertwined issues of fact and law, it may be permissible to utilize a jury in an advisory capacity, but responsibility for answering that ultimate question remains with the court.

*Civil Rights Law > Immunity From Liability > Defenses*
*Civil Rights Law > Immunity From Liability > Local Officials > Individual Capacity*
[HN14] In a qualified immunity analysis, fundamental fairness dictates a totality-of-the-circumstances review, since the test for reasonableness is not capable of precise definition or mechanical application. It depends on all of the chaotic details that emerge in real time in real life.

*Civil Procedure > Trials > Judgment as Matter of Law > General Overview*
[HN15] On a motion for judgment as a matter of law under *Fed. R. Civ. P. 50(a)*, evidence must be viewed in the light most favorable to the nonmoving party.

*Civil Procedure > Appeals > Standards of Review > Harmless & Invited Errors > Harmless Error Rule*
[HN16] An error is harmless where it is highly probable that the error did not affect the outcome of the case.

**COUNSEL:** David S. Gould [ARGUED], Steven L. Salzman, Richard L. Huffman, David S. Gould, P.C., New York, NY, Counsel for Appellant.

Jeffrey M. Kadish, Esq. [ARGUED], Morgan Melhuish Abrutyn, Livingston, NJ, Counsel for Appellees.

**JUDGES:** Before: FISHER, JORDAN and ROTH, Circuit Judges. ROTH, Circuit Judge, dissenting.

**OPINION BY:** JORDAN

**OPINION**

OPINION OF THE COURT

JORDAN, *Circuit Judge*.

This civil rights suit, after a long and difficult history, is before us for the second time. Plaintiff Corvet Curley ("Curley"), an officer with the Port Authority of New York and New Jersey, and his wife, Elaine, sued defendant Ronald Klem ("Klem"), a New Jersey State Trooper, under *42 U.S.C. § 1983*, alleging that Klem violated Curley's constitutional rights by shooting him while both Curley and Klem were responding to a police emergency at the George Washington Bridge. The Curleys appeal from a judgment order of the United States District Court for the District of New Jersey, entered after a jury trial. The jury made various findings of fact through special interrogatories, and stated by a [*2] verdict sheet its conclusion that Trooper Klem had not acted unreasonably under the circumstances. Based on those findings, the District Court entered judgment in favor of Klem on the basis of qualified immunity. For the reasons that follow, we will affirm, albeit on different grounds.

I.

A. Factual Background

On the evening of November 20, 1997, at approximately 8:45 p.m., Trooper Klem was on duty and learned that a suspect, Deon Bailey ("Bailey"), had shot and killed a Long Branch police officer and stolen a police car. A follow-up radio transmission informed Klem that Bailey was on the Garden State Parkway and had fired shots at a another police car. Shortly after 9:00 p.m., Klem received another transmission, this one saying that Bailey was now in a green Toyota Camry he had stolen from a woman at a gas station. A few minutes later, a further radio transmission described Bailey as a "tall, black male" [1] and [*3] stated that he was headed north in the Camry on the New Jersey Turnpike. Klem and several other troopers found Bailey on the Turnpike and began chasing him, while Bailey shot at them. One of the troopers in the chase was shot in the arm, and Klem's windshield was struck by a bullet.

> 1  At the summary judgment stage of the case, Klem claimed that the radio transmission described Bailey as a "thin, black male" rather than a "tall, black male." See Curley v. Klem, 298 F.3d 271, 274 (3d Cir. 2002) ("Curley I"). However, at trial, Klem stated that the transmission had described the suspect as a "tall black male" and that he had misheard it as "thin black male."

During the chase, Klem ended up as the nearest trooper behind Bailey. He followed Bailey to the toll plaza at the George Washington Bridge, where, according to his testimony, he briefly lost sight of the Camry. He then saw the Camry stopped on the far left side of the plaza. Klem stopped his car about thirty yards back, and approached the Camry at a jog. He testified that he was unaware of any other police officers on the scene at that time, and that he did not wait for back-up.

Klem did not know that Bailey, upon arriving at the toll [*4] plaza, had crashed the Camry at high speed into a Nissan Pathfinder that was waiting in a toll lane. The crash sent the Pathfinder spinning out into the toll plaza some thirty feet from where the Camry had stopped. Immediately after the crash, Bailey shot himself in the head. According to a toll booth attendant and another law enforcement officer, Bailey was sprawled across the passenger seat of the Camry. The toll booth attendant stated that he had no trouble seeing the body. That same attendant next saw the two principal parties in this dispute, Curley and Klem, approaching the ill-fated scene.

Curley was on duty that evening at the bridge. He was in his Port Authority police uniform, although not wearing his hat. He too had received a radio transmission stating that a black male in a stolen vehicle was being pursued by the New Jersey State Police, and was heading toward the bridge. By now it was nearing 9:30 p.m. Curley went to the New York side of the toll plaza in his marked police car, with both the lights and sirens on. After reaching the plaza, he turned his sirens off but left the lights on. He then saw a vehicle, which he later learned was the stolen Camry, headed toward the [*5] toll plaza at a high rate of speed, and he heard it crash into the Pathfinder.

Curley drove his car toward the Pathfinder and stopped next to it. He looked over at the Camry, but had trouble seeing inside of it because the front end was smashed. He unholstered his gun, told the driver of the Pathfinder to stay in his vehicle, and moved toward the Camry. Curley testified that, at this point, he had his gun pointed toward the Camry. Realizing that he did not have cover, Curley pointed his gun at the ground, turned and began to move back toward his own car.

At approximately the same time that Curley was investigating the scene, Klem approached the back of the Camry with a shotgun in hand. He saw a toll collector pointing toward the center of the toll plaza. Klem testified that he had not heard any shots, and that all of the doors on the Camry were closed. Klem approached the Camry from the back right, and stopped by the right front passenger door, close enough to the Camry to be able to touch it. He testified that, as he approached the Camry, he looked into the rear seat of the vehicle and into the front seat of the vehicle; he testified that the air bags had deployed, and that the interior [*6] of the Camry was filled with dust from the air bags. Klem stated that, at that time, he did not see a body in the Camry and did not see blood on the air bags or seat.

