**ROTH, Circuit Judge, dissenting:**

The jury's findings make clear that, were it not for Trooper Klem's unreasonable actions, the tragic shooting of Officer Curley would never have occurred. In the special interrogatories, the jury found that the sole perpetrator was dead and visibly sprawled across the passenger seat of the Camry at the time Klem approached it, and that Klem came within an arm's length of the Camry's passenger side window, yet failed to look into the car to check for the perpetrator's body. Klem admitted at trial that, had he looked into the Camry and seen the perpetrator lying there, Klem would not have confronted and shot Curley. Klem would have holstered or lowered his gun, thus breaking the chain reaction of events leading to the shooting, and Curley would have walked away unharmed. In Question 1 of the liability verdict sheet, the jury had to decide whether Klem's failure to break the chain reaction--by failing to look into the Camry--was an objectively reasonable mistake of fact, in light of the totality [*51] of the circumstances. The jury concluded that it was not.

Based on these facts, I cannot agree with the majority's conclusion that the jury returned a verdict for Klem. The exact opposite is true. The jury answered Question 1 in favor of Curley, which established a constitutional violation. Although the jury answered Question 3 in favor of Klem, this question should never have been posed, as it asked the ultimate question of qualified immunity and encompassed purely legal issues reserved exclusively for the court. The majority concedes that such a question is outside the province of the jury, and our prior precedents, including our prior decision in this case, have never stated otherwise. Therefore, in order to justify its decision to affirm, the majority takes a revisionist view of history and refashions Question 3 into a factual, rather than legal, question. The majority does so notwithstanding the fact that the language and structure of the verdict sheet and the understanding of the District Court and the parties clearly demonstrate that Question 3 was an improper legal question.

For these reasons and those that follow, I respectfully dissent. Question 3 should be stricken, the judgment [*52] for Klem should be vacated, and this case should be remanded in order to permit the District Court, rather than the jury, to resolve the ultimate question of qualified immunity. If the District Court were to conclude that immunity is not warranted under clearly established law, judgment should be entered in favor of Curley and the case should proceed to a damages determination.

**I. BACKGROUND**

In *Curley v. Klem*, 298 F.3d 271 (3d Cir. 2002) ("*Curley I*"), we reversed the summary judgment for Klem on Curley's excessive force claim because the District Court failed to "recognize the existence of disputed historical facts that are clearly material to the question of objective reasonableness." *Id.* at 281. Specifically, we identified a series of disputed facts relating to "two key events--the inspection of the suspect's vehicle and the actual confrontation between Klem and Curley." *Id.* We discussed each event in detail, under separate topic headings entitled "The Body in the Camry" and "The Confrontation," *id.* at 281-282, and noted their sequential relationship to one another:

> When Klem arrived at the toll plaza, he was unaware that his suspect had just shot and killed himself while sitting inside [*53] the stolen Camry. But it is uncontroverted that Klem knew there was only one perpetrator. *Thus, had Klem known of Bailey's suicide, it would have been clearly unreasonable for him later to confuse Curley with the suspect.* Assuming that a reasonable officer in Klem's position would have looked inside the Camry upon arriving at the scene, a key issue becomes whether Klem did, in fact, look inside the Camry's window.

*Id.* at 281 (emphasis added). We noted that, while qualified immunity is supposed to act as immunity from suit, not just liability, "the reality [is] that factual disputes often need to be resolved before determining whether the defendant's conduct violated a clearly established constitutional right." *Id.* at 278. We noted that "[a] judge may use special jury interrogatories, for instance, to permit the jury to resolve the disputed facts upon which the court can then determine, as a matter of law, the ultimate question of qualified immunity." *Id.* at 279. Our analysis was colored by the Supreme Court's directive, in *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), that *Fourth Amendment* qualified immunity analysis "must be undertaken in light of the *specific context of the case*, not as a [*54] broad general proposition." *Id.* at 201 (emphasis added).

