UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATE EMPLOYEES BARGAINING AGENT COALITION, ET AL, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| V. | : | CIV. NO. 3:03CV221 (AVC) |
| | : | |
| JOHN G. ROWLAND, ET AL, | : | |
| | : | |
| Defendants. | : | MAY 19, 2008 |

## REQUESTS FOR ADMISSION

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, plaintiffs request that defendants admit or deny the truth of the following matters within thirty days.

## DEFINITIONS

1. As used in these Requests, "termination" or "terminated" means any cessation of state employment, whether by way of lay off, separation, or bumping, and whether or not such cessation of employment was "for cause," and specifically includes any cessation of employment that defendants contend was a lay off for economic necessity.

2. As used in these Requests, the term "defendants" refers to the defendant Governor of the State of Connecticut and the defendant Secretary of the Office of Policy and Management of the State of Connecticut, acting in their official capacities.

## REQUESTS

### A

1. It is defendants' position in this lawsuit that the job terminations at issue in this lawsuit were layoffs necessitated by the State of Connecticut's Fiscal Year ("FY") 2003 budget deficit.

2. The permanent state employees whose job terminations are at issue in this lawsuit received written notices from the State notifying them that they were being laid off due to economic necessity caused by the State of Connecticut's FY 2003 budget deficit.

3. It is defendants' position in this lawsuit that where there is an economic necessity for lay-offs in the State of Connecticut's work force, defendants may, consistent with the First and Fourteenth Amendments to the United States Constitution, select which employees to lay off based on whether the employees are or are not members of state employee unions.

4. It is defendants' position in this lawsuit that where there is an economic necessity for lay-offs in the State of Connecticut's work force and where the state employee unions have failed to agree

to collective bargaining agreement concessions sought by defendants as a means to avoid such lay

offs, defendants may, consistent with the First, Fifth and Fourteenth Amendments to the United States

Constitution, lay off only members of state employee unions.

5.  It is defendants' position in this lawsuit that because there was an economic necessity in

November-December 2002 for layoffs in the State of Connecticut's work force due to the State of

Connecticut's FY 2003 budget deficit, it was constitutionally permissible for defendants to choose

which employees to lay off based on whether the employees were or were not members of state

employee unions.

6.  It is defendants' position in this lawsuit that because there was an economic necessity in

November-December 2002 for layoffs due to the State of Connecticut's FY 2003 budget deficit and

because the state employee unions did not agree to collective bargaining agreement concessions

sought by defendants as a way to avoid such lay offs, it was constitutionally permissible for

defendants to choose which employees to lay off based on whether the employees were or were not

members of state employee unions.

7. It is defendants' position in this lawsuit that should there be an economic necessity for layoffs in the State of Connecticut's work force in the future, defendants may, consistent with the First and Fourteenth Amendments to the United States Constitution, select which employees to lay off based on whether the employees are or are not members of state employee unions.

8. It is defendants' position in this lawsuit that should there be an economic necessity for layoffs in the State of Connecticut's work force in the future, and should the state employee unions decline to agree to collective bargaining agreement concessions sought by defendants as a way to avoid such lay offs, defendants may, consistent with the First, Fifth and Fourteenth Amendments to the United States Constitution, select which employees to lay off based on whether the employees are or are not members of state employee unions.

9. It is defendants' position in this lawsuit that where there is an economic need for lay-offs in the State of Connecticut's work force, defendants may, consistent with the First and Fourteenth Amendments to the United States Constitution, choose which non-policy-making employees to lay-off based on whether the employees did or did not support the sitting Governor's bid for re-election.

4

10. It is defendants' position in this lawsuit that should there be an economic necessity for layoffs in the State of Connecticut's work force in the future. it will be constitutionally permissible for defendants to choose which employees to lay-off based on whether the employees did or did not support the sitting Governor's bid for re-election.

**B**

11. In November 2002, John G. Rowland, then Connecticut's Governor, and Marc S. Ryan, then Secretary of Connecticut's Office of Policy and Management ("OPM"), met with leaders of the plaintiff unions and advised the plaintiff union leaders that unless the unions agreed to modify their collective bargaining agreements to grant the State hundreds of millions of dollars in future annual concessions, defendants would terminate, through purported lay offs, the employment of approximately 3,000 unionized state employees.

12. In response to defendants' requests, the plaintiff unions offered financial concessions that would have provided tens of millions of dollars of savings to the State of Connecticut in FY 2003.

5

13. The financial concessions offered by the plaintiff unions for FY 2003 exceeded by tens of millions of dollars any FY 2003 budget savings realized by the State from the job terminations at issue in this lawsuit.

