3cv 221 Roland

**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

FILED

STATE EMPLOYEES BARGAINING     :
AGENT COALITION, et al.,       :
  plaintiffs,                  :
                              :
v.                             :     CIVIL NO: 3:03CV221(AVC)
                              :
JOHN G. ROWLAND, et al.,       :
  defendants.                  :

2011 JUL -1  A 10: 45

US DISTRICT COURT
HARTFORD CT

## **RULING ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT**

    This is an action seeking a declaratory judgment and

injunctive relief in connection with a labor dispute.[1]  The

complaint alleges violation of the plaintiffs' rights as

guaranteed under the First and Fourteenth Amendments to the U.S.

Constitution and Article I section 10 of the U.S. Constitution.

The action is brought pursuant to 42 U.S.C. § 1983.

    The plaintiffs have filed the within motion for summary

judgment, arguing that based on the parties' joint stipulated

facts, there is no dispute that their constitutional rights were

violated, and therefore, that they are entitled to judgment as a

matter of law.[2]

---

[1] In their cross motions for summary judgment, the parties request declaratory
judgment only.  The plaintiffs state that they "have agreed that the issue of
remedy will be considered in subsequent proceedings . . ."

[2] The amended complaint, dated May 27, 2003, alleges ten causes of action.
The court previously dismissed counts one through four, and the plaintiffs
withdrew claims six and eight.  The plaintiffs "are not pursuing the
substantive due process claims."  Therefore, the only remaining claims for

The defendants have also filed a motion for summary

judgment. They argue that the plaintiffs' constitutional claims

are without merit, and that they are, therefore, entitled to

judgment as a matter of law.

The issue is whether the defendants violated the

plaintiffs' rights as guaranteed under the U.S. Constitution.

For the reasons that follow, the plaintiffs' motion for summary

judgment is denied, and the defendants' motion for summary

judgment is granted.

### FACTS

The parties have submitted a joint local rule 56(a)1 & 2

statement of facts and stipulate that the facts contained

therein govern the within cross-motions for summary judgment.

By way of background, the plaintiff, State Employees Bargaining

Agent Coalition ("SEBAC"), is a coalition of 13 state employee

unions that represents about 40,000 Connecticut state employees.

The plaintiffs include SEBAC and twelve of its thirteen

constituent unions. Prior to November and December 2002, SEBAC

and each of the twelve unions entered into multi-year collective

bargaining agreements with the State of Connecticut that covered

health care, pension benefits, and other terms and conditions of

---

relief are those numbered five and seven, alleging violation of the First
Amendment right to freedom of association, and the Equal Protection Clause
and Contract Clause components of claims nine and ten.

2

employment.  The Connecticut legislature approved the

agreements.  These agreements served as the operative collective

bargaining agreements between the unions and the state during

the time period at issue.

The five individual plaintiffs include: Denise Bouffard, a

former support enforcement officer with the Connecticut Judicial

Branch; Marcelle Groves, a former management analyst for the

Connecticut Department of Environmental Protection; Geneva

Hedgecock, a former secretary with the Connecticut Department of

Social Services; Dennis Heffernan, a former store keeper for the

Connecticut Department of Administrative Services; and William

Hill, a former drug and alcohol rehabilitation counselor for the

Connecticut Department of Mental Health and Addiction Services.

The individual plaintiffs received lay-off notices in either

December 2002 or January 2003.  All notices were effective

immediately except for Hill, whose lay-off became effective in

the summer of 2003.  At the time of the notices, each plaintiff

belonged to a constituent union of SEBAC.  Their union

memberships continue through the present.[3]

---

[3] In paragraph 23 of their stipulated facts, the parties state that the
"[p]laintiffs further bring this action on behalf of the [c]lass established
by this [c]ourt's March 9, 2010 [r]uling certifying this action as a class
action."  In its March 9, 2010 ruling, this court recognized that the
defendants' stipulation met all the requirements under Federal Rule of Civil
Procedure 23 and concluded that "because the plaintiffs at this time are
seeking only injunctive and declaratory relief, certification as a Rule
23(b)(2) class is warranted."  Although a First Amendment retaliation claim

