**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| STATE EMPLOYEES BARGAINING AGENT COALITION, ET AL | : | Civil No. 3:03CV00221 (AVC) |
| v. | : | |
| JOHN G. ROWLAND, ET AL | : | |
| | : | October 12, 2016 |

**RULING**

**A. Procedural History**

This action was commenced pursuant to 42 U.S.C. §1983, in February 2003, by the State Employees Bargaining Agent Coalition ("SEBAC"), a collation of 13 public employee unions that represent approximately 49,000 Connecticut state employees; 12 of SEBAC's 13 constituent labor unions; and five individual union members. The Amended Complaint asserted claims against then-Governor of the State of Connecticut John G. Rowland, and the then-Secretary of Connecticut's Office of Policy and Management Mark S. Ryan, in both their official and individual capacities. It alleged that defendants had intentionally violated plaintiffs' constitutional rights to freedom of speech, freedom of association, due process and equal protection of the law under the First, Fifth and Fourteenth Amendments to the United States Constitution by ordering that 3,000 union members be terminated from their jobs in retaliation for the unions'

exercise of their First and Fourteenth Amendment rights to freedom of association and freedom of speech and the unions' refusal to forego certain statutorily protected contract rights. Plaintiffs' Amended Complaint sough declaratory and injunctive relief and money damages. Years of litigation ensued. In December 2013, the parties pursued settlement discussions resulting in the settlement of the case.

A Settlement Order and Final Judgment was entered by the Court (Covello, J.) on October 1, 2015. [Doc. #296]. The Settlement Agreement provided for both noneconomic compensatory damages to all members of the class and economic damages to class members who sustained economic damages resulting from the subject layoffs. To date, noneconomic compensatory damage awards have been paid to virtually all of the over 49,000 class members and the parties are now engaged in the process of calculating economic damages for nearly 3,000 class members who may be entitled to them. The parties are currently scheduling evidentiary hearings, beginning in October 2016, to determine economic damages.

**B. Four Issues**

In advance of the evidentiary hearing, the parties seek the Court's consideration of the following four issues.

**1. The Meaning of the Term "As of November 17, 2002"**

The first question presented is whether an individual had to be employed by the State on November 17, 2002, in order to be a class member. The parties identified only two employees, Linda

Almquist and DeBree Robinson, who were offered employment prior to November 17, 2002, but began working for the state shortly after that date. Both employees were laid off in January 2003.

The Settlement Agreement contains a definition of the term "Class Members", which includes five subclasses. Each description of a subclass begins with the phrase, "[a]ll individuals who were employees of the State of Connecticut as of November 17, 2002 ...." The Settlement Order and Final Judgment Approving Settlement defines the class in identical terms. [Settl. Agreement §2 (D)(a)-(e); Doc. #296, ¶3(a)-(e)]. Likewise, the plaintiffs' Amended Complaint at page 8 specifically alleges that the affected employee class "consists of all individual a) who were employees of the State of Connecticut as of November 17, 2002 ...." [Doc. #52-1 at 8].

Plaintiffs argue that

> November 17, 2002 was the first date Governor Rowland made any public mention of demanding concessions from the unions and of threatening layoffs if the concessions were not granted. No state employee actually suffered any adverse employment action on November 17, 2002-layoff notices did not actually go out on November 17, 2002 and no state employee was laid off, bumped or demoted, or suffered other adverse job impact on November 17, 2002 (which was a Sunday).
>
> Plaintiffs submit that the State's contention that only individuals employed "as of" November 17, 2002 are covered by the settlement-while a literally feasible interpretation of the Settlement Order and Judgment-makes no practical sense. The purpose of the settlement is to compensate union members for their economic loss resulting from the layoff orders, and there is no rational basis to provide relief for some and exclude others who were adversely affected by

layoff orders.

[Pl. Let. dated 7/5/16 at §1]. Plaintiffs argue that, "[i]t is the fact of the adverse action taken against the employee pursuant to Governor Rowland's orders-not the date the employee first entered into state employment-that is the determinative fact for class membership purposes." Id.

Defendants argue that the only rational interpretation of the term "as of November 17, 2002" is that an employee must have been employed by the state on that date in order to be included in the class.

The letter offering employment to Ms. Almquist was dated November 14, 2002, providing a start date of November 18, 2002. The offer letter was signed and accepted by her on November 18, 2002, with an "effective" date November 18, 2002. See Trainor Let. 11/14/02. Ms. Almquist was laid off on January 28, 2003.

The offer letter to Ms. Robinson was dated November 15, 2002, providing a start date of November 20, 2002. See Bunt Let. 11/15/02. A payroll services record for Ms. Robinson shows that she was laid-off on January 17, 2003. See UC-61.[1] These are the only two employees identified by the parties who would be affected by the Court's ruling.

The Court finds that the letters offering employment to Linda Almquist and De'Bree Robinson can reasonably be interpreted to constitute employment by the State "as of"

[1] The Form UC-61 shows a start date of 11/2/02 and last date worked of 1/17/03. The start date of November 20, 2002 is not disputed.