Klem turned in the direction that the toll collector had been pointing and saw a black male with a gun in his hand. According to Klem, the man had both hands on the gun and was pointing it directly at him. Klem testified that he shouted three times for the man with the gun, who was, in reality, Curley, to drop his gun. He also testified that Curley raised and lowered his gun to point at Klem three times while backpedaling away from Klem. Klem hesitated briefly, then fired his shotgun, [2] hitting Curley in the leg. Immediately after he fired, someone screamed to him that he had just shot a cop. Klem then looked into the Camry and saw Bailey's body. Klem testified that, had he earlier seen the body in the Camry, he never would have shot Curley. [3] Curley testified that he never saw Klem and that he never heard anyone tell him to drop his gun.

> 2  At his deposition, Klem testified that about thirty seconds passed between the time he first saw Curley and the time he fired his shotgun. At

trial, he testified that only ten to fifteen [*7] seconds had passed.

3   It is undisputed that Bailey had been alone, and that Klem knew that.

B. Procedural Background

Curley filed suit under *42 U.S.C. § 1983*, alleging that Klem used excessive force against him, in violation of the *Fourth Amendment*. 4 Curley's wife joined in the complaint, alleging loss of consortium. After discovery, the District Court granted summary judgment in favor of Klem. It held that Klem's conduct was objectively reasonable and that he was thus shielded by qualified immunity. *See Curley I, 298 F.3d at 276* (recounting procedural history). Curley appealed, and we reversed the summary judgment. *See id. at 273-74*. In that opinion, we analyzed both the question of whether Klem's conduct had violated Curley's constitutional rights, and whether Klem was entitled to qualified immunity. We did so recognizing--indeed we reiterated it no less than four times in different ways--that, because we were reviewing a decision on a summary judgment motion, we were required to take the facts as Curley, the nonmovant, had alleged them and to view every fact and inference in the light most favorable to Curley. *See id. at 276-77; 279-80; 282-83*. Given that procedural perspective, [*8] we determined that Klem's actions would constitute an unreasonable seizure. *Id. at 280*.

4   [HN1] "To state a claim for excessive force as an unreasonable seizure under the *Fourth Amendment*, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999)* (citing *Brower v. County of Inyo, 489 U.S. 593, 599, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989))*. An officer seizes a person whenever he "restrains the freedom of a person to walk away[.]" *Tennessee v. Garner, 471 U.S. 1, 7, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)*. Thus, there is "no question" that a shooting constitutes a seizure under the *Fourth Amendment. Id.* ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the *Fourth Amendment*."). The question that remains is whether the shooting was reasonable.

Next, we decided that, in the District Court's qualified immunity analysis, the Court had not recognized factual disputes that precluded a grant of summary judgment. *Id. at 281*. Specifically, we noted that a number of facts, including whether Klem looked inside the Camry and how Curley behaved during the confrontation between him and Klem, were disputed and required resolution [*9] by a jury. *Id. at 281-83*. Thus, we remanded the case to the District Court for resolution of the disputed facts by a jury. *Id. at 283*.

On remand, the District Court held a jury trial and submitted both special interrogatories and a liability verdict sheet to the jury. In answer to the special interrogatories, the jury found that, when Klem approached the Camry, Bailey's body was on the front seat of the car, not on the floorboards, and that Klem did not look into the window of the car. Furthermore, the jury found that Bailey's body should have been visible to someone standing in Klem's position but that Klem had not made an objectively reasonable effort to look into the Camry. The jury also found that it was objectively reasonable for Klem to believe that the toll collector was signaling to the center of the plaza. Additionally, the jury found that Curley did not repeatedly point his gun at Klem, and that, when Curley was shot, he was not raising his gun to point it at Klem. Finally, the jury could not reach a unanimous decision and so did not answer whether Curley's police uniform was visible to someone in Klem's position or whether it was reasonable for Klem to believe that Curley [*10] was in civilian clothing.

In addition to the special interrogatories, the District Court submitted to the jury a liability verdict sheet asking whether Klem's conduct was objectively reasonable. *See Curley v. Klem, 2006 U.S. Dist. LEXIS 8606, 2006 WL 414093, at *2 (D.N.J. Feb. 21, 2006) ("Post-trial Opinion")*. More precisely, the liability verdict sheet contained four questions, three of which the jury answered. Question One asked the jury whether "Trooper Ron Klem's failure to act in an objectively reasonable manner in observing the Camry prevent[ed] him from seeing the perpetrator's body in the Camry?" Question Two asked "Did Trooper Ron Klem act in an objectively reasonable manner in shooting Officer Curley during the confrontation?" Question Three asked "Was Trooper Ron Klem's mistake in firing his weapon objectively reasonable?" The fourth question, left unanswered by the jury, asked whether "the plaintiff suffer[ed] damages that were proximately caused by Trooper Ron Klem's conduct?"

The jury answered yes to Question One, thus finding that Klem's failure to look in the Camry was not objectively reasonable. However, the jury also found, in response to Question Two, that Klem did act in an objectively reasonable [*11] manner during the confrontation with Curley. Finally, in response to Question Three, the jury found that Klem's mistake in firing his weapon was objectively reasonable. Based on these findings, and with no separate analysis, the District Court entered judgment for Klem, stating that Klem was entitled to qualified immunity based on the jury's answer to Question Three, and also noting the jury's answer to Question Two.

Curley moved for judgment as a matter of law or a new trial.[5] In its opinion addressing those post-trial motions, the District Court stated that the parties had agreed early in the case "that the jury would decide the issue of qualified immunity, and not the Court." *2006 U.S. Dist. LEXIS 8606, [WL] at \*4*. On appeal, however, Curley points to several places in the record where he objected to the inclusion of Question Three on the liability verdict sheet and where he argued that a determination of qualified immunity was a question of law for the Court, not the jury. *See* Joint Appendix at A125 ("A jury can contribute fact finding to a qualified immunity question but not law finding"); Trial Transcript at T113 ("[Counsel for Klem] wants the jury to decide objectionable [sic] reasonableness and then to [*12] decide whether there was a violation of the state of the law. Which you called the second prong on qualified immunity. And what is very clear is that no case ever did or could submit that to the jury."). Whether the District Court misunderstood Curley's position or Curley failed to make it clear during the framing of the special interrogatories and the verdict sheet, the objective reasonableness of Klem's actions was put to the jury.

> 5   For purposes of the following discussion, when we speak of Officer Curley taking certain legal positions, it should be understood that his wife and co-plaintiff has also taken those positions.