In accordance with our directives in *Curley I*, the District Court submitted a series of special interrogatories to the jury at the conclusion of trial. These 10 interrogatories were derived from the material fact disputes we had identified in our decision in *Curley I*. Five interrogatories sought to resolve fact disputes relating to the extent of Klem's inspection of the Camry. All of these interrogatories were answered in favor of Curley in that they tended to demonstrate that Klem had acted unrea-

sonably by failing to look into the Camry, where he would have seen the perpetrator's dead body. [21] The other five interrogatories addressed Klem's subsequent confrontation with Curley -- which, by Klem's own admission, never would have happened had Klem acted reasonably by looking into the Camry. Two of these interrogatories were answered in favor of Curley (in that they tended to demonstrate that Klem confronted Curley in an unreasonable manner), [22] one interrogatory was answered in favor of Klem (in that it tended to demonstrate that Klem had acted reasonably), [23] and two interrogatories were left unanswered due to the jury's failure [*55] to reach a unanimous decision on them. [24]

[21] These interrogatories are as follows. Interrogatory 1 asked: "At the time Trooper Klem approached the Camry, was the perpetrator's body on the front seat of the car?" The jury answered: "Yes." Interrogatory 2 asked: "At the time Trooper Klem approached the Camry, was the perpetrator's body on the passenger side floor of the car?" The jury answered: "No." Interrogatory 3 asked: "When Trooper Ron Klem was within about an arm's length from the passenger side window of the Camry, did he look into the window of the Camry to see if the perpetrator was in the car?" The jury answered: "No." Interrogatory 4 asked: "Regardless of where the perpetrator's body was located in the Camry, should it have been visible to someone looking in the passenger side window from where Trooper Klem was positioned?" The jury answered: "Yes." Interrogatory 5 asked: "Did Trooper Ron Klem make an objectively reasonable effort to observe into the Camry to determine if the perpetrator was inside the Camry?" The jury answered: "No."

[22] These interrogatories are as follows. Interrogatory 7 asked: "Did Officer Curley raise his gun to point directly at Trooper Ron Klem several [*56] times during "the confrontation?" The jury answered: "No." Interrogatory 8 asked: "At the time Officer Curley was shot, was Officer Curley's gun coming up to aim at Trooper Ron Klem?" The jury answered: "No."

[23] This interrogatory, Interrogatory 6, asked: "Was it objectively reasonable for Trooper Ron Klem to believe that toll collector Jenkins signaled to him with an arm motion towards the east side center of the plaza?" The jury answered: "Yes."

[24] These interrogatories are as follows. Interrogatory 9 asked: "Was Officer Curley's uniform visible as a police uniform from the position where Trooper Ron Klem was standing?" Interrogatory 10 asked: "Was it objectively reasonable for Trooper Ron Klem to believe that the individual he observed holding a weapon was wearing civilian clothing?"

The District Court also submitted to the jury a separate "Liability Verdict Sheet" premised on and guided by our discussion in *Curley I*. Although the majority opinion reproduces the four liability questions in full, the majority fails to include the instructions that accompanied these questions. Because these instructions are critical to understanding the meaning of the questions themselves, I set forth [*57] the verdict sheet in its entirety, as returned by the jury, below:

### LIABILITY VERDICT SHEET

After you have finished answering the written interrogatories, please proceed to liability, and, if appropriate, damage questions.

**1. Did Trooper Ron Klem's failure to act in an objectively reasonable manner in observing the Camry prevent him from seeing the perpetrator's body in the Camry?**

X Yes    No

**2. Did Trooper Ron Klem act in an objectively reasonable manner in shooting Officer Curley during the confrontation?**

X Yes    No

If you answered Yes to Question 1 and/or No to Question 2, proceed to Question 3.

If you answered No to Question 1 and also Yes to Question 2, then go no further. Stop deliberating and inform the attendant that you have reached the verdict. If not, proceed to Question 3.

**3. Was Trooper Ron Klem's mistake in firing his weapon objectively reasonable?**

X Yes    No

If you answered No to Question 3, then proceed to Question 4.

If you answered Yes to Question 3 then proceed no further. Stop deliberating

and inform the attendant that you have reached a verdict.

**4. Did the plaintiff suffer damages that were proximately caused by Trooper Ron Klem's conduct?**

Yes    No

If you answered [*58] Yes to Question 4 you must proceed to the Damages Verdict Sheet.

If you answered No to Question 4, proceed no further. Stop deliberating and inform the attendant that you have reached a verdict.