14. When the plaintiff unions declined to agree to all of the concessions demanded by defendants, defendants directed that the employment of approximately 2,800 unionized state employees be terminated, through purported lay offs based on claimed economic necessity due to the State of Connecticut's FY 03 budget deficit.

15. The terminations ordered by defendants in late November or early December 2002 were limited to unionized state employees.

16. As reported in *The New York Times* on August 8, 2003, Secretary Ryan publicly stated on August 7, 2003 that defendants "did target union workers, because we got no concessions."

17. Secretary Ryan's statement on August 7, 2003 that defendants "did target union workers, because we got no concessions" was truthful.

6

18. In late November or early December 2002, OPM – acting pursuant to defendants' directions – instructed the State of Connecticut's agency heads to reduce agency staffing based upon specified reductions of the numbers of employees in each collective bargaining unit in each agency.

19. OPM's written instructions in late November or early December 2002 to State of Connecticut agency heads to reduce agency staffing were limited to reductions of employees in collective bargaining units.

20. The instructions provided by OPM to State of Connecticut agency heads were not based on any evaluations by OPM of the staffing needs of each agency with respect to whether union or non-union employees in the agency were needed for the performance of the agency's functions or the savings that could be realized by reducing non-union employee staffing.

21. Defendants did not determine which and how many job reductions to order in late November or early December 2002 based on any calculation of which and how many job reductions were necessary to achieve the savings in FY 2003 sought by defendants in their demand to the plaintiff unions for collective bargaining agreement concessions.

7

22.  There was no relationship between the savings in FY 2003 from the unionized work force reductions ordered by defendants in late November or early  December 2002 and the amount of the concessions demanded by defendants for FY 2003.

23.  OPM instructed the agency heads that with respect to employees in their worker test period or working in training classes, all of those working test period employees and trainees with a bargaining unit title as their target class were to be separated from state service, but no such instructions were given with respect to such employees who did not have a bargaining unit title as their target class.

24.  Included in the terminations ordered by defendants in late November or early December 2002 were employees who, by contract, could not be laid off before June 30, 2003.

25.  Included in the terminations ordered by defendants in late November or early December 2002 were employees whose positions were funded by private industry.

8

26. Included in the terminations ordered by defendants in late November or early December 2002 were employees who were entitled to receive payment for accrued unused sick days and vacation pay that required the State of Connecticut to continue paying the employees their salary beyond June 30, 2003.

27. On at least three occasions, at arbitration hearings to consider grievances by employees who contended that there was no economic necessity to warrant their lay offs, it was determined by the arbitrators, after hearing, that the lay off was improper in that the State of Connecticut had failed to establish any economic necessity for the lay-off.

28. Included in the terminations ordered by defendants in late November or early December 2002 were lieutenants in the State of Connecticut Department of Corrections ("DOC") who had recently voted to unionize and to recognize plaintiff CSEA as their union representative.

29. During the negotiations for the DOC lieutenants' first contract with the State, the DOC lieutenants were advised by the State negotiators that they would not have been subjected to reductions if they had not voted to join the union.

30. Governor Rowland advised the state unions and their members in December 2002 that the layoffs of union employees would be rescinded if the unions agreed to the collective bargaining agreement concessions sought by defendants.

31. The collecting bargaining agreements as to which defendants sought concessions from the plaintiff unions in November 2002 had been approved by the Connecticut General Assembly pursuant to Conn. Gen. Stats. § 5-278(b).

32. The plaintiffs unions had a statutory right under Connecticut law to decline to agree to the collective bargaining agreement concessions sought by defendants.

33. The layoffs ordered by OPM in late November or early December 2002 were limited to state employees who were members of unions that did not support Governor Rowland's 2002 bid for re-election.

## C

34. The law has been clearly established in the District of Connecticut since at least August 2, 1996 decision that the First and Fourteenth Amendments to the United States Constitution  protect the rights of employees to associate and participate in union activities.


35. The law has been clearly established in the District of Connecticut since at least August 2, 1996 decision that a state employer may not, consistent with the First and Fourteenth Amendments to the United States Constitution, retaliate against an individual, such as by terminating his or her employment, because of his or her union activities.


36. The law has been clearly established in the District of Connecticut since at least August 2, 1996 decision that discrimination against public employees because of their union membership violates the First and Fourteenth Amendments to the United States Constitution and is actionable under 42 U.S.C. §1983.

11

37. The law has been clearly established in the District of Connecticut since at least August 2, 1996 decision that termination of a public employee because of his or her union activities would violate the individual's rights pursuant to the First and Fourteenth Amendments to the United States Constitution.

38. The law has been clearly established in the District of Connecticut since at least 1980 that a state may not, consistent with the First and Fourteenth Amendments to the United States Constitution, discharge non-policy making public employees based on their political views or support for particular political candidates.