The defendants, John Rowland and Marc Ryan, are sued in their official capacities only. From November 2002 through July 1, 2004, Rowland served as Governor of the State of Connecticut. From November 2002 through the end of December 2004, Ryan served as Secretary of the Office of Policy and Management of the State of Connecticut.[4]

The following is a verbatim account as contained in the parties' joint stipulation of facts:

"In November 2002, shortly after Rowland was re-elected as Governor, he determined to seek long-term changes to the plaintiff unions' collective bargaining agreements. . . . Rowland (and at Rowland's direction, Ryan) sought hundreds of millions of dollars (initially, approximately $450 million) in long-term (i.e., extending for the life of the agreements) concessions to the vested contract benefits covered by the unions' legislatively-approved collective bargaining agreements with the state, including changes applicable in years subsequent

---

can be appropriate in a class action context, see Elrod v. Burns, 427 U.S. 347 (1976), here, the court only certified the class on the basis of the requested injunctive and declaratory relief. Therefore, with respect to the plaintiffs' within motion for summary judgment, in which the parties state that "remedy will be considered in subsequent proceedings," the class is not a proper plaintiff.

[4] Subsequent to Rowland, M. Jodi Rell served as Governor of the State of Connecticut. During Rell's tenure, Brenda L. Sicsio and Robert Genuario each served as Secretary of the Office of Policy and Management. Elected in 2010, Dannel P. Malloy is the current Governor of the State of Connecticut. Ben Barnes is the current Secretary of the Office of Policy and Management.

to Fiscal Year ("FY") 2003 to the health care and pension benefits provided for and vested by the SEBAC agreement."

"At all times relevant to this lawsuit, the State of Connecticut's work force has consisted of unionized and non-unionized employees. State employees are not required to belong to a union. Non-unionized employees occupy non-management and management, as well as temporary positions, and hold the same non-management positions as unionized employees. In November 2002, there were approximately 50,000 employees in the State's work force. Approximately 37,500 (75%) of these employees were members of state unions, and approximately 12,500 (25%) were non-unionized."

"In November 2002, Rowland and Ryan met with leaders of SEBAC and the other plaintiff unions and advised the union leaders that unless the unions agreed to modify their collective bargaining agreements to grant the State hundreds of millions of dollars in future annual concessions, they would terminate, through purposed [sic] layoffs, the employment of approximately 3,000 unionized state employees. The collective bargaining agreements as to which Rowland (and, at Rowland's direction, Ryan) sought concessions from SEBAC and the other plaintiff Unions in November 2002 had been approved by the Connecticut General Assembly pursuant to Conn Gen Stats 5-278(b). The

plaintiff unions had a statutory right, pursuant to Conn. Gen. Stat. 5-2727(c) to decline to agree to the collective bargaining agreement concessions sought by Rowland and Ryan."

"Although the state work force has both union and non-union members, and although all state employees receive the same health care and pension benefits, Rowland (and, at Rowland's direction, Ryan) intentionally directed their demands for health care and pension concessions (and their corresponding threats of termination if the concessions were not granted) solely to state union employees."

"In response to Rowland's and Ryan's demands, SEBAC and the other plaintiff [u]nions offered financial concessions that would have provided tens of millions of dollars of savings to the State of Connecticut in FY 2003.  When SEBAC and the plaintiff unions declined to agree to all of the concessions demanded by Rowland, Rowland ordered Ryan to cause the employment of approximately 2,800 unionized state employees to be terminated, and Ryan caused [the Office and Policy Management] to implement Rowland's instructions as directed. . .
. Rowland ordered the elimination of union positions and the termination of union employees to try to compel the plaintiffs to agree to the demanded concessions.  The decision to order reductions in each bargaining unit was based on Rowland's

6

determination of what it would take to compel the plaintiff Unions to agree to the demanded concessions.  Rowland advised the plaintiff Unions and their members in December 2002 that the terminations of union employees would be rescinded if the plaintiff Unions agreed to the long-term collective bargaining agreement concessions he sought."