November 17, 2002 notwithstanding their employment start dates of November 18 and 20, 2002, respectively. Plaintiffs correctly state that they must also establish that they sustained one of the specified adverse employment actions specified in the Amended Complaint in order to recover economic damages.

**2. Durational Employees**

The next question presented is whether durational employees terminated before they completed six months continuous service are included in the definition of "class member" under the Settlement Agreement.

The parties' Settlement Agreement and the Settlement Order and Final Judgment expressly include employees

> working a test period or training program, including provisional employees and employees appointed to durational positions for six months or more, and who were designated for membership in a bargaining unit upon successful completion of the requirements of such working test period, training program or provisional employment ....

See Settl. Agreement, §II, ¶D(d); Sett. Ord. [Doc. #296 ¶3(d)].

The State Personnel Act allows the Commissioner of Administrative Services to establish temporary positions in the classified service for various reasons and under circumstances set forth in Conn. Gen. Stat. 5-235(b).[2] A durational employee is one type of temporary appointment.

Defendants argue that "durational employees cannot be

[2] The statute further provides that "[n]o such appointments shall be authorized for a period of more than six months and such appointments shall not be renewed within any fiscal year." Conn. Gen. Stat. §5-235(b).

considered 'members of a bargaining unit', at least during the first six months of employment in the durational position. [Def. Let. 7/6/16 at 2]. Defendants state that

> Although there may be some variation between the many state employee collective bargaining agreements, most such agreements provide that durational employees are covered by the agreement only after six months of continuous service in the position ... Article 1, Section 2(c) of the NP-3 Agreement defines "durational employee" as "an employee who has been hired to fill one of the following types of positions: a position of an individual who is on workers' compensation leave; a position of an individual who is on an extended paid or unpaid leave; or a position created for a specially funded program of a specified term." Article 1, Section 3 specifically provides that the Agreement "shall not apply to nonpermanent employees appointed to temporary or durational positions except as provided in Article 22, which provides that "[a] temporary employee, as defined in Article 1, shall be covered by this Agreement after six (6) months of continuous service, except that a temporary employee may be terminated at any time by the Employer without right of appeal." Thus, it is beyond dispute that durational employees are not guaranteed continued employment beyond the termination date of the appointment and generally are not entitled to fringe benefits during the first six months of employment in the durational position.

Id. (quoting NP-3 Agreement. Art. 1 & 22).

In support of their position, defendants point to the Settlement Agreement, subsection (d) of the "Class Members" definition, that specifically mentions "employees appointed to durational positions for six months or more". They contend that, "two additional conditions must be met for inclusion in the class. First, the individual must be employed 'under a working test period or training program' and the individual must

be 'designated for membership in a bargaining unit upon successful completion of the requirement of such working test period, training program or provisional appointment ....'" Id. Defendant contend that even if a durational employee were employed for more than six months, he/she could meet neither of these conditions, as they do "not serve a working test period, are not in a training program and are not 'provisional appointments.'" Id. Defendants define a "durational employee" as someone who is "hired to fill in for employees who are out of work on extended leaves or to fill specially funded positions for a designated period of time." Id. Thus, a "durational employee" would have no right to continued employment beyond the termination date of the appointment.

Plaintiffs maintain that, "[i]t is undisputed that durational employees designated for membership in bargaining units were terminated during the period of their durational employment." [Pl. Let. §3]. Again, plaintiff states that the key question is whether the adverse job action was caused by Governor Rowland's layoff orders. If the durational employee was fired as part of these layoff orders, the employee may recover the ensuing economic losses. Id.

It is apparent that the parties dispute whether a durational employee could ever qualify as a class member as defined in the Settlement Agreement. Defendants' argument makes it clear that "durational" has a specific meaning and is not meant to be redundant or equivalent in meaning to "provisional". Nevertheless, the Settlement Agreement includes the term

"durational," seemingly contemplating that there are terms and conditions that an employee could meet that would include him or her in class membership. See Settl. Agreement §II, ¶D(d). The Court finds that unless the employee has completed the requirements for inclusion in a bargaining unit prior to his/her layoff, he/she cannot meet class membership requirements and economic damages may not be awarded.

**3. Temporary Service in a Higher Class**

The next question presented is whether class members who were in "Temporary Service in a Higher Class" ("TSHC") status at the time of the layoffs and were returned to their lower paying permanent positions because of the layoffs are entitled to compensation for lost wages as a result of the change.

The Settlement Agreement provides that "each class member who has sustained economic loss as a result of the layoffs (or lay off orders) shall be entitled to receive a sum to compensate for economic loss." [Settl. Agreement, §V, ¶15A]. "Gross economic loss," the base for each class member's economic recovery, is defined to

> include all forms of economic loss that are ordinarily recoverable under state and federal law in similar cases (subject to the limitations set forth below), including, where applicable, lost wages, lost pension benefits, and lost health insurance and/or damages resulting from the loss of health insurance coverage.

Id. ¶15B.