In support of his post-trial motions, Curley argued that the jury's general liability verdict was not supported by the facts the jury had found in the special interrogatories and that the verdict should therefore be overridden. He also argued that the verdict could not stand because it was internally inconsistent, since it faulted Klem's action in not looking in the Camry and yet stated that Klem's behavior, including the mistaken shooting, was reasonable. The District Court found that the jury's verdict was not inconsistent, and that the facts found by the jury [*13] in the special interrogatories did not warrant overturning the jury's verdict for Klem. *Post-trial Opinion, 2006 U.S. Dist. LEXIS 8606, 2006 WL 414093, at \*2-5*.

The District Court reasoned that Curley was attempting to reduce the case "down to a handful of seconds in the continuum of events." *2006 U.S. Dist. LEXIS 8606, [WL] at \*2*. Rejecting that effort, the District Court found that the relevant events spanned a lengthy period, beginning at the time that Klem received the first radio transmission about Bailey. *Id.* Thus, the Court stated, although

> those seconds discussed by the Third Circuit are important, still they were singled out not because they were "the case," but because this [District] Court erroneously saw them as unfolding only one way. That the jury decided otherwise, that it viewed some of the preshooting events contrary to Trooper Klem's account, does not necessarily drive a determination that he acted unreasonably when he mistakenly shot Officer Curley.

*Id.* The District Court therefore found that there was no inconsistency or tension between the jury's answers to the Special Interrogatories and its answers on the Liability Verdict Sheet. *Id.* Characterizing Questions One and Two as "General Liability" questions, the District [*14] Court held that those questions did not present alternative theories of liability. *2006 U.S. Dist. LEXIS 8606, [WL] at \*5*. The Court also held that the jury had decided in Question Three that Klem was entitled to qualified immunity. *2006 U.S. Dist. LEXIS 8606, [WL] at \*3-5*. Accordingly, the Court denied Curley's motion for judgment as a matter of law or a new trial. *2006 U.S. Dist. LEXIS 8606, [WL] at \*5*.

Curley then filed this appeal. He raises five questions, some of which are conceptually overlapping: (1) Whether the District Court erred in putting to the jury the question of the objective reasonableness of Klem's mistake in shooting Curley; (2) Whether the District Court erred in refusing to treat the jury's answers to special interrogatories as requiring a verdict for Curley; (3) Whether the District Court likewise erred in refusing to treat the jury's answer to the first question on the verdict sheet, which dealt with Klem's failure to see Bailey's body in the Camry, as requiring a verdict for Curley (Curley calls this his "first theory of liability"); (4) Whether the District Court erred in refusing to enter a verdict for Curley or to order a new trial based on Klem's actions in the confrontation and shooting (Curley's "liability theory number two"); and (5) Whether [*15] the District Court erred in refusing to treat Curley's two liability theories as alternatives that necessitated a verdict for Curley if the jury agreed with either.

II.

The District Court had jurisdiction over this case under *28 U.S.C. §§ 1331* and *1343*, and entered final judgment on September 29, 2005. This Court has jurisdiction over final judgments of the District Court under *28 U.S.C. § 1291*.

[HN2] The standard of review for a motion for judgment as a matter of law is plenary. *Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)* ("We exercise plenary review of an order granting or denying a motion for judgment as a matter of law and

apply the same standard as the district court."). The standard of review on a motion for a new trial is "abuse of discretion unless the court's denial of the motion is based on application of a legal precept, in which case our review is plenary." *Honeywell, Inc. v. American Standards Testing Bureau, Inc., 851 F.2d 652, 655 (3d Cir. 1988).*

III.

A. The *Saucier* Test for Qualified Immunity

As we noted in *Curley I*, the claim here arises under [HN3] *42 U.S.C. § 1983*, which "provides a cause of action for any person who has been deprived of rights secured by [*16] the Constitution or laws of the United States by a person acting under color of law." *298 F.3d at 277*. [HN4] Police officers, embodying the authority of the state, are liable under *§ 1983* when they violate someone's constitutional rights, unless they are protected by qualified immunity. Qualified immunity is "the best attainable accommodation of competing values ... ." *Harlow v. Fitzgerald, 457 U.S. 800, 814, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*. Since public officials exercising discretionary powers may sometimes abuse their discretion, the immunity is qualified, rather than absolute, so that civil damages can serve as a restraint. At the same time, the immunity incorporates a recognition that "claims frequently run against the innocent as well as the guilty--at a cost not only to the defendant officials, but to society as a whole." *Id.* While unproductive societal costs may be unavoidable in a system that relies on private litigation as one means to enforce our constitutional norms, the aim of qualified immunity is to limit those costs to the greatest practical degree. We do not want to let the threat of litigation and personal liability "deter[] ... able citizens from acceptance of public office[,]" nor do we want to "dampen [*17] the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties." *Id.* (internal quotation marks, brackets, and citation omitted). Hence, "[t]his immunity is broad in scope and protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Couden v. Duffy, 446 F.3d 483, 501 (3d Cir. 2006)* (Weis, J., dissenting) (quoting *Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986))*.

[HN5] In *Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)*, the Supreme Court articulated a two step test for determining whether a government official, such as a police officer, is entitled to qualified immunity. [6] In the first step, a court must address whether "the officer's conduct violated a constitutional right[.]" *Id. at 201*. [HN6] In an excessive force case, whether there is a constitutional violation is "properly analyzed under the *Fourth Amendment's* 'objective reasonableness' standard[.]" *Graham v. Connor, 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)*. The relevant inquiry is "the reasonableness of the officer's belief as to the appropriate level of force[,]" which "should be judged from [the officer's] on-scene perspective," and not in the "20/20 vision of hindsight." *Saucier, 533 U.S. at 205* [*18] (internal citations and quotation marks removed).

  6 *Saucier* was not the first time the Court had framed the analysis in two parts, see *Siegert v. Gilley, 500 U.S. 226, 232, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991)* ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."), but it is the decision that has become synonymous with the current approach to qualified immunity analysis.

That reasonableness inquiry requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham, 490 U.S. at 396*. The analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's *Fourth Amendment* interests against the countervailing governmental interests at stake." *Id.* (citations and internal quotation marks omitted). The balancing must be conducted in light [*19] of the facts that were available to the officer. See *Maryland v. Garrison, 480 U.S. 79, 85, 107 S. Ct. 1013, 94 L. Ed. 2d 72 (1987)* ("[W]e must judge the constitutionality of [the officers'] conduct in light of the information available to them at the time they acted."). It is, in other words, a "totality of the circumstances" analysis. See *Curley I, 298 F.3d at 279* (assessing objective reasonableness of defendant's actions on basis of totality of the circumstances); *cf. Graham, 490 U.S. at 396* (proper application of reasonableness test used to analyze a claimed violation of *Fourth Amendment* right against unreasonable seizure "requires careful attention to the facts and circumstances of each particular case"); *Abraham, 183 F.3d at 289* ("How much force is permissible to effectuate an arrest ... is determined based on the 'totality of the circumstances.'").

[HN7] "If, and only if, the court finds a violation of a constitutional right," *Scott v. Harris, 127 S. Ct. 1769, 1774, 167 L. Ed. 2d 686 (2007)*, the court moves to the second step of the analysis and asks whether immunity should nevertheless shield the officer from liability. [7] The question at this second step is whether the right that was violated was clearly established, or, in other words, [*20] "whether it would be clear to a reasonable officer

that his conduct was unlawful in the situation he confronted." *Saucier, 533 U.S. at 202*. The Court explained that, again, "this inquiry ... must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id. at 201*. The Court went on to emphasize that even where reasonableness is a part of the inquiry for both the constitutional question and for qualified immunity, as it is in an excessive force case, the inquiries remain distinct. *Id. at 204-05*. "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id. at 205*.

> 7 As further explained herein, *infra* at sections IV.B and IV.C, we do not have occasion to reach that second step here, because no constitutional violation occurred in this case.

[HN8] Thus, the first step of the analysis addresses whether the force used by the officer was excessive, and therefore violative of the plaintiff's constitutional rights, or whether it was reasonable in light of the facts and circumstances available to the officer at the time. This is not a question of immunity at all, but is [*21] instead the underlying question of whether there is even a wrong to be addressed in an analysis of immunity. The second step is the immunity analysis and addresses whether, if there was a wrong, such as the use of excessive force, the officer made a reasonable mistake about the legal constraints on his actions and should therefore be protected against suit.

[HN9] While the *Saucier* analytical approach has been criticized for being unduly rigid and demanding resolution of constitutional issues when cases could be more simply disposed of on other grounds, *see, e.g., Los Angeles County, California v. Rettele, 127 S. Ct. 1989, 1994, 167 L. Ed. 2d 974 (2007)* (Stevens, J., dissenting) (discussing the "unwise practice of deciding constitutional questions in advance of the necessity for doing so."); *Scott, 127 S. Ct. at 1774 n.4* (recounting criticisms of *Saucier*); P. Leval, *Judging Under the Constitution, 81 NYU L. Rev. 1249, 1275-81 (2006)* (describing *Saucier* as requiring courts to engage in "a puzzling misadventure in constitutional dictum"), its order of inquiry nevertheless remains mandatory. *Scott, 127 S. Ct. at 1774 n.4* (declining to "address the wisdom of *Saucier*").

B. Evolving Approaches to Applying the Test

The [*22] length of the foregoing review notwithstanding, the two-step *Saucier* test can be stated simply. Its application, however, presents perplexing logical and practical problems. [HN10] The point of immunity is to protect someone from the burden imposed by litigation itself. It is supposed to be "an *immunity from suit* rather than a mere defense to liability ... ." *Mitchell v. Forsyth,* *472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)* (original emphasis). Hence, the Supreme Court has instructed that "[i]mmunity ordinarily should be decided by the court long before trial." *Hunter v. Bryant, 502 U.S. 224, 228, 112 S. Ct. 534, 116 L. Ed. 2d 589, (1991)*. That is well and good when there are no factual issues in a case, but often the facts are intensely disputed, and our precedent makes clear that such disputes must be resolved by a jury after a trial. *E.g., Estate of Smith v. Marasco, 430 F.3d 140, 152-53 (3d Cir. 2005); Curley I, 298 F.3d at 278; Reitz v. County of Bucks, 125 F.3d 139, 147 (3d Cir. 1997)*. As a practical matter, then, in such cases the immunity becomes no more than a mere defense, *Sloman v. Tadlock, 21 F.3d 1462, 1468 n.6 (9th Cir. 1994)*, and a sometimes challenging one to establish at that.

The fundamental challenge lies in the nature of the [*23] questions that compose the test. Since they are mixed questions of law and fact, one is left to ask who should answer them. As we noted in *Curley I*, "[a] disparity of opinion exists among our sister circuits as to whether a judge or jury should make the ultimate immunity determination." *298 F.3d at 278 n.3*. The First, Fourth, Seventh, and Eleventh Circuits have all indicated that qualified immunity is a question of law reserved for the court. [8] The Fifth, Sixth, Ninth, and Tenth Circuits have permitted the question to go to juries. [9] Precedent from the Second and Eighth Circuits can be viewed as being on both sides of the issue, with the evolution being toward reserving the question for the court. [10]

> 8 *See Rodriguez-Marin v. Rivera-Gonzalez, 438 F.3d 72, 83 (1st Cir. 2006)* ("While preliminary factual questions regarding qualified immunity are sent to the jury, the legal question of the availability of qualified immunity is ultimately committed to the court's judgment.") (internal quotation marks omitted); *Willingham v. Crooke, 412 F.3d 553, 560 (4th Cir. 2005)* ("The issue having now come before us, we hold that the legal question of a defendant's entitlement to qualified immunity under [*24] a particular set of facts should be decided by the court, not by the jury."); *Riccardo v. Rausch, 375 F.3d 521, 526 (7th Cir. 2004)* ("Immunity, however, is a matter of law for the court, to be decided without deference to the jury's resolution-and preferably before the case goes to the jury."); *Johnson v. Breeden, 280 F.3d 1308, 1318 (11th Cir. 2002)* ("When the case goes to trial, the jury itself decides the issues of historical fact that are determinative of the qualified immunity defense, but the jury does not apply the law relating to qualified immunity to those historical facts it finds; that is the court's duty.").

9   See *McCoy v. Hernandez*, 203 F.3d 371, 376 (5th Cir. 2000) ("while qualified immunity ordinarily should be decided by the court long before trial, if the issue is not decided until trial the defense goes to the jury which must then determine the objective legal reasonableness of the officers' conduct."); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) ("The issue of whether qualified immunity is applicable to an official's actions is a question of law. However, where the legal question of qualified immunity turns upon which version of the facts [*25] one accepts, the jury, not the judge, must determine liability.") (internal citations and quotation marks omitted); *Ortega v. O'Connor*, 146 F.3d 1149, 1156 (9th Cir. 1998) (finding no error in "the district court's 'extra' reasonableness test, which ... constituted an appropriate and proper instruction to the jury on the second prong of the defendants' qualified immunity defense-whether a reasonable state official could have believed his conduct was lawful-the prong as to which the existence of factual disputes requires the jury's determination."); *Maestas v. Lujan*, 351 F.3d 1001, 1010 (10th Cir. 2003) ("In short, the disputed issues of material fact concerning the objective reasonableness of Mr. Lujan's actions are dispositive of the qualified immunity issue. Further, as stated above, Mr. Lujan retained the defense of immunity from liability even though the jury was needed to resolve issues of objective legal reasonableness. Therefore, the district court properly presented the reasonableness element of the qualified immunity analysis to the jury.").

10   Compare *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) ("We believe that use of special interrogatories in this case resolves the [*26] difficulty of requiring the jury to decide 'what the facts were that the officer faced or perceived' and requiring the court to make the ultimate legal determination of whether qualified immunity attaches on those facts.") with *Oliveira v. Mayer*, 23 F.3d 642, 650 (2d Cir. 1994) ("The District Court should have let the jury (a) resolve these factual disputes and (b) based on its findings, decide whether it was objectively reasonable for the defendants to believe that they were acting within the bounds of the law when they detained the plaintiffs."); see also *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) (discussing roles of judge and jury in qualified immunity analysis, and citing both *Stephenson* and *Oliveira*). Compare *Littrell v. Franklin*, 388 F.3d 578, 585 (8th Cir. 2004) ("Where, as in this case, factual questions prevent a district court from ruling on the issue of qualified immunity, it is appropriate to tailor special interrogatories specific to the facts of the case. This practice allows the jury to make any requisite factual findings that the district court may then rely upon to make its own qualified immunity ruling. Special interrogatories related to the qualified [*27] immunity defense are not improper per se, but they must be carefully crafted so that the fact-finder's role is limited to determining whether the underlying facts are as the plaintiff has alleged or proved.") (internal citations and quotation marks omitted) with *Turner v. Ark. Ins. Dep't*, 297 F.3d 751, 754 (8th Cir. 2002) (in discussing an official's burden to come forward with "undisputed and material facts that demonstrate that his actions were reasonable under the circumstances[,]" the Court stated that "[i]f such facts are undisputed, then that is a question of law to be reviewed by a court; if not, then it is a question for a jury and summary judgment is improper.")

Our precedents too have evolved. Our recent precedents say that the court, not a jury, should decide whether there is immunity in any given case. E.g., *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 194 n.12 (3d Cir. 2005); *Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004); *Doe v. Groody*, 361 F.3d 232, 238 (3d Cir. 2004). But that was not always our counsel. We had previously permitted the jury to answer the key immunity question of whether the challenged behavior of a government official was [*28] objectively reasonable. In *Sharrar v. Felsing*, 128 F.3d 810, 830-31 (3d Cir. 1997), we referred with approval to our earlier decision in *Karnes v. Skrutski*, 62 F.3d 485 (3d Cir. 1995), characterizing it as holding that, "a factual dispute relating to qualified immunity must be sent to the jury, and suggest[ing] that, at the same time, the jury would decide the issue of objective reasonableness." *Sharrar*, 128 F.3d 830-31.

Later, in *Curley I*, we cited *Sharrar* for the proposition "that a jury can evaluate objective reasonableness when relevant factual issues are in dispute." [11] 298 F.3d at 279. We also went on to say, however, that it would not be inappropriate "for a judge to decide the objective reasonableness issue once all the historical facts are no longer in dispute[,]" and we suggested the use of special interrogatories as a means to that end. *Id.*

11   We are not suggesting that the objective reasonableness of an officer's view of the law may be submitted to the jury. Rather, we are recognizing that, when material issues of fact are in dis-

pute, our past precedents, in particular *Karnes*, *Sharrar*, and *Curley I*, have allowed the jury to resolve those disputes and also to determine the [*29] objective reasonableness of the officer's conduct in light of the facts.

Finally, in a line of cases beginning with *Doe v. Groody*, we began highlighting that "qualified immunity is an objective question to be decided by the court as a matter of law." *Carswell, 381 F.3d at 242* (citing *Doe, 361 F.3d at 238*). In *Carswell*, we elaborated on that point. We explained that the jury "determines disputed historical facts material to the qualified immunity question[,]" and we again suggested that "District Courts may use special interrogatories to allow juries to perform this function," *id.* (citing *Curley I, 298 F.3d at 279*). We emphasized that "[t]he court must make the ultimate determination on the availability of qualified immunity as a matter of law." *Id.* That emphasis reemerged in *Harvey*, when we cited *Carswell* and *Doe* for the proposition that qualified immunity is purely a question of law to be answered by the court. *421 F.3d at 194 n.12*.

It appears that much of the discussion in *Carswell* was dicta, since we were actually affirming in that case the grant of judgment for the defendant as a matter of law, following the presentation of the plaintiff's case at trial. *381 F.3d at 239, 245*. In [*30] a technical sense, then, the dicta is not binding. *See Abdelfattah v. United States Dep't of Homeland Sec., 488 F.3d 178, 185 (3d Cir. 2007)* ([HN11] "While '[i]t is the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels,' Internal Operating Procedure 9.1, it is also well established that we are not bound by dictum in an earlier opinion.") (citing *Mariana v. Fisher, 338 F.3d 189, 201 (3d Cir. 2003)*). It has nevertheless been repeated and understood as a definitive direction on the respective roles of judge and jury when a qualified immunity defense is raised. *See, e.g., Johnson v. Anhorn, 416 F. Supp. 2d 338, 361 (E.D. Pa. 2006)* ("[Q]ualified immunity is an objective question to be decided by the court as a matter of law.... . The jury, however, determines disputed historical facts material to the qualified immunity question.") (quoting *Carswell, 381 F.3d at 242*); *Iwanejko v. Cohen & Grigsby, P.C., 2006 U.S. Dist. LEXIS 66023, 2006 WL 2659109, at *9 (W.D. Pa. Sept. 15, 2006)* (quoting *Carswell* and stating, "in the Third Circuit 'qualified immunity is an objective question to be decided by the Court as a matter of law.'"); *Brown v. City of Camden, 2006 U.S. Dist. LEXIS 56215, 2006 WL 2177320, at *7 (D.N.J. July 27, 2006)* [*31] (citing *Carswell* and saying "In this Circuit, the Court must make the ultimate determination on the availability of qualified immunity as a matter of law.").

There is some irony in this, since *Carswell* relied on *Curley I* and *Sharrar*, correctly citing them as support for the proposition that objective reasonableness is a question of law. But neither *Curley I* nor *Sharrar* stand for the related proposition that the question of objective reasonableness cannot be presented to a jury. Indeed they both teach "that a jury can evaluate objective reasonableness when relevant factual issues are in dispute." *Curley I, 298 F.3d at 279; see also Sharrar, 128 F.3d at 830-31*.

Nevertheless, the *Carswell* approach, despite its limitations, *see infra* at section III. C., appears to have taken root and to represent the pattern and practice both in our Circuit and much of the rest of the country. We therefore take the opportunity to reiterate and clarify a central message from that case: [HN12] whether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury. *Carswell, 381 F.3d at 242*. When a district court submits [*32] that question of law to a jury, it commits reversible error.

Question Three on the liability verdict sheet was evidently intended to reach the question of qualified immunity. [12] However, as we discuss further below, the question as framed actually pertains to whether there was any constitutional violation at all. Since it properly presented an essentially factual question regarding the constitutional violation, it was not error for the jury to consider it.

12  We acknowledge again that our language in *Curley I* left open the possibility of giving that question to the jury. Discussing "the procedure for deciding the immunity question when the existence of disputed issues of fact precludes disposition on summary judgment," *298 F.3d at 278*, we stated:

> We addressed the issue in *Sharrar*, in which we observed that the "reasonableness of the officers' beliefs or actions is not a jury question," *128 F.3d at 828*, but qualified that observation by later noting that a jury can evaluate objective reasonableness when relevant factual issues are in dispute, *id. at 830-31*. This is not to say, however, that it would be inappropriate for a judge to decide the objective reasonableness issue once all the historical [*33] facts are no longer in dispute. A judge may use special jury interrogatories, for instance, to permit the jury to resolve the disputed facts upon which the court can then de-

termine, as a matter of law, the ultimate question of qualified immunity.

*Id. at 279*. We cannot fault the District Court for following our instructions on remand. Unlike our dissenting colleague, we do not view *Curley I* as making "clear the respective roles of the judge and jury in cases such as this," post at 18. To the extent *Curley I* can be read as allowing the District Court to submit the question of qualified immunity to the jury we are hard pressed to say the District Court erred in doing so. We hope, however, that it will now be clear that [HN13] the second step in the *Saucier* analysis, i.e., whether an officer made a reasonable mistake about the legal constraints on police action and is entitled to qualified immunity, is a question of law that is exclusively for the court. When the ultimate question of the objective reasonableness of an officer's behavior involves tightly intertwined issues of fact and law, it may be permissible to utilize a jury in an advisory capacity, *see infra* at sec. III.C., but responsibility [*34] for answering that ultimate question remains with the court.

C. The Challenge of Preserving "Totality of Circumstances" Review

As this case demonstrates, trying to separate the ultimate from the underlying questions is no easy matter and can have a disturbing, unintended consequence. It can undermine the basic principle that both the threshold constitutional question and the immunity question are to be decided on the totality of the circumstances.

[HN14] Fundamental fairness dictates a totality-of-the-circumstances review, since the test for reasonableness "is not capable of precise definition or mechanical application," *Bell v. Wolfish, 441 U.S. 520, 559, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)*. It depends on all of the chaotic details that emerge in real time in real life.[13] Yet the method that we and many other courts have taken to address the mixed legal and factual questions posed by the *Saucier* test cannot easily, perhaps cannot ever, capture those circumstances in their totality. When one picks and chooses a few questions to pose to a jury to ferret out historical facts, staying away from asking the broader question of what constitutes reasonable behavior under those facts, one cannot help but focus attention on some [*35] events to the diminution or exclusion of others. In short, a totality-of-the-circumstances test is replaced by a test focusing on those few circumstances featured in the questions a court is able and willing to articulate.

13   We have here a fundamental parting of the ways with the dissent. While our colleague sees this case as coming down to, to use her analogy, one domino in the sequence of events, post at 12, we feel compelled to recognize that reality is a good deal more complicated than the simple causality evident in falling dominoes.

The District Court clearly saw that problem in this case. As quoted before, the judge observed that the analysis in this case could not properly be shrunk into the few moments immediately before Klem shot Curley, but instead must be decided in light of all the events which had taken place over the course of the entire evening. *Post-trial Opinion, 2006 U.S. Dist. LEXIS 8606, 2006 WL 414093, at *2*. The desire to avoid the kind of difficulty presented here is perhaps what has motivated other courts to sanction the alternative approach of permitting the question of objective reasonableness to go to juries. *See Sloman, 21 F.3d at 1468* ("[S]ending the factual issues to the jury but [*36] reserving to the judge the ultimate 'reasonable officer' determination leads to serious logistical difficulties. Special jury verdicts would unnecessarily complicate easy cases, and might be unworkable in complicated ones.").

In spite of the foregoing problem inherent in articulating specific questions to address factual issues, our most current precedent counsels that course.[14] However, while the judge must make the ultimate determination regarding the objective reasonableness of challenged behavior, that does not mean that the use of an advisory jury is foreclosed. We need not consider the propriety of such a step under the circumstances presented here, though, because the jury in this case was not acting in an advisory capacity. The Court put to the jury the question of the objective reasonableness of Klem's actions, and the Court upheld the verdict rendered.

14   We note that in the Supreme Court's recent decision in *Scott, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)*, the Court stated that, because the case "was decided on summary judgment, there [had] not yet been factual findings by *a judge* or jury ... ." *Id. at 1774* (emphasis added). Without wanting to read too much into that statement, since it may refer [*37] to nothing more than a case in which the parties waive any right to a jury, it appears the Court at least contemplated a circumstance where a judge may resolve factual issues. Certainly the dissent in *Scott* was concerned about judicial fact finding. *See id. at 1781* (Stevens, J., dissenting) ("Relying on a *de novo* review of a videotape ..., eight of the jurors on this Court reach a verdict that differs from the views of the judges on both the District Court and

the Court of Appeals who are surely more familiar with the hazards of driving on Georgia roads than we are.").

IV.

A. The Jury Was Not Choosing Between Alternative Theories of Liability

The jury was not facing a choice of alternative liability theories driven by "outcome-determinative facts," as Curley would have it. *See Post-trial Opinion, 2006 U.S. Dist. LEXIS 8606, 2006 WL 414093, at \*4*. The District Court rightly rejected that view. We did not, in *Curley I*, presume to set forth any theories of liablilty, let alone the strict alternatives Curley characterizes our opinion as requiring. We simply identified "disputed issues of material fact with regard to at least two key events--the inspection of the suspect's vehicle and the actual confrontation between [\*38] Klem and Curley." *298 F.3d at 281*. As Curley sees it, resolution of the factual issues in his favor was not merely a necessary condition for him to prevail, it was an entirely sufficient condition. But that was never so. Our pointing to "*at least* two key events[,]" *id.* (emphasis added), accurately implied that there were more facts on the table than the two areas of dispute we singled out for discussion. Consistent with our own cases and with precedent from the Supreme Court, we could not have directed the District Court to ignore the totality of the circumstances and to focus instead on those two areas.

Even if those specifically identified factual areas were the only ones to be considered, it is an unwarranted leap to say that the jury's responses to selected yes-or-no questions means that only one set of inferences and conclusions can be drawn from those responses. For example, the jury's answer of "no" to the question of whether "Officer Curley raise[d] his gun to point directly at Trooper Ron Klem several times during 'the confrontation'" might mean that the jury decided that Curley had raised his gun to point at Klem only once or twice, rather than "several times," as the question [\*39] asks. 15 One need not draw the inference that Curley demands. Indeed, we cannot. Though multiple inferences are possible, we must draw all inferences in Klem's favor, rather than Curley's, since we are reviewing a verdict for Klem. *See McGreevy v. Stroup, 413 F.3d 359, 364 (3d. Cir. 2005)* ([HN15] on a motion for judgment as a matter of law under Federal *Rule 50(a)*, evidence must be viewed "in the light most favorable to the nonmoving party"). In short, any ambiguity in the interrogatories and the answers to them must, at this stage, be interpreted against Curley. The District Court therefore did not err in rejecting Curley's "alternative theories of liability" view of the verdict sheet.

15  Given that Curley acknowledged pointing the gun in the direction of the Camry and that Klem was standing next to the car, it is not fanciful to believe that the jury could have interpreted the question as described.

B. The Focus Should Have Been on the Threshold Question

Where the District Court did go astray was in assuming that a constitutional violation had occurred and then applying its efforts to answering the question of immunity. The Court's confusion appears to have been the product both of language [\*40] in our *Curley I* opinion and of the intertwined questions of objective reasonableness posed by the two prongs of the *Saucier* test when applied to this case.

The panel in *Curley I* addressed the question of whether Klem's conduct violated Curley's constitutional rights in the summary judgment context, and thus "consider[ed] only the facts alleged by Curley, taken in the light most favorable to him." *Curley I, 298 F.3d at 280*. In determining that, under Curley's version of the facts, he had established a violation of his constitutional rights, we said:

> [T]hese facts, *viewed in the light most favorable to Curley*, are sufficient to support the claim that Klem's shooting of Curley constituted an unreasonable seizure, violative of Curley's rights under the *Fourth Amendment*. ... [W]e find that *under Curley's account of events*, it was unreasonable for Klem to fire at Curley based on his unfounded, mistaken conclusion that Curley was the suspect in question.

*Id. at 280* (emphasis added). The District Court apparently read our opinion as establishing that Curley's constitutional rights were violated. In its ruling on post-trial motions, the District Court stated that "there was a constitutional violation [\*41] in that Officer Curley had a right not to be shot by Trooper Klem." *2006 U.S. Dist. LEXIS 8606, 2006 WL 414093, at \* 1*. That, however, is an oversimplification and a misreading of *Curley I*. Whether Klem committed a constitutional tort turns not on the simple fact that he shot the wrong man. That would end the inquiry before it began. The question is whether Klem's use of force, even though mistakenly directed, was objectively reasonable in light of the totality of the circumstances. That question had yet to be answered when *Curley I* was decided, since a trial was required. There is no substitute for "slosh[ing one's] way

through the factbound morass of 'reasonableness.'" *Scott, 127 S. Ct. at 1778.*

Thus, our earlier opinion was not a decision on whether, under all of the facts and circumstances of the case, Klem's conduct violated Curley's constitutional rights. The jury was not bound at trial, and the District Court was not bound post-trial, by our earlier statements involving a hypothetical set of facts favoring Curley, since the facts and inferences actually found by the jury were clearly different than those which we were required to posit in *Curley I* when considering the summary judgment order. [16]

> 16    The procedural [*42] posture of *Curley I* provides another key reason why we cannot agree with the dissent. Our colleague takes as a given that *Curley I* established alternative theories of liability based on a "simple syllogism," post at 13-14, but *Curley I* was in a procedural posture that required every inference to be drawn for Curley. It thus did not present an opportunity to frame a set of factual questions to constrain the jury's fresh look at the evidence. The jury was not constrained by the *Curley I* opinion's necessarily biased view of the facts, and the jury was therefore free to consider the entire set of facts facing Klem when determining whether Klem's conduct violated Curley's constitutional rights.

Confusion between the threshold constitutional inquiry and the immunity inquiry is also understandable given the difficulty courts have had in elucidating the difference between those two analytical steps. [17] At the risk of understating the challenges inherent in a qualified immunity analysis, we think the most helpful approach is to consider the constitutional question as being whether the officer made a reasonable mistake of fact, while the qualified immunity question is whether the officer was [*43] reasonably mistaken about the state of the law.

> 17    The *Saucier* opinion itself was generated by the confusion inherent in such conceptually close questions. See *Saucier, 533 U.S. at 197* ("The matter we address is whether the requisite analysis to determine qualified immunity is so intertwined with the question whether the officer used excessive force in making the arrest that qualified immunity and constitutional violation issues should be treated as one question, to be decided by the trier of fact.").

With that in mind, we turn to the questions presented to the jury in this case. The constitutional liability question posed to the jury, Question Two on the verdict sheet, was "Did Trooper Ron Klem act in an objectively reasonable manner in shooting Officer Curley during the confrontation?" Question Three, designed as the immunity question, was posed as, "Was Trooper Ron Klem's mistake in firing his weapon objectively reasonable?" The difference between those two questions is essentially semantic, the only difference being that Question Three makes explicit what was already obvious and conceded in the case: that the shooting was a mistake.

For practical purposes, then, the analysis of objective [*44] reasonableness that the District Court undertook under the rubric of an immunity question actually applies better to the preliminary constitutional question. The immunity step of the *Saucier* test is typically focused on established legal standards and requires a review of relevant case law, a review a jury simply cannot undertake. See *Saucier, 533 U.S. at 205* ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."). However, the constitutional analysis focuses on the factual circumstances of the incident and asks whether the officer made a reasonable mistake of fact. Question Three did exactly that. It asked not whether Trooper Klem made a mistake of law--wrongly believing that it was legal to shoot the wrong person--but whether it was reasonable for him to make the factual mistake of believing Officer Curley was the armed and dangerous Bailey. Therefore, if the jury properly determined that Klem made an objectively reasonable mistake when he shot Curley, then it found that there was no constitutional violation, and the District Court did not err in entering a verdict in favor of Trooper [*45] Klem. [18] We turn now to that question of the sufficiency of the evidence.

> 18    The fact that the District Court relied on Question Three as answering the qualified immunity question and entered a verdict based on Trooper Klem deserving qualified immunity is not reversible error. Because Trooper Klem was entitled to a verdict in his favor either if there was no constitutional violation or if he was entitled to qualified immunity, the error in the District Court's analysis was harmless. *Hill v. Reederei F. Laeisz G.M.B.H., 435 F.3d 404, 411 (3d Cir. 2006)* (holding that [HN16] error is harmless where it is "highly probable" that the error did not affect the outcome of the case).

C. The Jury's Verdict is Supported by the Evidence

The jury's verdict on the objective reasonableness of Trooper Klem's actions is well supported by the record. There are many facts that the jury was entitled to rely on that were not in dispute, including Bailey's behavior prior to and during the high speed car chase that led to the George Washington Bridge. Bailey had shot and killed a

police officer, had shot at another officer, had stolen a police car, had then carjacked the Camry from a rest stop on the New Jersey Turnpike, had launched a [*46] high speed chase on the Turnpike and, during that chase, had fired shots at Klem and other officers, wounding an officer and hitting Klem's windshield. Furthermore, whether or not Klem knew exactly what had occurred, no one disputes that he came on the scene in the immediate aftermath of Bailey's creating additional havoc by crashing into the Pathfinder. In short, no one disputes that Bailey was actively evading arrest after committing several severe crimes, that he posed a serious danger to both the police and public, and that Klem could properly approach the scene prepared to use deadly force. In fact, Curley himself did so. He testified that, when he began to approach the Camry, his gun was drawn.

The very real danger that both Curley and Klem perceived at the toll plaza was intensified by the presence of numerous innocent bystanders. Curley's solicitude for the safety of the driver of the Pathfinder is not just commendable; it reflects the well-founded fear that people who got out of their cars were in danger of being shot. Added to all of this is the jury's finding that, when Klem approached the wrecked Camry, he saw a toll booth attendant signaling him to look to the middle of [*47] the toll plaza. That is where Curley was standing with a gun in his hands.

In Curley's view, none of those facts is of any moment, since Klem's failure to look into the Camry is dispositive. According to Curley, had Klem looked, he would have seen Bailey's dead body and there would have been no confrontation. [19] However, as we have stated several times, the reasonableness of Klem's conduct must be examined based on the totality of the circumstances, and the inquiry cannot be collapsed into a single instant, particularly not when, at that instant, Klem's vision was being drawn by the toll booth attendant toward Curley, standing in the plaza with a gun. [20] Thus, when we examine all of the facts and circumstances, the jury's verdict that Klem acted reasonably is supported by the evidence.

> 19  This, of course, is the dissent's view as well, post at 11-12, and we do not suggest that this is illogical, only that it is not the exclusively logical view. We stated in *Curley I* that Klem knew there was only one suspect and, "had Klem known of Bailey's suicide, it would have been clearly unreasonable for him later to confuse Curley with the suspect." *298 F.3d at 281*. Hence, the question of whether [*48] Klem looked in the Camry is highly relevant. But it is not outcome determinative. We did not equate looking in the Camry with knowledge of Bailey's death, since it was conceivable that a factfinder could have decided that an objectively reasonable officer could look in the Camry and still not see Bailey, no matter how obvious the body might have been to others not in that officer's unique position. It was also conceivable that a factfinder could conclude, as the jury apparently did, that despite Klem's overlooking information that could have enlightened him about the suicide, his actions in totality and under the pressure of the moment were such that his failure to look in the car did not make the shooting objectively unreasonable.
>
> 20  The jury's conclusion that Klem's failure to look into the Camry was unreasonable is not beyond dispute. Given all else that had occurred and was occurring, it can be argued that looking at the gesticulating toll booth attendant, rather than into the car, may not have been the most reasonable action but was still within the bounds of reason. However, since we are upholding the verdict on other grounds, we do not address that issue.

The mistake Klem made [*49] has undoubtedly been terrible in its long-term consequences for Officer Curley and his family, and we do not for a moment discount the pain, sorrow, expense, and frustration that it has visited on them in their innocence. But a mistake, though it may be terrible in its effects, is not always the equivalent of a constitutional violation. In *Curley I*, we acknowledged "the great pressure and intensity inherent in a police officer's hot pursuit of a suspect known to be armed and highly dangerous ... ." *298 F.3d at 280*. That would amount to little more than lip service, were we to reverse the jury's verdict and the District Court's thoughtful decision on the post-trial motions. "[P]olice officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Graham, 490 U.S. at 397*. Those were the circumstances facing both Trooper Klem and Officer Curley at the George Washington Bridge toll plaza. Viewed from that perspective, *Saucier, 533 U.S. at 205*, the seizure effected by the mistaken shooting was not unreasonable under the *Fourth Amendment*. It therefore was not [*50] a constitutional violation.

V.

For the foregoing reasons, we will affirm the judgment of the District Court on the ground that no constitutional violation occurred.

**DISSENT BY:** ROTH

**DISSENT**