There is certainly some ambiguity in the verdict sheet. However, as I will discuss below, I believe it is clear that--in light of the special interrogatories, the verdict sheet instructions, and other record evidence-- Questions 1 and 2 represented alternate theories of liability, and Question 3 represented the ultimate qualified immunity question. Although Questions 1 and 2 were more or less in accordance with our directives in *Curley I*, Question 3 was not--and it never should have been included on the verdict sheet.

Upon receiving the jury's answer to Question 3, the District Court promptly entered judgment for Klem on that basis, without any further analysis, in a two-page judgment order. *See* 9/29/05 Order. In its post-trial opinion, the District Court made clear that the issue of qualified immunity was out of its hands and had been delegated to the jury in Question 3: "Question 3 properly asks the jurors to make the finding that is inherent in the remand, and in answering it as they did, unanimously, [*59] *this jury decided the issue of qualified immunity* in Trooper Klem's favor." *Curley v. Klem, No. 98-5256, 2006 U.S. Dist. LEXIS 8606, 2006 WL 414093, at *5 (D.N.J. Feb. 21, 2006)* (emphasis added). By entering judgment for Klem on the basis of Question 3, the District Court disregarded the jury's answers to the special interrogatories, overrode the jury's finding of liability in Question 1, and improperly delegated the ultimate question of qualified immunity to the jury.

## II. DISCUSSION

First, I will explain why Questions 1 and 2 were alternate theories of liability. Second, I will explain why Question 3 asked the ultimate question of qualified immunity, and thus should be stricken. Third, I will explain how the District Court should have handled the issue of qualified immunity.

### A. Questions 1 & 2

It is self-evident that Klem shot the wrong man. That mistake alone, however, does not establish a *Fourth Amendment* violation for unreasonable seizure. Rather, what must be shown is that the facts of the case rendered it objectively unreasonable for Klem to mistake Curley for the fleeing perpetrator and then use deadly force to seize him. As we noted in *Curley I*, there are at least two ways in which the jury could have found [*60] the mistaken identification and corresponding shooting to be objectively unreasonable. First, the jury could have concluded that Klem acted unreasonably by failing to check the Camry for the perpetrator's body, which directly led to the mistaken identification and shooting. Indeed, we explicitly stated in *Curley I* that, "had Klem known of Bailey's suicide, it would have been clearly unreasonable for him later to confuse Curley with the suspect." *298 F.3d at 281*. Second, even if Klem had acted reasonably in failing to check the Camry, the jury could still find that Klem acted unreasonably in mistaking Curley for the perpetrator during the subsequent confrontation depending on the circumstances of that event. *Id. at 282*.

Although these two theories were not the only potential avenues for liability, they were the focus of our opinion in *Curley I* and influenced the District Court's decision to place Questions 1 and 2 on the verdict sheet as alternative theories of liability. The trial record reflects that the parties and the District Court understood and intended Questions 1 and 2 to be alternate liability questions. This understanding was in line with the verdict sheet instructions directing [*61] the jury to proceed to Question 3 "[i]f you answered Yes to Question 1 and/*or* No to Question 2" (emphasis added). The fact that an answer for Curley on *either* Question 1 or 2 warranted consideration of Question 3 suggests that Questions 1 and 2 were in fact alternate and independent liability questions. They had to be, because an answer for Curley on either question took the jury to the same place. Questions 1 and 2 operated independently and a finding for Curley on either one was sufficient to establish a constitutional violation.

Klem argues that Question 1 was actually a special interrogatory, as opposed to an independent liability question. This argument makes little sense in light of the fact that all other special interrogatories were placed on a separate sheet entitled "Special Interrogatories" and Question 1 appeared on the "Liability Verdict Sheet." Klem also argues that the District Court would have included instructions to skip Question 2 upon a finding in favor of Curley on Question 1 if those two questions were actually alternate and independent theories of liability. This argument seems plausible at first blush, but Curley rightly points out that it was sensible for the [*62] District Court to instruct the jury to answer both

questions, despite being independent of one another, in case this Court were to invalidate one of the two theories of liability on appellate review--a reasonable concern given the complexity and history of this case. Finally, Klem argues that our comment in *Curley I* that "a key issue"--as opposed to *the* key issue--was "whether Klem did, in fact, look inside the Camry's window," *id. at 281*, shows that it is impossible for Question 1 to be outcome-determinative. This argument falls short because it fails to appreciate the fact that identifying *a* proximate cause of an injury can be outcome-determinative even if it is not the *only* proximate cause of that injury.

With regard to this last argument, the majority adopts a somewhat similar view by arguing that one event - the unreasonable failure to inspect the Camry - cannot alone support liability because the totality of the circumstances must be considered. I do not dispute that the totality of the circumstances must be considered and I fully agree that "[a]ll of the events leading up to the pursuit of the suspect are relevant." *Carswell v. Borough of Homestead, 381 F.3d 235, 243 (3d Cir. 1999)* [*63] (citing *Abraham v. Raso, 183 F.3d 279, 292 (3d Cir. 1999))*. Indeed, the jury was instructed to consider the totality of the circumstances, [25] and did so in answering Question 1. Application of the totality of the circumstances standard, however, does not make it impossible for one particular circumstance to be outcome-determinative, as it was here, because it is entirely possible that some circumstances are more important that others. *See Abraham, 183 F.3d at 292* (disagreeing with the proposition that "all preceding events are equally important" in a similar *Fourth Amendment* case). We highlighted this fact in *Curley I* when we explained that Klem's unreasonable failure to look into the Camry would be important enough to render his misidentification and shooting of Curley immediately thereafter unreasonable; in other words, the first unreasonable act would necessarily carryover and render the second act unreasonable as well. *See Curley I, 298 F.3d at 281*.

25 In its charge to the jury, the District Court stated that "[a]ll of the events leading up to the pursuit of the suspect are relevant," apparently quoting *Carswell* verbatim. App. at T1166.

This is so because the high-speed chase was [*64] composed of a sequence of events forming a chain reaction, like a row of falling dominoes. One event caused the next event which caused the next. Had Klem looked into the Camry for the sole perpetrator--which is what the jury concluded an objectively reasonable police officer would have done in light of the circumstances [26] --a key domino would have been removed and the chase would have come to an end. Indeed, Klem admitted at trial that, had he seen the perpetrator in the Camry, he never would have shot Curley. App. at T1016. Klem's admission negates any suggestion that, even if he knew of the perpetrator's death, Curley's subsequent approach with a gun might have nevertheless presented a new danger that would have warranted the use of deadly force.

26 In *Curley I*, we "[a]ssum[ed] that a reasonable officer in Klem's position would have looked inside the Camry upon arriving at the scene." *298 F.3d at 281*. Our assumption was borne out by the jury's findings in Interrogatory 5 and Question 1. In Interrogatory 5, the jury was asked, "Did Trooper Ron Klem make an objectively reasonable effort to observe into the Camry to determine if the perpetrator was inside the Camry?," and answered, [*65] "No." In Question 1, the jury was asked, "Did Trooper Ron Klem's failure to act in an objectively reasonable manner in observing the Camry prevent him from seeing the perpetrator's body in the Camry?," and answered, "Yes."

The District Court correctly instructed the jury: "The question is whether, in the circumstances here, a reasonable officer would not have made the mistake that Trooper Klem made." App. at T1166-67. By concluding, in Question 1, that a reasonable officer would have looked in the Camry--where, according to the jury's findings in the special interrogatories, Bailey was lying in plain view - the jury answered the dispositive question of liability in favor of Curley. For Klem's shooting of Curley to have been reasonable, Klem's misidentification of Curley must have been reasonable as well. The jury concluded that Klem's misidentification was not reasonable. Therefore, the shooting could not have been reasonable. [27] It is this simple syllogism, premised upon the law of the case as set forth in *Curley I, see In re City of Phila. Litig., 158 F.3d 711, 722 (3d Cir. 1998)* (applying law of the case doctrine in a similar *Fourth Amendment* case), [*66] that the majority fails to appreciate.

27 This is so notwithstanding the jury's answer to Question 2, which, as discussed above, was answered in case this Court were to invalidate Question 1. The shooting during the confrontation was unreasonable by necessity--due to the sequential nature of the events--once the jury concluded that it was unreasonable for Klem not to look into the car. The unreasonableness of Klem's failure to look into the Camry carried over and rendered Klem's misidentification during the confrontation unreasonable as well. This "carry over" effect can be understood with a hypothetical. If, during a high-speed car chase, an officer unreasonably turned off his police radio and therefore did not hear that the perpetrator being

pursued had been stopped, by necessity it would be unreasonable if the officer then rammed an innocent driver, wrongly identified as the fleeing perpetrator, after the unreasonable action of turning off the radio--an unreasonable action directly responsible for the misidentification and ramming of the innocent driver. Similarly, Klem's misidentification of Curley is unreasonable due to the unreasonable action that directly preceded it--the failure [*67] to look into the Camry--which directly caused the misidentification and shooting to occur.

For these reasons, I would conclude that, by answering Question 1 in favor of Curley, the jury found that Klem had committed a constitutional violation. In this case, proof of an unreasonable action that directly causes a later action that might otherwise be reasonable but nevertheless should not have occurred should be enough to prove a violation. [28] Having concluded that the jury found a constitutional violation, I consider whether we should permit that finding to be negated by Question 3.

> 28   This is not to say that in all circumstances one unreasonable action that occurs within a series of reasonable actions necessarily establishes a violation. For example, if the hypothetical officer discussed above, *supra* note 7, turned his radio back on before any relevant information was transmitted, the officer's misidentification later would not necessarily constitute a violation simply because of the officer's earlier unreasonable action of turning off his radio.

### B. Question 3

As I noted above, there is no dispute that Klem shot the wrong man. Therefore, Questions 1 and 2 did not ask whether Klem had made [*68] a mistake, since that was conceded; rather, they asked whether Klem's mistake was an objectively reasonable one, for *Fourth Amendment* purposes, in light of the factual circumstances at hand. That is, Questions 1 and 2 resolved step one of the *Saucier* test concerning whether a constitutional violation had occurred.

Since the jurors found a constitutional violation by answering "Yes" to Question 1, they next considered Question 3, which asked, "Was Trooper Ron Klem's mistake in firing his weapon objectively reasonable?" The majority acknowledges that "Question Three on the liability verdict sheet was evidently intended to reach the question of qualified immunity," i.e., *Saucier* step two, but nevertheless concludes that Question 3 "actually pertains to whether there was any constitutional violation at all." Maj. Slip Op. at 27. The majority's conclusion is unfounded because, as discussed above, the language and the structure of the verdict sheet make clear that Questions 1 and 2 already asked whether a constitutional violation had occurred. Under the majority's reading, Question 3 is essentially redundant. I believe the more logical reading is that Question 3 sought to resolve *Saucier* [*69] step two, i.e., the objective reasonableness of a mistake of law, whereas Questions 1 and 2 resolved *Saucier* step one, i.e., the objective reasonableness of a mistake of fact. [29]

> 29   That said, there is certainly some ambiguity in the verdict sheet, in large part because "objective reasonableness" is the standard by which a mistake of fact (or any decision based on real or perceived facts) and a mistake of law (or any decision based on a correct or incorrect understanding of the law) must be judged in the context of a *Fourth Amendment* case such as this one. See Maj. Slip Op. at 17-18 (noting that, in a *Fourth Amendment* case, *Saucier* steps one and two require an objective analysis of what is reasonable under the facts and the law, respectively). Courts create confusion by talking about "objective reasonableness" in the *Fourth Amendment* context without specific reference to either *Saucier* step one or two.

As alluded to by the majority, my conclusion is in line with the understanding of the parties and the District Court. In its post-trial opinion, the District Court made clear that Question 3 asked the ultimate question of qualified immunity. The District Court stated that "the litigants [*70] agreed to submit the ultimate question of qualified immunity to the jury," [30] despite the fact that "there is Third Circuit law on the books that indicates the trial judge, and not the jury, decides qualified immunity." *Curley*, 2006 U.S. Dist. LEXIS 8606, 2006 WL 414093, at *1. Therefore, "the jury would decide the issue of qualified immunity," 2006 U.S. Dist. LEXIS 8606, [WL] at *4, "and in answering [Question 3] as they did, unanimously, this jury decided the issue of qualified immunity in Trooper Klem's favor," 2006 U.S. Dist. LEXIS 8606, [WL] at *5. By interpreting Question 3 to apply to *Saucier* step one, rather than step two, the majority is rewriting history.

> 30   It should be noted, however, that Curley never agreed to submit the qualified immunity question to the jury. The record clearly reflects that Curley objected to the inclusion of Question 3 on the verdict sheet prior to its submission to the jury. Curley correctly noted that Question 3 asked about a purely "legal matter" that "should not be a jury question." App. at T1062.

Having concluded that Question 3 did, in fact, ask the ultimate question of qualified immunity, I consider whether it was permissible for the District Court to submit that question to the jury. I have no trouble concluding that it was not. [*71] Although the objective reasonableness of a mistake of *fact* is a question that the jury may answer, the jury may never consider the objective reasonableness of a mistake of *law*.[31] See *Carswell, 381 F.3d at 242* ("The court must make the ultimate determination on the availability of qualified immunity as a matter of law.") (citing *Curley I, 298 F.3d at 279* and *Sharrar v. Felsing, 128 F.3d 810, 828 (3d Cir. 1997)*). The majority agrees: "whether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury." Maj. Slip Op. at 25. This was the law at the time of trial, and this is the law today. Although the jury may "determine[] disputed historical facts material to the qualified immunity question," *Carswell, 381 F.3d at 242*, under no circumstances may the court delegate the ultimate question of qualified immunity to the jury, *id.*, as was done in this case. Rather, the court should have decided--based on the facts of the case, as clarified by the special interrogatories--whether immunity was warranted under the *Fourth Amendment* jurisprudence of the Supreme Court and this Court.

> 31    In this case, [*72] the mistake of fact was for Klem to think that Curley was the fleeing perpetrator. The mistake of law, if there was one, would have been for Klem to think that the *Fourth Amendment* jurisprudence of the Supreme Court and this Court permitted the use of deadly force in this situation, when it did not.

The majority suggests that our decision in *Curley I* left open the possibility of giving the ultimate question of qualified immunity to the jury. The majority points out that we stated in that case "that a jury can evaluate objective reasonableness when relevant factual issues are in dispute." Maj. Slip Op. at 25 (quoting *Curley I, 298 F.3d at 279*). I disagree with the majority's interpretation of *Curley I*. To the extent we were permitting juries to consider the question of "objective reasonableness," we were referring to the objective reasonableness of one's view of the facts (i.e., *Saucier* step one, which asks whether a violation occurred), as opposed to the objective reasonableness of one's view of the law (i.e., *Saucier* step two, which asks whether a right was clearly established under the case law). *See supra* note 9. Indeed, we made clear the respective roles of the judge and jury in [*73] cases such as this one: "A jury must resolve these [fact] issues before a court can determine whether it would have been clear to a reasonable officer that Klem's conduct was unlawful." *Curley I, 298 F.3d at 283*.

The majority also suggests that our decisions in *Sharrar and Karnes v. Skrutski, 62 F.3d 485 (3d Cir. 1995)*, both *Fourth Amendment* cases, demonstrate that "[w]e had previously permitted the jury to answer the key immunity question of whether the challenged behavior of a government official was objectively reasonable." Maj. Slip Op. at 22. Although *Sharrar* and *Karnes* are not controlling in light of our subsequent cases, such as *Carswell* and *Curley I*, it is important to note that the majority's suggestion concerning our supposedly "evolv[ing]" precedents, Maj. Slip Op. at 22, is not accurate and is the result of a misreading of *Sharrar* and *Karnes* that resembles the majority's misreading of *Curley I*. In each instance, the majority improperly assumes that a jury empowered to address the objective reasonableness of one's view of the facts may also address the objective reasonableness of one's view of the law. That is not the case and never has been. We have never said that the qualified [*74] immunity question concerning the objective reasonableness of an officer's view of the law may be submitted to the jury. "Objective reasonableness" can be a jury issue to the extent it applies to the question of whether, as a factual matter, a violation was committed. However, "objective reasonableness" is most definitely not a jury issue to the extent it applies to the question of whether, as a legal matter, a right was clearly established. Whether a right was clearly established is the "key immunity question"; we have never permitted a jury to answer that question. Indeed, we never would have said so because determining whether a right is clearly established--which requires a review of the applicable case law--is clearly outside the expertise of the jury. There is simply nothing in *Sharrar* or *Karnes* that permits submission of the ultimate question of qualified immunity, i.e., *Saucier* step two, to the jury.[32]

> 32    For example, in *Sharrar*, we held "that in deciding whether defendant officers are entitled to qualified immunity it is not only the evidence of 'clearly established law' that is for the court but also whether the actions of the officers were objectively reasonable. Only if the [*75] historical facts material to *the latter issue* are in dispute . . . will there be an issue for the jury." *128 F.3d at 828* (emphasis added). Therefore, we made clear that consideration of *Saucier* step two is exclusively reserved for the court. (Consequently, I believe the majority misstates the law by saying that, "in a line of cases beginning with *Doe v. Groody*, we began highlighting that 'qualified immunity is an objective question to be decided by the court as a matter of law.'" Maj. Slip Op. at 23 (citation omitted). This basic proposition cited by the majority was well-established before *Doe*;

it was previously set forth in *Bartholomew v. Pennsylvania*, 221 F.3d 425, 428 (3d Cir. 2000), where we actually cited *Sharrar*, 128 F.3d at 828 for support.) We went on to find no reversible error where the jury decided the objective reasonableness of what was essentially a mistake of fact, i.e., one officer's mistaken belief that an accompanying officer had obtained a warrant. *Id. at 830-31.* In *Karnes*, we made the unremarkable statement that, "[w]hile the qualified immunity defense is frequently determined by courts as a matter of law, a jury should decide disputed factual issues relevant to [*76] that determination." 62 F.3d at 491. We stopped short of saying that a jury may answer the ultimate question of qualified immunity, and we remanded for jury resolution of disputed issues of credibility related to qualified immunity, but not qualified immunity itself. *Id. at 499.*

As previously noted, *supra* note 9, any ambiguity in our precedents exists because "objective reasonableness" is the standard by which mistake of facts *and* mistakes of law are to be judged in the context of the *Fourth Amendment's* prohibition of unreasonable searches and seizures. Courts, including this one, create confusion by talking about "objective reasonableness" in the *Fourth Amendment* context without specific reference to either *Saucier* step one or two. The use of the term "objective reasonableness" without reference to factual or legal reasonableness is what has made this area of the law so confusing and it is why our precedents appear at times to say contradictory things with regard to the respective roles of judge and jury in determining objective reasonableness.

I will try to clarify matters. If there are no disputed material facts, the court must determine the objective reasonableness of a mistake [*77] of fact (here, whether it was objectively reasonable for Klem to mistake Curley for the perpetrator). However, if there are triable issues of material fact, the jury must determine the objective reasonableness of that mistake of fact. With regard to the objective reasonableness of a mistake of law (here, whether it was objectively reasonable for Klem to believe that the law permitted him to use of deadly force against Curley in the situation at hand), the court should *always* determine this issue, because doing so requires a review of case law, which is not a task appropriate for the jury. (Of course, this second *Saucier* step need not be reached if it is established that no constitutional violation occurred. At that point, there is no violation, so there is no need for immunity analysis.) If there are no disputed material facts, the court should make this determination as soon as possible. However, if factual disputes relevant to this legal analysis do exist, the court will have to postpone making this determination until the jury resolves all the relevant factual disputes, because determining what actually happened is a prerequisite to determining whether the law clearly established [*78] that a particular action was permitted or prohibited by the *Fourth Amendment* under those circumstances. *See Saucier*, 533 U.S. at 202 (noting that step two asks "whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*") (emphasis added). After the jury resolves these relevant fact disputes, presumably through the use of special interrogatories, *see Curley I*, 298 F.3d at 279 (suggesting this method), the court is then capable of deciding whether or not the law clearly permitted or prohibited the conduct constituting the constitutional violation.

The District Court committed reversible error by submitting the ultimate question of qualified immunity to the jury by way of Question 3. Having so concluded, I next address what the District Court should have done instead. In doing so, I address what I believe to be the proper methods for handling qualified immunity where material fact disputes preclude resolution of that issue prior to trial.

### C. Proper Methods

After answering one of the two alternate liability questions in favor of Curley, the jury should have been instructed to proceed to Question 4, concerning proximate causation. The jury [*79] would have had to find that Klem's shooting of Curley caused Curley's injuries, since the evidence overwhelmingly reflected that fact and the issue was essentially uncontested. Indeed, at the charging conference, counsel for Klem agreed to place the proximate causation question separately at the bottom of the verdict sheet, rather than alongside each liability question, because causation was "not really a contested issue in this case." App. at T1061-62. Next, the jurors should have been instructed to proceed to the separate damages verdict sheet, where they would have had to decide on dollar amounts that accurately reflected the economic and non-economic losses suffered by Curley as a result of Klem's violation.

After receiving the jury's verdict for Curley, the District Court should have considered whether qualified immunity, *Saucier* step two, nevertheless prevented judgment from being entered against Klem. That would have been appropriate if the *Fourth Amendment* jurisprudence of the Supreme Court and this Court did not clearly establish that Klem's conduct, in the circumstances at hand, was unlawful. In other words, if Klem's conduct could have been the result of an objectively reasonable [*80] but mistaken view of law, he should have been entitled to qualified immunity.

In making the ultimate qualified immunity determination for a *Fourth Amendment* case such as this one, the District Court should have reviewed the answers to the special interrogatories in order to determine what actually happened. Then the District Court should have applied these findings to its survey of the relevant case law in order to determine if it was clearly established that a police officer was permitted to use deadly force in circumstances similar to the instant case. Post-trial briefing likely would have been helpful to the District Court in this regard. If the District Court had concluded that Klem was entitled to qualified immunity, judgment should have been entered for Klem, notwithstanding the jury's verdict. If the District Court had made the opposite conclusion, judgment should have been entered for Curley. Either way, the District Court should have issued a written opinion explaining its reasoning with regard to qualified immunity.

### III. CONCLUSION

In my view, the District Court improperly delegated the ultimate question of qualified immunity to the jury. I would vacate the judgment for Klem [*81] and remand the case so that the District Court can decide the question of qualified immunity in the first place.[33]

   33   However, I would not remand to a different judge, as Curley requests, because there is little evidence, if any, of judicial bias. Curley attempts to show bias by pointing to several unremarkable rulings and remarks made by Judge Hayden during the official proceedings of this case. This Court has said, however, that such official judicial activity is almost never sufficient to warrant recusal under *28 U.S.C. § 455. See United States v. Bertoli, 40 F.3d 1384, 1412 (3d Cir. 1994)* (citing *Liteky v. United States, 510 U.S. 540, 554, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994))*. In addition, a new trial in not required, as Curley requests, for purported racial discrimination during juror selection. The District Court correctly concluded that Curley failed to make out a prima facie showing of racial discrimination during voir dire under *Batson v. Kentucky, 476 U.S. 79, 96, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)* and *United States v. Milan, 304 F.3d 273, 281 (3d Cir. 2002)*. In any case, Klem's race-neutral explanation for striking the juror at issue was adequate.

The District Court considered post-trial motions regarding various issues, including [*82] potential inconsistencies in the verdict, and in doing so conducted some analysis of the special interrogatory answers. However, the District Court has not considered qualified immunity anew based on the jury's answers to the special interrogatories and the relevant case law, which is what I believe the law in the Circuit requires. If the District Court were to conclude that Klem was not entitled to qualified immunity, a trial would have to be held on the damages issue, which never reached the jury. If, on the other hand, the court were to conclude that Klem was entitled to qualified immunity, then the court would have to set aside the liability verdict as it had before.[34]

   34   Although this Court might be able to conduct the immunity analysis for the first time on appeal based on a review of the law in light of the jury's special interrogatory answers, the District Court is in a better position to do so. For example, the District Court, having sat through the trial and being very familiar with the facts, is in a better position to determine the meaning of answers to some of the more ambiguous special interrogatory questions (such as Interrogatory 7, *see supra* note 2), and to consider [*83] how they apply to the *Saucier* step two analysis. That said, it would be surprising if the District Court were to grant qualified immunity in this situation given Klem's admission in his appellate brief that the issue in this case "is not whether there was a misunderstanding of the law." Klem Br. at 25; *see also* Klem Br. at 2 ("This case, involving a 'friendly fire' shooting as a result of mistaken identity, is one of the class of *Fourth Amendment* and qualified immunity cases where the *decisive issue* is whether a police officer has made a reasonable *mistake of fact* in carrying out his duties.") (emphasis added).

Although the outcome reached by the majority brings closure to nine years of litigation in this difficult case, I do not believe that this outcome is the correct one. In my view, the majority's decision is not faithful to its own opinion, *Curley I*, or our other precedents, and thus should be modified as I have proposed.