39. The law has been clearly established in the District of Connecticut since at least 1994 that First and Fourteenth Amendment rights are violated when a person holding a non-policymaking position is dismissed from public employment for political reasons.

**D**

40. Connecticut's General Assembly has enacted mandatory procedures that the Connecticut Governor and other members of Connecticut's Executive Branch must follow if the Governor seeks to modify allotment requisitions or allotments in force due to a projected deficit in a budget adopted by the General Assembly for a fiscal year in progress.

41. The Connecticut Governor is required to submit a report to the General Assembly, in accordance with the provisions of Conn. Gen. Stats. § 11-4a, on or before the thirtieth day of October, January and April of each fiscal year concerning whether or not a deficit is projected for the fiscal year in progress.

42. Where the Connecticut Governor seeks to modify budgeted allotment requisitions or allotments in force due to a change in circumstances since the budget for a fiscal year was adopted, the Governor is required, by statute, to file a report with the General Assembly's joint standing committee having cognizance of matters relating to appropriations and the budgets of state agencies and the joint standing committee having cognizance of matters relating to state finance, revenue and bonding describing the change in circumstances which makes it necessary that certain reductions

13

should be made in allotment requisitions or allotments in force or the basis for his determination that estimated budget resources will be insufficient to finance all appropriations in full.

43. When the Connecticut Comptroller issues a cumulative monthly statement that includes a projected General Fund deficit greater than one per cent of the total of General Fund appropriations, the Connecticut Governor is required to file a report describing the circumstances of the budget deficit with the General Assembly's joint standing committee having cognizance of matters relating to appropriations and the budgets of state agencies and the joint standing committee having cognizance of matters relating to state finance, revenue and bonding that includes a plan that he would implement to modify budgeted allotment requisitions or allotments in force to the extent necessary to prevent the deficit reported to him by the Comptroller.

44. When the Governor's plan to modify budgeted allotment requisitions or allotments in force in order to prevent a deficit reported to him by the Comptroller in excess of one per cent of the total of General Fund appropriations indicates a reduction of more than three per cent of the total appropriation from any fund or more than five per cent of any appropriation to prevent a deficit, the reduction must be approved by Finance Advisory Committee.

14

45. When the Governor's plan to modify budgeted allotment requisitions or allotments in force in order to prevent a deficit reported to him by the Comptroller in excess of one per cent of the total of General Fund appropriations would result in a reduction of more than five per cent of total appropriations, the reduction must be approved by the General Assembly.

46. When the Connecticut Governor modifies budgeted allotment requisitions or allotments in force because of a change in circumstances or to prevent a deficit, the State of Connecticut Secretary of the OPM is required to submit copies of any modifications to allotment requisitions or allotments in force ordered by the Governor, with the reasons for any modifications, to the administrative heads of the budgeted agencies concerned, to the Comptroller and to the joint standing committee of the General Assembly having cognizance of appropriations and matters relating to the budgets of state agencies, through the Office of Fiscal Analysis.

47. When the Connecticut Governor modifies budgeted allotment requisitions or allotments in force because of a change in circumstances or to prevent a deficit, the State of Connecticut Comptroller is required to set up any modified allotment requisitions or allotments in force on the Comptroller's books.

15

48.  Governor Rowland did not submit a report to the General Assembly, in accordance with the provisions of Conn. Gen. Stats. § 11-4a, on or before October 30, 2002 concerning whether or not a deficit was projected for FY 2003.

49.  Before ordering the job terminations at issue in this action, Governor Rowland did not file a report with the General Assembly's joint standing committee having cognizance of matters relating to appropriations and the budgets of state agencies and the joint standing committee having cognizance of matters relating to state finance, revenue and bonding describing the change in circumstances which makes it necessary that certain reductions should be made in allotment requisitions or allotments in force or the basis for his determination that estimated budget resources will be insufficient to finance all appropriations in full.

50.  By letter dated September 3, 2002, the Comptroller of the State of Connecticut reported to Governor Rowland that the projected General Fund deficit for  FY 2003 exceeded one percent of the fund's appropriations.

51. Governor Rowland did not, within thirty days of the issuance of the Comptroller's September 3, 2002 letter, file a report with the General Assembly's joint standing committee having cognizance of matters relating to appropriations and the budgets of state agencies and the joint standing committee having cognizance of matters relating to state finance, revenue and bonding that described the circumstances of the deficit or included a plan that he would implement to modify budgeted allotment requisitions or allotments in force to the extent necessary to prevent the deficit reported by the Comptroller on September 3, 2002.

52. Governor Rowland did not request the General Assembly Finance Advisory Committee to approve the job terminations at issue in this lawsuit.

53. The General Assembly Finance Advisory Committee did not approve the job terminations at issue in this lawsuit.

54. The General Assembly did not approve the job terminations at issue in this lawsuit.

55.  Secretary of OPM Ryan did not submit copies of any modified allotment requisitions or allotments in force pertaining to the job terminations at issue in this lawsuit, with the reasons for the modifications, to the administrative heads of the budgeted agencies concerned, to the Comptroller and to the joint standing committee of the General Assembly having cognizance of appropriations and matters relating to the budgets of state agencies, through the Office of Fiscal Analysis.

56.  The Comptroller did not set up any modified allotment requisitions or allotments in force pertaining to the job terminations at issue in this lawsuit on the Comptroller's books for FY 2003.

57.  Governor Rowland's December 6, 2002 "Balanced Budget Plan" was a proposal calling for action by the General Assembly to balance Connecticut's FY 2003 budget.

58.  Governor Rowland's December 6, 2002 "Balanced Budget Plan" included proposed deficit-reduction measures – such as proposed new taxes – that he did not have the authority to implement absent authorization by the General Assembly.

59.  Governor Rowland's December 6, 2002 "Balanced Budget Plan" was not filed with the General Assembly's joint standing committee having cognizance of matters relating to appropriations and the budgets of state agencies and the joint standing committee having cognizance of matters relating to state finance, revenue and bonding.


60.  Governor Rowland's December 6, 2002 "Balanced Budget Plan" did not describe "the change in circumstances which makes it necessary that certain reductions should be made in allotment requisitions or allotments in force or the basis for his determination that estimated budget resources will be insufficient to finance all appropriations in full."


61.  Defendants issued a press release announcing the reductions in each agaency's unionized work force prior to Governor Rowland's speech announcing his Balanced Budget Plan.


62.  Governor Rowland's December 6, 2002 "Balanced Budget Plan" was submitted to the General Assembly after the job terminations at issue in this lawsuit had been ordered.


19

63. Governor Rowland's December 6, 2002 "Balanced Budget Plan" did not include, as one aspect of a plan to prevent the FY 2003 budget deficit, the job terminations at issue in this lawsuit.

64. Governor Rowland's December 6, 2002 "Balanced Budget Plan" did not mention the job terminations at issue in this lawsuit as a deficit-mitigating measure.

65. Governor Rowland's December 6, 2002 "Balanced Budget Plan" was not adopted by the General Assembly.

66. Governor Rowland never invoked his authority pursuant to Conn. Gen. Stats. § 4-85(b) as the basis for the job terminations at issue in this lawsuit.

67. In November 2002, Secretary Ryan advised a number of Executive Branch agencies of the Governor's invocation of Conn. Gen. Stats. §4-85(b) with respect to modifications to allocation in force or allocation requisitions in the FY 2003 budget because of the budget deficit, but did not include the job terminations at issue in this lawsuit in the specified modifications.

68. Defendants did not comply with any of the mandatory procedural requirements of Conn. Gen. Stats. § 4-85(b) with respect to the job terminations at issue in this lawsuit.

69. Connecticut Public Act 03-2 did not alter the funding to state agencies for labor previously adopted in the FY 03 budget.

70. Connecticut Public Act 03-2 did not eliminate the positions in the State of Connecticut's work force held by state employees whose terminations are at issue in this lawsuit.

71. In budgets adopted by the Connecticut General Assembly for fiscal years subsequent to FY 2003, the General Assembly approved funding for employees working in the state agencies, but – with limited programmatic exceptions not applicable to the job terminations at issue in this lawsuit – did not designate specific positions in the agencies that were to be filled or eliminated.

72. With limited programmatic exceptions not applicable to the job terminations at issue in this lawsuit, with respect to monies budgeted for labor by the Connecticut General Assembly,

Connecticut's Executive Branch determines how the total amount of funding budgeted for labor in the various state agencies by the General Assembly is to be spent and determines which positions in each agency to create and fill.


73.  With limited programmatic exceptions not applicable to the job terminations at issue in this lawsuit, with respect to monies budgeted for labor by the Connecticut General Assembly in fiscal years subsequent to FY 2003, Connecticut's Executive Branch has determined which positions in each agency to create and fill.


BY_____

DAVID S. GOLUB  ct 00145
JONATHAN M. LEVINE ct 07584
SILVER GOLUB & TEITELL LLP
184 ATLANTIC STREET
P.O. BOX 389
STAMFORD, CONNECTICUT  06904
TEL.  (203) 325-4491
FAC.  (203) 325-3759
dgolub@sgtlaw.com
jlevine@sgtlaw.com