"Rowland directed Ryan to target union workers (i.e., to order the elimination of union positions and termination of union employees) because the plaintiff unions did not agree to the long-term concessions in their vested collective bargaining agreements that Rowland had demanded.  Ryan complied with Rowland's instruction."

"On August 7, 2003, Secretary Ryan publicly stated, truthfully, that defendants 'did target union workers, because we got no concessions.'"   The terminations ordered by Rowland and effectuated by Ryan [and the Office of Policy and Management] in December 2002 were limited to unionized state employees.   In December 2002, Rowland instructed Ryan to cause [the Office of Policy and Management] to instruct the State's agency heads to reduce agency staffing based upon specified reductions of the numbers of employees in each bargaining unit of unions that refused to grant concessions. . . ."

7

"The instructions provided by [the Office of Policy and Management] to State of Connecticut agency heads were not based on any evaluations by [the Office of Policy and Management] of the staffing needs of each agency with respect to whether union or non-union employees in the agency were needed for the performance of the agency's functions or the savings that could be realized by reducing non-union employee staffing."

"Rowland and Ryan did not determine which and how many job reductions to order in December 2002 based on any calculation of which and how many job reductions were necessary to achieve the savings in FY 2003 sought by Roland and Ryan in their demand to the plaintiff Unions for collective bargaining agreement concessions."

"The savings realized in FY 2003 from the unionized work force reductions Governor Rowland ordered in early December 2002 did not correlate to the amount of the concessions he demanded for FY 2003, and governor Rowland understood that no such correlation existed when they caused the reductions to be ordered."

"[The Office of Policy and Management] instructed the agency heads that with respect to employees in their worker test period or working in training classes, all of those working test period employees and trainees with a bargaining unit title as

8

their target class were to be separated from state service, but no such instructions were given with respect to such employees who did not have a bargaining unit title as their target class. The employment of the [i]ndividual [p]laintiffs (other than Hill) was terminated in January 2003 pursuant to [the Office of Policy and Management's] implementation of Ryan's instructions as ordered by Rowland. Many of the terminations ordered by Governor Rowland had no effect on the State's FY 03 budget deficit. . . ."

"The reductions ordered by Governor Rowland had minimal effect on the State's FY 03 expenses and were ordered as a means of trying to compel the plaintiff unions to agree to the concessions demanded by Governor Rowland. The financial concessions offered by SEBAC and the plaintiff Unions for FY 2003 exceeded by millions of dollars any FY 2003 budget savings realized by the State from the job terminations at issue in this lawsuit. The permanent state employees whose job terminations are at issue in this lawsuit received written notices from the State notifying them that they were being laid off due to economic necessity caused by the State of Connecticut's FY 2003 budget deficit."

"On at least three occasions, at arbitration hearings to consider grievances by employees who contended that there was no

9

economic necessity to warrant their layoffs, it was determined

by the arbitrators, after hearing, that that the layoffs were

improper in that the State of Connecticut had failed to

establish any economic necessity for the layoffs.  On December

6, 2002, Governor Rowland announced a "Balanced Budget Plan," a

proposal setting forth actions to eliminate Connecticut's FY

2003 budget deficit.  The job terminations at issue in this

lawsuit were not included in Governor Rowland's Balanced Budget

Plan as one of the actions to eliminate Connecticut's FY 2003

budget deficit.  Rowland and Ryan were acting under color of

state law when they engaged in the conduct described above."

## STANDARD

A motion for summary judgment may be granted "if the movant

shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  Summary judgment is appropriate if,

after discovery, the nonmoving party "has failed to make a

sufficient showing on an essential element of [its] case with

respect to which [it] has the burden of proof."  Celotex Corp.

v. Catrett, 477 U.S. 317, 323 (1986).  "The burden is on the

moving party 'to demonstrate the absence of any material factual

issue genuinely in dispute.'"  Am. Int'l Group, Inc. v. London

Am. Int'l Corp., 644 F.2d 348, 351 (2d Cir. 1981) (quoting

10

Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d
Cir. 1975)).

A dispute concerning a material fact is genuine "'if
evidence is such that a reasonable jury could return a verdict
for the nonmoving party.'" Aldrich v. Randolph Cent. Sch.
Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must
view all inferences and ambiguities in a light most favorable to
the nonmoving party. See Bryant v. Maffucci, 923 F. 2d 979, 982
(2d Cir. 1991). "Only when reasonable minds could not differ as
to the import of the evidence is summary judgment proper." Id.

## DISCUSSION

## I.    First Amendment Claim

The plaintiffs first argue that the defendants retaliated
against them "for asserting their union rights in an effort to
compel relinquishment of union rights," and that such conduct
violated the plaintiffs' First Amendment rights to freedom of
association. Specifically, they argue that their "insistence on
preserving their collective bargaining rights is plainly a
matter of public concern." The plaintiffs argue that the
defendants made "layoff determinations based solely on the
employees' union membership" in violation of the First

11

Amendment, and that their "association status as union members .
. . is clearly a matter of public concern."

The defendants respond that "the First Amendment does not
protect the self-interested economic activities of a union in
the context of a labor dispute." Specifically, the defendants
argue that "in a vernacular sense" collective bargaining
negotiations may be matters of public concern, "[b]ut in a *legal*
sense, it is demonstrably false." The defendants further
contend that "matters [considered] 'quintessentially employment
matters' are not matters of public concern and do not enjoy
constitutional protection." In addition, the defendants state
that "[t]he only motive to which [they] have stipulated is that
Governor Rowland ordered layoffs because the unions refused to
accede to his demands for concessions."[5]

---

[5] The defendants also argue that by entering into collective bargaining
agreements, the plaintiffs waived their First Amendment rights.
Specifically, they argue that the "Management Rights" provision of the
plaintiffs' collective bargaining agreements give the State "*unfettered*
discretion to reduce the size of its work force through layoffs." The
plaintiffs respond that there is nothing in the collective bargaining
agreements "that can be meaningfully construed as an intentional and knowing
relinquishment of union employees' First Amendment rights."

The law does not presume the waiver of constitutional rights. See D.H.
Overmyer v. Frick Co., 405 U.S. 174, 185 (1972). The Supreme Court has
stated that "a waiver of constitutional rights in any context must, at the
very least, be clear." Fuentes v. Shevin, 407 U.S. 67, 95 (1972); see also
Wright v. Universal Maritime Service Corp., 525 U.S. 70, 80 (1998). The
waiver must be made knowingly, voluntarily, and intelligently. D.H. Overmyer
Co., 405 U.S. at 185, 187. The defendants do not cite to a specific
provision in the agreement that expressly provides a waiver and, therefore,
the court concludes that the plaintiffs have not waived their First Amendment

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of *speech* . . . or the right of the people peaceably to *assemble*."[6] U.S. Const. amend. I. (emphasis added). "Although freedom of expressive 'association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition.'" Piscottano v. Murphy, 511 F.3d 247, 268 (2d Cir. 2007) (quoting Healy v. James, 408 U.S. 169, 181 (1972)). The First Amendment "thus prohibits a state, as sovereign, from abridging an individual's 'right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends. Boy Scouts of America v. Dale, 530 U.S. 640, 647 (2000) (quoting Roberts v. United States Jaycees 468 U.S. 609, 622 (1984)).

Courts have repeatedly recognized that "'public employees do not surrender all their First Amendment rights by reason of their employment.'" Maglietti v. Nicholson, 517 F. Supp. 2d 624, 633 (D. Conn. Sept. 29, 2007) (quoting Garcetti v.

---

rights. See Ciambriello v. County of Nassau, 292 F.3d 307, 322 (2d Cir. 2002).

[6] The First Amendment has been applied against state action by the Fourteenth Amendment. See Gitlow v. New York, 268 U.S. 652, 666 (1925); see also Pickering v. Bd. of Educ., 391 U.S. 563 (1968); Garcetti v. Ceballos, 547 U.S. 410, 418 (2006).

Ceballos, 547 U.S. 410 (2006)). In Pickering v. Bd. Of Educ.,

the Supreme Court recognized that,

> [t]he problem in any case is to arrive at a balance between
> the interests of the [employee], as a citizen, in
> commenting upon matters of public concern and the interest
> of the State, as an employer, in promoting the efficiency
> of the public services it performs through it employees.

Pickering v. Bd. Of Educ., 391 U.S. 563, 568 (1968)). "The

Pickering test thus poses two questions . . . : (1) whether the

employee's speech as a citizen was on a matter of public

concern, and if so, (2) whether the employer has shown that the

employee's interest in expressing himself on that matter is

outweighed by injury that the speech could cause to the

employer's operations." Piscottano, 511 F.3d at 268 (citing

Garcetti, 511 U.S. at 668). In analyzing the public concern

requirement, the court must ask "whether the public employee

spoke 'as a citizen upon matters of public concern' or 'as an

employee upon matters of personal interest.'" Maglietti, 517 F.

Supp. 2d at 633-34 (quoting Connick v. Myers, 461 U.S. 138, 147

(1983)).[7]

"The issue whether the subject of an employee's speech or

expressive conduct is a matter of public concern is a threshold

---

[7] In Connick, the Court further stated that "[w]hen employee expression can-
not be fairly considered as relating to any matter of political, social, or
other concern to the community, government officials should enjoy wide
latitude in managing their offices, without intrusive oversight by the
judiciary in the name of the First Amendment." Connick v. Myers, 461 U.S.
138, 146 (1983).

14

question." Id. "The Second Circuit has held that the requirement that speech be on a 'matter of public concern' also applies to associational conduct in claims asserting a violation of the First Amendment right to freedom of association." Maglietti, 517 F. Supp. 2d at 633 (quoting Cobb v.Pozzi, 363 F.3d 89, 102 (2d Cir. 2004)). Courts have recognized that the "public concern" test "is difficult to apply in the context of an association claim." Id. at 633 (citing Balton v. City of Milwaukee, 133 F.3d 1036, 1039 (7th Cir. 1998)).

With respect to unions, the second circuit has stated that "[t]here is no doubt that retaliation against public employees solely for their union **activities** violates the First Amendment." Clue v. Johnson, 179 F.3d 57, 61 (2d Cir. 1999) (recognizing union official's constitutional right to be free from retaliation for the official's activites on behalf of transit authority union's minority faction) (emphasis added). However, the court went on to recognize that,

> [t]here may well be intraunion disputes that do not raise
> enough of a public concern to trigger First Amendment
> protection. And there undoubtedly exist intraunion
> conflicts that manifestly raise matters of public concern
> because the faction's activity would be tantamount to core
> union activity.

15

Id.[8]    In Cobb, the second circuit declined to decide the

question "whether union membership alone touches on a matter of

public concern and therefore provides a proper basis for a First

Amendment retaliation claim." Cobb, 363 F.3d at 107 (declining

to address the issue where the plaintiffs failed to provide

sufficient evidence that their union membership was a

"motivating factor in the defendants' decision to discipline

[them].").

    The cases recognizing a First Amendment right to freedom of

association with respect to unions did so in the context of

outward union activity and/or communications, such as handing

out pamphlets, lodging complaints, or the like. See Clue v.

Johnson, 179 F.3d 57, 61 (2d Cir. 1999) (recognizing a First

Amendment right where the plaintiff union officials "hand[ed]

out leaflets and flyers . . . distribut[ed] a newsletter . . ."

and sought "signatures on a petition . . . ."); Boals v. Gray,

775 F.2d 686, 693 (6th Cir. 1985) (stating that retaliation for

the plaintiff's "membership in and support of a union states a

valid First Amendment claim," where the plaintiff was active in

supporting the union and encouraged others to join it, but

---

[8] The court did not conduct the balancing test set forth in Pickering, in
concluding that union activity raises a pubic concern. The Supreme Court's
"public concern" balancing requirement is rendered a hollow statement when
courts simply make a declaration that something meets the public interest
requirement without engaging in the requisite analysis.

concluding that the plaintiff failed to provide evidence that
his suspension was related to his union membership).

     In this case, by contrast, the plaintiffs' First Amendment
claim rests solely on the fact of their union membership.  There
was no quintessential "union activity" or efforts of any
plaintiff to further such activity.  In addition, unions are
created for the benefit of their members in order to extract
from employers the most favorable salary, working conditions,
benefits, etc.  The essence of a union does not have as its
central concern matters of interest to the public in general.
The court recognizes that "activities on behalf of a union
faction that necessarily entail a substantial criticism of
management raise matters of public concern under Connick,"
Clue, 179 F.3d at 61.  The facts of this case, however, do not
include activities sufficient to raise a public concern in order
to trigger First Amendment protection pursuant to Pickering and
Connick.  Although "[u]nion **organizing** is clearly the type of
associational activity directed at 'political and social
changes' that government censorship might chill . . . 'an
employee's speech, activity or association, merely because it is
union-related, does not touch on a matter of public concern as a
matter of law.'"  Maglietti v. Nicholson, 517 F. Supp. 2d 624,
635 (D. Conn. Sept. 29, 2007) (quoting Boals v. Gray, 775 F.2d

686, 693 (6th Cir. 1985) (emphasis added)).  A blanket
determination that membership in a union, in and of itself,
warrants First Amendment protection would compromise the state's
ability, "as an employer, in promoting the efficiency of the
public services it performs through it employees."  Pickering v.
Bd. Of Educ., 391 U.S. 563, 568 (1968)).

The plaintiffs have failed to persuade the court that their
union association, in and of itself, raises a matter of public
concern and is the type of "speech" or "assembly" that warrants
constitutional protection.  Therefore, the defendants' motion
for summary judgment with respect to this claim is granted and
the plaintiffs' motion is denied.

## II.  **Contract Clause**

The plaintiffs argue, inter alia, that "based on
defendants' admissions, their conduct impermissibly conditioned
the continued public employment of the members of the plaintiff
[u]nions on a waiver of their Contracts Clause right to insist
upon performance of their legislatively-approved contracts."[9]

The defendants respond that the "Contract Clause does not
prohibit a state from giving unions a *choice* between concessions
or layoffs."  The defendants argue, inter alia, that "the

---

[9] They further argue that "[u]nder [Perry v. Sindermann, 408 U.S. 593 (1972)],
defendants' conduct violated plaintiffs' Contracts Clause rights.  In Perry,
however, the plaintiff did not allege a violation of the Contract Clause.
Therefore, the court concludes it is not applicable to this claim.

[p]laintiffs successfully bargained for certain terms and conditions of employment[;]" and "[a] quid pro quo of that bargain was the [p]laintiffs' assent to the State's reservation of its inherent management right to control the size and cost of the workforce through layoffs."[10]

The Contract Clause of the U.S. Constitution provides that "[n]o state shall . . . pass any . . . law impairing the obligation of contracts." U.S. Const. art. I, § 10, c. 1. Courts "must attempt to reconcile the strictures of the Contract Clause with the essential attributes of sovereign power . . . ." U.S. Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 20 (1977)(internal citations and quotations omitted). In order to accomplish this, courts first ask "whether the state law has . . . operated as a substantial impairment of a contractual relationship." Energy Reserves Group, Inc. v. Kansas Power and Light Co., 459 U.S. 400, 411 (1983).

The plaintiffs here have not challenged any law enacted by the Connecticut legislature, see, e.g., Condell v. Bress, 983 F.2d 415 (2d Cir. 1993), or any other legislative action, see, e.g., Donohue v. Paterson, 715 F. Supp. 2d 306 (N.D.N.Y. May 28, 2010). Instead, the plaintiffs point to Rowland and Ryan's act

---

[10] The defendants further state that the cases that the plaintiffs cite are irrelevant as "[t]his case does not involve an involuntary furlough of state employees, a wage freeze or a pay lag."

of ordering "the elimination of union positions and the
terminations of union employees because the unions did not agree
to the collective bargaining agreement concessions demanded by
Rowland."

The court concludes that such conduct does not amount to a
"state law" and, therefore, does not fall within the meaning of
the Contract Clause. Accordingly, Article I, section 10, of the
Constitution does not provide a basis for the claims in this
case. The plaintiffs' motion for summary judgment with respect
to the Contract Clause claim is, therefore, denied, and the
defendants' motion for summary judgment with respect to that
claim is granted.

## III. **Equal Protection Clause**

The plaintiffs finally "assert that [the] defendants'
intentional targeting of union employees for layoffs violated
[the] plaintiffs' rights under the Equal Protection Clause of
the Fourteenth Amendment." Specifically, the plaintiffs cite
the stipulated fact that the defendants "'may distinguish among
state employees in making layoff decisions based solely upon
state employees' status as union members, and have done so here
as the basis for mass layoffs in the state workforce.'"

In response, the defendants argue, inter alia, that the
plaintiffs have failed to "first establish that the two classes

20

at issue are similarly situated." Specifically, the defendants
state that with respect to the two classes at issue here, the
union and non-union employees, the difference between them
"could not be clearer [as]. . . [u]nion members have collective
bargaining agreements with the state [and] non-union, managerial
employees do not."

"The Equal Protection Clause requires that the government
treat all similarly situated people alike." Harlen Associates
v. Inc. Vill. Of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).
Thus, "to successfully assert an equal protection challenge,
petitioners must first establish that the two classes at issue
are similarly situated."[11] Yuen Jin v. Mukasey, 538 F.3d 143,
158 (2d Cir. 2008). "[A] court can properly grant summary
judgment where it is clear that no reasonable jury could find
the similarly situated prong met." Harlen Associates v. Inc.
Vill. Of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001). The
plaintiffs must show that they are "similarly situated in all
material respects to the individuals with whom [they] seek[] to

---

[11] "[T]he prototypical equal protection claim involves discrimination against
people based on their membership in a vulnerable class." Harlen Associates,
273 F.3d at 499. "Although union members are not a suspect class, the
Supreme Court has held that discrimination based on union membership must
satisfy the rational basis test to survive scrutiny under the Equal
Protection Clause." Bond v. Bd. of Ed. of the City of New York, No. 97 CV
1337, 1999 WL 151702, at *4 (E.D.N.Y. March 17, 1999)(citing City of
Charlotte v. Local 660, International Assoc. of Firefighters, 426 U.S. 283,
286 (1976)); see Cobb v. Pozzi, 363 F.3d 89, 110 (2d Cir. 2004).

compare [themselves]." Graham v. Long Island Railroad, 230 F.3d 34, 39 (2d Cir. 2000). The second circuit has explained that "all material respects" means that "there should be an objectively identifiable basis for comparability." Id. at 40.

The parties' stipulated facts state that "each of the plaintiff Unions was designated by the State of Connecticut Board of Labor Relations as the representative and exclusive bargaining agent of its members for the purpose, inter alia, of negotiating and entering into collective bargaining agreements covering terms of employment on behalf of its members." The union employees are subject to specific employment terms applicable only to union members and receive representation to negotiate these employment terms on their behalf. There is no evidence that non-union employees were subject to such terms of employment or received such representation. Although "[n]on-unionized employees occupy non-management and management, as well as temporary positions, and hold the same non-management positions as unionized employees[,]" and "all state employees receive the same health care and pension benefits," these facts are not sufficient to establish that the two classes of employees are "similarly situated in all material respects . . ." Graham v. Long Island Railroad, 230 F.3d 34, 39 (2d Cir. 2000).

The court concludes that the plaintiffs have failed to show that the union and non-union employees were similarly situated for the purposes of prosecuting an equal protection claim. The plaintiffs' motion for summary judgment in this respect is denied and the defendants' motion for summary judgment is granted.

This opinion does not address nor does it determine the merits of other avenues of redress available to the plaintiffs or other defenses available to the defendants. It simply determines that the facts as agreed upon by the parties do not constitute a violation of the U.S. Constitution. Since this disposes of the issues outstanding in this matter, the case is ordered dismissed.

## CONCLUSION

Based on the foregoing, the plaintiffs' motion for summary judgment (document no. 232) is **DENIED** and the defendant's motion for summary judgment (document no. 236) is **GRANTED**.

It is so ordered, this $29$nd day of June 2011, at Hartford, Connecticut.

/s/ Alfred V. Covello, USDJ

Alfred W. Covello, U.S.D.J.

23