Conn. Gen. Stat. §5-209 authorizes an appointing authority to assign an employee the duties and responsibilities of a

higher job classification and requires that the employee be compensated at the rate of the higher class if the assignment is for a period in excess of sixty days.[3] Defendants state that "[m]any if not all of the state employee collective bargaining agreements contain provisions regarding TSHC, which differ slightly from the statute ... Thus, it is understood that such appointments are temporary in nature and are subject to termination at the request of the employer or employee at any time." See Def. Let 7/5/16 at 3 (quoting NP-3 Agreement, Art. 18 (compensation is paid at the higher rate if assignment is on a continuing basis for more than thirty working days); Conn. Gen. Stat. §5-209 (compensation is paid at the higher rate if assignment is on a continuous basis for more than sixty days).

---

[3] The statute provides,

> Any state employee, except an employee who has been designated managerial, who is assigned, by the employee's appointing authority, duties and responsibilities of a job classification higher than the class in which the employee is placed, which assignment has been approved by the Commissioner of Administrative Services, and who works in such assignment on a continuous basis for a period of more than sixty working days, shall be compensated for such time in excess of sixty days at a rate in the higher class which shall not be less than one step in that class above the employee's existing rate of pay. Service in a higher classification under this section shall not constitute permanent status in such class.

Conn. Gen. Stat. §5-209.

Plaintiffs contend that "class members are clearly entitled to recover for any economic loss resulting from a position change caused by Governor Rowland's layoff orders." [Pl. Let. 7/5/16 at §2]. They concede that the calculation of "class member's economic loss may be affected by the expected duration of a temporary appointment to a higher position" but this should not preclude recovery compensation for the economic loss caused by Governor Rowland's layoff orders. Id.

Defendants argue that TSHC employees should not be entitled to economic damages as a result of the termination of TSHC status. [Def. Let 7/5/16 at 4]. They maintain that "it is understood that such appointments are temporary in nature and are subject to termination at the request of the employer or employee at any time." Id. As such, "[e]mployees have no rights to extended or permanent assignment to the positions and may be returned to the former positions at any time." Id. at 4.

Here, the issue is whether the termination of TSHC status was caused by Governor Rowland's layoff orders, rather than at the request of the employer or employee. The Court agrees with defendants that "[a]ny suggestion that the employee would remain[] in the TSHC position indefinitely is speculative." Id. at 3 (emphasis added]. However, plaintiffs understand that the "extent of a class member's economic loss may be affected by the expected duration of a temporary appointment to a high paying

position." [Pl. Let 7/5/16 at §2 (emphasis added)]. Accordingly, the Court finds that a TSHC employee demoted because of Governor Rowland's layoff orders may recover economic damages for the expected duration of the TSHC appointment. The burden is on the employee to show that the employee had a specific expectation as to the duration of the TSHC appointment.

**4. Voluntary Demotions**

The last issue presented is whether class members who voluntarily demoted to lower paying positions in order to avoid being laid off are entitled to compensation for lost wages as a result of the voluntary demotion.

The Settlement Agreement includes in its definition of "class members" individuals "who were bumped or demoted to different positions as a result of the terminations alleged in the Amended Complaint." [Settl. Agreement II(D)(c) (emphasis added)]. At issue is whether this language applies to individuals who were demoted by the employer, rather than those who requested a return to a lower level position in order to avoid layoff. Plaintiffs argue that

> [i]n the substantial majority of these cases, the individual had been promoted in the recent past and, therefore, had less seniority relative to other individuals in that (promoted) position whereas the employee had substantially greater years of service and seniority in the prior (lower) position. By accepting a "voluntary demotion," – i.e., return to the lower position where they enjoyed greater seniority-these individuals were able to avoid layoff,

> although at the expense of a cut in their pay from the level they received before their jobs (in the promoted position) were jeopardized by Governor Rowland's lay off orders.

[Pl. Let. 7/6/16 at §4].

The State argues that individuals who chose demotion to a different position for reasons unrelated to the layoffs simply do not fit within this definition and economic damages are not warranted as "[i]ndividuals may choose to voluntarily demote to a different position for a variety of reasons unrelated to the layoffs." [4] [Def Let. 7/5/16 at 4]. An interpretation of the Settlement Agreement permitting recovery of economic damages to include voluntary demotions as well as the individual who was laid off or involuntarily demoted or bumped would, defendants argue, be fundamentally unfair to the State.

It seems to the Court that there may be individuals who are able to show that they made a calculated decision to request a demotion to avoid loss of employment because of Governor Rowland's layoff orders. Although, as defendants point out, making this showing may be a difficult task. However, the Court declines to preclude a plaintiff from offering such proof.

---

[4] Defendants suggest, for example, that a lower classified position might offer an opportunity for more overtime or assignment to a more desirable shift, work location, or supervisor. Such decisions, defendants contend, are personal choices that do not implicate the Settlement Agreement. With this position, the Court agrees.

**CONCLUSION**

This is not a Recommended Ruling. This is a ruling and order which is reviewable pursuant to the "clearly erroneous" statutory standard of review. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); and D. Conn. L. Civ. R. 72.2. As such, it is an order of the Court unless reversed or modified by the district judge upon motion timely made.

SO ORDERED at Bridgeport this 12th day of October 2016.

/s/
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE